# EXHIBIT 12

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

SCOMA CHIROPRACTIC, P.A., a )
Florida corporation, individually and )
as the representative of a class of )
similarly-situated persons, )
                                   )   Case No.: 2:20-cv-430 -FtM-66MRM
               Plaintiff, )
                                     )
    v. )
                                       )
NATIONAL SPINE AND PAIN )
CENTERS LLC, a Delaware limited )
liability company, SPINE CENTER )
OF FL, LLC and PAIN )
MANAGEMENT CONSULTANTS )
OF SOUTHWEST FLORIDA, P.L., )
Florida limited liability companies, )
                                       )
             Defendants. )

## DECLARATION OF ROSS M. GOOD

I, ROSS M. GOOD, declare that:

1.     I have personal knowledge of the facts and matters alleged herein and can competently testify to same.

2.     I reside in Cook County, Illinois.

**The Subpoena Process**

3.     In order to identify a "stand-alone fax machine class," proposed Class B, Plaintiff first sought to identify putative class members that were using "online fax services." This involves using a three-step process: (1) subpoena the Local Number Portability Administrator ("LNPA") of the Number Portability

Administrative Center ("NPAC") to identify all phone carriers for all phone numbers in the putative class to be included in the class definition; (2) use the subpoena response to subpoena each identified phone carrier to determine whether the subscriber of each phone number was utilizing "online fax services" at the time of the faxing identified in the class definition; and (3) provide the Court an option to specifically exclude from the certified class all telephone numbers utilizing "online fax service."

4.     Plaintiff completed Step 1, namely, obtaining a subpoena response from the current LNPA for the United States (Telcordia Technologies, Inc. dba iconectiv) ("iconectiv"). Plaintiff produced this subpoena response to Defendants NATIONAL SPINE AND PAIN CENTERS LLC, SPINE CENTER OF FL, LLC and PAIN MANAGEMENT CONSULTANTS OF SOUTHWEST FLORIDA, P.L.'s ("Defendants") Counsel. This subpoena response only identified phone carriers by name, it did not provide Carrier Identification Codes or instructions to effectuate service of civil subpoenas.

5.     Regarding Step 2, Plaintiff's Counsel researched and then served subpoenas to the phone carriers identified in step 1 ("phone carrier subpoenas") where Plaintiff could determine whether the carrier was still active as a business entity and, if so, obtain an address for the carrier. For those phone carriers which were no longer active business entities but were purchased, or merged with another carrier (or carriers), Plaintiff's Counsel used best practices to identify the successor

2

entity and obtain the current mailing address for that entity. The phone carrier

subpoenas contain two requests, as follows:

> 1. For each telephone number on the list below, identify whether or not you provided online fax service to the subscriber of that telephone number from April 3, 2020 to June 10, 2020.

> 2. Please prepare a brief declaration stating (a) your authority to respond to this subpoena as the custodian of records and (b) that data provided pursuant to the attached subpoena in this case represents true and correct copies of that data that is made and kept in the regular course of business.

The phone carrier subpoenas identify the relevant phone number(s) based on the

LNPA response obtained in Step 1.

6.     Plaintiff's Counsel received many subpoena responses following Step

2. All subpoena responses, including late responses, have been produced to

Defendant's Counsel on a rolling basis.

7.     I reviewed Exhibit 1 to the Supplemental Expert Report of Robert

Biggerstaff ("Biggerstaff Supplemental Expert Report Exhibit 1").  Exhibit A is

the list of all 8,144 unique fax numbers that were successfully sent the fax at issue

from Defendants between April 3, 2020 to June 10, 2020.

8.     Plaintiff's Counsel tracked inputted subpoena responses from Steps 1

and 2 to the corresponding fax number identified in Biggerstaff Supplemental

Expert Report Exhibit 1. This exhibit is attached hereto as Exhibit B.

9.     The breakdown of each column is as follows:

- Column A (Number): the fax number obtained from Biggerstaff Expert Report Exhibit 1.

- Column B (iconectiv name): the phone carrier identified by the LNPA in its subpoena response in Step 1.

- Column C (Provide Online Fax Service?): identifies whether the phone carrier responded affirmatively to Topic 1 of the subpoena to the phone carrier in Step 2. Possible answers to this in the database are: "did NOT", "Yes", "n/a", and blank (indicating no response).

10.     The totals for each entry in Column C are as follows:

   - No, did NOT provide online fax service: 7,137

   - Yes, did provide online fax service: 377

   - n/a: 6

   - no response: 624

   TOTAL: 8,144

11.     In other words, to date, the proposed Class B stand-alone fax machine class consists of 7,137 putative class members. The phone carriers either did or did not provide online fax service to each of its subscribers; this is binary. To date, phone carrier subpoena responses indicate that between April 3, 2020 to June 10, 2020, online fax service was provided to 377 recipients, and 7,137 received the fax at issue on a stand-alone fax machine.  Additionally, 630 were excluded from the final count because the subpoena response did not fully respond to Topic 1.

12.     The 7,137 putative class members in Class B were successfully sent a total of 14,131 faxes from April 3, 2020 to June 10, 2020. The 377 online fax service recipients were successfully sent a total of 711 faxes from April 3, 2020 to

June 10, 2020. The remaining 630 fax numbers that are being excluded from the final count were successfully sent a total of 1,380 faxes from April 3, 2020 to June 10, 2020. This exhibit is attached hereto as Exhibit C.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 18, 2022.

s/ *Ross M. Good*
Ross M. Good

**Scoma Chiropractic v. National Spine, et al.     Case No.: 2:20-cv-00430**
**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

# EXHIBITS A, B, and C
## to

## Declaration of Ross M. Good

## BEING FILED UNDER SEAL

# EXHIBIT 13

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

**SCOMA CHIROPRACTIC, P.A.**

            *Plaintiff*

v.

**NATIONAL SPINE AND PAIN
CENTERS LLC; SPINE CENTER OF
FLORIDA, LLC; AND PAIN
MANAGEMENT CONSULTANTS OF
SOUTHWEST FLORIDA, P.L.**

            *Defendants*

Civil Action No. 2:20-cv-430-FtM-66MRM

## DEFENDANTS' RESPONSES TO
## PLAINTIFF'S FIRST SET OF INTERROGATORIES

Pursuant to Federal Rule of Civil Procedure 34, Defendants National Spine and Pain Centers LLC ("NSPC"); Spine Center of Florida, LLC ("SCF"); and Pain Management Consultants of Southwest Florida, P.L. ("PMCSF") (together, "Defendants") respond as follows to Plaintiff Scoma Chiropractic, P.A.'s ("Scoma") First Set of Interrogatories dated November 2, 2020 (the "Interrogatories"):

## GENERAL OBJECTIONS

1.    Defendants' responses and objections are limited to information obtained to date, and are made without prejudice to Defendants' right to amend or supplement any responses and objections.  We note that discovery is ongoing in this matter.

2.    Defendants object to each of the Definitions and Instructions in the Interrogatories to the extent they purport to exceed the scope and authority of the Federal Rules of Civil Procedure or the Local Rules of the United States District Court for the Middle District of Florida, or purport to impose obligations on Defendants beyond those set forth in those rules.

3.     Defendants object to the last sentence of the instruction concerning the term "fully identify" and the instructions concerning the term "describe in detail" because they purport to interpose additional interrogatories beyond the limits set out in Fed. R. Civ. P. 33(a)(1).

4.     Defendants object to the Interrogatories to the extent they seek discovery regarding any matter (i) that is not relevant to any party's claim or defense, or (ii) that is not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

5.     Defendants object that there is no time period specified in the Interrogatories. These responses are expressly limited to the 4 years before the date of Scoma's Complaint, unless otherwise expressly noted.

6.     Defendants object to the Interrogatories to the extent they seek, without specific justification, material created after the date of the Complaint in this litigation.

7.     Defendants object to the Interrogatories to the extent they seek material that is cumulative or duplicative, is in Scoma's possession, or is obtainable publically or from some other source that is more convenient, less burdensome, or less expensive.

8.     Defendants object to the Interrogatories to the extent they seek material protected from disclosure by the attorney-client privilege, work-product privilege, statutory privilege, or any other legally cognizable privilege or immunity.  The production of any material is without waiver of any privilege or claim of confidentiality.  In the event Defendants produce any privileged discovery material, its production is inadvertent and does not constitute a waiver of any privilege or immunity.

DocuSign Envelope ID: 584F995B-C4A2-451B-8838-F80C841B375A

9.     Defendants are providing this response without waiver of or prejudice to their right, at any later time, to raise objections to the competence, relevance, materiality, privilege, or admissibility of any evidence.

10.     Defendants reserve the right to supplement, revise, correct, add to, or clarify the objections, answers, or responses set forth here.  Defendants reserve the right at that time to amend their objections, answers, or responses, including, without limitation, to evaluate whether any privilege or immunity applies to such discovery material and to assert such privilege or immunity.

11.     Defendants object to the specific Interrogatories to the extent that they are redundant or duplicative of other specific Interrogatories.

12.     Defendants reserve the right to make use of or to introduce at any hearing discovery material responsive to the Interrogatories but discovered subsequent to the date of its responses, including, but not limited to, any discovery material obtained during or after discovery.

13.     Defendants object to the Interrogatories to the extent that they call for disclosure of contain confidential or proprietary business information.  To the extent the Interrogatories call for the production of confidential or proprietary business information, Defendants will produce any non-privileged information only after the entry of an appropriate Confidentiality Order between the parties by the Court.

14.     Defendants object to the definition of "You," "Your," and "Defendants" in the Interrogatories to the extent it purports to include  within the scope of the response Defendants' agents, attorneys, affiliates, and parent companies, or other non-parties.

15.     Defendants object to the definition of "Document" as overly broad.  For example (but without limitation) the definition of a "Document" to include a "hard drive[]s" "mainframe[]" and "computer diskette" would require the production of every complete computer hard drive

containing *any* responsive document.  Scoma should propose a common-sense and workable definition of "Document" that is consistent with this term's ordinary meaning.

16.     Defendants object to each Interrogatory that seeks information not related to or corresponding to a purported class of persons under Fed. R. Civ. P. 23 of which Scoma is a member, including but not limited to Interrogatories related to or corresponding to any set of fax messages not sent to Scoma.

17.     Defendants object to each Interrogatory that purports to incorporate, impose, infer, or suggest a legal definition or conclusion, whether under the Telephone Consumer Protection Act ("TCPA") or any other statute or regulation.  A production of a document in response to any such Interrogatory is not an admission of any fact or that a particular document satisfies or does not satisfy any legal definition or conclusion.

DocuSign Envelope ID: 584F995B-C4A2-451B-8838-E60C841B375A

## RESPONSES TO INTERROGATORIES

**Interrogatory No. 1**

**Fully identify each person involved in answering these Interrogatories, including persons who you consulted or who provided information relied on by you in answering any Interrogatory, and state the information supplied by each such person.**

**RESPONSE:**

NSPC:  The objections set out above are incorporated by reference here.  In addition, NSPC further objects to this request to the extent it seeks information protected by the attorney client privilege, attorney work-product protection, or any other privilege against disclosure.  NSPC notes that this request comprises two interrogatories (the identity of the people, and the information each person supplied) and will construe the limits set out in Fed. R. Civ. P. 33(a)(1) accordingly.

Subject to and without waiving these objections, NSPC identifies the following people:

| Person: | Contact Details: | Information Supplied: |
|---|---|---|
| Upland Software, Inc. d/b/a/ Interfax | 401 Congress Ave., Suite 1850, Austin, TX 78701 | (The production of documents by Interfax in response to Scoma's September 16, 2020 subpoena is incorporated by reference here) |
| William Koleszar *Chief Marketing Officer NSPC* | Through Defendants' counsel, McDermott Will & Emery LLP | Documents and information concerning the faxes sent to Scoma in 2020 |
| Defendants' inside and outside counsel | Through Defendants' counsel, McDermott Will & Emery LLP | (Defendants object to providing this information on the grounds of the attorney client privilege and work-product protection) |

PMCSF:  The response of NSPC is incorporated by reference.

SCF:  The response of NSPC is incorporated by reference.

**Interrogatory No. 2**

**Identify, by date(s) sent and subject matter, all documents (including but not limited to the one fax advertisement attached to Plaintiff's Complaint as Exhibit "A") sent by facsimile transmission during the Relevant Time Period that either (a) were used for any advertising or promotional purpose; or (b) which advertised any property, goods, or services, and describe in detail the content of each different document sent by such transmissions and the time period during which each different document was sent.**

**RESPONSE:**

NSPC:        The objections set out above are incorporated by reference here.  In addition, this Defendant objects that the document identified as Exhibit A is not an advertisement, and notes further that the question whether this document constitutes an advertisement is presently pending before the Court in response to Defendants' Motion to Dismiss the Complaint.  Answering further, Defendants have not identified any advertisements they sent or caused to be sent via fax in the Relevant Time Period.

PMCSF:      The response of NSPC is incorporated by reference.

SCF:          The response of NSPC is incorporated by reference.

**<u>Interrogatory No. 3</u>**

**State whether any facsimile transmissions referred to in Interrogatory 2 were sent to the telephone number 239-945-1963 and/or any other telephone number during the Relevant Time Period and state the dates such transmissions were sent.**

**<u>RESPONSE:</u>**

NSPC:      The objections set out above are incorporated by reference here. In addition, this Defendant directs Scoma to its response to Interrogatory 2. To the extent the Court determines that the fax(es) in question were advertisements, the Defendants will provide a supplemental response.

PMCSF:      The response of NSPC is incorporated by reference.

SCF:      The response of NSPC is incorporated by reference.

**Interrogatory No. 4**

**Fully identify each person who has knowledge and/or was in any way involved in the facsimile transmission(s) of any documents identified in response to Interrogatory No. 2.**

**RESPONSE:**

NSPC:          The objections set out above are incorporated by reference here.  In addition, this Defendant directs Scoma to its response to Interrogatory 2.  To the extent the Court determines that the fax(es) in question were advertisements, the Defendants will provide a supplemental response.

PMCSF:        The response of NSPC is incorporated by reference.

SCF:            The response of NSPC is incorporated by reference.

**Interrogatory No. 5**

**Identify the telephone number(s) and telephone service provider(s) of the telephone line(s) used to send each of the faxes identified in response to Interrogatory No. 2.**

**RESPONSE:**

NSPC:        The objections set out above are incorporated by reference here.  In addition, this Defendant directs Scoma to its response to Interrogatory 2.  To the extent the Court determines that the fax(es) in question were advertisements, the Defendants will provide a supplemental response.

PMCSF:      The response of NSPC is incorporated by reference.

SCF:          The response of NSPC is incorporated by reference.

**Interrogatory No. 6**

**If you contend an "Established Business Relationship" ("EBR") existed between you and Plaintiff (or any other person you believe was associated with telephone number 239-935-1963) at the time of any facsimile transmissions sent to telephone number 239-935-1963, then fully identify all facts supporting the existence of such alleged EBR.**

**RESPONSE:**

NSPC:        The objections set out above are incorporated by reference here.  Answering further, this Defendant responds that there is an existing business relationship between Scoma and one or more Defendants based on the referral of patients from Scoma to Defendant PMCSF for medical treatment.  Without limitation, this Defendant directs Scoma to the documents produced as PMC_TCPA_000001 to 000002, which were prepared by Scoma and submitted to PMCSF by Scoma and reflect Scoma's fax number.  This Defendant expects that additional facts regarding the existing business relationship between PMCSF and Scoma will be identified during discovery.

PMCSF:     The response of NSPC is incorporated by reference.

SCF:        The response of NSPC is incorporated by reference.

DocuSign Envelope ID: 584F995D-C4A2-4519-8839-F60C841B375A

**Interrogatory No. 7**

**Fully identify each and every person who participated in your or any of the other Defendants' decision to send facsimile transmissions identified in response to Interrogatory 2, including the extent and substance of each such person's participation therein.**

NSPC:          The objections set out above are incorporated by reference here.  In addition, this Defendant directs Scoma to its response to Interrogatory 2.  To the extent the Court determines that the fax(es) in question were advertisements, the Defendants will provide a supplemental response.

PMCSF:         The response of NSPC is incorporated by reference.

SCF:           The response of NSPC is incorporated by reference.

**<u>Interrogatory No. 8</u>**

**If you or a person acting on behalf of you or any of the other Defendants operated any device used to send, during the relevant time period, any facsimile transmissions referred to in Interrogatory No. 2, state (a) the number of occasions you or any of the other Defendants engaged in such transmissions, and (b) for each such occasion, state the number of individual facsimile transmissions sent. If you do not know the actual number of individual transmissions sent for any occasion, state the number of transmissions Interrogatory and/or expected to be sent on that occasion and the source of such information.**

NSPC:   The objections set out above are incorporated by reference here.  In addition, this Defendant directs Scoma to its response to Interrogatory 2.  To the extent the Court determines that the fax(es) in question were advertisements, the Defendants will provide a supplemental response.

PMCSF:   The response of NSPC is incorporated by reference.

SCF:   The response of NSPC is incorporated by reference.

**Interrogatory No. 9**

**If you or a person acting on your or any of the other Defendants behalf operated any device used to send, during the Relevant Time Period, any facsimile transmissions referred to in Interrogatory No. 2, fully describe the equipment and/or software used.**

NSPC:           The objections set out above are incorporated by reference here.  In addition, this Defendant directs Scoma to its response to Interrogatory 2.  To the extent the Court determines that the fax(es) in question were advertisements, the Defendants will provide a supplemental response.

PMCSF:          The response of NSPC is incorporated by reference.

SCF:            The response of NSPC is incorporated by reference.

**Interrogatory No. 10**

**Identify the name, address, and telephone number of each person, other than Plaintiff, with whom you or any of the other Defendants contend an EBR existed between you or any of the other Defendants and such person at the time of any facsimile transmissions sent to that person.**

**RESPONSE:**

NSPC:       The objections set out above are incorporated by reference here.  In addition, this Defendant objects to the request to the extent it seeks information for faxes to persons and entities who are not members of the proposed class.  With respect to the members of the proposed class, NSPC's investigation and the process of identifying the members of the proposed class is ongoing, and NSPC will provide a supplemental response regarding its contentions in this regard.  *C.f.,* Fed. R. Civ. P. 33(a)(1) (a court may order that contention interrogatories be deferred until designated discovery is completed).

PMCSF:       The response of NSPC is incorporated by reference.

SCF:       The response of NSPC is incorporated by reference.

DocuSign Envelope ID: 584F995D-C4A2-451B-8B30-F90C841B375A

**Interrogatory No. 11**

**If Defendants contend they had "prior express invitation or permission" from Plaintiff (or any other person Defendants believe were associated with telephone number 239-935-1963) to send facsimiles at the time of any facsimile transmissions sent to telephone number 239-935-1963, then fully identify each person involved in obtaining such "prior express invitation or permission," all facts supporting the existence of such "prior express invitation or permission," the date(s) on which such "prior express invitation or permission" was obtained, and each person involved in maintaining a log or other record of such "prior express invitation or permission."**

**RESPONSE:**

NSPC:      The objections set out above are incorporated by reference here.   Answering further, this Defendant objects that this interrogatory consists of four distinct questions for the purposes of the limit set forth in Fed. R. Civ. P. 33(a)(1).

Answering further, this Defendant responds that Scoma's referral of patients to and fax communications with PMCSF comprise prior express invitation or permission to send faxes related to the subject matter of Exhibit A to the Complaint. Without limitation, this Defendant directs Scoma to the documents produced as PMC_TCPA_000001 to 000002, which were prepared by Scoma and submitted to PMCSF by Scoma and reflect Scoma's fax number.  This Defendant expects that additional facts regarding the prior express invitation or permission Scoma will be identified during discovery.

PMCSF:     The response of NSPC is incorporated by reference.

SCF:        The response of NSPC is incorporated by reference.

**Interrogatory No. 12**

**If Defendants contend they had "prior express invitation or permission" from any member of the putative class to send facsimiles, then fully identify each person involved in obtaining such "prior express invitation or permission," all facts supporting the existence of such "prior express invitation or permission," the date(s) on which such "prior express invitation or permission" was obtained, and each person involved in maintaining a log or other record of such "prior express invitation or permission."**

**RESPONSE:**

NSPC:        The objections set out above are incorporated by reference here.  Answering further, this Defendant objects that this interrogatory consists of four distinct questions for the purposes of the limit set forth in Fed. R. Civ. P. 33(a)(1).

                    Answering further, this Defendant responds that the putative class has not yet been identified, and that its investigation of the business relationship with and consent to fax members of this putative class is not complete.  This Defendant will supplement its response upon discovery of additional information.

PMCSF:      The response of NSPC is incorporated by reference.

SCF:         The response of NSPC is incorporated by reference.

**Interrogatory No. 13**

**Fully identify every person, other than Plaintiff, who has contacted you or any of the other Defendants to communicate a desire not to receive facsimile transmissions.**

**RESPONSE:**

NSPC:    The objections set out above are incorporated by reference here.  To date, this Defendant has identified two entities that submitted requests not to receive fax transmissions, and will produce copies of these written requests in response to this interrogatory, which identify the persons involved in the requests.

PMCSF:    The objections set out above are incorporated by reference here.  In addition, this Defendant responds that it has not identified any removal or opt-out requests submitted to it to date.  To the extent such requests are identified during its investigation of the facts of this matter, a supplemental response will be provided to identify such persons.

SCF:    The objections set out above are incorporated by reference here.  In addition, this Defendant responds that it has not identified any removal or opt-out requests submitted to it to date.  To the extent such requests are identified during its investigation of the facts of this matter, a supplemental response will be provided to identify such persons..

**Interrogatory No. 14**

**Fully identify each person who was involved in handling or responding to removal or opt out requests for any advertisement during the Relevant Time Period.**

**RESPONSE:**

NSPC:    The objections set out above are incorporated by reference here.  In addition, this Defendant objects to this interrogatory to the extent it seeks information about purported "advertisements" that were not transmitted by fax.  Answering further, to date, this Defendant has identified two entities that submitted requests not to receive fax transmissions, and will produce copies of these written requests in response to this interrogatory, which identify the persons involved in handling or responding to the requests.  In submitting this response, this Defendant does not admit (and expressly denies) that the fax(es) in question were advertisements.  .

PMCSF:   The objections set out above are incorporated by reference here.  In addition, this Defendant objects to this interrogatory to the extent it seeks information about purported "advertisements" that were not transmitted by fax.  In addition, this Defendant responds that it has not identified any removal or opt-out requests submitted to it to date.  To the extent such requests are identified during its investigation of the facts of this matter, a supplemental response will be provided to identify such persons.

SCF:    The objections set out above are incorporated by reference here.  In addition, this Defendant objects to this interrogatory to the extent it seeks information about purported "advertisements" that were not transmitted by fax.  In addition, this Defendant responds that it has not identified any removal or opt-out requests submitted to it to date.  To the extent such requests are identified during its investigation of the facts of this matter, a supplemental response will be provided to identify such persons.

**Interrogatory No. 15**

**Describe in detail how you or any of the other Defendants obtained or developed a list of persons and/or telephone numbers to which telephone calls have been initiated by or on behalf of you or any of the other Defendants that utilized a facsimile transmission identified in response to Interrogatory No. 2.**

**RESPONSE:**

NSPC:       The objections set out above are incorporated by reference here.  In addition, this Defendant objects that the document identified as Exhibit A is not an advertisement, and notes further that the question whether this document constitutes an advertisement is presently pending before the Court in response to Defendants' Motion to Dismiss the Complaint.  Answering further, Defendants have not identified any advertisements they sent or caused to be sent via fax in the Relevant Time Period.  To the extent the Court determines that the fax(es) in question were advertisements, the Defendants will provide a supplemental response.

PMCSF:     The response of NSPC is incorporated by reference.

SCF:       The response of NSPC is incorporated by reference.

**Interrogatory No. 16**

**If you or any of the other Defendants instructed any person to construct, develop, purchase, or otherwise use a list of persons and/or telephone numbers to send any facsimile transmission referred to in Interrogatory 2, describe in detail all directions and/or instructions given to such third party for determining the contents of such a list.**

**RESPONSE:**

NSPC:      The objections set out above are incorporated by reference here.  In addition, this Defendant objects that the document identified as Exhibit A is not an advertisement, and notes further that the question whether this document constitutes an advertisement is presently pending before the Court in response to Defendants' Motion to Dismiss the Complaint.   Answering further, Defendants have not identified any advertisements they sent or caused to be sent via fax in the Relevant Time Period.  To the extent the Court determines that the fax(es) in question were advertisements, the Defendants will provide a supplemental response.

PMCSF:    The response of NSPC is incorporated by reference.

SCF:        The response of NSPC is incorporated by reference.

**Interrogatory No. 17**

**Identify any entity other than you or any of the other Defendants that operated the equipment used to send any facsimile transmissions identified in response to Interrogatory No. 2.**

**RESPONSE:**

NSPC:        The objections set out above are incorporated by reference here.  In addition, this Defendant objects that the document identified as Exhibit A is not an advertisement, and notes further that the question whether this document constitutes an advertisement is presently pending before the Court in response to Defendants' Motion to Dismiss the Complaint.  Answering further, Defendants have not identified any advertisements they sent or caused to be sent via fax in the Relevant Time Period.  To the extent the Court determines that the fax(es) in question were advertisements, the Defendants will provide a supplemental response.  Answering further, the fax in Exhibit A to the Complaint was sent by PMCSF using a cloud fax sending platform provided by Upland Software, Inc. d/b/a/ Interfax (identified in the response to Interrogatory 1).

PMCSF:        The response of NSPC is incorporated by reference.

SCF:        The response of NSPC is incorporated by reference.

**<u>Interrogatory No. 18</u>**

**State the full caption, including court term, civil action number and jurisdiction, of each lawsuit asserting a TCPA claim filed against you and/or any other Defendants.**

**<u>RESPONSE:</u>**

NSPC:          The objections set out above are incorporated by reference here.   Answering further, NSPC has not identified any such claims (apart from the present action).

PMCSF:       The response of NSPC is incorporated by reference.

SCF:            The response of NSPC is incorporated by reference.

**Interrogatory No. 19**

**Identify which of your or any of the other Defendants' entities produces, sells or distributes any of the property, goods, or services that are the subject of the one fax advertisements attached as Exhibit A to Plaintiff's Complaint and any facsimile transmission referred to in Interrogatory 2.**

**RESPONSE:**

NSPC:         The objections set out above are incorporated by reference here.  In addition, this Defendant objects that the document identified as Exhibit A is not an advertisement, and notes further that the question whether this document constitutes an advertisement is presently pending before the Court in response to Defendants' Motion to Dismiss the Complaint.  Answering further, Defendants have not identified any advertisements they sent or caused to be sent via fax in the Relevant Time Period.  To the extent the Court determines that the fax(es) in question were advertisements, the Defendants will provide a supplemental response.  Answering further, the pain-management appointments referenced in Exhibit A to the Complaint are provided by defendant PMCSF.

PMCSF:       The response of NSPC is incorporated by reference.

SCF:            The response of NSPC is incorporated by reference.

**<u>Interrogatory No. 20</u>**

**Identify each fact witness whom you may call as a witness and state in detail the subject matter of each witness' knowledge of the facts in this case.**

**<u>RESPONSE:</u>**

NSPC:          The objections set out above are incorporated by reference here.  In addition, this Defendant states that it has not yet identified the witnesses it plans to call at trial.

PMCSF:        The response of NSPC is incorporated by reference.

SCF:            The response of NSPC is incorporated by reference.

**Interrogatory No. 21**

**Identify each opinion witness whom you may call as a witness and state in detail the opinion each witness will provide at trial.**

**RESPONSE:**

NSPC:      The objections set out above are incorporated by reference here.  In addition, this Defendant states that it has not yet identified the witnesses it plans to call at trial.

PMCSF:    The response of NSPC is incorporated by reference.

SCF:        The response of NSPC is incorporated by reference.

*Verification as to factual responses:*

I, William Koleszar, declare under penalty of perjury that the following is true and correct:

I am the Chief Marketing Officer at National Spine & Pain Centers.  I have read the above Responses and Objections to Plaintiff's Interrogatories and know its contents in connection with my duties as the Chief Marketing Officer at National Spine & Pain Centers.  The responses were prepared with the assistance of other knowledgeable individuals and the answers are based on, and therefore necessarily limited by, the records and information still in existence, presently recollected and thus far discovered in the course of preparing this response.  Defendants reserve the right to amend, revise, correct, add to, supplement or clarify these responses if it appears that omissions or errors have been made or that more accurate information is available.  Subject to these limitations, the responses are true to the best of my knowledge, information and belief, which depends in part on information provided by others.

Name: William Koleszar

Signature: *William Koleszar*
45F28ADB002841E...
1/4/2021 | 2:27:28 PM PST

Date: _____, 2021

26

*As to legal objections:*

Date:   January 4, 2021                          MᴄDᴇʀᴍᴏᴛᴛ Wɪʟʟ & Eᴍᴇʀʏ LLP

                                    By:     */s/ Matthew L. Knowles*
                                            Matthew L. Knowles (MA No. 678935)
                                            (admitted *pro hac vice*)
                                            mknowles@mwe.com
                                            200 Clarendon Street, Floor 58
                                            Boston, MA 021116
                                            T: 617.535.3885

                                            Kamal H. Sleiman (FBN 105574)
                                            ksleiman@mwe.com
                                            Kristin A. Taylor (FBN 1019775)
                                            kataylor@mwe.com
                                            333 SE 2nd Avenue, Suite 4500
                                            Miami, FL 33131-4336
                                            T: 305.347.6501 | F: 305.675.8403

                                            *Counsel for Defendants*

**EXHIBIT 14**

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| **SCOMA CHIROPRACTIC, P.A.** | |
| *Plaintiff* | |
| v. | Civil Action No. 2:20-cv-430-FtM-66MRM |
| **NATIONAL SPINE AND PAIN CENTERS LLC; SPINE CENTER OF FLORIDA, LLC; AND PAIN MANAGEMENT CONSULTANTS OF SOUTHWEST FLORIDA, P.L.** | |
| *Defendants* | |

**DEFENDANTS' SUPPLEMENTAL RESPONSES TO**
**PLAINTIFF'S FIRST SET OF INTERROGATORIES**

Pursuant to Federal Rule of Civil Procedure 26 and 33, Defendants National Spine and Pain Centers LLC ("NSPC"); Spine Center of Florida, LLC ("SCF"); and Pain Management Consultants of Southwest Florida, P.L. ("PMCSF") (together, "Defendants"), by and through their undersigned attorneys, make the following Supplemental Responses and Objections to Plaintiff Scoma Chiropractic, P.A.'s ("Scoma") First Set of Interrogatories dated November 2, 2020 (the "Interrogatories"):

## GENERAL OBJECTIONS

1.      Defendants' responses and objections are limited to information obtained to date, and are made without prejudice to Defendants' right to amend or supplement any responses and objections.  We note that discovery is ongoing in this matter.

2.      Defendants object to each of the Definitions and Instructions in the Interrogatories to the extent they purport to exceed the scope and authority of the Federal Rules of Civil Procedure

or the Local Rules of the United States District Court for the Middle District of Florida, or purport to impose obligations on Defendants beyond those set forth in those rules.

3.      Defendants object to the last sentence of the instruction concerning the term "fully identify" and the instructions concerning the term "describe in detail" because they purport to interpose additional interrogatories beyond the limits set out in Fed. R. Civ. P. 33(a)(1).

4.      Defendants object to the Interrogatories to the extent they seek discovery regarding any matter (i) that is not relevant to any party's claim or defense, or (ii) that is not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

5.      Defendants object that there is no time period specified in the Interrogatories. These responses are expressly limited to the 4 years before the date of Scoma's Complaint, unless otherwise expressly noted.

6.      Defendants object to the Interrogatories to the extent they seek, without specific justification, material created after the date of the Complaint in this litigation.

7.      Defendants object to the Interrogatories to the extent they seek material that is cumulative or duplicative, is in Scoma's possession, or is obtainable publically or from some other source that is more convenient, less burdensome, or less expensive.

8.      Defendants object to the Interrogatories to the extent they seek material protected from disclosure by the attorney-client privilege, work-product privilege, statutory privilege, or any other legally cognizable privilege or immunity.  The production of any material is without waiver of any privilege or claim of confidentiality.   In the event Defendants produce any privileged

2

discovery material, its production is inadvertent and does not constitute a waiver of any privilege or immunity.

9.      Defendants are providing this response without waiver of or prejudice to their right, at any later time, to raise objections to the competence, relevance, materiality, privilege, or admissibility of any evidence.

10.     Defendants reserve the right to supplement, revise, correct, add to, or clarify the objections, answers, or responses set forth here.  Defendants reserve the right at that time to amend their objections, answers, or responses, including, without limitation, to evaluate whether any privilege or immunity applies to such discovery material and to assert such privilege or immunity.

11.     Defendants object to the specific Interrogatories to the extent that they are redundant or duplicative of other specific Interrogatories.

12.     Defendants reserve the right to make use of or to introduce at any hearing discovery material responsive to the Interrogatories but discovered subsequent to the date of its responses, including, but not limited to, any discovery material obtained during or after discovery.

13.     Defendants object to the Interrogatories to the extent that they call for disclosure of contain confidential or proprietary business information.  To the extent the Interrogatories call for the production of confidential or proprietary business information, Defendants will produce any non-privileged information only after the entry of an appropriate Confidentiality Order between the parties by the Court.

14.     Defendants object to the definition of "You," "Your," and "Defendants" in the Interrogatories to the extent it purports to include  within the scope of the response Defendants' agents, attorneys, affiliates, and parent companies, or other non-parties.

15.     Defendants object to the definition of "Document" as overly broad.  For example (but without limitation) the definition of a "Document" to include a "hard drive[]s" "mainframe[]" and "computer diskette" would require the production of every complete computer hard drive containing *any* responsive document.  Scoma should propose a common-sense and workable definition of "Document" that is consistent with this term's ordinary meaning.

16.     Defendants object to each Interrogatory that seeks information not related to or corresponding to a purported class of persons under Fed. R. Civ. P. 23 of which Scoma is a member, including but not limited to Interrogatories related to or corresponding to any set of fax messages not sent to Scoma.

17.     Defendants object to each Interrogatory that purports to incorporate, impose, infer, or suggest a legal definition or conclusion, whether under the Telephone Consumer Protection Act ("TCPA") or any other statute or regulation.  A production of a document in response to any such Interrogatory is not an admission of any fact or that a particular document satisfies or does not satisfy any legal definition or conclusion.

## SUPPLEMENTAL RESPONSES TO INTERROGATORIES

### Interrogatory No. 11

**If Defendants contend they had "prior express invitation or permission" from Plaintiff (or any other person Defendants believe were associated with telephone number 239-935-1963) to send facsimiles at the time of any facsimile transmissions sent to telephone number 239-935-1963, then fully identify each person involved in obtaining such "prior express invitation or permission," all facts supporting the existence of such "prior express invitation or permission," the date(s) on which such "prior express invitation or permission" was obtained, and each person involved in maintaining a log or other record of such "prior express invitation or permission."**

### RESPONSE:

NSPC:    The objections set out above are incorporated by reference here. Answering further, this Defendant objects that this interrogatory consists of four distinct questions for the purposes of the limit set forth in Fed. R. Civ. P. 33(a)(1).

Answering further, this Defendant responds that Scoma's referral of patients to and fax communications with PMCSF comprise prior express invitation or permission to send faxes related to the subject matter of Exhibit A to the Complaint. Without limitation, this Defendant directs Scoma to the documents produced as PMC_TCPA_000001 to 000002, which were prepared by Scoma and submitted to PMCSF by Scoma and reflect Scoma's fax number. This Defendant expects that additional facts regarding the prior express invitation or permission Scoma will be identified during discovery.

PMCSF:   The response of NSPC is incorporated by reference.

SCF:     The response of NSPC is incorporated by reference.

### SUPPLEMENTAL RESPONSE:

NSPC:    The objections set out above are incorporated by reference here.  Answering further, this Defendant objects that this interrogatory consists of four distinct questions for the purposes of the limit set forth in Fed. R. Civ. P. 33(a)(1).

Answering further, this Defendant responds that Scoma's referral of patients to and fax communications with PMCSF comprise prior express invitation or permission to send faxes related to the subject matter of Exhibit A to the Complaint.  Without limitation, this Defendant directs Scoma to the documents produced as PMC_TCPA_000001 to 000002, which were prepared by Scoma and submitted to PMCSF by Scoma and reflect Scoma's fax number.  Defendants identify Dr. Eugene Mahaney, Dr. Louis Scoma, and Dr. Louis Scoma's staff in response to this request.  Further, after conducting a diligent search, Defendants have produced all

5

documents that they identified in their possession, custody, and control that either reference Scoma or were sent to or received from Scoma.

PMCSF:      The response of NSPC is incorporated by reference.

SCF:        The response of NSPC is incorporated by reference.

**Interrogatory No. 12**

**If Defendants contend they had "prior express invitation or permission" from any member of the putative class to send facsimiles, then fully identify each person involved in obtaining such "prior express invitation or permission," all facts supporting the existence of such "prior express invitation or permission," the date(s) on which such "prior express invitation or permission" was obtained, and each person involved in maintaining a log or other record of such "prior express invitation or permission."**

**RESPONSE:**

NSPC:        The objections set out above are incorporated by reference here. Answering further, this Defendant objects that this interrogatory consists of four distinct questions for the purposes of the limit set forth in Fed. R. Civ. P. 33(a)(1).

                Answering further, this Defendant responds that the putative class has not yet been identified, and that its investigation of the business relationship with and consent to fax members of this putative class is not complete. This Defendant will supplement its response upon discovery of additional information.

PMCSF:     The response of NSPC is incorporated by reference.

SCF:        The response of NSPC is incorporated by reference.

**SUPPLEMENTAL RESPONSE:**

NSPC:        The objections set out above are incorporated by reference here.  Answering further, this Defendant objects that this interrogatory consists of four distinct questions for the purposes of the limit set forth in Fed. R. Civ. P. 33(a)(1).

                Answering further, Defendants state that they have not identified any other responsive information at this time, and state that they will promptly supplement this response in the event that they do so.

PMCSF:     The response of NSPC is incorporated by reference.

SCF:        The response of NSPC is incorporated by reference.

*As to legal objections:*

Dated: October 29, 2021

**MCDERMOTT WILL & EMERY LLP**

By:    */s/ Matthew L. Knowles*

        Matthew L. Knowles (MA No. 678935)
        (admitted *pro hac vice*)
        Elizabeth A. Rodd (MA No. 706724)
        (admitted *pro hac vice*)
        200 Clarendon Street, Floor 58
        Boston, MA 02116
        Telephone:  (617) 535-3885
        Email: mknowles@mwe.com
               erodd@mwe.com

        Kamal H. Sleiman (FBN 105574)
        McDermott Will & Emery LLP
        333 SE 2nd Avenue, Suite 4500
        Miami, FL 33131-4336
        Telephone:  (305) 358-3500
        Email:  ksleiman@mwe.com

        *Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on October 29, 2021, I served a true and correct copy of the foregoing document on the parties via email to the addresses listed below.

Brian Wanca
Ryan M. Kelly
ANDERSON + WANCA
3701 Algonquin Road, Suite 500
Rolling Meadows, IL 60008
bwanca@andersonwanca.com
rkelly@andersonwanca.com

         */s/ Elizabeth A. Rodd*
         Elizabeth A. Rodd

**EXHIBIT 15**

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| **SCOMA CHIROPRACTIC, P.A.** | |
| *Plaintiff* | |
| v. | |
| **NATIONAL SPINE AND PAIN CENTERS LLC; SPINE CENTER OF FLORIDA, LLC; AND PAIN MANAGEMENT CONSULTANTS OF SOUTHWEST FLORIDA, P.L.** | Civil Action No. 2:20-cv-430-FtM-66MRM |
| *Defendants* | |

**DEFENDANTS' SUPPLEMENTAL RESPONSES TO**
**PLAINTIFF'S FIRST REQUEST FOR PRODUCTION**

Pursuant to Federal Rules of Civil Procedure 26 and 34, Defendants National Spine and Pain Centers LLC ("NSPC"); Spine Center of Florida, LLC ("SCF"); and Pain Management Consultants of Southwest Florida, P.L. ("PMCSF") (together, "Defendants"), by and through their undersigned attorneys, make the following Supplemental Responses and Objections to Plaintiff Scoma Chiropractic, P.A.'s ("Scoma") First Requests for Production dated November 2, 2020 (the "Requests"):

**GENERAL OBJECTIONS**

1.       Defendants' responses, objections, and production of documents are limited to information obtained to date, and are made without prejudice to Defendants' right to amend or supplement any responses and objections.

2.       Defendants object to each of the Definitions and Instructions in the Requests to the extent they exceed the scope and authority of the Federal Rules of Civil Procedure or the Local Rules of the United States District Court for the Middle District of Florida, or purport to impose

obligations on Defendants beyond those set forth in those rules.  Defendants will make a diligent, good faith search of sources and will produce responsive discovery material located in connection with that search.  If any discovery material is inadvertently overlooked in the course of such search, such discovery material will be produced when located, subject to the objections set forth here.

3.      Defendants object to the Requests to the extent they seek discovery regarding any matter (i) that is not relevant to any party's claim or defense, or (ii) that is not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.  In particular (but without limitation), Defendants object to the Requests as overly broad and unduly burdensome to the extent they seek "all documents" or "communications" relating to a given subject matter, and likewise that the Requests

4.      Defendants object to the Requests to the extent they seek, without specific justification, material created after the date of the Complaint in this litigation.

5.      Defendants object to the Requests to the extent they seek material that is cumulative or duplicative, is in Scoma's possession, or is obtainable publically or from some other source that is more convenient, less burdensome, or less expensive.

6.      Defendants object to the Requests to the extent they seek material protected from disclosure by the attorney-client privilege, work-product privilege, statutory privilege, or any other legally cognizable privilege or immunity.  The production of any material is without waiver of any privilege or claim of confidentiality.  In the event Defendants produce any privileged discovery material, its production is inadvertent and does not constitute a waiver of any privilege or immunity.

7.     Defendants are providing this response and will produce material without waiver of or prejudice to its right at any later time, to raise objections to:  (i) the competence, relevance, materiality, privilege, or admissibility of (a) the Requests or any part thereof, (b) statements made in this response to the Requests or any part thereof, or (c) any document or information produced pursuant to this response; and (ii) any other demand for discovery material involving or relating to the matters raised in the Requests or the discovery material produced in response to the Requests.

8.     Defendants have not yet completed discovery in this action, and will produce material responsive to these Requests on a rolling basis.  Defendants reserve the right to supplement, revise, correct, add to, or clarify the objections, answers, or responses set forth here and any production of material.  Defendants reserve the right at that time to amend their objections, answers, or responses, including, without limitation, to evaluate whether any privilege or immunity applies to such discovery material and to assert such privilege or immunity.  Defendants also expressly reserve the right to redact discovery material produced in response to the Requests.

9.     Defendants object to the specific Requests to the extent that they are redundant or duplicative of other specific requests.  Where discovery material is reasonably responsive to more than one request, Defendants will produce that discovery material only once.

10.     Any assertion that Defendants will produce discovery material in response to a particular request is not to be construed as an admission that any discovery material exists within any requested category or categories but solely as an assertion that Defendants will produce responsive discovery material within their possession, custody, or control should any be found.

11.     Defendants reserve the right to make use of or to introduce at any hearing discovery material responsive to the Requests but discovered subsequent to the date of its responses, including, but not limited to, any discovery material obtained during discovery.

12.     Defendants reserve the right to object to the admissibility at the hearing of any objection, answer, or response made here, and Defendants' objections, answers, and responses are not and shall not be deemed an admission or concession of the relevance of any request, or an admission as to the admissibility of any objection, answer or response in this action.

13.     Defendants object to the Requests to the extent that they call for the production of documents that contain confidential or proprietary business information.   To the extent the Requests call for the production of confidential or proprietary business information, Defendants will produce any non-privileged documents responsive to such Requests only after the entry of an appropriate Confidentiality Order between the parties by the Court.

14.     Defendants object to Instructions in the Requests regarding the production format of electronically stored information to the extent that certain requirements for production format would impose an unreasonable cost or be unduly burdensome on Defendants.  Defendants will endeavor to reach a mutually acceptable agreement with Scoma regarding the production format, and will produce electronically stored information pursuant to such an agreement.

15.     Defendants object to the definition of "You," "Your," and "Defendants" in the Requests to the extent it purports to include  within the scope of the response Defendants' agents, attorneys, affiliates, and parent companies.

16.     Defendants object to requests that call for the production of HIPAA Protected Health Information ("PHI") or other sensitive personal information of non-parties.

17.     Defendants object to the definition of "Document" as overly broad.  For example (but without limitation) the definition a "Document" to include a "hard drive[]s" "mainframe[]" and "computer diskette" would require the production of every complete computer hard drive

containing *any* responsive document.  Scoma should propose a common-sense and workable definition of "Document" that is consistent with this term's ordinary meaning.

18.     Defendants object to each Request that seeks documents not related to or corresponding to a purported class of persons under Fed. R. Civ. P. 23 of which Scoma is a member, including but not limited to requests for documents related to or corresponding to any set of fax messages not sent to Scoma.

19.     Defendants object to each Request that purports to incorporate, impose, infer, or suggest a legal definition or conclusion, whether under the Telephone Consumer Protection Act ("TCPA") or any other statute or regulation.  A production of a document in response to any such Request is not an admission of any fact or that a particular document satisfies or does not satisfy any legal definition or conclusion.

20.     Defendants object to Instructions 23 and 25 as inconsistent with Fed. R. Civ. P. 34(b)(2)(E)(i).

21.     Defendants object to Instructions 24, 26, 27, 30, 31, and the bold/capitalized text on page 7 of the Requests as purporting to impose an obligation inconsistent with the Federal Rules of Civil Procedure.

## SUPPLEMENTAL RESPONSES TO REQUESTS FOR PRODUCTION

**Request No. 2**

**All documents indicating that any person gave prior express permission or invitation to receive facsimile transmissions of any document referred to in Request No. 1.**

**RESPONSE:**  The objections set out above are incorporated by reference here. Defendants also object that any production of documents in response to this request is not an admission that any fax transmissions were "advertisements" under the TCPA, nor an admission of any other fact or conclusion relevant to this matter. Defendants also object that this Request seeks documents not related to or corresponding to a purported class of persons under Fed. R. Civ. P. 23 of which Scoma is a member, including but not limited to documents related to or corresponding to any set of fax messages not sent to Scoma.

Subject to and without waiving these objections, Defendants respond to this request as follows:

**NSPC:**  This defendant responds that production of the requested records for all members of the proposed or putative class—which might number in the thousands, depending on facts identified during discovery—would be unduly burdensome and the burden imposed would fail the proportionality test set out in Fed. R. Civ. P. 26. This defendant proposes that the parties meet and confer to discuss an approach to addressing Scoma's requests for these documents while mitigating the burden on each defendant.

**PMCSF:**  The response of NSPC is incorporated here by reference.

**SCF:**  The response of NSPC is incorporated here by reference.

**SUPPLEMENTAL RESPONSE:**  The objections set out above are incorporated by reference here.  Defendants also object that any production of documents in response to this request is not an admission that any fax transmissions were "advertisements" under the TCPA, nor an admission of any other fact or conclusion relevant to this matter.  Defendants also object that this Request seeks documents not related to or corresponding to a purported class of persons under Fed. R. Civ. P. 23 of which Scoma is a member, including but not limited to documents related to or corresponding to any set of fax messages not sent to Scoma.

Subject to and without waiving these objections, Defendants respond to this request as follows:

**NSPC**:  This defendant responds that production of the requested records for all members of the proposed or putative class—which might number in the thousands, depending on facts identified during discovery—would be unduly burdensome and the burden imposed would fail the proportionality test set out in Fed. R. Civ. P. 26. Subject to and without waiving this and the foregoing objections, Defendants state that they have conducted a diligent search and produced all documents in their possession, custody, and control in response to this request identified during such a search.  To the extent Defendants identify additional responsive and non-privileged documents under this request, they will promptly produce them.

6

**PMCSF**:          The response of NSPC is incorporated here by reference.

**SCF**:            The response of NSPC is incorporated here by reference.

**Request No. 7**

**If you contend Plaintiff provided prior express permission or invitation in any way to receive any document sent by fax by, or on your behalf provide all documents that evidence such consent or with regard to such consent, how it was sought or obtained.**

**RESPONSE:**  The objections set out above are incorporated by reference here. Defendants also object that any production of documents in response to this request is not an admission that such documents are "advertisements" under the TCPA, nor an admission of any other fact or conclusion relevant to this matter.

Subject to and without waiving these objections, Defendants respond to this request as follows:

**NSPC**:    In addition to the documents produced together with the Defendants' initial disclosures (which are incorporated by reference in this response), this defendant will produce responsive and non-privileged documents that it identifies during a search of locations and repositories likely to contain such information.

**PMCSF**:    The response of NSPC is incorporated here by reference.

**SCF**:    The response of NSPC is incorporated here by reference.

**SUPPLEMENTAL RESPONSE:**  The objections set out above are incorporated by reference here.  Defendants also object that any production of documents in response to this request is not an admission that such documents are "advertisements" under the TCPA, nor an admission of any other fact or conclusion relevant to this matter.

Subject to and without waiving these objections, Defendants respond to this request as follows:

**NSPC**:    In addition to the documents produced together with the Defendants' initial disclosures (which are incorporated by reference in this response), Defendants state that they have conducted a diligent search and produced all documents in their possession, custody, and control in response to this request identified during such a search.  To the extent Defendants identify additional responsive and non-privileged documents under this request, they will promptly produce them.

**PMCSF**:    The response of NSPC is incorporated here by reference.

**SCF**:    The response of NSPC is incorporated here by reference.

**Request No. 23**

**All documents that contain, refer to, set forth, or explain your or any of the other Defendants'
policy or practice of obtaining prior express permission or invitation to send, by fax to any
person, any document referred to in Request Number 1.**

**RESPONSE:**  The objections set out above are incorporated by reference here. The Defendants
further object to this request to the extent it seeks documents apart from those related to removals
or opt-out requests related to the transmission of fax advertisements.

Subject to and without waiving these objections, Defendants respond to this request as follows:

**NSPC:**         This defendant will produce responsive and non-privileged documents that it
identifies during a search of locations and repositories likely to contain such
information.

**PMCSF:**       The response of NSPC is incorporated here by reference.

**SCF:**           The response of NSPC is incorporated here by reference.

**SUPPLEMENTAL RESPONSE:**   The objections set out above are incorporated by reference
here.  The Defendants further object to this request to the extent it seeks documents apart from
those related to removals or opt-out requests related to the transmission of fax advertisements.

Subject to and without waiving these objections, Defendants respond to this request as follows:

**NSPC**:         Defendants state that they have conducted a diligent search and produced all
documents in their possession, custody, and control in response to this request
identified during such a search.  To the extent Defendants identify additional
responsive and non-privileged documents under this request, they will promptly
produce them.

**PMCSF**:      The response of NSPC is incorporated here by reference.

**SCF**:          The response of NSPC is incorporated here by reference.

9

**Request No. 26**

**All documents that contain, refer to, set forth, or explain your or any of the other Defendants' policies or practices about maintaining a log or record showing prior express permission or invitation from any person to receive via facsimile any document referred to in Request No. 1.**

**RESPONSE:**  The objections set out above are incorporated by reference here.

Subject to and without waiving these objections, Defendants respond to this request as follows:

**NSPC:**       This defendant will produce responsive and non-privileged documents that it identifies during a search of locations and repositories likely to contain such information.

**PMCSF:**    The response of NSPC is incorporated here by reference.

**SCF:**        The response of NSPC is incorporated here by reference.

**SUPPLEMENTAL RESPONSE:**  The objections set out above are incorporated by reference here.

Subject to and without waiving these objections, Defendants respond to this request as follows:

**NSPC**:       Defendants state that they have conducted a diligent search and produced all documents in their possession, custody, and control in response to this request identified during such a search.  To the extent Defendants identify additional responsive and non-privileged documents under this request, they will promptly produce them.

**PMCSF**:    The response of NSPC is incorporated here by reference.

**SCF**:        The response of NSPC is incorporated here by reference.

**Request No. 39**

**All documents which describe, contain, list, set forth, or compose any part of the list of persons and/or telephone numbers to which any document referred to in Request Number 1 was sent by fax during the Relevant Time Period.**

**RESPONSE:**  The objections set out above are incorporated by reference here.

Subject to and without waiving these objections, Defendants respond to this request as follows:

**NSPC:**        In addition to the documents produced by non-party Interfax in response to Scoma's subpoena (which are incorporated by reference in this response), this defendant will produce responsive and non-privileged documents that it identifies during a search of locations and repositories likely to contain such information.

**PMCSF:**      The response of NSPC is incorporated here by reference.

**SCF:**          The response of NSPC is incorporated here by reference.

**SUPPLEMENTAL RESPONSE:**   The objections set out above are incorporated by reference here.

Subject to and without waiving these objections, Defendants respond to this request as follows:

**NSPC**:        In addition to the documents produced by non-party Interfax in response to Scoma's subpoena (which are incorporated by reference in this response), Defendants state that they have conducted a diligent search and produced all documents in their possession, custody, and control in response to this request identified during such a search.   To the extent Defendants identify additional responsive and non-privileged documents under this request, they will promptly produce them.

**PMCSF**:      The response of NSPC is incorporated here by reference.

**SCF**:          The response of NSPC is incorporated here by reference.

Dated: October 29, 2021

**MCDERMOTT WILL & EMERY LLP**

By:   */s/ Matthew L. Knowles*

Matthew L. Knowles (MA No. 678935)
(admitted *pro hac vice*)
Elizabeth A. Rodd (MA No. 706724)
(admitted *pro hac vice*)
200 Clarendon Street, Floor 58
Boston, MA 02116
Telephone:  (617) 535-3885
Email: mknowles@mwe.com
      erodd@mwe.com

Kamal H. Sleiman (FBN 105574)
McDermott Will & Emery LLP
333 SE 2nd Avenue, Suite 4500
Miami, FL 33131-4336
Telephone:  (305) 358-3500
Email:  ksleiman@mwe.com

*Attorneys for Defendants*

12

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 29, 2021, I served a true and correct copy of the foregoing document on the parties via email to the addresses listed below.

Brian Wanca
Ryan M. Kelly
ANDERSON + WANCA
3701 Algonquin Road, Suite 500
Rolling Meadows, IL 60008
bwanca@andersonwanca.com
rkelly@andersonwanca.com

_/s/ Elizabeth A. Rodd_____
Elizabeth A. Rodd

**EXHIBIT 16**

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| **SCOMA CHIROPRACTIC, P.A.** | |
| *Plaintiff* | |
| v. | |
| **NATIONAL SPINE AND PAIN CENTERS LLC; SPINE CENTER OF FLORIDA, LLC; AND PAIN MANAGEMENT CONSULTANTS OF SOUTHWEST FLORIDA, P.L.** | Civil Action No. 2:20-cv-430-FtM-66MRM |
| *Defendants* | |

**DEFENDANTS' RESPONSES TO**
**PLAINTIFF'S FIRST REQUEST FOR ADMISSION**

Pursuant to Federal Rule of Civil Procedure 36, Defendants National Spine and Pain Centers LLC ("NSPC"); Spine Center of Florida, LLC ("SCF"); and Pain Management Consultants of Southwest Florida, P.L. ("PMCSF") (together, "Defendants") respond as follows to Plaintiff Scoma Chiropractic, P.A.'s ("Scoma") First Set of Requests for Admission dated November 2, 2020 (the "Requests"):

**GENERAL OBJECTIONS**

1.      Defendants' responses and objections are limited to information obtained to date, and are made without prejudice to Defendants' right to amend or supplement any responses and objections.  We note that discovery is ongoing in this matter.

2.      Defendants object to each of the Definitions and Instructions in the Requests to the extent they purport to exceed the scope and authority of the Federal Rules of Civil Procedure or

DocuSign Envelope ID: 8D3C7A88-25D4-477E-B0A9-61D229A4F003

the Local Rules of the United States District Court for the Middle District of Florida, or purport to impose obligations on Defendants beyond those set forth in those rules.

3.      Defendants object to the Requests to the extent they seek discovery regarding any matter (i) that is not relevant to any party's claim or defense, or (ii) that is not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

4.      Defendants object that there is no time period specified in the Requests.  These responses are expressly limited to the 4 years before the date of Scoma's Complaint, unless otherwise expressly noted.

5.      Defendants object to the Requests to the extent they seek, without specific justification, information after the date of the Complaint in this litigation.

6.      Defendants object to the Requests to the extent they seek material that is cumulative or duplicative, is in Scoma's possession, or is obtainable publically or from some other source that is more convenient, less burdensome, or less expensive.

7.      Defendants object to the Requests to the extent they seek material protected from disclosure by the attorney-client privilege, work-product privilege, statutory privilege, or any other legally cognizable privilege or immunity.  The production of any material is without waiver of any privilege or claim of confidentiality.  In the event Defendants produce any privileged discovery material, its production is inadvertent and does not constitute a waiver of any privilege or immunity.

8.      Defendants are providing this response and will produce material without waiver of or prejudice to their right, at any later time, to raise objections to the competence, relevance, materiality, privilege, or admissibility of any evidence.

9.      Defendants reserve the right to supplement, revise, correct, add to, or clarify the objections, answers, or responses set forth here.  Defendants reserve the right at that time to amend their objections, answers, or responses, including, without limitation, to evaluate whether any privilege or immunity applies to such discovery material and to assert such privilege or immunity.

10.      Defendants object to the specific Requests to the extent that they are redundant or duplicative of other specific Requests.

11.      Defendants reserve the right to make use of or to introduce at any hearing discovery material responsive to the Requests but discovered subsequent to the date of its responses, including, but not limited to, any discovery material obtained during or after discovery.

12.      Defendants object to the Requests to the extent that they that they call for disclosure of contain confidential or proprietary business information.  To the extent the Requests call for the production of confidential or proprietary business information, Defendants will produce any non-privileged information only after the entry of an appropriate Confidentiality Order between the parties by the Court.

13.      Defendants object that the terms "You" and "Your" are undefined in these requests.

14.      Defendants object to each Request that seeks information not related to or corresponding to a purported class of persons under Fed. R. Civ. P. 23 of which Scoma is a member, including but not limited to Requests for documents related to or corresponding to any set of fax messages not sent to Scoma.

15.     Defendants object to each Request that purports to incorporate, impose, infer, or suggest a legal definition or conclusion, whether under the Telephone Consumer Protection Act ("TCPA") or any other statute or regulation.

16.     Any admissions below are for the purpose of the pending action only.  *See* Fed. R. Civ. P. 36(a).

## RESPONSES TO REQUESTS FOR ADMISSIONS

**Request No. 1**

**Exhibit A describes the commercial availability of property, goods, or services offered by you.**

**RESPONSE:**

NSPC:   The objections above are incorporated by reference here.  Answering further, this Defendant objects to this Request on the grounds that the term "you" is not defined. Answering further, DENIED.  This Defendant states that the document identified as Exhibit A is not an advertisement, and notes further that the question whether this document constitutes an advertisement is presently pending before the Court in response to Defendants' Motion to Dismiss the Complaint.

PMCSF:   NSPC's response is incorporated by reference.

SCF:   NSPC's response is incorporated by reference.

**Request No. 2**

**You or someone on your behalf sent Exhibit A to the telephone number 239-935-1963.**

**RESPONSE:**

NSPC:          The objections above are incorporated by reference here.  Answering further, this
               Defendant objects to this Request on the grounds that the term "you" is not defined.
               Answering further, DENIED.

PMCSF:         The objections above are incorporated by reference here.  Answering further, this
               Defendant objects to this Request on the grounds that the term "you" is not defined.
               Answering further, ADMITTED.

SCF:           The objections above are incorporated by reference here.  Answering further, this
               Defendant objects to this Request on the grounds that the term "you" is not defined.
               Answering further, DENIED.

**Request No. 3**

**You or someone on your behalf has sent Exhibit A to more than 40 persons in the United States.**

**RESPONSE:**

NSPC:       The objections above are incorporated by reference here.  Answering further, this Defendant objects to this Request on the grounds that the term "you" is not defined. Answering further, DENIED.

PMCSF:     The objections above are incorporated by reference here.  Answering further, this Defendant objects to this Request on the grounds that the term "you" is not defined. Answering further, as to this Defendant, it is ADMITTED that the fax identified as Exhibit A was sent to more than 40 persons, but because the location of those persons is unknown (and was not identified through reasonable inquiry) it is DENIED that all of those persons are in the United States.

SCF:        The objections above are incorporated by reference here.  Answering further, this Defendant objects to this Request on the grounds that the term "you" is not defined. Answering further, DENIED.

**Request No. 4**

**You or someone on your behalf has sent Exhibit A to more than 1,000 persons.**

**RESPONSE:**

NSPC:        The objections above are incorporated by reference here.  Answering further, this
             Defendant objects to this Request on the grounds that the term "you" is not defined.
             Answering further, DENIED.

PMCSF:       The objections above are incorporated by reference here.  Answering further, this
             Defendant objects to this Request on the grounds that the term "you" is not defined.
             Answering further, DENIED.

SCF:         The objections above are incorporated by reference here.  Answering further, this
             Defendant objects to this Request on the grounds that the term "you" is not defined.
             Answering further, DENIED.

**Request No. 5**

**You or someone on your behalf has sent Exhibit A to more than 5,000 persons.**

**RESPONSE:**

NSPC:       The objections above are incorporated by reference here.  Answering further, this
            Defendant objects to this Request on the grounds that the term "you" is not defined.
            Answering further, DENIED.

PMCSF:      The objections above are incorporated by reference here.  Answering further, this
            Defendant objects to this Request on the grounds that the term "you" is not defined.
            Answering further, DENIED.

SCF:        The objections above are incorporated by reference here.  Answering further, this
            Defendant objects to this Request on the grounds that the term "you" is not defined.
            Answering further, DENIED.

**Request No. 6**

**You or someone on your behalf has sent Exhibit A to more than 10,000 persons.**

**RESPONSE:**

NSPC:     The objections above are incorporated by reference here.  Answering further, this
          Defendant objects to this Request on the grounds that the term "you" is not defined.
          Answering further, DENIED.

PMCSF:    The objections above are incorporated by reference here.  Answering further, this
          Defendant objects to this Request on the grounds that the term "you" is not defined.
          Answering further, DENIED.

SCF:      The objections above are incorporated by reference here.  Answering further, this
          Defendant objects to this Request on the grounds that the term "you" is not defined.
          Answering further, DENIED.

**Request No. 7**

**You or someone on your behalf has sent Exhibit A to more than 40 telephone numbers.**

**RESPONSE:**

NSPC:        The objections above are incorporated by reference here.  Answering further, this
            Defendant objects to this Request on the grounds that the term "you" is not defined.
            Answering further, DENIED.

PMCSF:       The objections above are incorporated by reference here.  Answering further, this
            Defendant objects to this Request on the grounds that the term "you" is not defined.
            Answering further, ADMITTED.

SCF:         The objections above are incorporated by reference here.  Answering further, this
            Defendant objects to this Request on the grounds that the term "you" is not defined.
            Answering further, DENIED.

DocuSign Envelope ID: 8D3C7A88-25D4-477E-B0AD-91D229A4F003

**Request No. 8**

**You or someone on your behalf has sent Exhibit A to more than 1,000 telephone numbers.**

**RESPONSE:**

NSPC:      The objections above are incorporated by reference here.  Answering further, this
           Defendant objects to this Request on the grounds that the term "you" is not defined.
           Answering further, DENIED.

PMCSF:     The objections above are incorporated by reference here.  Answering further, this
           Defendant objects to this Request on the grounds that the term "you" is not defined.
           Answering further, DENIED.

SCF:       The objections above are incorporated by reference here.  Answering further, this
           Defendant objects to this Request on the grounds that the term "you" is not defined.
           Answering further, DENIED.

**Request No. 9**

**You or someone on your behalf has sent Exhibit A to more than 5,000 telephone numbers.**

**RESPONSE:**

NSPC:        The objections above are incorporated by reference here.  Answering further, this
             Defendant objects to this Request on the grounds that the term "you" is not defined.
             Answering further, DENIED.

PMCSF:       The objections above are incorporated by reference here.  Answering further, this
             Defendant objects to this Request on the grounds that the term "you" is not defined.
             Answering further, DENIED.

SCF:         The objections above are incorporated by reference here.  Answering further, this
             Defendant objects to this Request on the grounds that the term "you" is not defined.
             Answering further, DENIED.

DocuSign Envelope ID: 8D3C7A88-25D4-477E-B0AD-81D229A4F003

**Request No. 10**

**You or someone on your behalf has sent Exhibit A to more than 10,000 telephone numbers.**

**RESPONSE:**

NSPC:        The objections above are incorporated by reference here.  Answering further, this
             Defendant objects to this Request on the grounds that the term "you" is not defined.
             Answering further, DENIED.

PMCSF:       The objections above are incorporated by reference here.  Answering further, this
             Defendant objects to this Request on the grounds that the term "you" is not defined.
             Answering further, DENIED.

SCF:         The objections above are incorporated by reference here.  Answering further, this
             Defendant objects to this Request on the grounds that the term "you" is not defined.
             Answering further, DENIED.

**Request No. 11**

**You or someone on your or any of the Defendant's behalf did not contact Plaintiff and receive Plaintiff's express consent before sending Exhibit A to 239-935-1963.**

**RESPONSE:**

NSPC:     The objections above are incorporated by reference here.  Answering further, this Defendant objects to the compound nature of this request. Answering further, this Defendant objects to this Request on the grounds that the term "you" is not defined. Answering further, ADMITTED that this Defendant did not contact Scoma before sending the fax identified as Exhibit A for the purpose of obtaining express consent; DENIED that this Defendant did not have express consent to send it.

PMCSF:     The objections above are incorporated by reference here.  Answering further, this Defendant objects to the compound nature of this request. Answering further, this Defendant objects to this Request on the grounds that the term "you" is not defined. Answering further, ADMITTED that this Defendant did not contact Scoma before sending the fax identified as Exhibit A for the purpose of obtaining express consent; DENIED that this Defendant did not have express consent to send it.

SCF:     The objections above are incorporated by reference here.  Answering further, this Defendant objects to the compound nature of this request. Answering further, this Defendant objects to this Request on the grounds that the term "you" is not defined. Answering further, ADMITTED that this Defendant did not contact Scoma before sending the fax identified as Exhibit A for the purpose of obtaining express consent; DENIED that this Defendant did not have express consent to send it.

**Request No. 12**

**You or someone on your or any of the Defendants' behalf maintains a record of persons who provided prior express permission or invitation to receive advertisements by fax and the dates of their consent.**

**RESPONSE:**

NSPC:  The objections above are incorporated by reference here.  Answering further, this Defendant objects to this Request on the grounds that the term "you" is not defined. Answering further, despite a reasonable inquiry made to date, this Defendant is unable to readily obtain information sufficient to admit or deny this request at this time, and accordingly on this basis, the request is DENIED at this time, without prejudice to the right to supplement or amend this response later.

PMCSF:  The objections above are incorporated by reference here.  Answering further, this Defendant objects to this Request on the grounds that the term "you" is not defined. Answering further, despite a reasonable inquiry made to date, this Defendant is unable to readily obtain information sufficient to admit or deny this request at this time, and accordingly on this basis, the request is DENIED at this time, without prejudice to the right to supplement or amend this response later.

SCF:  The objections above are incorporated by reference here.  Answering further, this Defendant objects to this Request on the grounds that the term "you" is not defined. Answering further, despite a reasonable inquiry made to date, this Defendant is unable to readily obtain information sufficient to admit or deny this request at this time, and accordingly on this basis, the request is DENIED at this time, without prejudice to the right to supplement or amend this response later.

**Request No. 13**

**You or someone on your or any of the Defendants' behalf do not maintain a record of persons who provided prior express permission or invitation to receive advertisements by fax and the dates of their consent.**

**RESPONSE:**

NSPC:       The objections above are incorporated by reference here.  Answering further, this
            Defendant objects to this Request on the grounds that the term "you" is not defined.
            Answering further, despite a reasonable inquiry made to date, this Defendant is
            unable to readily obtain information sufficient to admit or deny this request at this
            time, and accordingly on this basis, the request is DENIED at this time, without
            prejudice to the right to supplement or amend this response later.

PMCSF:      The objections above are incorporated by reference here.  Answering further, this
            Defendant objects to this Request on the grounds that the term "you" is not defined.
            Answering further, despite a reasonable inquiry made to date, this Defendant is
            unable to readily obtain information sufficient to admit or deny this request at this
            time, and accordingly on this basis, the request is DENIED at this time, without
            prejudice to the right to supplement or amend this response later.

SCF:        The objections above are incorporated by reference here.  Answering further, this
            Defendant objects to this Request on the grounds that the term "you" is not defined.
            Answering further, despite a reasonable inquiry made to date, this Defendant is
            unable to readily obtain information sufficient to admit or deny this request at this
            time, and accordingly on this basis, the request is DENIED at this time, without
            prejudice to the right to supplement or amend this response later.

**Request No. 14**

**You or someone on your or any of the Defendants' behalf do not maintain written records regarding prior express permission provided by customers/recipients to send them advertisements by fax.**

**RESPONSE:**

NSPC:        The objections above are incorporated by reference here.  Answering further, this Defendant objects to this Request on the grounds that the term "you" is not defined. Answering further, despite a reasonable inquiry made to date, this Defendant is unable to readily obtain information sufficient to admit or deny this request at this time, and accordingly on this basis, the request is DENIED at this time, without prejudice to the right to supplement or amend this response later.

PMCSF:        The objections above are incorporated by reference here.  Answering further, this Defendant objects to this Request on the grounds that the term "you" is not defined. Answering further, despite a reasonable inquiry made to date, this Defendant is unable to readily obtain information sufficient to admit or deny this request at this time, and accordingly on this basis, the request is DENIED at this time, without prejudice to the right to supplement or amend this response later.

SCF:        The objections above are incorporated by reference here.  Answering further, this Defendant objects to this Request on the grounds that the term "you" is not defined. Answering further, despite a reasonable inquiry made to date, this Defendant is unable to readily obtain information sufficient to admit or deny this request at this time, and accordingly on this basis, the request is DENIED at this time, without prejudice to the right to supplement or amend this response later.

**Request No. 15**

**Within a four-year period from the date of Plaintiff's original Complaint to present, you or someone on your behalf has sent advertisements on more than five (5) separate dates to telephone numbers by fax.**

**RESPONSE:**

NSPC:      The objections above are incorporated by reference here. Answering further, this Defendant objects to this Request on the grounds that the term "you" is not defined. Answering further, this Defendant objects to this Request on the grounds that the question whether the fax sent to Scoma and attached as *Exhibit A* to the Complaint is an advertisement is presently pending before the Court in response to Defendants' Motion to Dismiss the Complaint.

        Answering further, with respect to the period of time March 1, 2020 to present, this request is DENIED. With respect to the period of time prior to that date, this Defendant presently lacks information sufficient to admit or deny the request, despite conducting a reasonably inquiry to date, and on this basis the request is DENIED, without prejudice to the right to supplement or amend this response later.

PMCSF:    The objections above are incorporated by reference here. Answering further, this Defendant objects to this Request on the grounds that the term "you" is not defined. Answering further, this Defendant objects to this Request on the grounds that the question whether the fax sent to Scoma and attached as *Exhibit A* to the Complaint is an advertisement is presently pending before the Court in response to Defendants' Motion to Dismiss the Complaint.

        Answering further, with respect to the period of time March 1, 2020 to present, this request is DENIED. With respect to the period of time prior to that date, this Defendant presently lacks information sufficient to admit or deny the request, despite conducting a reasonably inquiry to date, and on this basis the request is DENIED, without prejudice to the right to supplement or amend this response later.

SCF:        The objections above are incorporated by reference here. Answering further, this Defendant objects to this Request on the grounds that the term "you" is not defined. Answering further, this Defendant objects to this Request on the grounds that the question whether the fax sent to Scoma and attached as *Exhibit A* to the Complaint is an advertisement is presently pending before the Court in response to Defendants' Motion to Dismiss the Complaint.

        Answering further, with respect to the period of time March 1, 2020 to present, this request is DENIED. With respect to the period of time prior to that date, this Defendant presently lacks information sufficient to admit or deny the request,

despite conducting a reasonably inquiry to date, and on this basis the request is DENIED, without prejudice to the right to supplement or amend this response later.

**Request No. 16**

**Within a four-year period from the date of Plaintiff's original Complaint to present, you or someone on your behalf has sent advertisements on more than ten (10) separate dates to telephone numbers by fax.**

**RESPONSE:**

NSPC:     The objections above are incorporated by reference here.  Answering further, this Defendant objects to this Request on the grounds that the term "you" is not defined. Answering further, this Defendant objects to this Request on the grounds that the question whether the fax sent to Scoma and attached as *Exhibit A* to the Complaint is an advertisement is presently pending before the Court in response to Defendants' Motion to Dismiss the Complaint.

Answering further, with respect to the period of time March 1, 2020 to present, this request is DENIED.  With respect to the period of time prior to that date, this Defendant presently lacks information sufficient to admit or deny the request, despite conducting a reasonably inquiry to date, and on this basis the request is DENIED, without prejudice to the right to supplement or amend this response later.

PMCSF:     The objections above are incorporated by reference here.  Answering further, this Defendant objects to this Request on the grounds that the term "you" is not defined. Answering further, this Defendant objects to this Request on the grounds that the question whether the fax sent to Scoma and attached as *Exhibit A* to the Complaint is an advertisement is presently pending before the Court in response to Defendants' Motion to Dismiss the Complaint.

Answering further, with respect to the period of time March 1, 2020 to present, this request is DENIED.  With respect to the period of time prior to that date, this Defendant presently lacks information sufficient to admit or deny the request, despite conducting a reasonably inquiry to date, and on this basis the request is DENIED, without prejudice to the right to supplement or amend this response later.

SCF:     The objections above are incorporated by reference here.  Answering further, this Defendant objects to this Request on the grounds that the term "you" is not defined. Answering further, this Defendant objects to this Request on the grounds that the question whether the fax sent to Scoma and attached as *Exhibit A* to the Complaint is an advertisement is presently pending before the Court in response to Defendants' Motion to Dismiss the Complaint.

Answering further, with respect to the period of time March 1, 2020 to present, this request is DENIED.  With respect to the period of time prior to that date, this Defendant presently lacks information sufficient to admit or deny the request,

DocuSign Envelope ID: 8D3C7A88-25D4-477E-B0A9-91D229A4F003

despite conducting a reasonably inquiry to date, and on this basis the request is DENIED, without prejudice to the right to supplement or amend this response later.

**Request No. 17**

**Within a four-year period from the date of Plaintiff's original Complaint to present, you or someone on your behalf has sent more than five (5) different advertisements to telephone numbers by fax.**

**RESPONSE:**

NSPC:  The objections above are incorporated by reference here.  Answering further, this Defendant objects to this Request on the grounds that the term "you" is not defined.  Answering further, this Defendant objects to this Request on the grounds that the question whether the fax sent to Scoma and attached as *Exhibit A* to the Complaint is an advertisement is presently pending before the Court in response to Defendants' Motion to Dismiss the Complaint.

    Answering further, with respect to the period of time March 1, 2020 to present, this request is DENIED.  With respect to the period of time prior to that date, this Defendant presently lacks information sufficient to admit or deny the request, despite conducting a reasonably inquiry to date, and on this basis the request is DENIED, without prejudice to the right to supplement or amend this response later.

PMCSF:  The objections above are incorporated by reference here.  Answering further, this Defendant objects to this Request on the grounds that the term "you" is not defined.  Answering further, this Defendant objects to this Request on the grounds that the question whether the fax sent to Scoma and attached as *Exhibit A* to the Complaint is an advertisement is presently pending before the Court in response to Defendants' Motion to Dismiss the Complaint.

    Answering further, with respect to the period of time March 1, 2020 to present, this request is DENIED.  With respect to the period of time prior to that date, this Defendant presently lacks information sufficient to admit or deny the request, despite conducting a reasonably inquiry to date, and on this basis the request is DENIED, without prejudice to the right to supplement or amend this response later.

SCF:  The objections above are incorporated by reference here.  Answering further, this Defendant objects to this Request on the grounds that the term "you" is not defined.  Answering further, this Defendant objects to this Request on the grounds that the question whether the fax sent to Scoma and attached as *Exhibit A* to the Complaint is an advertisement is presently pending before the Court in response to Defendants' Motion to Dismiss the Complaint.

    Answering further, with respect to the period of time March 1, 2020 to present, this request is DENIED.  With respect to the period of time prior to that date, this Defendant presently lacks information sufficient to admit or deny the request,

despite conducting a reasonably inquiry to date, and on this basis the request is DENIED, without prejudice to the right to supplement or amend this response later.

**Request No. 18**

**Within a four-year period from the date of Plaintiff's original Complaint to present, you or someone on your behalf has sent more than 10 different advertisements to telephone numbers by fax.**

**RESPONSE:**

NSPC:       The objections above are incorporated by reference here. Answering further, this Defendant objects to this Request on the grounds that the term "you" is not defined. Answering further, this Defendant objects to this Request on the grounds that the question whether the fax sent to Scoma and attached as *Exhibit A* to the Complaint is an advertisement is presently pending before the Court in response to Defendants' Motion to Dismiss the Complaint.

Answering further, with respect to the period of time March 1, 2020 to present, this request is DENIED. With respect to the period of time prior to that date, this Defendant presently lacks information sufficient to admit or deny the request, despite conducting a reasonably inquiry to date, and on this basis the request is DENIED, without prejudice to the right to supplement or amend this response later.

PMCSF:     The objections above are incorporated by reference here. Answering further, this Defendant objects to this Request on the grounds that the term "you" is not defined. Answering further, this Defendant objects to this Request on the grounds that the question whether the fax sent to Scoma and attached as *Exhibit A* to the Complaint is an advertisement is presently pending before the Court in response to Defendants' Motion to Dismiss the Complaint.

Answering further, with respect to the period of time March 1, 2020 to present, this request is DENIED. With respect to the period of time prior to that date, this Defendant presently lacks information sufficient to admit or deny the request, despite conducting a reasonably inquiry to date, and on this basis the request is DENIED, without prejudice to the right to supplement or amend this response later.

SCF:         The objections above are incorporated by reference here. Answering further, this Defendant objects to this Request on the grounds that the term "you" is not defined. Answering further, this Defendant objects to this Request on the grounds that the question whether the fax sent to Scoma and attached as *Exhibit A* to the Complaint is an advertisement is presently pending before the Court in response to Defendants' Motion to Dismiss the Complaint.

Answering further, with respect to the period of time March 1, 2020 to present, this request is DENIED. With respect to the period of time prior to that date, this Defendant presently lacks information sufficient to admit or deny the request,

DocuSign Envelope ID: 8D3C7A88-25D4-477E-B0AD-81D229A4E003

despite conducting a reasonably inquiry to date, and on this basis the request is DENIED, without prejudice to the right to supplement or amend this response later.

*Verification as to factual responses:*

I, William Koleszar, declare under penalty of perjury that the following is true and correct:

I am the Chief Marketing Officer at National Spine & Pain Centers.  I have read the above Responses and Objections to Plaintiff's Requests for Admission and know its contents in connection with my duties as the Chief Marketing Officer at National Spine & Pain Centers.  The responses were prepared with the assistance of other knowledgeable individuals and the answers are based on, and therefore necessarily limited by, the records and information still in existence, presently recollected and thus far discovered in the course of preparing this response.  Defendants reserve the right to amend, revise, correct, add to, supplement or clarify these responses if it appears that omissions or errors have been made or that more accurate information is available.  Subject to these limitations, the responses are true to the best of my knowledge, information and belief, which depend in part on information provided by others.

Name: _____ William Koleszar _____

Signature: _____ William Koleszar _____
45F28ADB002841F...

Date: 1/4/2021 | 2:24:27 PM PST
_____, 2021

*As to legal objections:*

Date:   January 4, 2021                    MCDERMOTT WILL & EMERY LLP

                                  By:    */s/ Matthew L. Knowles*
                                         Matthew L. Knowles (MA No. 678935)
                                         (admitted *pro hac vice*)
                                         mknowles@mwe.com
                                         200 Clarendon Street, Floor 58
                                         Boston, MA 021116
                                         T: 617.535.3885

                                         Kamal H. Sleiman (FBN 105574)
                                         ksleiman@mwe.com
                                         Kristin A. Taylor (FBN 1019775)
                                         kataylor@mwe.com
                                         333 SE 2nd Avenue, Suite 4500
                                         Miami, FL 33131-4336
                                         T: 305.347.6501 | F: 305.675.8403

                                         *Counsel for Defendants*

**EXHIBIT 17**

Page 1

1            UNITED STATES DISTRICT COURT
         FOR THE MIDDLE DISTRICT OF FLORIDA

2

3

   SCOMA CHIROPRACTIC, P.A.,

4

              Plaintiff,

5

   vs.    CASE NO. 2:20-CV-430-FTM-66MRM

6

   NATIONAL SPINE AND PAIN CENTERS LLC;

7  SPINE CENTER OF FLORIDA, LLC; AND PAIN
   MANAGEMENT CONSULTANTS OF SOUTHWEST

8  FLORIDA, P.L.,

9              Defendants.

10

11 VIDEOTAPED VTC
   DEPOSITION OF:   ROBERT R. BIGGERSTAFF

12                  (Appearing by VTC)

13 DATE:            February 7, 2022

14 TIME:            8:20 a.m.

15 LOCATION:        Mt. Pleasant, SC

16 TAKEN BY:        Counsel for the Defendants

17 REPORTED BY:     Susan M. Valsecchi, Registered
                    Professional Reporter, CRR

18 _____

19

20

21

22

23

24

25

Page 2

```
 1   APPEARANCES OF COUNSEL:
 2        ATTORNEYS FOR PLAINTIFF
               SCOMA CHIROPRACTIC, P.A.:
 3
               ANDERSON WANCA
 4             BY:  RYAN M. KELLY
                    WALLACE SOLBERG
 5                  (Appearing by VTC)
               3701 Algonquin Road, Suite 500
 6             Rolling Meadows, IL  60008
               (847) 368-1500
 7             rkelly@andersonwanca.com
               wsolberg@andersonwanca.com
 8
 9
10        ATTORNEYS FOR DEFENDANT
               NATIONAL SPINE AND PAIN CENTERS LLC;
11             SPINE CENTER OF FLORIDA, LLC; AND PAIN
               MANAGEMENT CONSULTANTS OF SOUTHWEST
12             FLORIDA, P.L.:
13             MCDERMOTT WILL & EMERY
               BY:  MATTHEW L. KNOWLES
14                  ELIZABETH RODD
                    (Appearing by VTC)
15             200 Clarendon Street, Floor 58
               Boston, MA  02116
16             (401) 862-7243
               mknowles@mwe.com
17             erodd@mwe.com
18
          ALSO PRESENT VIA VTC:
19             Roosevelt Harrison, III, Videographer
20
21           (INDEX AT REAR OF TRANSCRIPT)
22
23
24
25
```

Page 3

1           THE VIDEOGRAPHER:  Good morning.  We're

2    going on the record.  The time on the monitor is

3    8:16 a.m. Eastern Standard Time.  Today's date is

4    February 7th, 2022.

5                This is the video-recorded deposition

6    of Mr. Robert Biggerstaff in the matter of Scoma

7    Chiropractic, P.A., versus National Spine and Pain

8    Centers, LLC, et al.  This deposition is being held

9    remotely via Zoom.

10               Counsel, please introduce yourselves,

11    after which the court reporter, Susan, will swear

12    in the witness.

13               MR. KELLY:  Ryan Kelly -- Ryan Kelly

14    for the Plaintiff.

15               MR. KNOWLES:  Good morning,

16    Mr. Biggerstaff.  My name is Matthew Knowles.  I

17    represent the three defendants in the case.  I'm an

18    attorney at McDermott, Will & Emery based in

19    Boston, and I have a colleague on who will

20    introduce herself as well.

21               MS. RODD:  Good morning.  This is

22    Elizabeth Rodd, also from McDermott, Will & Emery

23    for the Defendants in the matter.

24               THE COURT REPORTER:  The attorneys

25    participating in this deposition acknowledge that I

Page 4

1   am not physically present in the deposition room

2   and that I will be reporting this deposition

3   remotely.

4           They further acknowledge that in lieu

5   of an oath administered in person, I will

6   administer the oath remotely.

7           The parties further agree that if the

8   witness is testifying from a state where I am not a

9   notary that the witness may be sworn in by an

10  out-of-state notary.

11          If any party has an objection to this

12  manner of reporting, please state it now.

13          [NO RESPONSE]

14          THE COURT REPORTER:  Hearing none, I

15  will proceed.

16          Would you raise your right hand to be

17  sworn, please. Do you solemnly swear to tell the

18  truth, the whole truth, and nothing but the truth,

19  so help you God?

20          THE WITNESS:  I do.

21          THE COURT REPORTER:  Thank you.

22              ROBERT R. BIGGERSTAFF

23  being first duly sworn, testified as follows:

24              EXAMINATION

25  BY MR. KNOWLES:

Page 5

1          Q.    Thank you.

2                Good morning.  Mr. Biggerstaff, I just

3     introduced myself a moment ago.  As I said, I

4     represent the three defendants in the case.  A

5     couple questions you just answered a moment ago off

6     the record, but let's start with your complete

7     legal name, please.

8          A.    Robert R. Biggerstaff.

9          Q.    And do you generally use your middle

10    initial in a professional context?

11         A.    No.

12         Q.    Have you ever changed your legal name?

13         A.    No.

14         Q.    What's the address where you are

15    physically today?

16         A.    3545 Henrietta Hartford Road.

17         Q.    And what state is that in?

18         A.    South Carolina.

19         Q.    Is there anyone else in the room with

20    you today?

21         A.    No.

22         Q.    Am I correct you've been deposed a

23    number of times before?

24         A.    Yes.

25         Q.    Approximately how many times?

```
                                                Page 6
 1            A.    I don't have a count.

 2            Q.    What's your best approximation?

 3            A.    More than 50.

 4            Q.    Do you agree you're familiar with the

 5       process?

 6            A.    Yes.

 7            Q.    Is there any reason at all that you

 8       can't provide complete and truthful answers today?

 9            A.    No.

10            Q.    And have you given virtual depositions,

11       which is to say depositions using a video

12       conferencing platform like Zoom, in the past?

13            A.    Yes.

14            Q.    Particularly during a virtual

15       deposition it's important to ensure that we

16       accurately record both my questions and your

17       answers.

18                  So if for some reason you don't hear

19       me, you don't hear my question or you don't

20       understand my question, I don't want you to answer

21       it.  You should ask for clarification or have the

22       question repeated.

23                  Likewise, if for some reason I cut you

24       off with my next question before you have finished

25       your answer, I want you to tell me so that we can
```

Page 7

1    stop and capture your complete answer, then we'll

2    move on.  Likewise, if for some reason our Zoom

3    connection is interrupted today, so if my

4    connection or your connection or Mr. Kelly's

5    connection is interrupted or it freezes, what we'll

6    do is we'll note that on the record.  Then we'll go

7    off the record, sort out the problem until we can

8    all see and hear each other again.  Do you

9    understand all of that?

10          A.   Yes.

11          Q.   For brevity today, Mr. Biggerstaff, if

12   I refer to the Plaintiff in the case, Scoma

13   Chiropractic, P.A., simply as Scoma, do you

14   understand what I'm referring to?

15          A.   We can agree to that.

16          Q.   Likewise, if I refer to defendant

17   National Spine and Pain Centers, LLC, as NSPC, do

18   you understand what I'm referring to?

19          A.   We can agree to that.

20          Q.   Likewise, as to Defendant Spine Center

21   of Florida, LLC, as SCF, does that make sense?

22          A.   Um, I guess, but who the names of the

23   parties are not relevant to my analysis.  I don't

24   know anything about the parties.  I haven't

25   referred to their names in any of my analysis.  So

Page 8

1  you're kind of just throwing words at me that don't
2  have any meaning to me.
3        Q.   Understood, and we'll cover that in a
4  moment.  There's another defendant called Pain
5  Management Consultants of Southwest Florida, PL.
6  That's a long name.  I may refer to them as PMC
7  today.  Do you understand what I'm referring to if
8  I say PMC?
9        A.   Same answer.  We can agree to that, but
10 I don't have any reference in my memory of anything
11 about an entity by either of those names.
12       Q.   Okay.  When I say Defendants today,
13 plural, I'm referring to those three Defendants
14 together.  Do you understand that?
15       A.   Same answer.
16       Q.   Are you familiar with the initialism
17 TCPA?
18       A.   Yes, I am.
19       Q.   What does it mean to you?
20       A.   Most commonly Telephone Consumer
21 Protection Act but also the Tennessee Consumer
22 Protection Act occasionally.
23       Q.   When we say TCPA today, we're going to
24 be talking about the former rather than the latter.
25 Does that make sense to you?

Page 9

1          A.    Yes.

2          Q.    Okay.  You've been retained by counsel

3    for Plaintiff Scoma Chiropractic, P.A., as an

4    expert witness in this case; is that right?

5          A.    Yes.

6          Q.    And in what field or what fields are

7    you offering expert opinions in this case?

8          A.    Any field where I'm asked questions.

9          Q.    What fields have you been asked

10   questions in today?

11         A.    I don't recall.  I'd have to refer back

12   to my reports.

13         Q.    You submitted three reports so far in

14   this case, correct?

15         A.    If you say -- I don't have a direct

16   recollection.  I think -- I know I've done at least

17   one extra report, possibly two, so it may have been

18   three.

19         Q.    Do you know, sitting here today, what

20   field or fields you offered expert opinions in

21   those reports that you submitted?

22         A.    I know generally, fax technology.

23         Q.    And what -- what does that mean?

24   What's fax technology?

25         A.    Information about the technology and

Page 10

1   standards involving fax transmissions.

2         Q.   Are there any other fields, apart from

3   fax technology, where you have offered opinions

4   thus far in your work on this case?

5         A.   Probably, I just don't recall them as

6   I'm sitting here without my report in front of me.

7   And, plus, I may consider something in one field,

8   someone else may consider it in a different field.

9   That's -- I can't account for other people's

10  interpretations of what field a particular

11  statement is made in.

12        Q.   So let me ask the question as to your

13  understanding, though.  Are there any other fields

14  in which you understand that you're offering expert

15  testimony in this case?

16        A.   And I said I've testified in a lot of

17  cases in a lot of areas, and I would need to -- to

18  be accurate, I would want to refer to my report.

19        Q.   Did you review --

20        A.   -- my report.

21        Q.   Did you review any of your reports in

22  preparation for today's deposition?

23        A.   No, I did not.

24        Q.   Have you reached any opinions in this

25  case that are not reflected in your expert reports?

1          A.    Not that I recall.

2          Q.    Do you know --

3          A.    But I'm also here to answer your

4    questions, and you may elicit opinions on new

5    topics today.

6          Q.    So let me ask you the question this

7    way.  Do you know whether or not the three expert

8    reports that you submitted in this case contain a

9    complete statement of all of the opinions that you

10   will express and the basis and the reasons for

11   them?

12         A.    As far as I know.  Some opinions I may

13   have had were higher level and somebody may want

14   more detail or more minutia behind those opinions.

15         Q.    So I'm not sure what the answer to my

16   question is.  So my question is whether or not you

17   know whether the expert reports that you submit are

18   a complete statement of all the opinions that

19   you'll express and the basis and the reasons for

20   them?

21         A.    And my point is, I don't want to get

22   into semantics.  A lot of my opinions may be a

23   high-level opinion that there is additional detail

24   which I have formed about that opinion to -- for

25   somebody who wants additional detail.  I may have

Page 12

1    not put every piece of minutia detail behind a

2    higher-level more general opinion, but I do -- I

3    have reached opinions on that -- those other

4    details.

5           Q.   So is it -- is it possible that those

6    reports are not a complete statement of all of the

7    opinions you'll express and the basis and the

8    reasons for them?

9           A.   It depends on what questions I'm asked.

10   I anticipate, as happens in most depositions, that

11   opinions will be elicited from me today that expand

12   on opinions that I have placed in my report.

13          Q.   Are you familiar with the term

14   telephone facsimile machine?

15          A.   I believe I am, yes.

16          Q.   What does that term mean to you?

17          A.   Well, you've given me a term which I

18   believe is defined by the relevant statute, so I

19   would defer to the -- if we're talking about the

20   statute, we need to talk about the statutory

21   definition.

22          Q.   So and the statute you're referencing

23   is the TCPA, correct?

24          A.   That's correct.

25          Q.   Do you know how the TCPA defines a

Page 13

1    telephone facsimile machine?

2          A.    Rather than rely on memory, I will

3    refer to the source, but I believe it's 47 USC 227.

4          Q.    How would you explain to a layperson

5    what a telephone facsimile machine is?

6          A.    It's depending on the layperson and

7    what my level of understanding that they had, and

8    level of education.

9          Q.    Okay.  Let's say you're talking to the

10   jury in this case.  How would you explain to the

11   jury what a telephone facsimile machine is?

12         A.    Well, I would say that fax machines are

13   actually older than the telephone.  They've been

14   around for a long, long time.  And they are a way

15   to take a document and reduce it to black and white

16   dots and to send a message over telephone lines

17   that those black and white dots can be put back

18   together in sequence at the other end so that you

19   can get a picture of a document or an image from

20   one location to the other over a telephone line, or

21   over a communications line.

22         Q.    And -- so this is probably a

23   definitional question.  The word facsimile and fax,

24   are they interchangeable in the context of the way

25   they're used in your report?

Page 14

1          A.    I consider them so, yes.

2          Q.    Okay.  Are you familiar with how the

3     TCPA defines a telephone facsimile machine?

4          A.    Generally, yes.

5          Q.    Okay.  Tell us what your understanding

6     of that definition under the TCPA is, sitting here

7     today.

8          A.    It's a machine that sends or receives

9     faxes, or has the capacity to send and receive

10    faxes.

11         Q.    And is it a machine that has the

12    capacity to send or receive faxes or a machine that

13    has the capacity to send and receive faxes?

14         A.    I believe it's either send or receive;

15    but if one can do both, it's not excluded, and it

16    has the -- and it has the capacity to print.

17         Q.    Okay.  So you added something there,

18    the capacity to print.  How does that fit in?

19         A.    That's part of the statutory

20    definition.

21         Q.    If something does not have the capacity

22    to print, is it still a telephone facsimile

23    machine?

24         A.    Well, according to the definition, that

25    would be a legal opinion, since we're talking about

Page 15

1   a statutory definition.

2            I'm not aware of any working device

3   that can receive or send a facsimile that can't

4   also print, so I think that's a null set.  But from

5   a legal perspective, if it does not have the

6   capacity to print, it is probably outside the

7   definition in the statute.

8        Q.   Did you reach any opinions in this case

9   whether any Defendant has ever used a telephone

10  facsimile machine to send or receive a fax?

11       A.   Not that I recall.

12       Q.   Would it be helpful if we mark your

13  expert reports so that you have them handy?

14       A.   Well, that might be helpful, but also,

15  I really don't think I understand your question.

16       Q.   Sure.  I can ask it to you again.

17            My question is, Did you reach any

18  opinions in this case as to whether or not any of

19  the Defendants has ever used a telephone facsimile

20  machine to send or receive a fax?

21       A.   There's several layers of ambiguity in

22  that question.  You asked about "used a telephone

23  facsimile machine."

24            Does that mean used by an agent?  Used

25  by a contractor?  Used in what sense?  So I did

Page 16

1    reach opinions about records that I examined and

2    the contents of those records and analysis of those

3    records, and my recollection is those records were

4    about fax transmissions.  So whoever is responsible

5    for those fax transmissions, you could say I

6    reached a conclusion about that entity using a fax

7    machine to send those fax transmissions.  But,

8    again, there's several layers of ambiguity in

9    there.  What do you --

10          Q.   So you --

11          A.   What do you mean by used?

12          Q.   When you use the term used, what does

13    that term mean to you?

14          A.   I think it means used in any way, shape

15    or form, through an intermediary, through a direct

16    report or indirect report, set in motion, or is in

17    any way responsible for the events which resulted

18    in the using.

19          Q.   And so adopting the definition of used

20    that you just set out, have you reached any

21    opinions about whether any of the Defendants in

22    this case used a telephone facsimile machine to

23    send or receive a fax?

24          A.   I don't have enough information about

25    the Defendants' connection to the faxes.  I have

Page 17

1    the documentation of the faxes that were

2    transmitted.  It is up for somebody else to

3    identify the entities that were in the chain that

4    caused them to be sent.

5         Q.   Is your -- is your answer that you

6    don't know whether you reached that opinion, or

7    that you haven't reached that opinion?

8         A.   I don't recall if I reached an opinion

9    on that specific point in the reports in this case.

10   I would have to sit down and reread them.

11        MR. KNOWLES:  I'm going to mark three

12   exhibits here.  We're using continuous exhibit

13   numbering in this case.  The first one will be

14   Exhibit 22, and that's the first expert report that

15   you submitted in this case, and it includes the

16   internal exhibits to it.  We'll refer to those as

17   the internal exhibits when we need to.

18        The second exhibit is Exhibit 23.

19   That's the first supplemental expert report that

20   you submitted in this case.  And, again, it

21   includes its internal exhibits.

22        Then Exhibit 24 will be the second

23   supplemental report that you submitted in this

24   case, again, with its internal exhibits.

25        My colleague Ms. Rodd is uploading

Page 18

1   those now to the Exhibit Share platform.  I also

2   e-mailed PDF copies of these exhibits to your

3   counsel.  We can pull them up however is most

4   useful to you.  I find sometimes you just having

5   them open in PDF is most productive; but whatever

6   works best for you, just let us know.

7             THE WITNESS:  All right.  Mr. Kelly has

8   sent me a ZIP file with Exhibits 22, 23, 24, 25,

9   26, and 27.  So I have those in front of me.

10            (BIGGERSTAFF EXHIBIT 22, Original

11  Expert Report of Robert Biggerstaff with Internal

12  Exhibits, was marked for identification.)

13            (BIGGERSTAFF EXHIBIT 23, First

14  Supplemental Expert Report of Robert Biggerstaff

15  with Internal Exhibits, was marked for

16  identification.)

17            (BIGGERSTAFF EXHIBIT 24, Second

18  Supplemental Expert Report of Robert Biggerstaff

19  with Internal Exhibits, was marked for

20  identification.)

21  BY MR. KNOWLES:

22       Q.   Great.  So we're going to start with

23  the first three, 22, 23, and 24.  Just let me know

24  when you've got those open and available to you.

25       A.   Well, in order to have them in a size

Page 19

1    that's readable, I need to have only one at a time.

2    Which one would you like me to open?

3              Q.   Sure, let's start with Exhibit 22.

4              A.   Okay.

5              Q.   Take a look at it.  Can you confirm

6    that this is the first expert report that you

7    submitted in this case with its internal exhibits?

8              A.   This is dated December the 8th with my

9    signature on Page 14 of 16 and then a lengthy

10   exhibit of 25 pages.  Yes, this, appears to be my

11   report.

12             Q.   Okay.  Same question as to Exhibit 23.

13   Does that appear to be the first supplemental

14   expert report you submitted with its internal

15   exhibits?

16             A.   This is dated October the 1st, 2021,

17   and, yes, it does appear to be my supplemental

18   report.

19             Q.   And then as to Exhibit 24, does that

20   appear to be your second supplemental expert

21   report, again, with its internal exhibits?

22             A.   This is dated January the 28th, and

23   yes, it appears to be my second supplemental

24   report.

25             Q.   Okay.  So you've got your expert

Page 20

1    reports available to you, you can certainly refer

2    to them as you need to.

3            My next question for you is this:  Did

4    you reach any opinions as to whether any Defendant

5    in the case has ever sent an advertisement to a

6    telephone facsimile machine?

7        A.   I generally am not asked to opine on

8    whether a particular document is or is not an

9    advertisement, so that would be unusual for me, to

10   have reached an opinion on that aspect of your

11   question.

12       Q.   Am I correct that you did not do so in

13   this case?

14       A.   I have no recollection, and I think it

15   would be unusual for me to have reached a

16   conclusion in this report or any report about

17   whether a particular document is or is not an

18   advertisement.

19       Q.   Sitting here today, do you know one way

20   or another whether or not you reached that opinion?

21       A.   Not a hundred percent, but I think it's

22   very unlikely I reached that opinion in this

23   report -- any of these three reports.

24       Q.   My next question is a related one.

25            Did you reach any opinions as to

Page 21

1   whether any Defendant in this case has ever sent,

2   to a telephone facsimile machine, an unsolicited

3   advertisement?

4          A.   That is not a question I recall

5   approaching or addressing in any of these three

6   reports.

7          Q.   How long have you been an expert in the

8   field or fields in which you're offering expert

9   opinions in this case?

10         A.   At least thirty years, more than that.

11         Q.   When did you first develop expertise in

12  this field?

13         A.   I started doing forensic work in 1984,

14  and even before that I was doing database and

15  communications work involving computers and

16  electronic devices.  Around the late 1980s, I

17  started writing fax software and doing fax-enabled

18  applications for the other type of work, the

19  consulting work I was doing.  And I've worked

20  continuously in those fields ever since.

21         Q.   When is the first time that you offered

22  expert witness testimony in a legal proceeding in

23  that field?

24         A.   1984.

25         Q.   And what led to you doing that in 1984?

Page 22

1   What were the circumstances?

2           A.   That was an employment discharge for

3   computer misuse where I had to examine the

4   computers and database entries and other electronic

5   records to identify a particular employee as having

6   been responsible for some conduct in the company.

7           Q.   Approximately how many times have you

8   served as an expert witness in this field of fax

9   technology?

10          A.   I don't know.  I don't keep count.  To

11  anticipate your next question, I would say probably

12  close to or over 200 cases over the last 30 years.

13          Q.   And have you ever served as an expert

14  witness in a legal proceeding in any other fields

15  other than fax technology?

16          A.   Yes, I have.

17          Q.   What are the other fields where you've

18  served as an expert witness in a legal proceeding?

19          A.   In many types of data access, data

20  acquisition, data integrity, data recovery type

21  cases.  I've worked on -- I've worked on some

22  bankruptcy cases involving electronic assets, a

23  number of cases involving computer misuse, some in

24  the -- many of them in an employment context.

25          Q.   Are there any others?

Page 23

1      A.   That's all I can think of off the top

2  of my head.

3      Q.   I'm going to ask you a question about

4  the field of fax technology where you're offering

5  opinions today.  Can you name any scholarly or

6  scientific publications related to that field?

7      A.   That I have authored?

8      Q.   No, any that exist.

9      A.   There's one from -- I forget the name

10 of it, though I keep a copy of it stored

11 somewhere -- that addresses the quality of fax

12 transmissions, given certain types of errors on the

13 communication line, such as jitter, and how that

14 affects different types of, and different speeds

15 of, fax transmission.

16          And that's -- the reason I happen to

17 recall that one is I've used that particular

18 article in doing fax analysis in some cases.

19     Q.   Do you remember the author of that

20 article or publication?

21     A.    It starts with a T.  It's a fairly --

22 Topaz or Tomas, something like that.

23     Q.   Do you consider that article or

24 publication to be reliable?

25          A.   In the -- in the area that I was

Page 24

1    referring to it, yes, in terms of error rates.

2           Q.    Have you ever cited that publication in

3    an expert report in any case?

4           A.    I may have cited that article or

5    another article or a publication that, in turn, had

6    cited it.

7           Q.    Can you -- are there any other

8    scholarly or scientific publications or articles

9    related to the field of fax technology that you can

10   think of?

11          A.    Yeah, there's a book by, uh, a Mr. --

12   it might be Dr. Maryules, or Marvelis, who is an

13   excellent reference for fax software programming.

14          Q.    Do you consider that article to be

15   reliable, or that publication to be reliable?

16          A.    That book, yes, I do.

17          Q.    Can you identify anyone else who you

18   consider to be an expert in the field of fax

19   technology?

20          A.    Lee Howard, the author of HylaFAX.

21          Q.    Could you say the name of the

22   publication again, I didn't catch it.

23          A.    It wasn't a publication.  You said

24   persons this -- you included persons this time.

25          Q.    Yeah, I asked you -- so the question

Page 25

```
 1   was can you identify anyone else who you consider
 2   to be an expert, you said Lee Howard and you named
 3   something that he wrote.  I didn't catch the name
 4   of what he wrote.
 5           A.   Oh, he wrote the HylaFAX,
 6   H-Y-L-A-F-A-X, software package, or he was the
 7   principal author.
 8           Q.   And why do you consider him to be an
 9   expert?
10           A.   Well, in order to write fax software,
11   you have to have -- or any software about an
12   electronic process and so on, you have to have a
13   deep understanding of the process in order to
14   convert it from the standards document or
15   instructions into computer code, and he did that.
16   I've met Lee, and he is knowledgeable in fax
17   software --
18           Q.   Is there anyone else --
19           A.   -- and --
20           Q.   I'm sorry, go ahead.
21           A.   -- and the fax standards that are
22   necessary to understand in order to write
23   successful fax software.
24           Q.   Is there anyone else you can identify
25   who's -- who you consider to be an expert in fax
```

Page 26

1    technology?

2         A.    Not that I recall.

3         Q.    How would you determine whether someone

4    is reliable as an expert in the field of fax

5    technology?

6         A.    I don't know.  I've never been asked to

7    make such an evaluation of another party.

8         Q.    During the cases where you've worked as

9    an expert in the field of fax technology

10   specifically, have you always served as an expert

11   for the plaintiff's side or the defendants or a

12   combination of the two?

13        A.    No, I've represented -- I've been

14   retained by both plaintiffs and defendants.

15        Q.    And, again, limited to the cases where

16   you're working as an expert in the field of fax

17   technology, do you typically work for one side or

18   the other more frequently?

19        A.    Yes, more frequently for plaintiffs.

20        Q.    What portion or percentage of your

21   professional time involves working as an expert

22   witness in legal cases?

23        A.    It varies widely.  I might go several

24   months with no work done in that area at all.  I

25   might spend -- if I do -- like, depositions take

Page 27

1   the most time.  So if I get two depositions in one

2   month, that might be eight or ten hours in one

3   month.  Rarely --

4           Q.   So it --

5           A.   Rarely would it be more than ten hours

6   a month.

7           Q.   In the calendar year 2021, the previous

8   year, approximately what percentage of your time is

9   on expert witness work for legal cases, of all of

10  your professional time?

11          A.   Probably not more than 15, 20 percent.

12          Q.   Do you know what the methods and

13  analytical techniques and approaches that you used

14  in this case are?

15          A.   Those are not terms I would use.  Could

16  you possibly re-word your question?

17          Q.   Well, let me ask you the question this

18  way:  Did you use any methods, analytical

19  techniques, or similar approaches in your work on

20  this case?

21          A.   I'm sorry, that's a horribly ambiguous

22  question.  You need to narrow it down.

23          Q.   What analytical techniques did you use

24  in this case?

25          A.   I don't -- I don't know.  What is an

Page 28

1   analytical technique?

2           Q.   Do you know what that term means?

3           A.   I don't have a definition of that term.

4   I know the words, I could throw something out

5   there, but I don't know what you're asking.

6           Q.   Have you used any techniques, methods,

7   or approaches in this case that are peer-reviewed?

8           A.   I'm sure many of them are.  I have

9   employed mathematical and computer-based

10  instructions and analysis that I acquired over my

11  40 years of education and experience.

12               I mean, for example, I used database

13  software to prepare the exhibits, to sort the

14  entries into alphabetical or numerical order.

15               I'm sure somewhere there's some

16  peer-reviewed articles on sorting techniques, but I

17  didn't refer to any of them in preparing this

18  report; I just used the existing software to sort.

19               So -- and -- that's kind of why I

20  can't -- I don't really know what you're asking

21  here.  Your question is rather amorphous and can

22  incorporate very high-level data paradigms or down

23  into low-level minutia of whether you're going to

24  do a bubble sort or some other type of sort.

25          Q.   Do you know what it means for an

Page 29

1    analytical method to be peer-reviewed?

2           A.    I know generally, yes.

3           Q.    What does it mean?

4           A.    That some particular analytical method

5    has been published and documented and it's then

6    subjected to review by other people in the field.

7           Q.    And how do you know that some of your

8    methods or techniques in this case were

9    peer-reviewed?

10          A.    Sorting is an important operation in

11   the world of computers and programming.  I am most

12   positive there are many, many articles -- I have

13   read some of them in the past -- about sorting

14   techniques and sorting technology; and those were,

15   again, published, peer-reviewed-type journals.

16   They are a core part of computer science and

17   programming.  So I'm certain that those exist from

18   just the standpoint of being in the field for the

19   past 30, 40 years.

20          Q.    Do you reach any expert opinions in

21   this case about fax technology?

22          A.    Probably, but I don't -- I can't give

23   you any particular ones without referring to the

24   report.  And what I might consider a fact, other

25   people may consider an opinion, or vice versa.

Page 30

1    So --

2          Q.   Do you know --

3          A.   -- there's some ambiguousness there,

4    depending on perspective.

5          Q.   From your perspective, were any of the

6    opinions you reached about fax technology

7    peer-reviewed?

8          A.   I don't know.

9          Q.   Did you reach any opinions about what

10   technology is or isn't a fax machine under the

11   TCPA?

12         A.   I probably -- well, not any particular,

13   but I reached some general opinions about faxing

14   equipment.

15         Q.   What methods do you use to reach those

16   opinions about faxing equipment?

17         A.   My training and experience.

18         Q.   What training and experience is that?

19         A.   What I have acquired over the last

20   30-plus years working in the field.

21         Q.   Were the methods that you used to reach

22   opinions about faxing equipment peer-reviewed?

23         A.   I don't know.

24         Q.   Were the methods that you used to reach

25   opinions about faxing equipment generally accepted

Page 31

1    in the scientific community?

2           A.    To my knowledge, yes.

3           Q.    If we wanted --

4           A.    They're based principally on the T.30

5    and other relevant standards from the ITU.

6           Q.    If we wanted to confirm that that's

7    true, how would we confirm that?

8           A.    Point to any particular opinion, and

9    then we explore it more deeply.  You have to

10   realize, my reports are not written to be a

11   scientific article for a journal.  They're meant to

12   be read and understood by lay people.  So there's a

13   lot of things that are stated in general terms or

14   in lay terms that, if I was talking to another

15   expert, I would use different terms to talk about.

16   And I can explore -- when I talk about -- when I

17   talk about anything in my reports, almost

18   everything can be explored by drilling down and

19   moving the language and the discussion to a more

20   technical level.  But every document I write has an

21   audience, and the audience in this case was a

22   layperson, not another technical person like Lee

23   Howard.

24          Q.    Are you familiar with the term error

25   rate?

Page 32

1          A.    I am generally.

2          Q.    What does it mean to you?

3          A.    The rate of errors.

4          Q.    And with respect to the opinions you

5     reached about fax technology in the case, did those

6     opinions have an error rate?

7          A.    Yes, zero.

8          Q.    And how do you know that?

9          A.    Because they're facts; they're not

10    opinions.

11         Q.    Do you have any legal training?

12         A.    No, I have never been to law school.

13         Q.    Do you have any legal training other

14    than law school?

15         A.    What other legal training is there

16    other than law school?

17         Q.    Do you know if you have any other legal

18    training apart from the concept of law school?

19         A.    Not to my knowledge, no.

20         Q.    Do you feel that you're competent to

21    offer expert testimony on legal questions in this

22    case?

23         A.    It depends on the legal questions.

24         Q.    Which legal questions are you competent

25    to offer expert testimony about in this case?

1         A.    I'm afraid that's not a question I can

2    answer.  That's an open-ended list.  I think I

3    can't answer that question, not unless you narrow

4    it down to something in particular.

5         Q.    Do you feel that you're competent to

6    offer expert testimony about any legal questions in

7    this case?

8         A.    Again, you have to define legal

9    questions.  The legal questions are for a court to

10   answer, but I may answer technical questions that

11   have legal consequences.  That's the difference.

12        Q.    Have you ever published any journals,

13   articles, reports or any other publications of any

14   kind?

15        A.    I have.

16        Q.    Were any of them about the field of fax

17   technology?

18        A.    Indirectly.

19        Q.    Okay.  So what publications have you

20   written that are indirectly about fax technology?

21        A.    Well, I have written two law review

22   articles on the TCPA, and I have written comments

23   that have been filed with the Federal

24   Communications Commission regarding fax technology.

25        Q.    What are the names of the law review

Page 34

1    articles that you wrote about the TCPA?

2           A.   I don't necessarily remember exactly.

3    One was in the, I believe, Federal Communications

4    Law Journal, or law review, regarding application

5    of the TCPA to purely intrastate calls and faxes.

6    The other was Connecticut Law Review regarding the

7    jurisdictional aspects of the TCPA.

8                  MR. KNOWLES:  Let's put up as an

9    exhibit -- we'll mark -- Lizzie, can you -- I think

10   we're calling it Internal Document A.  That's going

11   to be the next exhibit in this case.  That'll be

12   Exhibit 28.  We've pre-marked some other ones, but

13   let's mark that as Exhibit 28, please, and publish

14   it to Mr. Biggerstaff.

15                  MS. RODD:  Will do.

16                  MR. KNOWLES:  This will take just a

17   moment.  We'll pause for just a second.

18                  (BIGGERSTAFF EXHIBIT 28, Winter 2001

19   Connecticut Law Review, 'State Courts and the

20   Telephone Consumer Protection Act of 1991: Must

21   States Opt-in? Can States Opt-Out?' by Robert R.

22   Biggerstaff, was marked for identification.)

23                  MR. KELLY:  Mr. Biggerstaff, is that

24   legible to you, or do you need it bigger?

25                  THE WITNESS:  No, it's not.  I can read

Page 35

1    about half the letters.  One more --

2              MR. KNOWLES:  Let's make that -- let's

3    make that bigger, please.

4              THE WITNESS:  Okay, I can -- I can read

5    the headline.

6              MR. KNOWLES:  So we've marked as

7    Exhibit 28 a winter 2001 article from the

8    Connecticut Law Review by Robert R. Biggerstaff.

9    BY MR. KNOWLES:

10        Q.   Is this an article that you wrote,

11   Mr. Biggerstaff?

12        A.   It is.

13        Q.   Yeah.  Why did you write this?

14        A.   There was, as the time, some divergent

15   case law on the question about state court

16   jurisdiction for TCPA claims, and like any article,

17   law review article, I sought to try to unify the

18   different branches of opinions on that particular

19   issue.

20        Q.   Did anyone assist you in writing this

21   article?

22        A.   No.  I may have circulated it to one or

23   two other people, but nobody really assisted me in

24   writing it.

25        Q.   Who conducted the legal research for

Page 36

1    this article?

2           A.    I did.

3           Q.    Were you paid to write this?

4           A.    No, I was not.

5           Q.    Can we scroll down to the second full

6    paragraph under introduction.  Is that -- is that

7    body text legible to you, Mr. Biggerstaff, or do

8    you need it bigger?

9           A.    Um, I can read it.

10          Q.    I have a question about the last

11   sentence of the second paragraph, it says,

12   "Finally, Part V addresses what one court has

13   called the 'unresolved' Testa question arising from

14   exclusive state court jurisdiction for a federal

15   cause of action."

16                You referenced an unresolved Testa

17   question.  What does that mean?

18          A.    That's a question left unresolved by

19   the case of Testa v. Katt, and that is whether

20   state courts can actually be compelled to hear

21   federal causes of action.

22          Q.    And how did you learn about that?

23          A.    How did I learn about what, the

24   existence of the case Testa v. Katt?

25          Q.    The unresolved Testa question, how did

Page 37

1   you learn about that?

2          A.    Through reading law review articles or

3   reading case law, just my own personal research.

4          Q.    Okay.  Do you read a lot of TCPA case

5   law?

6          A.    I used to, not anymore, not for several

7   years.

8          Q.    And why did that change?

9          A.    I just -- I had kids.  I had other

10  things to occupy my free time.

11         Q.    Where do you go to read the TCPA case

12  law?

13         A.    I don't read it hardly anymore.

14  Occasionally somebody might send me a link to

15  something and I would read it.

16         Q.    Does this article address the supremacy

17  clause in the context of the TCPA?

18         A.    Well, it does, because the supremacy

19  clause is -- and the compromise that created the

20  supremacy clause -- is the driver of the unresolved

21  Testa v. Katt issue, and that is do states -- are

22  state courts required to hear federal causes of

23  action?

24         Q.    Footnote 12 in this case --

25               MR. KNOWLES:  Lizzie, can you scroll

Page 38

1   down to Footnote 12, please.

2   BY MR. KNOWLES:

3         Q.    Footnote 12 references a case called

4   Biggerstaff v. Lowcountry Drug Screening.  Were you

5   a plaintiff in that case?

6         A.    I was.

7         Q.    Have you been a plaintiff in other TCPA

8   cases before?

9         A.    Yes, I was.

10        Q.    How many times?

11        A.    I don't know.  I don't keep count.

12        Q.    What's your best approximation?

13        A.    Um, I really do not know.  It's been a

14  very long time since I brought any of those cases.

15  That was over -- gosh, over 10 or 15 years ago now,

16  and that was before I moved to where I live now.

17  And it was over a 10-, 12-year period.  I did two

18  or three cases a year.  That would end up to be 20,

19  30 cases.  That's probably a reasonable estimate,

20  but it may be higher.

21        Q.    And I believe you said a moment ago

22  that you have stopped bringing TCPA cases now; is

23  that right?

24        A.    Oh, I stopped a long time ago, after I

25  had kids.

Page 39

1         Q.    Why did you stop?

2         A.    Just a lot better things to do with my

3     time.

4         Q.    You mentioned a moment ago another law

5     review article that you wrote in addition to the

6     one that we've marked as Exhibit 28.  Apart from

7     those two law review articles, have you published

8     anything else that's about the TCPA?

9         A.    Depends on what you mean published.  I

10    did mention that I had filed comments before the

11    Federal Communications commissioner related to

12    dockets that involve the TCPA.

13        Q.    Anything else?

14        A.    That's all that I can recall as I sit

15    here.

16        Q.    We're done with Exhibit 28, so we can

17    close that one.  I'm going to turn next to

18    Exhibit 22, which is your initial expert report in

19    this case.  If you could go ahead and open that one

20    up again, and just let me know when you're ready.

21        A.    Okay.

22        Q.    I have to ask your indulgence for just

23    a moment, my screen is frozen.  Hold on just a

24    moment, please.

25             Okay, we're back.  On the first page of

Page 40

1    your expert report under Notice there's some

2    language about the document being "proprietary and

3    confidential."

4              Do you see that language?

5         A.   Yes.

6         Q.   Can you just review that.  You don't

7    need to read it out loud.  Just read that first

8    paragraph to yourself and then let me know when

9    you're ready.

10         A.   Okay.

11         Q.   Do you purport to put any restrictions

12    on the Defendant's use of this document?

13         A.   The restrictions are applicable to

14    everyone, the Plaintiff and the Defendant.

15         Q.   What is it that we're not allowed to do

16    with this document?

17         A.   Violate a copyright.  If you want to do

18    something that's considered fair use, you're

19    certainly free to exercise fair use.

20         Q.   Do you object to Defendants filing some

21    or all of this document together with any of our

22    briefs in this case?

23         A.   Not to the extent that it's reasonably

24    necessary for your prosecution -- or your defense

25    of the case.

Page 41

1    Q.   Do you object to the Defendants
2  attaching this report to any of our filings?
3    A.   Not to the extent it's necessary --
4  reasonably necessary for your work on the case.
5    Q.   At the top of the second page there's a
6  header that says "Disclaimer" and some language
7  under that.  Do you see that?
8    A.   Yes.
9    Q.   Is there anything about your analysis
10  in this report that is proprietary?
11    A.   It is in some reports, which is why the
12  boilerplate language is there.  I don't remember
13  anything in particular in this report; but as we
14  work through the report, if we're going to work
15  through it, there may be something I'm just not
16  recalling that would be.  If I see it, I'll bring
17  it up.
18    Q.   Okay.  Is there anything in this report
19  that is subject to a patent that you own?
20    A.   No, because I don't own any patents.
21    Q.   Is there anything in this report that
22  is patented?
23    A.   Not to my knowledge.
24    Q.   Is there anything you did in this
25  report that you did under a license of any kind?

Page 42

1          A.    To the extent I used licensed software,

2    there would be a license in that regard.

3          Q.    Anything else that's subject to a

4    license other than your potential use of licensed

5    software?

6          A.    Not that I can think of.

7          Q.    Can you scroll down to Page 4, please.

8    I have a question about the first numbered

9    paragraph on Page 4.

10          A.    Paragraph 1?

11          Q.    Numbered Paragraph 1 on Page 4, if

12    you'd just take a look at that and let me know when

13    you're ready.

14          A.    Yes.

15          Q.    Paragraph 1 references "47,619 fully

16    received error-free fax transmissions."

17                Do you see that language?

18          A.    Yes.

19          Q.    What does "fully received" mean in this

20    context?

21          A.    That means that the receiving fax

22    machine sent a positive acknowledgment in

23    accordance with the fax protocols back to the

24    sender, and then the sender processed that

25    successfully.

Page 43

1          Q.    Is there such a thing as a partially
2     received fax?
3          A.    There can be such a thing as a
4     partially received fax, yes.
5          Q.    What would that be?
6          A.    Well, it is when, for example, a fax
7     transmission has begun sending the payload, which
8     is in Phase C, as in Charlie, but it takes several
9     seconds for the entire payload to be received at
10    the other end.
11              At any point during that several
12    seconds, you can have a failure of the
13    communications line so that part of the payload was
14    received by the receiving end but the entire
15    payload was not and the communications line
16    terminated before the entire payload could be
17    delivered.
18              In that case, typically what you have
19    is someone has -- at the receiving end -- an image
20    of a partial page of the fax transmission, but not
21    the entire image.
22         Q.    Did that happen with respect to any of
23    the faxes in this case?
24         A.    None of the faxes that were documented
25    as fully received error-free.  That may have

Page 44

1    happened into one of the fax transmissions that

2    failed.

3         Q.   And when you say fully received,

4    received by who or by what?

5         A.   By the receiving fax machine.

6         Q.   So in other words fully received

7    doesn't mean received by a person, correct?

8         A.   No, it does not.  As I have said many

9    times, a fax can be received, it can be sitting

10   there on the top of the fax machine and lightning

11   strike the building, burn it down; it was never

12   seen by human eyeballs.

13        Q.   So, in other words, with respect to the

14   47,619 faxes referenced in this paragraph, you

15   don't know one way or another whether any of them

16   were received by a person, correct?

17        A.   A person cannot receive a fax

18   transmission, only -- a person can receive a piece

19   of paper or a document or an image file, but they

20   cannot receive a fax transmission.

21        Q.   Do you know whether any of the 47,619

22   faxes were viewed by a person?

23        A.   No, I do not.

24        Q.   The next line references "unique fax

25   numbers."

Page 45

1              What is a fax number?

2         A.    Here in North America, that's a

3    10-digit canonical format fax -- or telephone

4    number that has a fax machine connected to it so

5    that it can receive a fax transmission under the

6    ITU standards.

7         Q.    Is there a difference between a fax

8    number and a telephone number?

9         A.    Only semantic.  They both function the

10   same.  You set up communications -- you set up a

11   communications link between the sending and

12   receiving end, and whether it's a voice call or a

13   fax call is optional at that point.  A fax number

14   would just refer to the subset of telephone numbers

15   that can receive a fax transmission under the ITU

16   standards.

17        Q.    Are there numbers that are both

18   telephone numbers and fax numbers at the same time?

19        A.    Sure.  I have a fax machine that will

20   answer the phone and be an answering machine and

21   take a voice message.

22        Q.    Do you know whether any of those kind

23   of numbers are included in the 11,193?

24        A.    No, I do not.

25        Q.    When you talk about a fully received

Page 46

1   fax, what does that mean with respect to an online

2   fax service?

3          A.   It means the same thing in all faxing

4   contexts, because the fax standards define a

5   rigorous process that has positive confirmation.

6               And as I discuss in my reports, the

7   positive confirmation protocol is like a green card

8   on mail -- mail that you want return receipt of.

9               If you get a positive confirmation,

10  that is -- not to be redundant -- but a positive

11  confirmation that the transmission was fully

12  successful at that point.

13              If you lack that, you don't get that,

14  you don't have positive confirmation.

15         Q.   Have you ever analyzed or tested an

16  online fax service in which the ultimate product of

17  the fax is delivered to a user by e-mail?

18         A.   Yes, I have.  Now, you say online fax

19  service.  What you've described is a fax server.

20  And online fax services, I mean, it's kind of a

21  term that's not technical.  So I'd rather just talk

22  about the term fax server, since that's a more

23  technical description -- technical term.

24         Q.   The FCC talks about online fax

25  services.  Do you know what that term means?

1        A.   It's not -- not without referring back

2   to the FCC's actual order where they describe it,

3   because, from a technical standpoint, an online fax

4   service is no different than any other fax server,

5   and I look at things from a technical standpoint in

6   this regard.

7        Q.   With respect to the online fax services

8   that do deliver the fax transmission ultimately to

9   the end user by e-mail, have you ever used one of

10  those or analyzed or tested one of those?

11       A.   Yes, I have.

12       Q.   Okay.  And with respect to those

13  services, does fully received mean that it was

14  e-mailed to the user at the end of the process?

15       A.   No, it doesn't.  What it means is -- if

16  you look at a paradigm of Point A to Point B to

17  Point C, which I use in my reports, where Point A

18  is the sending fax machine, Point B is the

19  receiving fax machine or fax server, and then

20  Point C is the human being who ultimately is the

21  person you want their eyeballs to look at the fax,

22  an online fax service or a fax server sits at

23  Point B.  And the positive confirmation in the logs

24  that I work with in a typical case like this one

25  are a record of the successful transmission without

Page 48

1    error between Point A and Point B.  And that the --

2    the faxes that I report on as fully received,

3    error-free transmissions were fully received

4    error-free transmissions received at Point B, which

5    is the fax server in the topology that you're

6    talking about.  It is irrelevant or doesn't have

7    anything to do with the subsequent, separate

8    journey from Point B to Point C to reach the

9    eyeballs of the individual who the sender wanted to

10   see the fax transmission -- or the image sent in

11   the fax transmission.

12        Q.   In the topology you just described,

13   fully received refers only to Step B and not to

14   Step C, correct?

15        A.   I wouldn't use the term Step B, but

16   Point B.

17        Q.   Do you know of --

18        A.   And -- I'm sorry.  I didn't mean to

19   step over your question.  And at Point B, the

20   payload of the fax is able to be sent as an e-mail

21   or stored as an image for later retrieval or

22   printed out and sent via a FedEx envelope.  Or any

23   other mechanisms or topologies can be used to get

24   from Point B to Point C, but none of those

25   subsequent actions undo the successful receipt

Page 49

1    that's already occurred at Point B.

2         Q.   With respect to the 47,619 fax

3    transmissions you reference in Paragraph 1, is

4    there -- do you know of any way to tell whether a

5    human being viewed any of those?

6         A.   No.

7         Q.   Other than ask them one by one?

8         A.   If that piece of information of whether

9    a human being looked at any particular one, in

10   order to answer that singular question, you would

11   have to employ something like asking individuals.

12        Q.   I have a question for you about

13   Paragraph 6, which appears on Page 5.  If you could

14   just scroll down to Paragraph 6 and just take a

15   look at it.  Again, read it to yourself.  You don't

16   need to read it out loud, please.

17        A.   Okay.

18        Q.   In Paragraph 6 you say that you have

19   direct experience "specifically with regard to

20   analyzing those records for the purposes of

21   identifying persons to whom facsimile

22   advertisements were sent."

23             End quote.

24             What do you do to identify the people

25   to whom fax advertisements were sent?

Page 50

1        A.   Well, I don't determine which one is an

2    advertisement.  I operate based on someone else

3    telling me that these were advertisements,

4    segregating these transmissions out from all of the

5    other transmissions that may have been mixed with

6    advertisements and non advertisements.

7        Q.   The next paragraph, Paragraph 7,

8    references "computer-based facsimile systems."

9    What is a computer-based facsimile system?

10        A.   Well, computer-based system, the way I

11    use the term, regards something that is iterating

12    and doing repetitive functions, such as sending a

13    document, to a list of fax destination numbers, as

14    opposed to a manual process not

15    computer-controlled, of someone sending one fax at

16    a time, typing in each telephone number manually

17    on, you know, something like a desktop fax machine,

18    in order -- and sending a fax one at a time.

19        Q.   So, in other words, what makes

20    something a computer-based facsimile machine is the

21    repetitive nature.  Is that a fair summary?

22        A.   Yes.

23        Q.   You stated that you have direct

24    experience with the installation and

25    configuration --

Page 51

1          A.    I'm sorry, I think I misunderstood your

2    question.  You said the repetitive nature?

3          Q.    Yeah, my question was, What makes

4    something a computer-based facsimile machine is the

5    repetitive nature; is that a fair summary?

6          A.    Not -- let me clarify that, because you

7    could be doing something repetitive manually.  It's

8    not just that it's repetitive.  It's that you are

9    letting a computer do the repetitive part.  You

10   have essentially told the computer to, in this

11   instance -- or in most instances -- send a

12   particular image to multiple destinations.

13             But an individual can do the same

14   repetitive tasks, but they have to do it manually,

15   and it's just much more efficient to do it with a

16   computer and let the computer handle the list and

17   handle retries and things like that than the person

18   doing it manually.

19         Q.    Is a computer-based facsimile system

20   different from a telephone facsimile machine?

21         A.    If that were a Venn diagram there would

22   be overlap.  I mean, a computer -- can you restate

23   the question and let me think about it again?

24         Q.    Sure, yeah, my question is whether a

25   computer-based facsimile system is different from a

Page 52

1    telephone facsimile machine?

2         A.   If you were looking at a Venn diagram,

3    the larger circle would be telephone facsimile

4    machines and then a computer-based system would be

5    a circle inside that larger circle.  There are

6    things that are fax machines that are not a

7    computer-based facsimile system.

8         Q.   And when you say fax machine, is fax

9    machine and telephone fax machine -- facsimile

10   machine -- those are the same things as you use the

11   terms?

12        A.   Yes, the larger circle of all devices

13   that are telephone facsimile machines, and a

14   computer-based fax machine would be a subset of the

15   larger set.

16        Q.   The next paragraph, Paragraph 8,

17   references "various fax forwarding and delivery

18   technologies function."

19             What is fax forwarding?

20        A.   Well, fax forwarding is something like

21   a T.38 OnRamp where -- or, I'm sorry, T.37 fax

22   forwarding -- where what I described before, you

23   have at phase -- at Point B in the diagram the fax

24   is received, and then it is forwarded on as an

25   e-mail.  That would be a type of fax-forwarding

Page 53

1  technology.

2       Q.   And are there any other kinds of fax

3  forwarding other than the scenario you just

4  described where a fax is received and then

5  forwarded as an e-mail?

6       A.   Well, potentially an unlimited number.

7  I have used the diagram before of a -- you're going

8  to be in a cabin in the mountains.  You don't have

9  a telephone line, but you're expecting some

10  important faxes to come in, so you appoint somebody

11  in your office to take the faxes that come in for

12  you and put them in a FedEx envelope and send them

13  to the mountain -- to the cabin in the mountains.

14  That's a form of fax forwarding, where as you

15  receive the fax on a fax machine and then you

16  forward it via some other communications

17  technology, whether it's e-mail or whether it's

18  snail mail or Federal Express or you take it and

19  put it in another fax machine and fax it off to

20  another destination.

21       Q.   Have you ever heard the term call

22  forwarding?

23       A.   I have.

24       Q.   What does that mean?

25       A.   Call forwarding is an SS7 technology

Page 54

1   that allows you, at the switch, to enter a

2   programming instruction for calls to a particular

3   number once they come into the switch to be routed

4   back out of the switch to another destination.

5          Q.   Can that technology be used for or with

6   respect to faxes?

7          A.   Well, it applies to all telephone

8   calls, not just faxes, not just voice calls.  It

9   can be done, but it introduces an extra hop, which

10  will tend to increase jitter and potentially

11  latency.  So it would have a degradation on the

12  quality and performance of the faxes sent or

13  received over a forwarded number, but it can be

14  done that way.

15         Q.   What does jitter mean?

16         A.   Jitter is variation in interpacket

17  spacing and, you know, other things, and I use

18  jitter generically to also include noise on the

19  line, echo, delay, other types of line problems.

20         Q.   When a telephone user or fax user turns

21  on or sets up call forwarding, where is that

22  setting or preference recorded?

23         A.   Generally that's going to be recorded

24  in the switch, the edge -- the classified edge

25  switch.

Page 55

1       Q.    And how does a user cause that to be
2    recorded?
3       A.    They enter what's known as a star code
4    on their handset, on the telephone.
5       Q.    Can you describe sort of what a regular
6    person would do to set up call forwarding?
7       A.    Well, I haven't memorized all of the
8    star codes, there's a lot of them, but if you want
9    to forward your number, you have to know what --
10   you have to first know how to -- what a forward is
11   and want to do it.  And then you'll have to find
12   the star code that you have to enter on your
13   telephone handset while you're connected to the
14   switch and enter the number you want calls
15   forwarded to.
16      Q.    And when someone does what you've just
17   described and it's entered into the switch, where
18   does the switch sit in the call process?
19      A.    A classified edge switch, which is
20   where it would generally be recorded, is the --
21   it's called an edge switch because it's at the edge
22   of the -- our telecommunications network in this
23   country.  It's what provides you the dial tone and
24   the ring to your phone line at your premises.
25      Q.    Is the switch a physical piece of

Page 56

1   computer equipment?

2          A.    I would use the word telecommunications

3   equipment, but it is a computer, yes.

4          Q.    And where would it physically be?

5          A.    If you're in a large office building

6   it'll probably be -- it'll be -- most likely be in

7   the building, depending on the size, if it's -- you

8   know, has enough telephone lines to need its own

9   switch.  In a residential setting, it's out in the

10  neighborhood somewhere, generally.

11         Q.    And generally who owns the switch?

12         A.    The incumbent local exchange carrier.

13         Q.    Who is the incumbent local exchange

14  carrier?  What does that mean?  What does that term

15  mean?

16         A.    In the past we had monopolies by

17  telephone companies in the regions where they

18  operated, and then they were required to resell

19  service and let other competitors come in and use

20  their facilities, their wires.

21               The incumbent local exchange carrier is

22  going to be the -- is generally the big phone

23  company that put in all of the infrastructure back

24  in the old days that's still in use.  Think about

25  people like Southwest Bell, AT&T, the old BellSouth

Page 57

1    before it was absorbed, as opposed to small, you

2    know, reseller telephone companies like -- I mean,

3    there are many of them that service local

4    customers.

5            Q.   Is it the same as the entity that you

6    pay your phone bill to every month?

7            A.   You would pay -- most people are

8    probably served by their incumbent local -- their

9    ILEC, incumbent local exchange carrier.  But if you

10   have a different local exchange carrier than the

11   incumbent, yes, that would be who you pay your

12   phone bill to.

13           Q.   Who would have records of whether or

14   not a particular user has call forwarding turned on

15   at a particular time, if anyone?

16           A.   It would -- you would have to access

17   the switch to know that information.

18           Q.   So in other words that's not something

19   that the carrier would have that it sends?

20           A.   No, the carrier would know it, but they

21   would not know it historically.  They would know if

22   you, for example, have it on now or off now, but it

23   would not know if you had it on six months ago on a

24   particular day.

25           Q.   So, in other words, I couldn't send a

Page 58

1    subpoena to a phone carrier and say did user X have

2    call forwarding turned on on January 1st of 2021?

3         A.   That's correct.

4         Q.   In Paragraph 9, you reference "fax

5    broadcasters."

6              First, what is a fax broadcaster?

7         A.   Well, that's not a technical term.

8    It's just, again, the audience that this document

9    was written for, was a term that I used to describe

10   sending a single document to multiple destinations.

11             And a broad -- that is fax

12   broadcasting.  And a fax broadcaster is somebody

13   who has the equipment and expertise to do that for

14   other people as a service.

15        Q.   Is -- do you know whether Upland

16   InterFAX is a fax broadcaster?

17        A.   It's my recollection that I have seen

18   records from them that indicated they were doing

19   fax broadcasting.

20        Q.   Is a fax broadcaster different from a

21   telephone fax machine?

22        A.   Those two terms don't fit together.

23   That's like comparing an apple to a automobile.

24        Q.   They're different things, in other

25   words.  Is that right?

Page 59

1        A.   Can you ask your question, again.  I'm

2   trying to --

3        Q.   Of course.  My question is whether a

4   telephone fax machine and a fax broadcaster, are

5   they different things or are they two words for the

6   same thing?

7        A.   Well, fax broadcaster is a company or a

8   person, an entity.  A fax machine is a device, or

9   pieces of equipment connected together.  So I

10   really -- yes, they're different things, although a

11   fax broadcaster uses fax machines; it's just

12   something that they use.  One is not equal to or

13   related to the other.

14        Q.   Do some fax broadcasters also receive

15   faxes?

16        A.   Yes.

17        Q.   Can you think of any examples of fax

18   broadcasters that also receive faxes?

19        A.   Yes, WestFax, or J2, which is -- I

20   think they have changed their name now to something

21   else.  But any of the fax broadcasters that also

22   let people set up accounts to receive incoming

23   faxes, they would fit that definition.

24        Q.   And do fax broadcasters use fax

25   machines to receive faxes?

Page 60

1          A.    A fax broadcaster...

2                Use a fax machine to receive faxes?

3          Q.    That's my question.  Do they?  Do fax

4    broadcasters use fax machines to receive faxes, or

5    some other technology?

6          A.    I would imagine that they do.  Most

7    businesses use fax machines and have fax machines

8    in their offices as a typical piece of business

9    equipment.  But a fax broadcaster, in the sending

10   of the faxes, would be using a computer-based

11   system and not a standalone fax machine, just for

12   efficiency purposes.

13         Q.    Is it possible for anyone to receive a

14   fax without a fax machine?

15         A.    No.  Now, we talked about different

16   topologies.  You may receive a FedEx envelope with

17   the printout of a fax in it, or you may receive an

18   e-mail that has a picture of the payload converted

19   to a PDF file as an attachment to the e-mail, but

20   in those two instances, you did not receive a fax,

21   you received a FedEx envelope or an e-mail.

22         Q.    Paragraph 12 of your report says that

23   you've "relied generally on orders, notices, and

24   other promulgations of the FCC regarding the

25   agency's administration of the TCPA."

Page 61

1          Which orders, notices, and other
2     promulgations do you rely on in this case?
3          A.   I don't have any particular order in
4     mind.  I have read and reviewed many orders and
5     other promulgations of the FCC, and I carry, for
6     lack of a better term, institutional knowledge of
7     what I've read and what I recall.
8          My general practice is if I refer to a
9     particular document, whether it was an FCC document
10    or something else, in preparing my report, then I
11    will try to drop a footnote in about that
12    particular document.
13          If I don't have any particular FCC
14    document footnoted, that would indicate that I did
15    not go and look at a particular FCC document in
16    the -- for the purposes of doing the report, but I
17    may have relied on my recollection about a general
18    principle or general information that I acquired
19    from an FCC document.
20          And as we go through the report and you
21    ask questions, there may be something that further
22    information or more detail or backup for that
23    statement in my report might be found in a
24    particular document that I could go and find for
25    you.

Page 62

1           Q.   Are you familiar with any instances

2    where an FCC report or promulgation or order has

3    been rescinded or overruled?

4           A.   Yes, and I'm assuming you mean by the

5    Commission itself or a bureau within the Commission

6    and not by court?

7           Q.   Well, let's take each of those.  So are

8    you familiar with any instances where that has

9    happened by a bureau or a commission within the

10   FCC?

11          A.   Yes, the Commission modified its order

12   in the BroadNet matter.

13          Q.   And are you familiar with any instances

14   where that's happened by order of a court, or, in

15   other words, a court has struck down an FCC rule or

16   order?

17          A.   Yes, I believe there was the net

18   neutrality, some of the -- some parts of the net

19   neutrality order.  There have been many, many times

20   courts have cut back or invalidated FCC orders over

21   the history of the Federal Communications

22   Commission.

23          Q.   With respect to the FCC rules, orders,

24   and promulgations that you relied on in this case,

25   were any of those struck down or rescinded or

Page 63

1    limited by either the FCC or by a court?

2         A.    Not that I recall.

3         Q.    Did you confirm whether or not that was

4    the case before finalizing your report?

5         A.    If I had knowledge I would have applied

6    it, and I don't recall any of the things I reported

7    on in this report being covered by anything that

8    had been reversed by the FCC, based on my

9    recollection.

10        Q.    In Paragraph 14 of your report --

11   that's on Page 6.  I'll give you just a moment to

12   scroll down there.

13        A.    Yes.

14        Q.    Paragraph 14 references a

15   "computer-based fax broadcasting platform" that

16   "contemporaneously and automatically records

17   metadata."

18             What does metadata mean in the context

19   you have used it here?

20        A.    Metadata is data about data.  Or data

21   about events.  And in this case the metadata about

22   a fax transmission would be the different columns

23   of information, such as the date and the time and

24   other information regarding each of the

25   transmissions that were documented, in addition to

Page 64

1    the ultimate piece of information, which is the

2    success or failure of the transmission.

3         Q.    You reviewed a file in preparing this

4    report -- you identify it in Paragraph 10a -- a CSV

5    file, correct?

6         A.    That's correct.

7         Q.    Is the data in that file what you

8    consider to be metadata?

9         A.    No, that is data, which includes

10   metadata.

11        Q.    So within that CSV file referenced in

12   10a, are any of the columns, or rows of that file,

13   metadata?

14        A.    Yes.  I'd have to return to the CSV

15   file itself in order to identify those.

16        Q.    Is it a situation where it's all

17   metadata or just some of the rows and columns are

18   metadata, some are not metadata?

19        A.    It depends on your perspective.  Most

20   people, the lay people, their perspective of a fax

21   transmission is I don't care about the date and the

22   time or the speed or other details about the

23   transmission.  I want to know if the fax was

24   successful or not.  And from that standpoint,

25   everything is metadata except whether it was

Page 65

1   successful or not.

2              From a technical standpoint, you may

3   consider it all data, because it's all relevant

4   information about the transmission.  It really just

5   depends on your perspective.  There's no difference

6   in my analysis based on whether somebody wants to

7   term a particular column of information to be

8   metadata or data.  It's not something I -- that

9   changes my analysis -- whether it's -- you want to

10  call it data from one perspective or metadata from

11  a different perspective.

12         Q.    I'm going to open that file and mark it

13  as our next exhibit, it's Exhibit 29.  Is there a

14  certain format or program that's most useful for us

15  to open that file in?  In other words, should we

16  open it in a text editor, in Excel?  What would be

17  best?

18         A.    No, a text editor is usually best.

19              MR. KNOWLES:  Okay.  Lizzie, can you

20  open Document F in a text editor, and then share

21  the screen.  And we're going to mark that document

22  as Exhibit 29, please.

23              (BIGGERSTAFF EXHIBIT 29, August 22 to

24  27, 2020, InterFAX Transactions, was marked for

25  identification.)

Page 66

1            THE WITNESS:  Can we take a short

2    break, one minute?

3            MR. KNOWLES:  Yeah, absolutely.  Why

4    don't we -- we'll go off the record.  We'll take a

5    five-minute break and grab some water.  So we'll

6    come back on, if we can, at 43 past the hour.  Does

7    that work for everyone?  Great, we'll do that.

8    We'll go off the record, off video, please.  Thank

9    you.

10            THE VIDEOGRAPHER:  The time on the

11    monitor is 9:39 a.m.  We're going off the record.

12            (A brief recess was held.)

13            THE VIDEOGRAPHER:  I'll get us back on

14    the record.  The time on the monitor is 9:51 a.m.,

15    and we're back on the record.

16    BY MR. KNOWLES:

17        Q.   Thank you.  So let me just set the

18    stage.  We have open in front of us as -- what

19    we've marked as Exhibit 29, a CSV document.

20            Mr. Biggerstaff, does this appear to be

21    the document that you reference in Paragraph 10a of

22    your initial report?

23        A.   Yes.

24        Q.   Can you describe in layperson's terms

25    what we're looking at here?

Page 67

1          A.   This is a data file of information that
2    is in a comma-separated values format.  The first
3    row is what we term a header row, and the data
4    follows in the rest of the rows.
5          Q.   And when you say the data follows in
6    the rest of the rows, what does each of those
7    second and subsequent rows of data represent?
8          A.   These are consistent with fax
9    transmission records.
10          Q.   How did you receive this file?
11          A.   I received that via e-mail from --
12    either as an e-mail or a download link from
13    Mr. Kelly.
14          Q.   Do you know where Mr. Kelly got the
15    file?
16          A.   No, and it's -- it's not relevant to my
17    analysis.
18          Q.   Do you know whether anyone made any
19    changes or edits or limitations or modifications of
20    any kind to this file before it was sent to you?
21          A.   No, I do not.
22          Q.   Do you know who or what generated this
23    file?
24          A.   Not from just looking at the file.  As
25    I said, the contents is consistent with my

Page 68

 1   experience with records from a computer-based fax

 2   broadcasting platform.

 3        Q.   And in Paragraph 14 of your report,

 4   which you were looking at a moment ago, you talked

 5   about computer-based fax broadcasting platforms

 6   that contemporaneously and automatically record

 7   metadata, and I asked you about what you meant by

 8   metadata.

 9             Can you tell us which rows or which

10   columns of this file that you have in front of you

11   constitute metadata as you use the term in

12   Paragraph 14.

13        A.   Metadata is literally data about data.

14   And if you look at the success or failure as the

15   singular important piece of data about a fax

16   transmission, from that perspective all the other

17   columns are metadata.  And that's the typical

18   perspective of a layperson.

19             From a perspective of a data analysis,

20   all data, including metadata, is data for --

21   potentially for analysis.  Does that help?

22        Q.   Let me ask the question, from your

23   perspective, as you used the term metadata, are any

24   of the columns in this file metadata?

25        A.   No.  I consider them all data.  Like I

Page 69

1    said, I used the term metadata since it's -- the

2    target of my report is a layperson.

3         Q.   So, in other words, as you use the word

4    metadata, none of this is metadata, this is all

5    just data; is that right?

6         A.   From my perspective as a data analyst

7    in analyzing the data, all data, including

8    metadata, is still data for analysis purposes.

9         Q.   I think we're done with this file, so

10   probably take that exhibit down for now.  We may

11   reference it later.  But I'm going to turn back to

12   your original report, and I'm still on

13   Paragraph 14.

14             The last sentence of Paragraph 14

15   states that, "Records automatically created by fax

16   systems recording the result of a transmission as

17   successful or failure of the indicated number of

18   pages, are reliable and are relied on in business

19   and in the fields of computer analysis and

20   forensics."

21             Did I read that correctly?

22        A.   Yes, you did.

23        Q.   Is the document, Exhibit 29, that we

24   just looked at, one of the kinds of records that

25   you're describing in the sentence I just read?

Page 70

1          A.    Yes.

2          Q.    And in your career, the whole time

3    you've been working in the field where you're

4    working now, have you ever seen a record

5    automatically created by a fax system that is not

6    reliable and not accurate?

7          A.    The only time that has ever occurred

8    and the only time I've ever heard of it occur is

9    the concept of a false negative, and that's because

10   there is a tiny window of time when the entire

11   document has been received by the receiving fax

12   machine.

13          And the very next thing that's going to

14   happen is the sending machine -- or, excuse me, the

15   receiving machine -- sends the positive

16   confirmation back saying, hey, I've got everything.

17          If your communications line gets

18   interrupted at that precise moment, the sending

19   machine will not receive the confirmation that it

20   was received, so the sending machine's perspective

21   is that the transmission failed.  The receiving

22   machine, however, did receive the entire payload

23   without error and was attempting to confirm that

24   fact with the sender.

25          So that's what's referred to as a false

Page 71

1   negative.  You were given a negative confirmation,

2   or your confirmation did not occur, so you have a

3   negative result, which is your fax transmission

4   failed -- that's a negative result -- when, in

5   fact, it went through completely; you just didn't

6   get the green card back.

7                And using the green card analogy, you

8   might send a letter with a return receipt, a green

9   card on the back of it, and the person actually

10  received the letter, they signed for it, they

11  signed the green card, and then the green card went

12  back in the mail system and it got eaten by some

13  piece of equipment, so you never received the green

14  card back.  That's a -- that's an example of a

15  false negative, you believe it was not received

16  when in fact it was.

17               That's the only time that the fax logs,

18  I'm aware of, could have information that's

19  unreliable.  But it's unreliable in the most

20  conservative way.  You'll never have a false

21  positive; that is, a belief or a record that the

22  transmission was successful when it was, in fact,

23  not successful.

24       Q.   Do you have any way to know whether

25  that false negative error type occurred in the data

Page 72

1   reflected in Exhibit 29?

2        A.   Because my analysis only looked at

3   confirmed -- positive conformation, successful

4   transmissions -- if that error occurred, which is

5   very rare, it would not be in the data that I

6   identified as a successful transmission.

7        Q.   Do you know one way or another whether

8   that error type occurred in this data?

9        A.   No, I don't.  But if it did, which is

10  exceedingly rare, it would not appear in my output

11  data set of successful transmissions.

12            So what you're saying, is, is there a

13  possibility somebody in the list of failed

14  transmissions, which are then not -- because their

15  transmission is recorded as failed -- are not in my

16  exhibit that I created of the received faxes, that

17  one of those actually was received but the line

18  dropped at that inopportune moment?  That's

19  possible.  But that's not in my output data set.

20  They would not be in the class.

21        Q.   Did the file -- the CSV file that we've

22  marked as Exhibit 29 -- have any file metadata

23  associated with it when you received it?

24        A.   It depends on how I received it.  If I

25  received it via e-mail, e-mail does not retain file

Page 73

1    metadata such as date timestamps.  If it was sent

2    in a ZIP file or sent via download link, then

3    potentially it would have had metadata attached to

4    it.

5            Q.   Did you look to see whether any file

6    metadata was attached to that file when you

7    received it?

8            A.   My standard practice when I receive

9    data is if it is delivered to me in a format that

10   retains file metadata, such as date timestamps, I

11   look at them for consistency.  And if they were

12   inconsistent, I would note it.

13           Q.   Did you do that here?

14           A.   That's my standard practice, so, yes, I

15   would have done it here.

16           Q.   Did you receive this file in a way that

17   preserves that metadata?

18           A.   I don't know.  I can look.

19           Q.   Have you ever, in your decades of doing

20   this, had an instance where the file metadata has

21   made a difference on the opinions that you reached

22   in the case?

23           A.   Yes, I have.

24           Q.   And without getting into the specifics

25   of that case, how would it make a difference?

Page 74

1          A.   Oh, I can get very specific about it.

2    I have -- I recall one case, for example, where

3    metadata about a file showed the file being edited

4    shortly after a subpoena was served on that person

5    to produce the file.

6          Q.   And why is that material or relevant?

7          A.   Well, that seems to be consistent with

8    somebody, once they received a subpoena for the

9    file, going into the file and editing it.

10         Q.   Have you ever seen a situation where

11   the metadata suggests the file was edited after the

12   subpoena?

13         A.   That's when -- the situation I was

14   showing about data, they edited it after that.

15         Q.   Do you know one way or another whether

16   there's any metadata indicating that in the present

17   case?

18         A.   If it had been there, I would have

19   noted it in my report.  So it would not have been

20   there.

21         Q.   Would you have noted in your report if

22   there was no file metadata?

23         A.   No, because that's not what I would

24   report on.  Because most of the files are sent to

25   me via e-mail.  And e-mail, you don't get metadata

Page 75

1    when a CSV file is attached via e-mail.

2         Q.   Did you ask for this data in a way that

3    would preserve the file metadata?

4         A.   No.

5         Q.   Would doing so make your analysis more

6    robust?

7         A.   No.

8         Q.   Do you care whether there's any file

9    metadata or not, or does it make no difference to

10   you?

11        A.   If it was inconsistent, yes, but my --

12   if -- well, let me back up.  If there was metadata

13   that was inconsistent, I would notice that and I

14   would -- I would report on it.  But if the document

15   came via e-mail, there is no file metadata because

16   the MIME encoding of e-mail attachments does not

17   encode or include the metadata about the file.

18        Q.   Do you have any way of telling us here

19   today whether this file had metadata, or you just

20   don't remember?

21        A.   I can look.  I can look at the copy of

22   the CSV file I have on my system.

23        Q.   How long would it take you to look?

24        A.   About 30 seconds.

25        Q.   Can you do that now for us?

Page 76

1          A.    I can.

2          Q.    Thank you.

3          A.    The copy I have has a creation date of

4     November the 9th, which is about the time I started

5     working on this case, and that would be consistent

6     with me saving it to the disk on that date, and it

7     has a modified date of September the 17th of 2020.

8          Q.    And when you said November 9, was that

9     also November 9, 2020?

10         A.    That's correct.  And if you go back to

11    my report, in Paragraph 2, I note that I was

12    retained in this case on November the 6th, so those

13    dates are all consistent.  I received it November

14    the 9th, and it did have metadata, so a

15    modification date of September the 17th of 2020.

16         Q.    In Paragraph 14 of your report --

17    excuse me, Paragraph 16 of your report --

18         A.    Yes.

19         Q.    -- you indicate that Exhibit 29

20    contained 47,659 rows of data plus one header row

21    and that your analysis produced 47,619 transmission

22    records with timestamps.

23              Were all of those 47,619 successful

24    faxes?

25         A.    I don't recall; I'd have to look in my

Page 77

1    report.  In some cases the data that I get is only

2    successfuls, in other cases it's not.

3          Q.    So you looked at -- looking at

4    Paragraph 16, the data you received had 47,659 data

5    rows and a header.

6                And you say, quote "I selected records

7    identifying fax transmissions consisting of one or

8    more pages that were fully-received without error."

9                End quote.

10               And then you state that that "analysis

11   produced a list of 47,619 transmission records."

12               So were those 47,619 all fully received

13   without error?

14         A.    Yeah, okay, now I understand your

15   question.  Yes, that is correct.

16         Q.    Is that to say that over 99.9 percent

17   of the faxes were fully received without error?

18         A.    Of the -- of the records that I

19   reviewed, that's correct.

20         Q.    So, in other words, there was a very

21   small number that were not fully received without

22   error, but over 99.9 percent of the faxes in

23   Exhibit 29 were fully -- excuse me -- fully

24   received without error, correct?

25         A.    Based on the contents of that CSV file,

Page 78

1    that's correct.

2         Q.   Is a success rate that high common or

3    uncommon?

4         A.   It depends on how fresh the list is.

5    It can depend on other factors.  But 99 percent is

6    about what you would expect if you had a clean,

7    fresh list of fax numbers and you were doing

8    retries so that if you got a busy signal, you would

9    retry them.

10        Q.   So how do you count busy signals in

11   this data?

12        A.   Oh, I don't.  Busy signals are handled

13   by a fax broadcasting system on retrying them a

14   certain number of times.

15        Q.   And the success rate here, though, is

16   higher; it's 99.916 percent.  Have you ever seen a

17   success rate that high in any other analyses you've

18   done?

19        A.   No, 99.9 is a very high rate; that

20   would indicate to me that it was either an

21   exceptionally good, fresh list, or the number of

22   retries was high, somebody wanted to make sure

23   everything got through, but -- it's not impossible,

24   but that is high.

25        Q.   Did you draw any conclusions from

Page 79

1    that -- that error -- that success rate being very
2    high?
3          A.   I just gave you a couple conclusions in
4    my previous answer.
5          Q.   Have you ever seen a scenario where
6    someone is sent tens of thousands of faxes with a
7    success rate that high, apart from the present
8    case?
9          A.   No, I haven't.
10         Q.   Did that cause you to question the
11   accuracy of the data in any way?
12         A.   No, it didn't.
13         Q.   Why not?
14         A.   It just didn't.  I suspected that
15   potentially they only -- in the queries that they
16   did against their data, they may have only selected
17   successful transmissions for at least part of the
18   data that they reported on.
19         Q.   But you also had some unsuccessful
20   transmissions in this data set, correct?
21         A.   I'd have to go back and look
22   specifically at the data as to why there were some
23   unsuccessfuls.  There were some records that were
24   corrupted and I could not count and could not use
25   in my analysis, as I mentioned in my report.

Page 80

1          Q.    How many were corrupted such that you

2     couldn't use them?

3          A.    I don't recall.

4          Q.    A question for you about Paragraph 20,

5     if you could scroll down to that one.  It starts on

6     Page 7 and continues on to the next page.

7          A.    Yes.

8          Q.    In Paragraph 20 you discuss various fax

9     transmission standards that you refer to as Groups

10    I through IV.  You indicate Groups I and II are

11    obsolete.  Do you know which group InterFAX used in

12    sending the faxes in question here?

13         A.    Group III.

14         Q.    And how do you know that?

15         A.    Otherwise their faxes wouldn't have

16    worked in North America.

17         Q.    Is -- so you said here Groups I and II

18    were obsolete.  So if you send a fax to Groups I or

19    II it doesn't work, correct?

20         A.    Correct.

21         Q.    What happens if you send a fax to

22    Group IV?

23         A.    Well, you can't send a Group IV fax

24    except to another Group IV fax machine, and you --

25    they have different addressing.  You can't take a

Page 81

1    list of 10-digit fax numbers in North America and

2    say send a broadcast to these numbers except via

3    Group III.

4           Q.   Are there any Group IV fax machines in

5    North America, to your knowledge?

6           A.   There are.

7           Q.   How common are they?

8           A.   Not very common.  But you can't send a

9    10-digit fax -- you can't send to a 10-digit fax

10   number.  Group III is analogue faxing to a 10-digit

11   telephone number.  Group IV is digital faxes over

12   like an ISDN line, and you have to have a circuit

13   identifier or an IP address.  You can't just use a

14   10-digit number.

15          Q.   In what circumstances are Group IV

16   faxes used in North America?

17          A.   Generally between corporate offices,

18   large-scale faxing or businesses that send a lot of

19   faxing and want the higher speed of a Group IV fax.

20   They never caught on; they were never widely

21   implemented anywhere.

22          Q.   Do any online fax services use

23   Group IV, to your knowledge?

24          A.   No, not to my knowledge.

25          Q.   And how did you test or evaluate that

Page 82

1   in this case?

2          A.    From my perspective, it's common

3   knowledge.

4          Q.    If a fax -- an online fax service sends

5   a fax to another user of its own online fax

6   service, is that sent over Group III or in some

7   other way?

8          A.    No, they would still be Group IV.  I'm

9   sorry, I misunderstood your question.  Yes, that

10  would be a Group III fax.

11         Q.    Are Group IV faxes ever used between

12  one company and a different company, or only

13  intracompany, or in other words, within the same

14  company?

15         A.    Because of the information you have to

16  know and how you address it, my experience has been

17  they're used between -- inside the same company.

18               But it's possible that people can

19  expand their addressing and exchange the

20  information necessary to make a Group IV fax work

21  intercompany.

22         Q.    Have you ever worked on a case where

23  Group IV faxes have been sent?

24         A.    Never.

25         Q.    If you could scroll down to

Page 83

1   Paragraph 29 of your report, please, and just let
2   me know when you're there.
3          A.   Okay.
4          Q.   In the second sentence of Paragraph 29
5   you indicate that "the two fax machines exchange
6   many pieces of information about the capabilities
7   each has, and about the document image itself."
8               Is that information --
9          A.   Which paragraph?
10         Q.   Paragraph 29, on Page 10.
11         A.   Okay, I see it.
12         Q.   Is the information you referenced
13  here -- information about the capabilities and of
14  the document image itself -- does that information
15  appear in Exhibit 29?
16         A.   The information that they exchange
17  about, in their handshaking, is not represented in
18  the log.
19              (Reporter clarification.)
20  BY MR. KNOWLES:
21         Q.   And just so we're clear, the log you're
22  referencing is what we were just looking at as
23  Exhibit 29?
24         A.   Correct, the CSV file.
25         Q.   Does that CSV file, Exhibit 29, have

Page 84

1   the information you reference here about the

2   document image itself?  And we could -- if it's

3   helpful, let us know, we can pull it up again if

4   it's helpful.

5          A.   This information about the document

6   itself would be the resolution and the encoding

7   method, and that's not represented in the log file.

8          Q.   In your experience, do fax broadcasters

9   like InterFAX generally save that information?

10         A.   No.

11         Q.   Do you know why that is?

12         A.    It's transient information that the

13  machines exchange in handshaking, and it's not

14  something that's generally kept in a fax log.

15         Q.   Paragraph 36 of your report, if you

16  could scroll down there, and just let me know when

17  you're there, please.

18         A.   Okay.

19         Q.   Paragraph 36 references "Noisy phone

20  lines and other issues" that "can impact the

21  success rate of faxes."

22              What are noisy phone lines?

23         A.    Telephone lines have a prescribed

24  frequency window that they carry, and the fax

25  transmission and our voice transmission takes place

Page 85

1    in between those frequency bands.

2              You can have -- when you make a phone

3    call as a voice phone call, most people have

4    experienced times when they get what they refer to

5    just generically as a bad connection.  They hear

6    noise, static, echo, other things on the telephone

7    line that make it more difficult to understand the

8    person talking to -- you're talking to.

9              But as a human, you can usually work

10   through that because humans have a brain that can

11   process the pieces of information and the sound

12   that you've got with the pieces that got cut out or

13   that you couldn't hear and piece your conversation

14   back together.

15             A fax machine, on the other hand, when

16   it encounters noise or echo or other -- other sound

17   on the line, other than the opposing fax machine on

18   the other end, it doesn't have the intelligence of

19   a human brain to put the conversation back together

20   again.  It has some smarts -- it has check zones;

21   it has retries -- but it's not going to be as good

22   as a human at putting that conversation back

23   together again and tolerating that noise and

24   static.

25        Q.   How common are noisy phone lines?

Page 86

1          A.    As the network infrastructure in the

2    United States gets better, they get less, but they

3    do still occur.

4          Q.    Are noisy phone lines more common or

5    less common with respect to standalone fax

6    machines, versus other kinds of fax machines, or

7    does it make no difference?

8          A.    No, it makes no difference.  You can --

9    and you can have a noisy phone line or noisy

10   connection and then you hang up and call the same

11   number right back and then you get a good

12   connection.

13          The point of Paragraph 36, though, is

14   it doesn't affect the accuracy of the results that

15   the ITU fax protocols produce; because it's a

16   positive confirmation protocol, anything that gets

17   upset or disrupted or corrupted will be a failure

18   and not -- can't be logged as a success.

19          Q.    You reference other issues that can

20   impact the success rate of faxes.  Are there any

21   other issues apart from noisy phone lines that can

22   do so?

23          A.    In the context of Paragraph 36, no, I'm

24   looking strictly at the telecommunication lines.

25          Q.    And when you talk about the success

Page 87

1    rate of faxes, what would a high success rate be?

2        A.   A high success rate, well, this case

3    had a high success rate, 99.9.  The peer-reviewed

4    articles -- for example, the one that I referred to

5    earlier by, I think, Mr. -- Mr. Tomas is one of the

6    authors -- they found that a typical fax-to-fax

7    transmission, meaning you have a good phone line,

8    you're not -- or, excuse me, a phone list; you're

9    not accidentally calling some voice lines.  But

10   when you have two fax machines talking to each

11   other, with the standard amount of noise and other

12   things on the phone line, you should have a 99

13   percent success rate.

14       Q.   What are the -- what would you consider

15   an average success rate in your experience?

16       A.   Oh, that depends widely on the quality

17   of your list.  For example, I remember a case that

18   only had a 29 percent success rate, or maybe even

19   lower.  It was a very low success rate.  But when I

20   went in and looked at the numbers, they were

21   sending to all the numbers that failed from a

22   broadcast they had done a few days earlier, which,

23   by definition, you have a bunch -- all of your

24   phone numbers that had -- been changed hands and

25   now were no longer fax machines but voice numbers

Page 88

1    belonging to somebody else, numbers that were

2    disconnected and the call would not go through.

3    Retrying all of those numbers was not going to

4    improve or finally get a fax to go through.

5               And so you would expect that if you

6    were sending to a list like that, a few days later,

7    you would expect the vast majority of them to fail,

8    which is what happened.

9         Q.   In instances where the InterFAX

10   database file had a zero in the status column, what

11   conclusions did you draw from that?

12        A.   Well, I recall reporting on the issues

13   that I had with this file because it was not a

14   proper CSV file and some of the records were -- had

15   unescaped or unquoted commas in the data itself.

16   So there could be zeros in columns that didn't

17   belong there, depending on the other data in

18   that --

19        Q.   Let's take a step back.  Sorry, go

20   ahead.

21        A.   But, if I recall correctly, a zero in

22   the status column was how InterFAX recorded a

23   successful transmission.

24        Q.   How reliable -- well, I guess, let me

25   just make clear I heard your last answer.  So you

Page 89

1    interpreted zero in status to mean success; is that

2    right?

3          A.   Yes.

4          Q.   How reliable is InterFAX in correctly

5    recording whether or not the fax was successful?

6          A.   I have no reason to believe this is not

7    a hundred percent.

8          Q.   Do you know one way or another whether

9    it is a hundred percent or some other number?

10         A.   I have never seen a fax broadcaster's

11   records that were not correct, absent, you know,

12   some type of formatting issue.  But I report on the

13   data as it comes to me.  Data is agnostic.  My

14   analysis of the data is based on the data itself,

15   not anything else.  If you want to -- I would

16   expect InterFAX -- and I would go to InterFAX if I

17   wanted to answer that question.

18         Q.   So in other words --

19         A.   I have no reason to believe it's

20   anything other than a hundred percent reliable as

21   their business records.

22         Q.   So is it fair to say that you assumed

23   zero equals success?

24         A.   No.   That's -- that is widely used in

25   fax logs as meaning of success.   It's widely used

Page 90

1    in computer programming in general that an exit

2    code of zero means success.  Can we take a short --

3    one-minute break?

4              MR. KNOWLES:  Yeah, absolutely.  Let's

5    go -- we'll go off video and off the record for

6    just a minute, please.

7              THE VIDEOGRAPHER:  The time on the

8    monitor is 10:24 a.m., and we're going off the

9    record.

10             (A brief recess was held.)

11             THE VIDEOGRAPHER:  All right.  The time

12   on the monitor is 10:27 a.m., and we're back on the

13   record.

14   BY MR. KNOWLES:

15        Q.   Mr. Biggerstaff, before we took the

16   previous break, I had asked you about the file

17   metadata for data sets you look at in response to a

18   subpoena, and you indicated that where the

19   modifying date in the file was later than the date

20   of the subpoena, it caused concern, or suspicion,

21   so to speak.  Can you explain why that was?

22        A.   Because that was a spreadsheet file

23   that was supposedly not used -- it was from a

24   period in the past where they kept information --

25   and, you know, there's a protective order in the

Page 91

1    case, so I can't be too specific -- but it was a

2    spreadsheet that had no business justification that

3    I -- that somebody could come up with for it being

4    modified, because it was from a period of time in

5    the past, like accounting information that should

6    have been closed and no longer modified.

7         Q.   And the records you reviewed a moment

8    ago indicated that the edit date of Exhibit 29, the

9    CSV you relied on here, was September 17 of 2020,

10   correct?

11        A.   That's -- let me go back to the date.

12   I believe that's correct.  Yes, September 17th,

13   2020.

14        Q.   And if that date is later than the date

15   of the subpoena in this case, what, if any,

16   conclusions would you draw from that?

17        A.   Well, it has to be later than the

18   subpoena because this is a file created in response

19   to the subpoena, as opposed to a subpoena to

20   produce a file that already existed.

21             For example, when you send a subpoena

22   to the phone company for call detail records, they

23   will give you a spreadsheet, and that spreadsheet

24   will have a date timestamp after your subpoena

25   because they only created that document in response

Page 92

1   to the subpoena.

2              This data file, the CSV file we've been

3   talking about, was clearly created in response to a

4   request that was part of this litigation, whether

5   it was a subpoena or an informal request or

6   whatever.  They don't keep a CSV file with just

7   these records in it as part of their business of

8   fax broadcasting; they keep a large log file of all

9   their information, and this is a subset that was

10  extracted out of it.

11       Q.   So in this case, does the file metadata

12  tell you anything about whether the file is

13  authentic or has been edited or tampered with in

14  any way?

15       A.   Well, the metadata of 9/17 of 2020 does

16  not tell me, without further inquiry, that there's

17  anything suspicious there if -- but coming in a

18  month or two before I started working on the case,

19  that tends to be typical in the type of data I get

20  from a fax broadcaster.

21       Q.   In doing your analysis in this case,

22  did you do anything to test or study how accurate

23  InterFAX is in recording whether or not a fax was

24  successful?

25       A.   No.

Page 93

1          Q.   Is there anything that could cause a

2     fax broadcaster not to be accurate in recording

3     that information?

4          A.   I'm not aware of any instances like

5     that, and if you aren't properly handling the T.30

6     protocols, your faxes won't go through.  So I have

7     no reason to believe that you're doing anything

8     wrong in regards to the fax protocols.  And, in

9     fact, I have reason to believe everything they're

10    doing is correct.  Fax protocols are not hard to

11    implement.  They're robust, but not hard to

12    implement.

13         Q.   What are the reasons that you have to

14    believe that InterFAX is doing everything correct?

15         A.   Well, they're a well-known fax

16    broadcaster, and, as I said, the protocols are

17    robust and not difficult to implement correctly.

18         Q.   How many times have you worked with

19    InterFAX before this present case?

20         A.   At least one; there may have been

21    others.

22         Q.   In the other case you had, at least the

23    other case that you remember involving InterFAX,

24    were their data files accurate in that case?

25         A.   Oh, I don't recall.  You've got to

Page 94

1    realize, I work on a lot of cases over the years.

2    I think it was a few years ago.

3          Q.    In Paragraph 37 of your report, which

4    is -- that starts on Page 12 and it spills over

5    onto Page 13.  Just let me know when you're there,

6    please.

7          A.    Yes.

8          Q.    There's a parenthetical at the top of

9    Page 13 that references "a 'stand-alone' fax

10   machine, a computer with a fax-modem, or a

11   network-connected device."

12              Taking the first one, a standalone fax

13   machine, what is that?

14         A.    A standalone fax machine would be your

15   typical desktop fax machine you buy at an office

16   supply store.

17         Q.    What does it plug into?

18         A.    It plugs into a telephone line and into

19   an electrical outlet, and possibly others, such as

20   a printer outlet, a USB port, a network connection,

21   et cetera.

22         Q.    Does a standalone fax machine ever have

23   a printer built into it?

24         A.    They do, sometimes.  Most of the time.

25         Q.    So -- but it sounds like from your

Page 95

1    answer that's not always the case; is that right?

2         A.   No, it's not always the case.   There

3    have been -- oh, wait a minute.   You're talking

4    about strictly a desktop fax machine?

5         Q.   So you said in your report "a

6    'stand-alone' fax machine."

7              I guess my question is, do they always

8    have printers built into them?

9         A.   If we're talking about a desktop fax

10   machine, I believe all the examples I'm aware of

11   have a printer built into it.

12        Q.   Is a desktop fax machine the same as a

13   standalone fax machine, or are those different?

14        A.   Well, depending on your perspective, it

15   could be used interchangeably.   I tend to use

16   standalone to mean the more self-contained device,

17   whereas desktop fax machine can be a few things,

18   such as a Castelle FaxPress or a FaxMe cartridge

19   for a Hewlett-Packard printer that is a little more

20   expansive than what other people refer to as just a

21   standalone fax machine that uses nothing else other

22   than power and a phone line.

23        Q.   So when you say standalone fax machine,

24   are you referring to a device that always has a

25   printer built into it; is that right?

Page 96

1        A.   To the best of my knowledge, all of the

2   examples I can think of of a desktop fax machine

3   would have a printer built in, a -- excuse me, a

4   standalone fax machine.  A desktop fax machine

5   could include a couple of devices that are very

6   rare, but I do recall seeing them, that would allow

7   you to preview a fax on a screen, even though this

8   was a self-contained desktop-type fax machine.  And

9   if you wanted to print it, you would -- it would

10  print through a parallel or a serial port.  But

11  those were 20, 30 years ago.  I've never seen one

12  of those since.  I saw it in a catalog at one time.

13  They have existed at one point in the past.  I

14  don't believe they exist anymore in operation.

15       Q.   The second thing you list in the

16  parenthetical in Paragraph 37 is "a computer with a

17  fax modem."

18            Can you explain what that is?

19       A.   A fax modem is a way to connect a

20  telephone line to a computer, and a fax modem is a

21  particular modem that has the ability to send and

22  receive faxes, and it gives the computer that

23  ability to send and receive faxes.

24            So you're talking about a computer,

25  meaning generally an IBM-compatible standard

Page 97

1   personal computer, and you install a fax modem in

2   it so that it can send and receive faxes.

3          Now, you can -- if you want to have two

4   phone lines going at the same time or four phone --

5   you can put more than one fax modem in a PC.

6          Q.   And can those PCs with the fax modem

7   both send and receive faxes?

8          A.   They can.

9          Q.   What do they need in order to print a

10  fax?

11         A.   A connection to it -- well, printing

12  requires a -- some type of connection or a medium

13  between the device and something they can print and

14  a common language or protocol that they share in

15  order to get the data over that connection from a

16  source to the printer.

17         Q.   So in other words, if there's no

18  printer, they can't print, correct?

19         A.   If there is no printer, they can't

20  print.  Well, it depends on how you're interpreting

21  the word can't.  I know that the -- I use the term

22  "capacity to print" because that's what seems to be

23  coming from, you know, the guidance from the FCC

24  and the statute.

25         I look at it this way.  If you have a

Page 98

1   desktop fax machine, a standalone desktop fax

2   machine with an integrated printer, and it has no

3   paper in it, does it still have the capacity to

4   print?  I think it does, the way I use capacity in

5   everyday speech, the way I think the average person

6   does.

7               So the same is true, if you have a PC

8   with a fax modem, does it have the capacity to

9   print?  Yes, it does, if it's connected to a

10  printer.  All it needs is the cable to be

11  connected.  It has that capacity, from the way I

12  look at it.

13              Just like one that just doesn't have

14  paper put in it still has the capacity to print

15  even though there's no paper in it that it can

16  physically print currently.

17       Q.   What you just described is how you use

18  the word capacity in your expert report; is that

19  right?

20       A.   Yes, and in everyday life.

21       Q.   The final thing in the parenthetical

22  we're looking at in Paragraph 37 is "a

23  network-connected device."

24              Can you explain what that is, please?

25       A.   Well, that's essentially a fax server,

Page 99

1    a fax that -- a device that multiple people can

2    access or has multiple phone lines and is not

3    necessarily a dedicated device but a purpose to the

4    device.  You have your PC on your desk, it's a

5    multipurpose device, you do word processing with

6    it; you might play games on it; you might use it

7    for making phone calls.  It's a multipurpose

8    device.  Whereas, if you want to take a machine and

9    dedicate it to specific functions -- for example,

10   you might have a PC that you turn into a file

11   server and it's just not used by a user as a --

12   with a monitor and a keyboard doing word

13   processing; it's just a file server now.

14              Same thing with a fax server, a network

15   device.  That's been given a single purpose, or

16   sometimes you might have two purposes.  But it's no

17   longer a PC -- considered a desktop PC that you use

18   for general purposes like word processing.

19        Q.   Is an online fax service a kind of

20   network-connected device, or are those different

21   things?

22        A.   Well, an online fax service -- did you

23   say online fax service or online fax server?

24        Q.   An online fax service.

25        A.   A service is a business, and online fax

Page 100

1    services use fax servers for sending and receiving

2    faxes.  I'm talking about the technology, from the

3    technology standpoint of the devices used by an

4    online fax service.

5         Q.   When you have a network-connected

6    device, as you used the term here, how does the fax

7    received get to the eyeballs of a person to look

8    at?

9         A.   Well, there are many different ways.

10   Because if you look at the network-connected device

11   as simply Point B in the diagram that I've included

12   in one of my later reports, once this device -- or

13   fax server, for lack of a better term -- receives

14   it, it can either print it out itself to a directly

15   attached printer on a parallel or USB port, it can

16   print out via a wireless connection to a printer

17   across the room.  It can print it over the network

18   to a printer down the hallway or a printer on the

19   other side of the world.  It can send out an e-mail

20   with an attachment containing an image of the fax

21   document.  There are literally innumerable

22   different ways that it could cause the contents of

23   the received fax transmission to then be printed.

24        Q.   When it sends out an e-mail with an

25   attachment containing an image of the fax document,

Page 101

1    is that e-mail itself a fax?

2            A.    No, that e-mail is not a fax.

3            Q.    And when it prints it out onto a piece

4    of paper, is that piece of paper a fax?

5            A.    No, that's a printed piece of paper.

6            Q.    What does the printed piece of paper

7    contain?

8            A.    It contains ink arranged in a pattern

9    to form an image.

10           Q.    When you say fax, what do you mean?

11           A.    I'm sorry, when did I use the term fax?

12   I need to understand the question better.

13           Q.    Do you ever use the term fax?

14           A.    Yes, I do.

15           Q.    So, in other words, I sent him a fax.

16           A.    I'm sorry, I thought you were saying

17   what did I mean by the word fax in some previous

18   statement I made.  Now I understand, just

19   generically.  The word fax is short for facsimile.

20           Q.    And does that refer to the -- strike

21   that.  Let's take a look at Paragraph 38 of your

22   report, please, next paragraph.

23           A.    Okay.

24           Q.    It says that you have reviewed

25   testimony, documentation, other documents regarding

Page 102

1    fax transmission systems.  If we wanted to see a

2    list of all those, where we would look for the list

3    of testimony, documentation, and other documents

4    that you reviewed?

5            A.   I don't have them.  I've never

6    maintained a list of that.  I would look at my list

7    of cases and documents produced in those cases.

8            Q.   Are the testimony, documentation, and

9    other documents referenced in the first line of

10   Paragraph 38 materials that you relied on in

11   forming your opinions in this case?

12           A.   No, I did not refer to any of those

13   documents.  I only relied on my experience that

14   includes having read those documents.

15           Q.   Paragraph 39 says that "Many things can

16   happen to the contents of a fax message after the

17   end of the fax transmission."

18                What are you referring to there?

19           A.   I'm referring to what we just talked

20   about earlier as the trip from Point B to Point C.

21           Q.   In other words, it could be printed;

22   that's one of the things, correct?

23           A.   Yeah, it could be printed in many, many

24   different ways.

25           Q.   It could be an e-mail?

Page 103

1           A.    It could be sent as an e-mail.   It

2    could be sent as a FedEx.   It could be stored on a

3    file for retrieval at a later date.

4           Q.    It could be posted in an online portal

5    where someone would log in to read them, correct?

6           A.    That's what I said, stored for

7    retrieval at a later date, that's what that

8    describes.

9           Q.    Okay.   It could be e-mail.   That's

10   another thing, correct?

11          A.    The contents of the payload -- the

12   image could be e-mailed as an attachment, that's

13   correct.

14          Q.    And do I have it right that the

15   network-connected device you referred to before,

16   that could be either inside someone's facility or

17   it could be remotely, like in the case of InterFAX;

18   is that correct?

19          A.    Well, it is typically referred --

20   exhibited -- or the typical example is a fax

21   server.   And since the online fax services all use

22   fax servers, then the way I understand your

23   question, that would be true.   But that's because

24   all online fax services use fax servers and fax

25   servers have these capacities.

Page 104

1      Q.   Are there any ways to send and receive

2  faxes other than the three categories listed in

3  that parenthetical we looked at in Paragraph 37?

4      A.   Every device that I'm aware of fits

5  into either the status of a standalone desktop fax

6  machine, a PC with a fax modem, and a fax server.

7      Q.   Does one's telephone carrier have any

8  way to know which of those methods one is using to

9  send or receive a fax?

10     A.   Only if you're using the carrier's

11 online fax service.

12     Q.   I have a question for you about

13 Paragraph 42, which is on Page 14.  If you could

14 scroll down to that, please.

15     A.   Okay.

16     Q.   Paragraph 42 says, "Taken as a whole,

17 all of the available evidence I have reviewed

18 indicates the fax transmission records I examined

19 are, to a very high degree of certainty, authentic

20 and accurate records related to fax transmissions

21 and were contemporaneously recorded automatically

22 by computer software."

23          Did I read that correctly?

24     A.   Yes.

25     Q.   When you wrote "authentic" in this

Page 105

1   paragraph, what did you mean by that?

2          A.   Well, they don't appear to be something

3   that was created manually, like fake.  They are --

4   they do appear to be authentic fax logs.  They're

5   internally consistent.  They're consistent with

6   other fax logs that I've reviewed over the past 30

7   years or so.

8          Q.   What does it mean that they're

9   internally consistent?

10          A.   Well, for example, if you look at the

11   logs, these logs record duration.  And when you

12   look at the duration and correlate it with the

13   success or failure of a transmission, you'll see

14   that they are consistent with each other.

15               If somebody was just going through and

16   trying to make a bunch of fake fax logs or going

17   through and taking failed faxes and changing the

18   status from something else back to zero, then the

19   durations would not match.

20               Does that make sense to you?

21          Q.   Is it -- how -- how do duration and

22   success or failure correlate in an authentic fax

23   log?

24          A.   That you have a distribution of the

25   durations that's, you know, consistent.  If you've

Page 106

1  got a failed -- a duration of only 1, 2, 3, 4, or 5

2  seconds, that's not long enough for a fax to be

3  successful.

4       Q.   What's the shortest duration that's

5  consistent with a successful fax?

6       A.   Generally the shortest I'd ever seen is

7  15 seconds, but I generally expect them to be 19

8  seconds or longer for a single-page fax.

9       Q.   Just so I'm clear, you said 19 seconds

10  or longer you would generally expect; is that

11  right?

12       A.   Generally I expect, yes, 19 seconds or

13  longer, but I have seen successful ones in 15 -- as

14  low as 15 seconds, but those would be statistically

15  fairly rare; I wouldn't expect to see very many in

16  a log.

17            There's also the column called units,

18  which that's typically used as a type of billing --

19  part of their billing system of how much they're

20  charging.  And you see the number of units will go

21  up incrementally consistent with the number of

22  seconds of duration.

23       Q.   Is it possible --

24       A.   That's part of the thing, somebody

25  that's going through a log file and just changing

Page 107

1    successful to failed or failed to successful is not

2    going to know that they need to go and hide their

3    steps by hiding -- by changing those numbers also.

4         Q.   Is it possible to have a long duration

5    and for -- and a fax to still fail, or be

6    unsuccessful?

7         A.   Yes, you can.  Long duration doesn't

8    tell you a whole lot because if you do -- if you

9    plot the durations on a curve, you'll see a long

10   tail due to the error correction cycling.  That's

11   the sign of a bad phone line.  Those can end up

12   being successful or failures.

13              Can I have 30 seconds please?

14              MR. KNOWLES:  Yeah, absolutely.  Let's

15   keep the video on.  We'll just pause for a moment

16   while the witness steps away.

17              (Off-the-record discussion.)

18              THE VIDEOGRAPHER:  The time on the

19   monitor is 10:51 a.m., and we're back on the

20   record.

21   BY MR. KNOWLES:

22         Q.   Mr. Biggerstaff, would one way to test

23   or evaluate the reliability of the InterFAX records

24   be to ask the recipients whether or not they

25   received the faxes that InterFAX says they did?

Page 108

1        A.   That would be one way.  I think the

2   better way would be to talk to InterFAX.

3        Q.   Which of those did you do?

4        A.   Oh, I did neither.  I don't speak to

5   the -- I take the data agnostically, as it is.  I

6   report on the data as it's contained.

7        Q.   Did you test the reliability of the

8   records?

9        A.   No, I have no ability to test them.

10       Q.   If I go and take the deposition of one

11  of the people who received one of these faxes and

12  ask them if they have copies of the fax, the log

13  that says they have, and they don't, does that

14  affect your view of the reliability of the InterFAX

15  records at all?

16       A.   The log doesn't say they have copies of

17  the faxes.  The logs say that the transmission was

18  successful to Point B.  The people that you talk to

19  may not have seen the faxes, may not know they were

20  received.

21       Q.   Does the log tell us whether or not --

22  strike that.

23            Have you reviewed any deposition

24  transcripts in this case?

25       A.   I don't recall.  I sometimes do.  And

1    the cases sometimes blur together since I do the

2    same type of work.  I don't recall.  I do recall I

3    believe Mr. Sponsler had a report that I reviewed,

4    but I don't recall if I looked at the deposition

5    transcript or not.  If I did, I would tend to cite

6    them in the reports.  I may have; I may not.  I

7    don't have a direct recollection.

8         Q.   Do you have any recollection of

9    reviewing the transcript of the deposition of

10   InterFAX in this case?

11        A.   Not that I recall.

12             MR. KNOWLES:  I'm going to mark the

13   next exhibit, which will be Exhibit 30.

14             Lizzie, if you could put up what we're

15   calling internally as Document E please.  This is

16   the transcript of the deposition of Dr. Louis

17   Scoma, the Plaintiff in this case, taken September

18   10th, 2021.

19             While she puts that up, I'll note I've

20   added some yellow highlighting to a few portions of

21   that.  I'm going to display those to you and I'll

22   have some questions about them.

23             You're free, of course, to review any

24   pages you wish, but my questions will be about the

25   highlighted portions that I'm going to show you in

Page 110

1    just a moment.

2                    (BIGGERSTAFF EXHIBIT 30, September 10,

3    2021, Deposition of Dr. Louis Scoma, was marked for

4    identification.)

5                    MR. KNOWLES:  Can we make that bigger,

6    please, Lizzie, so that it fills the whole screen.

7    Let's make the font as big as we can.  And, Lizzie,

8    if you could scroll to Page 9, please.

9                    Capability to allow your staff to

10   control the scrolling.

11                   (Technical difficulties.)

12                   MR. KNOWLES:  The first yellow

13   highlighted there, if you could read that, sir, and

14   just let us know when you're ready to scroll down

15   and Lizzie will scroll to the next section for you.

16                   THE WITNESS:  Go ahead.  Go ahead.

17   Okay.

18                   MR. KNOWLES:  So for the record, you've

19   reviewed Pages 9, line 4 through Pages 10, line 2.

20                   Lizzie if you could scroll down, now,

21   to Page 80, line 12, please.

22                   THE WITNESS:  Okay.  Go ahead.  Go

23   ahead.  Okay.

24                   MR. KNOWLES:  So we've just reviewed

25   Pages 80, line 12, through Page 82, line 2.  And

Page 111

1    then there's one more starting at Page 89, line 2.

2    Lizzie, if you could scroll down to that, please.

3                THE WITNESS:  Okay, okay.

4    BY MR. KNOWLES:

5        Q.   We've just -- the final portion was

6    lines -- excuse me -- Pages 89, line 2 through 90,

7    line 7.

8                Mr. Biggerstaff, have you ever reviewed

9    or read or seen that testimony before?

10       A.   No.

11       Q.   Has anyone ever described it to you

12   before, or summarized it to you before?

13       A.   No, not that I recall.

14       Q.   Did you find the testimony you just

15   reviewed to be consistent with the InterFAX

16   records?

17       A.   Yes, to the best of my knowledge.

18       Q.   Does the testimony affect in any way

19   your view of the accuracy or reliability of the

20   InterFAX data?

21       A.   Not based on my experience.

22       Q.   Did you find the testimony you reviewed

23   credible, based on your understanding of how faxes

24   work?

25       A.   There's a lot of working parts there.

Page 112

1    I don't know that I could talk about credibility

2    with respect -- I have no experience with the

3    office or other things about the people involved

4    here.  So I don't think I'm in a position to make

5    evaluations of credibility just on a few lines of

6    text.

7         Q.   Do you have any idea where we should

8    look for those three faxes that Dr. Scoma doesn't

9    seem to have copies of?

10        A.   No, I would not.

11        Q.   Do you have any expert opinions in this

12   case as to whether those three faxes were

13   successfully transmitted to him?

14        A.   The three, meaning the three he doesn't

15   recall receiving?

16        Q.   That's right.

17        A.   I would trust the log coming from the

18   fax broadcaster more than I would trust fallible

19   humans.  I've known of many examples in my life of

20   people who unknowingly lost faxes, sometimes

21   valuable faxes.  So I think it can happen.  And

22   humans are fallible.

23        Q.   Your opinions in this case are about

24   whether the faxes were successfully transmitted,

25   not whether they actually made it to people; is

Page 113

1   that fair?

2          A.   No, that's not.  I'm saying they

3   were -- they were successfully and fully received

4   because the receiving machine has to send the

5   message confirmation.  And absent the message

6   confirmation, which is proof of receipt, not just

7   being sent, then the log file would not reflect the

8   transmission as successful.

9          Q.   Your opinions, then, in this case are

10  about whether the fax was successfully received,

11  not whether it actually made it to people; is that

12  right?

13         A.   Received at Point B by the receiving

14  fax machine, not whether it was viewed by the

15  eyeballs of any person in particular.

16         Q.   Or any person at all, correct?

17         A.   Or any person at all, that's correct.

18              MR. KNOWLES:  I think we're done with

19  Exhibit 30.  Thank you, Lizzie.

20  BY MR. KNOWLES:

21         Q.   Mr. Biggerstaff, I have a question for

22  you about what is internal Exhibit 1 to your first

23  report, so that's deposition Exhibit 22.  If you

24  could turn to internal Exhibit 1 of that, please.

25         A.   Okay.

Page 114

1          Q.   Can you tell us what we're looking at

2     here, internal Exhibit 1?

3          A.   Make sure we're on the same page, no

4     pun intended.  Line 1 has a fax number of (201)

5     216-6694?

6          Q.   That's what I'm looking at.  Can you

7     tell us what this is?

8          A.   This is a listing of the 11,193 fax

9     numbers that I extracted and produced from the CSV

10    file that we've been talking about.

11         Q.   Okay.  What were the criteria you used

12    to decide which to extract, if any?

13         A.   I believe those are reported further up

14    in the report.

15         Q.   Do you know what they are?

16         A.   I'm looking for them.  Paragraphs 16

17    and 17, the criteria for the selection was -- is

18    set out in Paragraph 16, and Paragraph 6 -- 17,

19    identifies the number of unique fax numbers.

20         Q.   So I'm looking at internal Exhibit 1,

21    line 1 is a fax number -- I won't read the whole

22    one, the whole number, because of our protective

23    order, but it ends in 6694.  Do you see that line?

24         A.   Yes.

25         Q.   And next to that it says, faxes, four.

Page 115

1    Correct?

2            A.    Right.

3            Q.    Do you know what the content of those

4    four faxes were?

5            A.    No, I do not.

6            Q.    Do you know whether they were

7    advertisements?

8            A.    No, I do not.

9            Q.    Do you know who sent them?

10           A.    No, I do not.

11           Q.    Do you know whether any human being

12   ever saw those faxes?

13           A.    No, I do not.

14           Q.    Do you know the name of the recipient?

15           A.    No, I do not.

16           Q.    Do you know --

17           A.    Well -- okay, name of the recipient is

18   an ambiguous term.  I think you mean -- I interpret

19   that to mean the name of the intended -- the person

20   who was intended to receive the fax, or received

21   the fax.  I do know that some of the additional

22   data that came later, I was able to identify the

23   names associated with the fax numbers; but at the

24   time I wrote this report, I did not have that.

25           Q.    Do you know whether there was an

Page 116

1    existing business relationship between the sender

2    or the recipient?

3           A.   No, I do not.

4           Q.   Do you know if there was permission to

5    send this fax --

6           A.   No, I do not.

7           Q.   -- or these faxes?

8           A.   No, I do not.

9           Q.   Do you know whether an online fax

10   service was used to receive that fax we're looking

11   at on line 1?

12          A.   No.

13          Q.   Do you know if the fax was printed out

14   onto paper?

15          A.   No.

16          Q.   If I were to go through all the tens of

17   thousands of lines in this internal Exhibit 1 and

18   ask you those -- the same series of questions for

19   each, would you have --

20               (Technical difficulties.)

21               THE WITNESS:  I'm sorry, you're frozen.

22   I can't hear you.

23               MR. KNOWLES:  Off the record for just a

24   moment.

25               (Off-the-record discussion.)

Page 117

1    BY MR. KNOWLES:

2           Q.   Mr. Biggerstaff, if I were to go

3    through each of the thousands of lines in internal

4    Exhibit 1 and ask you that same series of

5    questions, would you have essentially the same

6    answers for each?

7           A.   Yes.   I do want -- I just noticed

8    something in the report that I wanted to supplement

9    a previous answer.

10          Q.   Go ahead at this time, please.

11          A.   On Page 7 of my report, in Footnote 1,

12   which is a footnote to Paragraph 16, where I talk

13   about my criteria of being fully received without

14   error, the footnote is through the interfax.net

15   website, where they list their error codes.

16               Seeing the footnote there refreshed my

17   memory that I did look at the InterFAX website.   As

18   I said, anything that I look at specifically for

19   the purposes of that report, I would try to

20   footnote it.

21               I did refer to their website for

22   identifying that -- their status codes of what they

23   meant and that a zero was a successful

24   transmission.

25          Q.   Is there anything else you looked at or

                                              Page 118

1    relied on to figure out what zero means in this

2    context?

3          A.   Not that I recall, other than my

4    experience.

5          Q.   I'm going to transition now to your

6    first supplemental expert report, so if you could

7    go ahead and open that, please.  That would be what

8    we've pre-marked as deposition Exhibit 23.

9          A.   Yes.

10         Q.   Just a moment, sorry.  It's still

11   loading at my end.

12              Okay.  Within Exhibit 23, I have some

13   questions first about Paragraph 2.  Could you

14   scroll to that paragraph, please.

15         A.   Okay.

16         Q.   Paragraph 2 says you were provided

17   additional materials by Mr. Kelly.  What were the

18   additional materials you were provided?

19         A.   Those are listed in Paragraph 5, and

20   that is the data I was provided in DOCX file names,

21   in an Excel spreadsheet, and the name of the

22   spreadsheet.

23         Q.   So, in other words, the additional

24   materials, other than the report of -- well, I

25   guess other than your report -- your first report

1  -- was just one XLSX [sic] file listed in 5b,

2  correct?

3         A.   Correct, and the data in there which

4  identified -- excuse me -- DOCX file names.

5         Q.   Do you know who prepared that XLSX

6  [sic] file?

7         A.   No, I do not.

8         Q.   Do you know what it contained?

9         A.   My recollection is it looked like

10  something produced in terms of a discovery, a table

11  of discovery-produced documents, but I don't know

12  who produced it.

13         Q.   In Paragraph 2 you explain that you

14  were asked to use a computer algorithm to take the

15  document names of the fax templates and match those

16  to the subject identifiers for the fax broadcasts

17  in your previous report, limited to certain dates,

18  which you list in Paragraph 2.  Do you know why you

19  did that?

20         A.   I do not know.  I was just asked to see

21  if I could match any of the document names to the

22  subject lines from the broadcast.

23         Q.   Which computer algorithm did you use?

24         A.   I just simply used a word counting

25  algorithm.  And I explained that down in

Page 120

1    Paragraphs 6 and 7.

2          Q.    Is it an algorithm that you wrote?

3          A.    I didn't invent word matching; it's

4    been around for a long time.  All I did was

5    implement it.

6          Q.    Does the algorithm you used have a

7    name?

8          A.    No, just word matching.

9          Q.    How did you access it?

10         A.    What do you mean access it?  I don't

11   understand that word in this context.

12         Q.    So there's an algorithm, a

13   computer instruction -- a set of computer code,

14   correct?

15         A.    Yes.

16         Q.    Where did that computer code live?

17         A.    Um, it would be in a appli -- it would

18   be in a PRG file.

19         Q.    How did you execute the algorithm?

20         A.    I wrote it.

21         Q.    What's a PRG file?

22         A.    Program file for Visual FoxPro.

23         Q.    Can you say the last word of your

24   answer again, please.

25         A.    Visual FoxPro.

Page 121

1          Q.    Do you still have --

2          A.    It's a Microsoft application.

3          Q.    What did you do to test whether that

4     algorithm is reliable?

5          A.    I manually reviewed all of the results

6     and manually calculated the evaluations.  It was

7     only a small number of records.  And the algorithm

8     matched the manual -- or the output from -- that I

9     produced in my report was a hundred percent

10    accurate based on manually doing the same

11    calculations.

12         Q.    Did you look at the --

13         A.    It's the -- it's the gold standard, is

14    to go back and redo the application -- the

15    algorithm -- manually and compare it to

16    the other -- your first results.

17         Q.    Did you look at the files that were

18    left out of the results to confirm if it was

19    accurate?

20         A.    I did.

21         Q.    There are four dates in 2020 listed in

22    Paragraph 2.

23         A.    Yes.

24         Q.    Do you know why those dates were

25    selected?

Page 122

1         A.    No, I do not.

2         Q.    Who instructed you to use those dates?

3         A.    Mr. Kelly.

4         Q.    In Paragraph 6 of this exhibit, you

5    discuss implementing the computer algorithm to

6    perform this task.  And you said that you "first

7    normalized document names and fax broadcast

8    'subject' names by removing non-alphabet

9    characters," and then you give some other examples.

10              Can you explain what normalizing means

11   in this context?

12        A.    Sure.  I like to use telephone numbers

13   as an example of normalize.  Some people write down

14   telephone numbers with dashes between the area

15   code, the prefix, and the extension, and the last

16   four digits.  Some people use commas.  Some people

17   put parentheses around the area code and use

18   spaces.  There's a whole lot of different formats

19   that can be used for normalizing.

20              And if you go back to my first report,

21   I believe I might have talked about data

22   normalization.  I did, in Paragraph 15.  I'm back

23   to Exhibit 22 to today's deposition, that

24   Paragraph 15 there is a good example of

25   normalization and how it's used.  That way,

Page 123

1  different formats of writing the same piece of

2  information will all be read or interpreted as

3  being the same piece of information and not

4  different telephone numbers.  There have been

5  instances in the past where my examination of

6  numbers differed from examination or the results

7  from another expert, and many times that difference

8  was because of normalization.  They did not

9  normalize the fax numbers, so they had more unique

10  fax numbers than I had.  So I explicitly talk about

11  doing data normalization now to make sure

12  everybody's on the same page.

13          Q.   And in this --

14          A.   Does that --

15          Q.   -- yeah, in this example, in

16  Paragraph 6 of Exhibit 23, you normalize North

17  Carolina to become a single word, all capitals,

18  NORTH_CAROLINA.

19          A.   Correct.

20          Q.   What's the point of doing that?

21          A.   Because North Carolina is an entity.

22  It's not North and Carolina as two separate words

23  that could be -- have another word in between them.

24  It's an entity.  And so an entity should only be

25  matched once in a matching algorithm.

Page 124

1          So I put the underscore in place of the

2     space so that NORTH_CAROLINA would be treated as

3     one singular word and it would be synonymous with

4     the word NC, which is the abbreviation for North

5     Carolina.

6          Q.   What are you trying to accomplish by

7     doing that?

8          A.   Well, because I wanted to identify it

9     as an entity, because that's what it is.  It's a

10    symbol for an entity, North Carolina.  It's not the

11    word north, meaning pointing towards the North

12    Pole, and it's not Carolina like a person's name.

13    It is supposed to be the entity of North Carolina.

14         Q.   In Paragraph 7, you discuss creating

15    aliases for state names and DBA names, correct?

16         A.   Correct.

17         Q.   How did you select the aliases to use

18    for a particular state?

19         A.   Those were the standard state

20    abbreviations for those states.

21         Q.   So, for example, you selected MD as the

22    abbreviation for Maryland, correct?

23         A.   Correct.

24         Q.   Does MD -- is MD ever used as an

25    abbreviation for anything else other than Maryland?

Page 125

1          A.    Certainly.  Medical doctor.

2          Q.    And how do you know that MD in this

3     data set means Maryland and not medical doctor?

4          A.    Well, because the data set is so small,

5     it could be manually examined to see if there were

6     any stop words -- which is what that term would be

7     called -- in the data, and there were not.  This

8     data set was very small.

9          Q.    And this data set included the subject

10    lines of files and faxes sent to medical doctors,

11    correct?

12         A.    Correct.

13         Q.    And you concluded that every time MD

14    appears it means Maryland; is that right?

15         A.    As a standalone term, yes.  My

16    examination of the data didn't indicate that it

17    should have been interpreted otherwise.

18         Q.    Did you look at the list of the

19    document names in deciding which abbreviations to

20    associate with which state names?

21         A.    I don't recall.

22         Q.    If you did, wouldn't that be circular?

23         A.    It might be self-evident, which may

24    imply circular, but it's still a matching

25    algorithm.  It either matches or it doesn't, and

Page 126

1   you can do the work manually to see.

2        Q.   You created an alias for -- this is the

3   bottom line of Paragraph 7 -- for PMC as NSPC.  Can

4   you explain why you did that?

5        A.   Mr. Kelly was the one that pointed out

6   to me that those were DBAs of the same entity.

7        Q.   So, in other words, Mr. Kelly told you

8   to associate every reference of PMC with every

9   reference to NSPC; is that right?

10        A.   Yes.  When I explained to him that I

11   was using aliases for the states, he pointed out to

12   me that the -- those two names of the company were

13   really just the same company; they just used a

14   different name in different places.

15        Q.   If he was wrong about that and they

16   weren't the same company, would that affect the

17   reliability or accuracy of your analysis in any

18   way?

19        A.   I don't think it would affect the

20   reliability.  You can certainly rerun the analysis

21   if that fact that I've relied on is not true.

22        Q.   Would it affect the accuracy of your

23   analysis?

24        A.   Well, the accuracy of the analysis is

25   going to be dependent on the rules that were

Page 127

1    applied, if the rules that were applied were the

2    correct rules.  And if you're telling me that that

3    rule that was applied is an incorrect rule, then

4    the outputs that depend on that rule being true

5    would have to be recalculated.

6         Q.   What does alias mean in this context in

7    which you've used it in Paragraph 7?

8              (Reporter clarification.)

9              THE WITNESS:  Can you restate the

10   question?

11   BY MR. KNOWLES:

12        Q.   Yeah.  The question is, what does alias

13   mean as you've used it in Paragraph 7?

14        A.   I can give you -- it means match these

15   as the same entity.  For example, if you were

16   looking for a court opinion in Westlaw and you're

17   looking for an opinion from New Jersey, you might

18   look for -- if you're doing a text search -- see

19   if -- you want to know if New Jersey is mentioned

20   in this opinion and you do a search, you might

21   search for New Jersey or NJ, meaning both would be

22   considered a match.

23              And that's what the alias is here, that

24   I'm looking for, in the text, a representation of

25   the entity of North Carolina.  And some people

Page 128

1   write the entity name as North Carolina, some write

2   it as NC, and those two would both be considered

3   equivalent.  And that's what the alias means.  It

4   is another way of spelling or writing the same

5   entity.

6        Q.   So is it fair to say that when you used

7   NSPC as an alias for PMC, that you treated the

8   two -- those two abbreviations as interchangeable?

9        A.   Yes.  And it doesn't mean they are

10  actually the same entity; it just means that when

11  one -- either one is mentioned, they should be

12  considered the same for the purposes of this

13  analysis.

14            Now, for the purposes of a bankruptcy

15  or purpose of a, you know, some other -- you know,

16  a phone bill or something, they may not be

17  considered the same.  They may be technically

18  separate corporations or separate LLCs or

19  something.  But for this analysis, I'm considering

20  them the same entity.  And if there is some piece

21  of information I'm missing that invalidates that, I

22  can rerun the analysis.

23       Q.   So if they're different entities, not

24  the same entity, how would your analysis change?

25       A.   I guess I wasn't clear.

Page 129

1              For some purposes, they may be

2    considered or considerable as the same entity,

3    treated as meaning the same entity, even though in

4    another instance, like a bankruptcy, they may

5    technically have a firewall between them and be

6    separate LLCs.  I treated them as equivalent.

7         Q.   Why did you treat them as equivalent?

8         A.   That was when Mr. Kelly said that they

9    were DBAs of the same company.

10        Q.   Paragraph 9b says, "If all of the words

11   in the broadcast subject were found in a single

12   document name, the match was identified as a

13   successful match."

14             Does a successful match mean that the

15   content of those documents and the broadcasts were

16   the same?

17        A.   No.

18        Q.   What does it mean?

19        A.   Well, it means that the algorithm has

20   identified a single matching document and that the

21   name of that document is the -- is the -- excuse

22   me, let me back up.

23             The name of the document, as compared

24   to the name of the subject on the fax broadcast,

25   that that document name is the closest document

Page 130

1    name to the broadcast subject line.

2         Q.   How did you handle it in your analysis

3    when there were multiple names or subject lines

4    that were similar?

5         A.   Let me reread this portion of the

6    report.

7              Okay, can you restate your question.

8         Q.   Sure.

9              My question is, How did you handle it

10   in your analysis when there were multiple names or

11   subject lines that were similar?

12        A.   If -- you had to have one match that

13   was better than all of the others, meaning more

14   words that were in common.

15        Q.   What would happen when there were an

16   equal number of words in common?

17        A.   If there were an equal number of words

18   in common, it would be thrown out because you could

19   not answer with a single match.  It has to be a

20   one-to-one match in order for it to be reported as

21   successful.

22        Q.   Did that happen at all in your

23   analysis?

24        A.   I don't -- I don't recall.

25        Q.   Paragraph 10, you reference a document

Page 131

1   name, "Coronavirus" -- excuse me -- "Coronavirus

2   Response & Telemedicine Fax (NSPC - NC) - March

3   2020 (FINAL).docx."

4          A.   Okay.

5          Q.   Have you ever seen that document

6   before?

7          A.   Not to my knowledge.

8          Q.   Do you have any idea what the content

9   of the document is?

10              (Technical difficulties.)

11              THE COURT REPORTER:  Repeat that.

12   BY MR. KNOWLES:

13          Q.   Do you have any idea what the content

14   of the document is?

15          A.   Not to my knowledge.

16          Q.   Do you know whether that document was

17   sent to Scoma?

18          A.   Not to my knowledge.

19          Q.   There's the broadcast subject in that

20   same paragraph "NSPC Telemedicine -

21   North_Carolina."

22              Do you know what the content of that

23   fax broadcast was?

24          A.   No, I do not.

25          Q.   Does the report tell us anything about

Page 132

1  what the content of the fax broadcast was?

2      A.   Not without additional information of

3  somebody knowing the content of those DOCX

4  documents.

5      Q.   Paragraph 11 references "18 fax

6  broadcasts."

7           What does fax broadcast mean as you

8  used it in this paragraph?

9      A.   That would be a unique subject line in

10  the log files, if I recall correctly.

11      Q.   So how did you -- how did you convert

12  the log file with, you know, 46,000-some rows, into

13  18 fax broadcasts?

14      A.   Well, I think it was actually more than

15  18.  There's only 18 that were matched.

16      Q.   How did you convert the rows of the log

17  file into fax broadcasts at all?

18      A.   The SQL programming language has a

19  function to do that automatically by the group by

20  command, so I totaled the transmissions grouped by

21  the subject line.

22      Q.   So, in other words, you assume that all

23  rows with the same subject line were part of the

24  same fax broadcast; is that right?

25      A.   That's what I believe based on my best

Page 133

1    recollection as I sit here right now.

2         Q.   Did you look at anything else to

3    confirm if rows with the same subject line were, in

4    fact, part of the same fax broadcast?

5         A.   I don't recall as I sit here right now.

6         Q.   If you can scroll down to, again,

7    internal Exhibit 1, this time of what we're calling

8    deposition Exhibit 23, please.

9         A.   Okay.  Which line?  Oh, the internal

10   exhibit, okay.

11        Q.   Yeah, there's a table with 18 rows.  Do

12   you see that table?

13        A.   Yes.

14        Q.   What question is this table answering?

15        A.   This is an exhibit that summarizes the

16   matching that I did.  The subject is the subject

17   line, the matched document is the document that was

18   matched by the algorithm, and the words "matched"

19   is the words that were matched between the subject

20   and the matched document name.

21        Q.   Do you know which, if any, of these fax

22   broadcasts listed here went to Scoma, the Plaintiff

23   in the case?

24        A.   No, that would be easy to determine by

25   looking up in the data if I knew Scoma's fax

Page 134

1   number, but it's not stated in this exhibit.

2        Q.   Am I right that you don't know what the

3   content of any of the documents in the matched

4   document column is, correct?

5        A.   To the best of my knowledge, I have not

6   been provided the content of the documents in the

7   matched document column.

8        Q.   And you don't know the content of any

9   of the faxes listed by fax subject in the subject

10  column, correct?

11       A.   That is correct, I do not know the

12  contents.

13            MR. KNOWLES:  I'm about to turn to the

14  second supplemental report, which is marked --

15  premarked as deposition Exhibit 24.

16            Does anyone need a break before I

17  proceed, or should I keep going here?

18            THE WITNESS:  Yes, please.

19            MR. KNOWLES:  Okay.  Could we take --

20  could we take a five-minute break, please.  We'll

21  come back at 35 past the hour if that works for

22  everyone.  Thank you.  Off the record please.

23            THE VIDEOGRAPHER:  The time on the

24  monitor is 11:29 a.m., and we're going off the

25  record.

Page 135

1              (A brief recess was held.)

2              THE VIDEOGRAPHER:  The time on the

3    monitor is 11:35, and we're back on the record.

4    BY MR. KNOWLES:

5         Q.   Thank you.

6              We're turning now to what we've marked

7    as deposition Exhibit 24, the second supplemental

8    expert report of Robert Biggerstaff.

9              Mr. Biggerstaff, why did you submit a

10   third expert report?

11        A.   Mr. Kelly produced to me some new data

12   files that were -- came from some e-mails

13   apparently that I did not have before.

14        Q.   There's also a discussion in here about

15   something you call a fax topography and some

16   diagrams of that.

17             When did you learn that -- when did you

18   learn that information?

19        A.   That's information I discussed with

20   Mr. Kelly in some other cases and that I have

21   included in some other reports.  And he requested

22   that I talk about fax topologies in this

23   supplemental report.

24        Q.   Why was it not included in the first

25   report?

1          A.   It wasn't part of my assignment.  I was

2     asked to analyze the data in the first report.

3          Q.   In Paragraph 4 you list the materials

4     that you reviewed in the process of producing this

5     report.  Do you see that, Paragraph 4?

6          A.   Yes.

7          Q.   You indicate that you reviewed the

8     expert rebuttal report of Ken Sponsler, correct?

9          A.   Yes.

10          Q.   You reviewed your own expert report,

11     correct?

12          A.   Yes.

13          Q.   You reviewed an XLSX file with the

14     Bates number PMC_TCPA_000700.  What -- what was

15     that file?

16          A.   I refer to that as a table of contacts.

17     It was what I'm generically referring to as name

18     and address files with information about entities,

19     including their names, addresses, fax numbers,

20     phone numbers, et cetera.

21          Q.   Did you do anything to verify the

22     accuracy of that underlying data?

23          A.   No, I accepted it as it was.  I

24     reported on its contents, not its accuracy.

25          Q.   And then you list in Subparagraph (d)

Page 137

1    of Paragraph 4, 34 e-mail files in MSG format.  Can

2    you tell us what those documents were?

3            A.    Those are e-mails.

4            Q.    What do they contain?

5            A.    E-mails.  Each one is a separate e-mail

6    with attachments.

7            Q.    How were they selected?

8            A.    I did not select them.  Those are all

9    the ones that I was sent.

10           Q.    Do you know what the -- did they all --

11   strike that.  Did they all have attachments?

12           A.    Yes, I believe so.

13           Q.    What were the attachments?

14           A.    They appear to be fax log files.

15           Q.    In Paragraph 6 -- if you could scroll

16   down to Paragraph 6, please, on Page 5.

17           A.    Yes.

18           Q.    In middle of that paragraph you say,

19   "However, the actual fax log data is certainly not

20   kept in a CSV file by InterFAX."

21               How do you know that to be true?

22           A.    Fax broadcasters like InterFAX send

23   millions of faxes and receive them.  It is

24   inconceivable that -- and actually impossible from

25   a processing standpoint -- that with all of the

                                                    Page 138

1    options out there in terms of SQL and other types

2    of databases, that they would keep their data in

3    what's called a flat CSV file.  That just doesn't

4    make -- that makes no operational sense.  That's

5    what databases are made for; that's what they are

6    good at; that's what businesses function on, is

7    databases.

8              Q.   And a CSV file is different from a

9    database, correct?

10             A.   A CSV file is different than a

11   database.  You can export information out of a

12   database into an Excel file, or into a CSV file or

13   into a text file, but that's not where you maintain

14   and keep the original of the data.  That's going to

15   be kept in a database.

16             Q.   Do you know which database InterFAX

17   used?

18             A.   No, and it doesn't matter.  It's just a

19   database --

20             Q.   Why doesn't it matter?

21             A.   Because databases are built on

22   standards, ANSI standards.  They have ANSI standard

23   command sets.  They support structured query

24   language known as SQL.  And they are very good at

25   what they do in terms of managing data.

Page 139

1        Q.    Are all databases equally robust and
2    reliable?
3        A.    No.   There are some that are obviously
4    better than others.   Some have features that others
5    don't have.   But the core functions are going to be
6    the same against -- across all platforms.
7        Q.    Do you know if InterFAX used one of
8    those better databases or didn't use one of the
9    better databases?
10       A.    I don't know which databases they used.
11       Q.    Do you know how InterFAX exported the
12   data from its database into the CSV file?
13       A.    Not specifically, no.   Just I would say
14   that they exported data from a larger database set
15   out into what was ultimately packaged in a CSV
16   file.
17       Q.    Do you know who did that?
18       A.    No.   It may have been --
19       Q.    Do you have --
20       A.    -- any one person.
21       Q.    Do you have any way to tell --
22             (Technical difficulties.)
23       Q.    -- accurately?
24       A.    I'm sorry, you broke up.
25       Q.    Do you have any way to tell whether or

Page 140

1    not that process was performed accurately?

2          A.    No.

3          Q.    Do you have any way to tell whether

4    there were any errors induced in the CSV file

5    through that process?

6          A.    No.

7          Q.    You write, "Almost certainly, it is

8    natively stored in a database such as an SQL

9    server."

10               What's an SQL server?

11         A.    SQL stands for structured query

12   language.  It's the ANSI standard for database

13   access in programming.  There are many different

14   SQL servers out there.  A popular one is MySQL.

15   Another one is Microsoft SQL, and then there are

16   others, Oracle, et cetera.

17         Q.    In Paragraph 7 you state that, "It is

18   common for people extracting data out of a database

19   (such as was apparently done here by InterFAX) to

20   export that data out to a CSV format file for

21   convenience."

22               Whose convenience are you referencing

23   there?

24         A.    The people exporting the data.

25         Q.    Changing it over into a new format

Page 141

1    makes their job easier, in other words?

2          A.   It makes their job easier, and it is a

3    format that is commonly accessible by lots of other

4    programs on the receiving side.  So a lot of people

5    would use Excel, and if it's a properly formatted

6    CSV file, you can open it in Excel and use it.

7          Q.   Do you have the capability of analyzing

8    files that were natively stored in a database like

9    an SQL server?

10         A.   I don't understand your question.  I

11   can analyze data that's been extracted out of an

12   SQL server as long as it's extracted properly.

13         Q.   If you were provided access to the

14   native database that InterFAX uses, would you have

15   the ability to analyze that file without it being

16   extracted?

17         A.   Databases are not set up like that.

18   They're not designed where you can just copy a

19   file.  Data may reside in multiple files in a

20   database.  You have -- a table may be split in

21   multiple locations.  You may have replication, you

22   may have encryption.  There may be other things

23   going on.  That is not the way I would want to or

24   go about examining data in a database.  I would run

25   an SQL command to extract the data and store the

Page 142

1   data into a new file.

2        Q.   Would it be more or reliable -- I'm

3   sorry, go ahead.

4        A.   I was going to say, in some instances,

5   in simple databases, depending on the vendor, you

6   can go in, if there's no encryption, and it's a

7   simple database schema, and copy individual files

8   out.  I have done that on occasion with MySQL

9   databases, simple ones.  But that's not the best

10  way to extract the data of -- out of a -- because

11  you'll get -- you'll get data for -- it doesn't

12  know what time period or whose -- what client's

13  records, because you should be only extracting to

14  give to me records of the specific broadcasts or

15  specific client's activity, not your entire

16  clients' activity -- of all -- the entire activity

17  of all your clients, which is what you might get if

18  I go in there copying raw files.

19       Q.   In conducting the sort of analysis you

20  did in this case, do you prefer to do the

21  extraction from the database yourself or have

22  someone else do that for you?

23       A.   No.  It's much preferable to have

24  somebody experienced with the schema of the

25  database to run the SQL query and extract the data.

Page 143

1          Q.    I have a question for you about

2    Paragraph 11, which is on Page 6.  If you could

3    just let me know when you're there, please.

4          A.    Okay.

5          Q.    Paragraph 11 references "The CSID

6    string from the receiving fax machine."

7                How would you explain to a layperson

8    what a CSID string is?

9          A.    Okay.  Do you remember VCRs that if you

10   didn't set the time, they just blinked twelve

11   o'clock, midnight, forever?

12         Q.    Sure.

13         A.    Okay.  A fax machine has something

14   similar called your CSID string.  That's a series

15   of 20 characters, that, if you don't put anything

16   in, it will just be blank.

17               But it's used so that you can identify

18   yourself on your faxes, such as the name of your

19   firm, your fax number, or some other piece of

20   information.  You program that into your fax

21   machine and then it appears in the header of your

22   outgoing faxes, usually.  It'll also be sent to the

23   fax machine on the other side.  So you might have

24   looked at your own fax machine while it's sending a

25   fax, and it will say "connected to" and it might

Page 144

1   say, you know, Joe's Pet -- Joe's Pet Store,

2   because that's who you're sending a fax to.  And it

3   got that information by the exchange of the CSID

4   string coming back.

5           So it's a -- it's a 20-character piece

6   of information, per the ITU standard, that allows

7   the receiving machine to identify itself to the

8   sending machine with some alphanumeric 20-character

9   string.

10      Q.   And that data is transmitted from the

11  receiving machine to the sending machine, correct?

12      A.   That's right.  The CSID stands for call

13  station identification.

14      Q.   And if the operator of the receiving

15  machine has not sent a CSID in at all, no CSID is

16  transmitted; is that right?

17      A.   No, 20 characters of blanks will be

18  transmitted.  20 characters is always transmitted,

19  but it's -- a default value is just 20 blank

20  characters.

21      Q.   Is the default value 20 blank

22  characters on all fax machines?

23      A.   No.  There are probably some that might

24  have something put there by a manufacturer, like

25  HP, or, you know, might -- they might use for

Page 145

1    advertising, who knows, but it's not mandatory that
2    it be blank, it's just mandatory that it be there
3    and accessible.  The SEC regulations require that
4    the date and the time and the sending fax machine
5    be identified on the first page of a fax or on a
6    header at the top or bottom of the page of each
7    page of the fax.  And so it's there in all fax
8    machines in order to comply with FCC regulations.
9              MR. KNOWLES:  Could we open Exhibit 29
10   again, please.  This is the InterFAX data that we
11   marked earlier.  I'll have Lizzie display it, but
12   Mr. Biggerstaff, if you want to just open it at
13   your end, that's fine as well.
14              THE WITNESS:  I don't have 29.
15              MR. KNOWLES:  Okay.  Lizzie, can you
16   explain it on the screen, please, in text editor
17   format.
18              THE WITNESS:  Okay.
19   BY MR. KNOWLES:
20        Q.   So when I look at the CSID fields in
21   this data, some are blank, the first one has the
22   term "fax," some appear to have the same fax number
23   as the -- as the receiving number.
24              When does that last scenario happen,
25   i.e., the CSID is the same as the destination fax.

Page 146

1           A.    That's common.  Most people just

2     program their own fax machine number -- their own

3     fax number into the header of their fax -- outgoing

4     faxes -- and that's how they do it, by putting it

5     in the CSID field.

6           Q.    In the ninth row, which is the eighth

7     row of data, the CSID is InterFAX.

8                 Do you see that?

9           A.    I do.

10          Q.    Do you know what that means?

11          A.    No, I don't.  I could speculate that it

12    is a test number that might have been put in by

13    InterFAX, but I don't know.

14          Q.    When you say a test number put in by

15    InterFAX, what does that mean?

16          A.    Some broadcasters will have one of the

17    faxes -- add their own number to an outgoing fax

18    list in some instances in order to review the fax

19    to see if it's going through okay, to see if they

20    got it, to see that the job is running.

21          Q.    So in other words, that would be a fax

22    that was not transmitted by the user, but it was

23    transmitted by the online fax service, correct?

24          A.    No.  What I'm saying is it could be

25    that InterFAX added its own fax number to the list

Page 147

1   of 10,000-and-some-odd numbers, just as a -- in

2   order to get confirmation that this job went out.

3           Or it could be somebody else that uses

4   InterFAX and InterFAX just happens to be the

5   default CSID string of a -- of a business that's

6   also using InterFAX.  Again, I'm just speculating

7   here.

8       Q.   So I can represent that InterFAX

9   appears as a remote CSID 135 times in these data.

10          Do you draw any conclusions from that,

11  assuming of course, the representation is true?

12      A.   Yes.  Like I said, it could be that

13  these people are also using InterFAX and that

14  happened to be the default CSID string from

15  something using InterFAX that doesn't change it.

16  InterFAX is using it as a sly way of a little bit

17  of advertising.

18      Q.   When InterFAX sends or transmits a fax

19  from a -- obviously an InterFAX sender to a

20  recipient who also uses InterFAX, do you know

21  whether the fax is transmitted in a different way

22  than a fax to a non InterFAX recipient?

23      A.   No.  But I'm looking at -- now that

24  you've told me there's more than one and I've

25  looked at them, it seems that the duration is

                                        Page 148

1    consistent with an actual fax transmission and not

2    some type of shortcut.

3          Q.    What does that tell you?

4          A.    That it's doing the simplest thing.

5    It's just dialing the fax numbers and sending the

6    faxes the same, even if the number happens to be an

7    InterFAX fax number.

8          Q.    When an InterFAX sender sends to an

9    InterFAX recipient, are there two telephone fax

10   machines involved, or just one?

11         A.    It appears from this data that it would

12   be two, the sender -- that you still have a sending

13   fax machine and a receiving fax machine.

14         Q.    In Paragraph 12, you indicate that

15   "some fax numbers were too long for the exported

16   column," so they're represented in scientific

17   notation.  How did you handle those instances?

18         A.    As I said in my report, those were

19   ignored.

20         Q.    So, in other words, did you treat them

21   as a success, a failure, or neither?

22         A.    Oh, they are failed, failures.  The

23   only thing I counted in my prior report in the

24   exhibit were successful, ones that were guaranteed

25   successful by -- or -- and confirmed successful,

Page 149

1    rather.

2         Q.   In Paragraph 15, you indicate that data

3    you receive, particularly data produced in response

4    to a subpoena or discovery, "is often compiled from

5    multiple sources, or collected and compiled at

6    different times by different people," and that a

7    number of times you have received data aggregated

8    together in a single file.

9              Do you know if that happened here with

10   respect to InterFAX data?

11        A.   It appears that that might have

12   happened here, yes, because some of the rows had

13   data in slightly different formats, which would be

14   consistent of either different people doing some of

15   the work and it finally being compiled together in

16   one file, or one person doing the work -- some of

17   the work at one point in time and some of it at a

18   different point in time and then compiling it

19   together into one file.

20        Q.   Got it.

21             You -- in this report you describe how

22   you analyzed 34 fax logs and identified 58,505

23   total records.  That's on Paragraph 19.

24             How, if at all, does this analysis

25   differ from the one you did in your first report?

1      A.   Well, it differs from the fact that the

2  files I had were discrete files for individual

3  broadcasts that were in a format that was

4  dispositively parsable, meaning there was no

5  ambiguity that was introduced by having extra

6  commas or extra columns or changing formats.

7           Everything was all consistent and

8  parsable without error, or without any ambiguity,

9  without any fax numbers, for example, that were too

10  long and got converted to scientific notation.

11      Q.   And in the later analysis, you got a

12  different answer as to the total number of faxes,

13  correct?

14      A.   That's correct.

15      Q.   Do you have any opinions as to which

16  analysis is more accurate?

17      A.   Definitely the second one.

18      Q.   Why?

19      A.   Well, I identified problems with the

20  export and handling of the data in the earlier data

21  set, and the latter data set had none of those

22  issues.  That makes it more reliable and more

23  accurate.  I didn't have to ignore any lines; I did

24  not have to try to interpret any lines.  Everything

25  was in a dispositively parsable -- 100 percent

Page 151

1    parsable format -- rather than a CSV file.

2          Q.   Does that suggest any problems with the

3    CSV file that we've marked as Exhibit 29?

4          A.   I already identified the issues in my

5    report with the CSV file, but those are issues I

6    see regularly in my work because we're often asking

7    people to do something that's an ad hoc process.  I

8    mean, a fax broadcaster, other than -- you know, is

9    being asked to supply, via subpoena response, data

10   that's in their system, but it's not something they

11   regularly go and pull up, so they have to do it on

12   an ad hoc basis, whereas the fax logs that were

13   attached to the e-mails were created regularly as

14   part of their regular business dealings with their

15   clients.  The client sent a broadcast; we sent a

16   copy of the log of the broadcast to the client

17   automatically at the time it was done.  And it's --

18   on top of everything else, it's sent in a parsable

19   format that is unmistakable when you parse it back

20   into columns into a database.

21         Q.   In Paragraph 19 you explain that, with

22   respect to data from April 1 through June 10th of

23   2020, the combined logs had 58,505 total records.

24              Do you see that?

25         A.   Yes.

1          Q.   Are those 58,505 total records all

2    unique from each other?

3          A.   All what from each other?

4          Q.   All unique from each other?

5          A.   Were they totally unique records?  Yes,

6    I believe so.

7          Q.   Did you do anything to de-duplicate or

8    make sure all the records were unique?

9          A.   I don't recall if I did or not.  It's a

10   fairly simple command in an SQL to select only the

11   unique records.

12         Q.   And you found that of those 58,505,

13   35,518 were documented as successful transmissions.

14              How did you determine which were

15   successful transmissions in the context of this

16   analysis?

17         A.   I believe that was the same criteria as

18   I used in the prior report, and that is the status

19   of zero and, um, a -- one or more successful pages.

20         Q.   This is a much lower success rate now,

21   about 71.4 percent, than you set out in your

22   original report.  Why is that?

23         A.   Well, as I hypothesized, that they may

24   have been producing only successful transmissions

25   the first time, or principally successful

Page 153

1    transmissions.  This time it was clear, because of

2    many different status codes showed up, meaning many

3    different types of errors occurred, that these

4    records were containing both the successful

5    transmissions as well as the failed transmissions.

6         Q.   In Paragraph 16 you reference 16,227

7    unique transmissions that were referenced in the 18

8    fax logs.  Those are different numbers from your

9    second report.  Why were the numbers different from

10   this time?

11        A.   As I said, in the first and second

12   report, I was relying on data that was from the CSV

13   file, and the CSV had some formatting issues that

14   were not completely overcomable, whereas this third

15   report uses the pristine transmission logs from the

16   e-mails, which are a much more reliable source.

17        Q.   Do the figures in Paragraph 21

18   represent your final answer as to the successful

19   transmission numbers?

20        A.   To the best of my knowledge, yes.

21        Q.   Let's turn to the next section of this

22   report, which begins on Paragraph 22.  It says, "As

23   a threshold matter, there is a common

24   misunderstanding about the nature of fax

25   transmissions that implies faxes can be received

Page 154

1    via email.  This is factually incorrect."

2          Do you see that paragraph?

3          A.    Yes.

4          Q.    Have you read the FCC's ruling in the

5    AmeriFactors case?

6          A.    I believe I have, yes.

7          Q.    Did you conclude that the FCC shared

8    that common misunderstanding that you explain in

9    Paragraph 22?

10         A.    I don't recall.

11         Q.    Where the FCC discusses faxes received

12   by e-mail, what do you make of that?

13         A.    That they are lay people talking about

14   the concept of receiving an e-mail with the fax as

15   an attachment.

16         Q.    Do you think the -- go ahead.

17         A.    That's why --

18         Q.    Go ahead.

19         A.    That's why I say it's a common

20   misperception.  A lot of people talk about

21   receiving an e-mail -- or receiving a fax via

22   e-mail or reading a fax -- receiving a fax on a

23   smartphone, when those are just manifestly

24   impossible.  Only an e-mail can be sent via e-mail.

25   You can send attachments, but those are also

Page 155

1    attachments that comply with e-mail standards, not

2    other standards.  You can't send or receive a fax

3    with an e-mail.  You can only send a picture or an

4    image of a fax via e-mail.  But people talk to it

5    as, you know, e-faxes or they just use the

6    shorthand from their lay perspective.  Even

7    WestFax, who filed a declaratory action with the

8    FCC, they were starting their business where they

9    were providing an online fax service where you

10   could sign up and once eFax received faxes on your

11   behalf, they would then e-mail them to you.  And

12   they were concerned that their subsequent e-mails

13   to their own clients might violate the TCPA, and

14   that's the context of the declaratory action that

15   they sought before the FCC.  And that's the way

16   they, as a fax broadcaster, was looking at it.

17   They wanted to make sure that their subsequent

18   e-mail was not running afoul of the TCPA.

19        Q.   Do you think the FCC's ruling in

20   AmeriFactors is based on a misunderstanding of the

21   technology involved in faxing?

22        A.   Yes, I do.

23        Q.   Can you explain why?

24        A.   They made a incorrect statement of fact

25   on which they say they relied, and that is that fax

Page 156

1    servers can't print.  I searched diligently in all

2    of the filings to the best of my ability.  I could

3    not find any statement by any filing that supported

4    the FCC's conclusion that fax servers can't print.

5    On the contrary, my filing explained very clearly

6    that they can print.

7              And, secondly, the FCC's AmeriFactors

8    ruling is manifestly at odds with earlier rulings

9    about PCs with fax modems and fax servers, that

10   they are covered by the TCPA's provisions.

11             So it appears to me, giving the most

12   generous reading I can to the FCC's position, is

13   they reached a incorrect and unsupported factual

14   determination on fax servers and printing and

15   failed to account for their prior orders that were

16   on point.

17        Q.   In Paragraph 22 [sic] you state "Faxes

18   are not 'received' by email.  Reading an email on a

19   computer screen or a smartphone does not mean you

20   'received' a 'fax' on a computer or a smartphone."

21             Did I read those two sentences

22   correctly?

23        A.   Yes.

24        Q.   Is that your conclusion to a reasonable

25   degree of scientific certainty?

Page 157

1          A.    Absolutely.

2          Q.    With respect to the 135 entries in

3    Exhibit 29 of people who have a remote CSID of

4    InterFAX, did those people receive a fax?

5          A.    Yes, they did.  They have employed an

6    agent, which is InterFAX, to provide them a fax

7    number and equipment for their use to receive faxes

8    at that fax number.  And as their agent, InterFAX

9    then receives the faxes on their behalf and then

10   processes them as according to the instructions

11   from their customer, to either e-mail them or store

12   them for retrieval over the internet, or do both,

13   or send them to multiple destinations, or whatever

14   options InterFAX provides.

15         Q.    So with respect to those 135 instances

16   where the remote CSID is InterFAX, does InterFAX

17   receive the fax, or does the recipient receive the

18   fax?

19         A.    InterFAX's fax machine receives the fax

20   on behalf of their client.  They provide some

21   dedicated resources, i.e., the telephone number,

22   and the servicing of that telephone number for

23   incoming and outgoing calls, but principally the

24   incoming, but they provide that as a service to

25   their clients, and those are dedicated to their

Page 158

1   clients.

2        Q.   And your conclusion that the client

3   received the fax in that scenario is based on the

4   fact that there's an agency relationship?  Is that

5   right?

6        A.   They're acting as an agent.  I'm not

7   saying there is or is not an agency relationship.

8   That's a legal question.  But they are being

9   employed as an agent to receive their faxes for

10  them.  And the agent is providing dedicated

11  resources, i.e., the telephone circuit, the

12  telephone number, to that client.

13       Q.   The -- in Paragraph 25, you discuss

14  that the fax transmission and then the e-mail of

15  the contents of that fax transmission are separate

16  events that could occur within just minutes of each

17  other or many days or weeks later.

18            Do you see that?

19       A.   Yes.

20       Q.   And who is the e-mail transmission sent

21  to in this scenario that you're describing in

22  Paragraph 25?

23       A.   Whoever -- or whatever e-mail address

24  the client provides to InterFAX to direct that

25  e-mail to -- or to the fax -- the person or entity

Page 159

1    operating the fax server that received the fax

2    transmission.

3         Q.   Is the analysis -- well, let me ask

4    this question:  Is it possible to have that e-mail

5    copy sent to multiple recipients?

6         A.   To multiple e-mail destinations, yes.

7         Q.   Is it possible for the end user of the

8    InterFAX service to review the fax transmission on

9    InterFAX's website without any e-mail being sent at

10   all?

11        A.   Most likely, yes.

12        Q.   Do you know of any online fax services

13   that provide the capability I just described?

14        A.   Yes, that's not an uncommon capability.

15        Q.   And is it possible for multiple people

16   to log on and look at the faxes in that so-called

17   portal?

18        A.   Yes.

19        Q.   Do you have any expert opinions as to

20   which of those things is a violation of the TCPA?

21        A.   I'm not being offered as a legal

22   expert.  I have an opinion I'll be happy to give to

23   you, but it's not my opinion as a legal expert.

24        Q.   Are you offering any opinions on that

25   question in this case?

Page 160

1          A.    If you ask for them, I will offer them,
2     but I'm not intending to, absent you asking.
3          Q.    You state in Paragraph 26 that "There
4     are only three devices that can receive a fax
5     transmission."
6               Do you see that, (a), (b), and (c)?
7          A.    Yes.
8          Q.    Are there certain required elements or
9     characteristics that make something one of these
10    three things?
11         A.    Yes, the ability to send or receive a
12    fax transmission according to fax standards.
13         Q.    Does the capacity to print factor in at
14    all?
15         A.    If we're talking about the TCPA, yes.
16         Q.    Is it -- is it possible for something
17    to be a fax machine, as you use that term, without
18    it being a fax -- telephone facsimile machine for
19    the purposes of the TCPA?
20         A.    Not that I can think of.  Can we have a
21    30-second break?
22              MR. KNOWLES:  Sure, yep, we'll go off
23    the record and off video, please.
24              THE VIDEOGRAPHER:  The time on the
25    monitor is 12:09 p.m., and we're going off the

Page 161

1    record.

2                    (A brief recess was held.)

3                    THE VIDEOGRAPHER:  The time on the

4    monitor is 12:11 p.m., and we're back on the

5    record.

6    BY MR. KNOWLES:

7        Q.   Mr. Biggerstaff, can you scroll down to

8    Paragraph 32 on Page 11, please.

9        A.   Paragraph 32?

10       Q.   Paragraph 32 on Page 11.

11       A.   Okay.

12       Q.   Paragraph 32 states, "It is important

13   to understand that a user can neither send nor

14   receive a fax with an email.  A user can receive an

15   email that has an image file attached to it and

16   that image can be an image of a previously-received

17   fax document -- just like you can receive a FedEx

18   envelope with a printout of a previously-received

19   fax document in that envelope.  But as I explained

20   earlier, you no more 'received a fax' via email

21   than you 'received a fax' via the FedEx envelope."

22                    Did I read those sentences correctly?

23       A.   Correct.

24       Q.   And do you agree that someone who

25   receives an e-mail with an image of a fax attached

Page 162

1    to it did not receive a fax, correct?

2          A.   That's correct.  They received an

3    e-mail.

4          Q.   If you can scroll down to Paragraph 34,

5    please.  It's -- it runs from Page 11 over on to

6    Page 12.  And I actually have a question about

7    Subparagraph (f), which is on Page 12.  Just let me

8    know when you're there.

9          A.   Okay.

10         Q.   In Paragraph (f) you write that,

11   "Number 6 illustrates an office with its own

12   computer that has one or more fax modems installed

13   (a/k/a local fax server) which can print the" fax

14   documents "or distribute it via email or file

15   sharing."

16              Have you ever used the kind of setup

17   that you describe there?

18         A.   Yes, I have.

19         Q.   Do you know how common that kind of set

20   up is?

21         A.   No, I don't.

22         Q.   Have you ever interacted with or worked

23   with a fax user who has that kind of setup?

24         A.   I have.

25         Q.   Approximately how many times?

Page 163

1          A.   I can't say how many times, but I can

2     say I've had clients or employers at various times

3     that employ fax servers.  In some cases I have been

4     asked to evaluate different fax servers on the

5     market for a client or employer and provide reports

6     as to what I recommended that they use.

7          Q.   Is the -- configuration that you

8     describe in Subparagraph F of Paragraph 35.

9               (Technical difficulties.)

10              (Off-the-record discussion regarding

11     technology.)

12              MR. KNOWLES:  Off the record.  Can you

13     hear me now?  Okay.  Back on.

14     BY MR. KNOWLES:

15          Q.   The setup described in Subparagraph

16     (f), does that setup have any kind of benefits or

17     advantages that you know of?

18          A.   Well, all different setups have

19     benefits, positives and negatives.  The positive is

20     you have complete control over the system.  The

21     negatives, you have complete responsibility for the

22     system with anything that goes wrong.

23          Q.   Do you know what the advantages of this

24     setup described in Subparagraph (f) are, if any?

25          A.   I just mentioned one of the benefits

Page 164

1    and one of the negatives.  Other benefits, you have

2    security since it's on your premises.

3           Q.   Are there any others?

4           A.   That's all I can think of off the top

5    of my head.  I mean, the fact that you get to use

6    the fax server is the main benefit, being able to

7    send faxes from your desktop, receive faxes via

8    e-mail or via file sharing, being able to broadcast

9    faxes to a list of destinations very easily, those

10   are all benefits.

11          Q.   Can you scroll down to Paragraph 38,

12   please.  It's on Page 12.

13          A.   Yes.

14          Q.   Paragraph 38 states that a standalone

15   desktop fax machine obviously has the capacity to

16   print.  Why is that obviously true?

17          A.   Well, the typical desktop fax machine

18   doesn't have ports to connect to a separate

19   pointer.  I mean, many do, but most do not.  And

20   since it doesn't have -- and most desktop fax

21   machines are purpose built to be fairly

22   inexpensive, so an expensive screen would be

23   counterproductive.  And the concept of a standalone

24   desktop fax machine is it is an all-in-one device,

25   so the printer is integrated into it.

Page 165

1          Q.   And in that integrated device, the

2     ribbon cable is usually several inches long,

3     correct?

4          A.   That's correct.

5          Q.   And you note in this paragraph that

6     when a computer receives faxes, like a desktop

7     computer with a fax modem or fax server, that cable

8     may be longer so that they're on the other side of

9     the room or down the hall, correct?

10         A.   It could be just a few inches or it

11    could be a few hundred meters.

12         Q.   And you write in the last sentence of

13    Paragraph 38 that you see "no distinction in the

14    length of the cable," correct?

15         A.   I did.  That's correct.

16         Q.   Does it make any difference if there's

17    any connection or any cable at all?

18         A.   No, as long as you have the capacity to

19    do it.  I mean, it has a port where you can plug in

20    a cable.  The cable doesn't have to actually be

21    connected.  Remember, the statute doesn't say that,

22    you know, a fax machine, you know, has the present

23    ability to print.  It's the capacity to print.  And

24    I talked about earlier what if it's out of paper,

25    it has no capacity to print?  If it's just simply

Page 166

1    out of paper, no, that would be silly.  No capacity

2    to print if the printer is moved across -- you

3    know, is connected to it by an external cable

4    versus an internal cable.  It makes no sense.

5         Q.   So when you use the word capacity in

6    your expert report, you include the potential

7    capacity of the different kind of devices attached;

8    is that right?

9         A.   Well, I look at the term equipment in

10   the definition.  Equipment is plural -- or -- well,

11   technically, equipment for grammarians is -- it's

12   an uncountable noun.  You can't say I have three

13   equipments.  That doesn't work.  It's an

14   uncountable noun.  So it applies to a collection.

15   I have camping equipment, which includes a sleeping

16   bag, a frame, a backpack, a canteen, et cetera.

17        So when the statute is talking about

18   equipment, it's talking about a collection of

19   equipment which is necessary to the task, and I

20   include that equipment to be any printers and

21   cables and ports that are present and are usable

22   for doing those jobs, just the same as I include

23   paper even though the paper may not physically be

24   there.

25        Q.   So I want to be clear as to the answer

1  to my question, though, which is when you say

2  capacity, do you include potential capacity?

3       A.   No, I don't need to -- I don't need a

4  modifier of potential.  That is capacity that it

5  has, by virtue of having those connections.  And

6  you have to realize, too, when you are talking

7  about a working fax server, it has the capacity to

8  print because, by definition, it is presently

9  connected to what's necessary to print, which is

10  the internet.

11       Q.   Is it your opinion that every computer

12  hooked to the internet has the capacity to print?

13       A.   No.  Every fax server is, though.

14       Q.   Are there any computers connected to

15  the internet that don't have the capacity to print?

16       A.   Yes.  You can have some special-purpose

17  devices that are unable to send an e-mail or unable

18  to provide file sharing or unable to provide a copy

19  command to an IP address.  Those are special, you

20  know, internet-of-things things, you know, for

21  example, devices that have some internet

22  connectivity built in, but it's been stripped down.

23  But fax servers, by definition, have to be able to

24  send e-mails and have to have internet access so

25  people can access the files.  Fax servers are based

Page 168

1  on well-known operating systems like Windows and

2  Linux.  And those have the innate capability to

3  send e-mails, to copy files, to open ports as part

4  of their operations.  So just like every PC can't

5  send a fax, but every PC with a working fax modem

6  can send a fax.  And just the same way, every fax

7  server can print.  They have the capacity to print

8  if they're working, if they're a working fax

9  server.  If they're not working, they don't.  Now,

10  if the printer that they're using is out of paper,

11  do they not have capacity to print?  That doesn't

12  make sense to construe it that way.

13       Q.   Do you use a smartphone, an iPhone or

14  Android smartphone?

15       A.   I do on occasion.

16       Q.   Is it an Android or an iPhone?  What

17  kind is it?

18       A.   I have both.

19       Q.   With respect to your iPhone, does your

20  iPhone with the capacity to print?

21       A.   It does.

22       Q.   And how would you print from your

23  iPhone?

24       A.   Well, I have a printing application on

25  there for printing.  I can send e-mails to an HP

1  printer.  I can open a command prompt.  And I can

2  copy a PDF file to a printer's IP address and print

3  it that way.

4       Q.   If you were -- you know, if you stand

5  in a Faraday cage or you stand somewhere with no

6  cell phone reception, does your iPhone still have

7  the capacity to print?

8       A.   The capacity to print, yes, because

9  you're blocking the signal.  That's the same as,

10  you know, just unplugging the cable temporarily.

11  It still has the capacity to print even if you're

12  blocking it with a Faraday cage.

13       Q.   Or if you're --

14       A.   But I'll also mention that if you're

15  blocking it with a Faraday cage, I can't receive

16  e-mails.  And I've talked about a fax server as

17  being a working fax server, which includes the

18  ability to be sending e-mails.  Because you can

19  print via -- by sending an e-mail.

20       Q.   And if you're in the mountains where

21  your phone has no reception, does your phone still

22  have the capacity to print?

23       A.   It does, and it still has the capacity

24  to receive e-mail.  If -- you know, I'm just away

25  from the tower.  I just need to get closer.

Page 170

1          Q.    Within Exhibit 24, your second
2    supplemental expert report, can you scroll down to
3    internal Exhibit 2, which starts on Page 17,
4    please.
5          A.    Okay.
6          Q.    Can you tell us what Exhibit 2 is,
7    please.
8          A.    I matched the fax numbers, the 8,147
9    unique fax numbers I talked about in my report, and
10   I matched the fax numbers to the other document
11   that I described in this report in Paragraph 4c,
12   what I talked about or described as a table of
13   contacts.  And then I produced the name and address
14   information out of the table of contacts with the
15   corresponding fax number.
16         Q.    Were there any instances where more
17   than one name or contact information was associated
18   with a single fax number?
19         A.    I don't recall.  I do recall that there
20   was no fax number that was not associated with a
21   name.
22         Q.    How would you have handled it if
23   there's a situation where there were multiple names
24   or addresses for one fax number?
25         A.    They would have both been listed based

Page 171

1    on the -- if I recall correctly -- the commands

2    that I used to produce the list.

3         Q.   Let me direct you to the first entry on

4    that list.  It's a phone number or fax number

5    ending in 0740 and the name and address for someone

6    in Washington, D.C.  Do you see that?

7         A.   Yes.

8         Q.   You wrote earlier that there are three

9    types of fax technology used to send and receive

10   faxes.  There's a traditional standalone fax, a fax

11   server, and a computer with one or more modems.

12             With respect to the person in that

13   first line, do you know which of those three kinds

14   of technology that person used to receive the faxes

15   in question?

16        A.   I do not.

17        Q.   Would you have any way to find out or

18   is there anything you -- strike that.  Is there

19   anything you could do to find out?

20        A.   Yes.

21        Q.   What's that?

22        A.   Well, you -- there's a process that you

23   can go through involving subpoenas where you find

24   out who the carrier for that 0740 number is and you

25   ask that carrier who their client is, or who the

Page 172

1  holder of the phone number is, and you can ask the

2  carrier if they provided that customer with fax

3  services at the time in question.  And if they did

4  not, you look at the identity of the customer to

5  see if they are a fax broadcasting-associated

6  entity.  And if neither of those are true, then you

7  have a situation where that person is the holder of

8  the number, they're not a faxing company, and they

9  would have received it on their own faxing

10  equipment.

11       Q.   So my question is, is there -- what

12  would you do to tell which of those three types of

13  fax technology the person used?  How would that

14  process answer that question?

15       A.   So you're saying, yes, the person in

16  Washington, D.C., could have used a desktop fax

17  machine or a local fax server on their own

18  premises.  I cannot distinguish between those.

19       Q.   Right.

20       A.   And a fax -- a fax modem is a fax

21  server.  Although I do list three, I list the

22  three, because that's what three -- that's the

23  three people generally talk about.  The second and

24  third are really the same thing.  A fax server is

25  just a PC with a fax modem in it.  You just -- it's

Page 173

1   typically a question of scale.  The fax server will

2   have more modems and more capability than a PC with

3   a fax modem, but at the basic core functionality,

4   they're both the same.

5          Q.   So you listed a -- or you described,

6   rather -- a process involving sending subpoenas and

7   looking at the results and comparing names to fax

8   broadcasters.

9               How would that process tell us whether

10  this person -- initials SS, the first row -- used a

11  traditional standalone fax machine, a fax server,

12  or a computer with one or more modems?

13         A.   Well, a computer with one or more

14  modems is essentially the same as a fax server, but

15  we'll go ahead and keep it separate for this

16  discussion.  The process that I described would

17  give you a positive confirmation if they were using

18  an online fax service, because the online fax

19  service would be the holder of the phone number.

20              If it's not held by an online fax

21  service and it's ringing to the clients, or to this

22  person's line in Washington, D.C., you don't know

23  which of those three he was using -- or she -- was

24  using in their actual office where the phone number

25  rang to.

Page 174

1        Q.   Would the process you described be able
2   to tell whether this user had forwarded his or her
3   number to an online fax server to answer for him?
4        A.   No, but I'm not a -- I'm not aware of
5   anybody doing something like that.  That seems kind
6   of silly.  You'd be paying money for a phone line
7   you're not using, you'd be introducing delays and
8   an extra pop, which would affect your reliability.
9   I guess it's possible, but I'm not aware of anybody
10  ever having done something like that.
11       Q.   So my question, though, is different,
12  and it's not as to whether or not someone's done
13  something like that, but whether the process you
14  described would be able to tell if the user
15  forwarded his or her number to an online fax
16  server.
17       A.   It would not.
18       Q.   Would -- would the -- go ahead.
19       A.   It would not.  I would go with the
20  standard of very few people know how to forward,
21  and it would be detrimental to the process and be
22  unnecessarily expensive, but somebody could do
23  that; that's correct.
24       Q.   Are you familiar with the porting of
25  telephone numbers?

Page 175

1           A.    I am.

2           Q.    How does porting of telephone numbers

3     work?

4           A.    You identify the phone number that you

5     want and you tell the carrier that you're going to

6     port it to them, and they do the necessary work

7     behind the scenes to change the national routing

8     database so that that number is now in their stable

9     of numbers rather than the old carrier's stable of

10    numbers.  You're basically moving the number from

11    one carrier to another.

12          Q.    And when you say a carrier, a carrier

13    is different from an online fax service, correct?

14          A.    Some online fax services have -- are

15    their own carriers.

16          Q.    And what would the subscriber

17    information for those ones show?

18          A.    That would show the online fax service.

19          Q.    Is that something you've tested or

20    confirmed yourself?

21          A.    I've seen it in the subpoena results,

22    yes.

23          Q.    If someone has an established fax

24    number on their business card or their letterhead

25    and they want to start using an online fax service

Page 176

1    to receive those faxes for them, how would they go

2    about getting that number associated with the

3    online fax service?

4         A.    They report it to the online fax

5    service.

6         Q.    Who would -- after they did so, who

7    would be the subscriber for the number?

8         A.    Well, in that case, the fax service

9    would generally be the subscriber, and then they

10   have an agreement with the subscriber themselves,

11   and -- because they're providing it as part of the

12   service to the subscriber or their customer.

13        Q.    Who is billed for the number in that

14   scenario?

15        A.    The fax service.

16        Q.    I think we're done with Exhibit 24, so

17   we can close that one, please.

18              Other than what we've discussed so far

19   and the sources of information listed in your three

20   expert reports, are there any other sources of

21   information or factual inputs of any kind that you

22   consulted or relied on in reaching your opinions in

23   this case?

24        A.    Not that I recall.

25        Q.    Did you make any assumptions in

Page 177

1    reaching any of the opinions you reached in this

2    case?

3          A.    Not that I recall.

4          Q.    Did anyone ever ask you to make an

5    assumption that you rejected or refused to make in

6    this case?

7          A.    Not that I recall.

8          MR. KNOWLES:  I'm going to pull up the

9    next exhibit, which will be Exhibit 31.  It's

10   internal Document I, if you can display that,

11   please, Lizzie, and then we'll mark that as

12   Exhibit 31.

13          (BIGGERSTAFF EXHIBIT 31, September 1,

14   2017 Reply of Robert Biggerstaff to AmeriFactors,

15   was marked for identification.)

16          MR. KNOWLES:  Exhibit 31 is a copy of

17   the petition submitted in the AmeriFactors matter

18   pending before the FCC entitled "Reply Comments of

19   Robert Biggerstaff."

20          I've added yellow highlighting to this

21   document in a few portions that we'll discuss in a

22   moment.

23   BY MR. KNOWLES:

24          Q.    But, Mr. Biggerstaff, have you ever

25   seen this before?

Page 178

1          A.   Yes.

2          Q.   Did you write it?

3          A.   I did.

4          Q.   Why did you write it?

5          A.   The same reason if I was witness to a

6    traffic accident, I would wait around and give the

7    police the information I had that might be helpful

8    to them.  I have provided comments in this matter

9    to the FCC because I wanted them to have the

10   perspective of my expertise in the field.

11         Q.   How much time, approximately, did it

12   take you to prepare and submit this?

13         A.   Um, probably a couple of hours.

14         Q.   Did anyone assist you in the process of

15   preparing and submitting it?

16         A.   No, no one.

17         Q.   Did anyone other than you pay for any

18   costs incurred in preparing or submitting it?

19         A.   No.

20         Q.   Have you reviewed this document

21   recently?

22         A.   No, I haven't seen it for years.

23         Q.   Well, my next question is whether this

24   document reflects your views as they exist today.

25              But before I ask, I will give you an

Page 179

1   opportunity to flip through it to the extent

2   necessary.

3        A.   Well, I would have to sit down and

4   reread it carefully if you want a carefully

5   considered answer; otherwise, we can just go

6   through it and I can tell you what I see.

7        Q.   Do you have any reason to believe that

8   your views or opinions about the subject matter

9   changed from the time that you wrote this document?

10       A.   I don't know.  I don't recall with

11  specificity other than a couple of the points that

12  I made in this document.

13            MR. KNOWLES:  Could we scroll down to

14  Page 2 in the first highlighted portion please, the

15  first highlighted sentence on page 2.  Perfect.

16  BY MR. KNOWLES:

17       Q.   The first highlighted sentence says,

18  "In actuality, the Commission's WestFax Order is

19  not flawed in its description of e-faxes, but is

20  perfectly correct in this context."

21            When you refer to the "Commission's

22  WestFax Order," what is that?

23       A.   That's an order that arose out of a

24  petition brought by WestFax -- I discussed it a

25  little earlier in the deposition -- where WestFax

Page 180

1    was offering what they termed e-faxes, and that is

2    they would receive a fax transmission on their

3    clients' behalf and then repackage that payload as

4    an e-mail attachment and send it to their client.

5    And they wanted to make sure that they were not

6    running afoul of the TCPA by sending that e-mail to

7    their clients.

8         Q.   Is there anything in the WestFax order

9    that you disagree with or that you think is

10   incorrect?

11        A.   Other than its existence and its

12   context and the fact that, you know, they relied on

13   WestFax for the definition of an e-fax, a term of

14   art used in that petition, I don't really recall a

15   lot else about it with specificity.

16             MR. KNOWLES:  Could we scroll down to

17   Page 5, please, the highlighted sentence on that

18   page.

19   BY MR. KNOWLES:

20        Q.   That highlighted sentence says, "The

21   gateway operated by the fax service provider is

22   analogous to the person you ask to forward your

23   faxes in a Federal Express envelope."

24             Do you see that sentence?

25        A.   Yes.

Page 181

1          Q.   When you talk about a gateway operated

2     by a fax service provider, is the fax service

3     provider and an online fax service or online fax

4     provider, are those all the same things in the way

5     you use them or are they different?

6          A.   Yes, they're all the same.  An online

7     fax provider and online fax service, those are

8     equivalent terms.

9          Q.   And what is the gateway that you're

10    referencing in this context in the highlighted

11    sentence?

12         A.   That's your fax server that sends you

13    the e-mail after it receives the fax transmission.

14         Q.   And is -- I assume that's just one

15    example of a gateway, gateways could operate in

16    other ways too; is that right?

17         A.   Yes, you can have a gateway that

18    provides -- excuse me -- provides file server

19    access where you can dial into a portal.  You can

20    have a gateway to another fax machine.  You know,

21    you can have a fax come into your online fax

22    service, and, for some reason, you might have said,

23    hey, all of my incoming faxes, I'm going to be

24    somewhere where I don't have internet, so I can't

25    get e-mail, but I do have a fax machine and a

Page 182

1    phone, so I want you to re-fax them back out to

2    this other fax number.  That would be another type

3    of gateway, gateway to an external fax machine.

4         Q.   And your submission to the FCC that

5    we've marked as Exhibit 31 suggests that what

6    happens to the fax transmission contents after the

7    fax -- i.e., an e-mail, a FedEx, hand delivery --

8    makes no difference as to whether it's a fax or

9    not; is that right?

10        A.   It makes no difference to the

11   transmission from Point A to Point B.  That's

12   already occurred.  It's over.  It's final.  It's

13   terminated.  Some time has passed.  Nothing can

14   undo what was done in the trip from A to B.  The

15   trip from B to C doesn't modify what happened in

16   the trip from A to B.  That's what I'm saying.

17        Q.   Does it make any difference as to

18   whether there's been a violation of the TCPA as you

19   understand it?

20        A.   No, it doesn't.  If a violation

21   occurred, it occurred between Points A and B.  What

22   was done with it after it left Point B or after it

23   was received at Point B doesn't undo what happened

24   between Points A and B.

25        Q.   Does it make any difference as to who

Page 183

1    gets to sue under the TCPA?

2         A.    It might make a difference if somebody

3    has assigned rights one way or the other, but

4    somebody certainly has the -- you might have a

5    joinder issue, but somebody has the ability to sue

6    for the TCPA violation.

7         Q.    And is that somebody the online fax

8    service or the recipient via e-mail?

9         A.    To me, it would be the recipient,

10   because they have been given, you know, exclusive

11   access to a resource -- and, that is, the telephone

12   number -- by the online fax service.  That would --

13        Q.    Who's the --

14        A.    -- be who I would expect to have it,

15   but there could be alternatives to that.

16        Q.    The subscriber to the number is the

17   online fax service in this scenario, correct?

18        A.    Yes, and then they turn around and

19   provide exclusive access to it to their customer.

20        Q.    And you referenced before the concept

21   of an agency relationship between the online fax

22   service recipient and the customer who gets the

23   e-mail, whether that's portal or e-mail.

24              Sorry, strike the question.  I used the

25   wrong word.

Page 184

1          You referenced before the concept of an

2    agency relationship between the online fax service

3    and the recipient and--

4          A.    Yes, I did.

5          Q.    -- on the one hand, and the customer

6    who gets the fax contents, regardless how they get

7    it, FedEx, e-mail, portal, whatever.

8          Is that something you know is true or

9    is that something that you think might be true?

10          A.    Well, as I cautioned when you asked --

11    we talked about that earlier -- I'm not in a

12    position to give a legal opinion on the existence

13    or nonexistence of a legal agency relationship

14    under the restatement of agency, or -- or anything

15    else.  I'm saying the concept, to me, is the

16    equivalent of appointing somebody in your office as

17    an agent, to use that term, since it's one most

18    people understand, to do something on your behalf,

19    and then they do it on your behalf.

20          Now, regardless of questions about

21    right to control, ability to control, those legal

22    questions, I'm saying, to me, it's an agent that I

23    or anyone in that position has selected to do

24    something on my behalf.

25          And that, to me, is maybe agency with a

Page 185

1    little A, not a capital A, because capital A is a

2    legal question, and I'm not here to answer those.

3        Q.   And is the existence -- or potential

4    existence -- of that agency relationship between

5    the user of the online fax service and the online

6    fax service itself, whether it's little A or big A,

7    is that part of your expert opinions in this case?

8        A.   Well, yes, because you've asked them --

9    asked me about them in this case.  Everything that

10   you've asked me about and I've given you my answer

11   to is either a fact or an opinion that I've given

12   in this case.

13       Q.   Is that opinion about an agency

14   relationship based on any particular facts that you

15   can identify, f-a-c-t-s?

16       A.   Well, again, you're looking at a

17   capital A legal opinion or my layperson's, you

18   know, opinion of, you know, retaining an agent to

19   do something on my behalf?  I know that there --

20   you know, when you have a unique fax number that

21   people use to send you faxes via an online fax

22   service, that is a dedicated resource.  I know that

23   they have to expand their resources and plan their

24   resources with enough capacity for their clients,

25   and their resources are limited.  They don't have

Page 186

1    an unlimited number of phone lines for their

2    rollovers in case of busy signals.  So, you know,

3    those are some of the facts that I think deserve

4    consideration, but I'm not saying that from a

5    standpoint of big A legal opinion about an agency

6    relationship under the restatement --

7            Q.    And you --

8            A.    -- or under federal case law.

9            THE COURT REPORTER:  I didn't hear

10   that.  Hold on.  I didn't hear that last sentence.

11   You said, "under the re"?

12           THE WITNESS:  Or under federal common

13   law.

14           MR. KNOWLES:  I think he said

15   "restatement" too, though.  I'm not sure if you

16   captured that word.

17           THE COURT REPORTER:  Right, that was

18   what I had the question.  Thank you.

19   BY MR. KNOWLES:

20           Q.    You referenced in your last answer

21   something called a rollover for busy signals.  Can

22   you explain what that is, please.

23           A.    You know, just like in any office where

24   you have a PBX, if your main receptionist line is

25   busy, it can roll over to somebody else so that

Page 187

1   under certain conditions the people dialing in

2   won't get a busy signal.

3           Q.   And is that rollover capacity something

4   that online fax servers have, to your knowledge?

5           A.   Yes, some of the fax server operators

6   offer that so that they have a reduced likelihood

7   of getting busy signals.

8           Q.   And does that make it possible for two

9   senders to send a fax to the same online fax

10  service number at the same or approximately the

11  same time?

12          A.   Yes, it does.

13          Q.   Have you ever used an online fax

14  service?

15          A.   I have.

16          MR. KNOWLES:   We can close this exhibit

17  too.  We're finished with this exhibit, thank you.

18  BY MR. KNOWLES:

19          Q.   Is it something you have done recently?

20          A.   No, not for several years.

21          Q.   How many times have you used an online

22  fax service, approximately?

23          A.   You mean how many times have I sent a

24  fax using an online fax service, or received one?

25          Q.   Yeah, well, it's a bad question.  Let

Page 188

1    me start, though, with your question.

2              How many times have you sent or

3    received a fax using an online fax service?

4         A.   Oh, probably in the nature of 100 or

5    200 times.

6         Q.   How many times have you signed up for

7    or subscribed to an online fax service?

8         A.   Probably no more than twice.

9         Q.   And why did you do that each time?

10        A.   I was doing it for testing purposes.

11        Q.   Do you communicate with people in your

12   business using fax other than for testing purposes?

13   Excuse me.

14        A.   I do occasionally.

15        Q.   What are the reasons that you would do

16   that?

17        A.   When specifically requested to.

18        Q.   Do online fax services offer any

19   advantages over conventional fax machines?

20        A.   I think they do offer plusses and

21   minuses, yes.

22        Q.   What would the plusses be?

23        A.   Well, you don't have to worry about

24   some of the things involved with having a local fax

25   machine, the maintenance of it, to buy supplies for

Page 189

1    it.  You don't have to keep a phone line for it.
2    You don't have to worry about if it's working or if
3    the power goes out, things like that.
4         Q.   What are the minuses?
5         A.   Well, the minuses are, if it goes down,
6    you go down.  Depending on what their offerings
7    are, you may have some privacy issues.  They can
8    become expensive, depending on which plans you
9    have, which ones you're using.  It could be less
10   expensive to just keep a local fax machine.
11        Q.   Do you know how common or how prevalent
12   online fax services are?
13        A.   Not currently.  There were some people
14   who kind of tracked market share and distribution
15   of the market back in the past, like Gardner, but I
16   haven't seen anything from them recently.
17        Q.   What's the most recent estimate of the
18   prevalence of online fax services that you've seen?
19        A.   I think I saw a number in the
20   neighborhood of saying about 12 million fax numbers
21   in use in the United States by fax servers, but
22   that's just not all the online ones.  That's all
23   the companies that have their own internal ones
24   too.
25        Q.   And do you know approximately how many

Page 190

1    fax numbers there are in total in the United

2    States?

3           A.   I did have that number in the past

4    because I have cited to it.  I just don't recall

5    what it is off the top of my head.

6           Q.   So what I'm trying to figure out is

7    your best estimate of the prevalence as a

8    percentage in the U.S. of online fax services

9    versus all the other ways you can get faxes.

10          A.   It tends to be -- if you look at

11   telephone carriers and how many subscribers a

12   particular carrier has, if you look at it and you

13   do AT&T, Verizon, MCI, WilTel, and if you do the

14   top 10 and you get 90-something percent of all the

15   people in the country, because there's a number of

16   big players that have the majority -- have a large

17   portion of the phone numbers.  I think the same is

18   true with fax broadcast -- excuse me -- with the

19   online fax services, that you have the large ones,

20   like eFax, and if you go through the top 10 or 20

21   and how many phone lines do they have, you'd have a

22   good number -- a good range on what to expect

23   nationwide, or the total of phone lines in use by

24   online fax services nationwide.

25          Q.   And have you --

1          A.    And then you compare that to -- I think

2     we're something around 900 million total telephone

3     numbers in use.

4          Q.    Have you ever offered an expert opinion

5     about what percentage of the fax numbers in the

6     U.S. are online fax numbers?

7          A.    I might have in the past.  I know I

8     have looked at numbers like that.  I just don't

9     recall if I actually cited to them in a report or

10    not.

11         Q.    What's your best understanding or your

12    best approximation of about what that percentage is

13    today?

14         A.    And the percentage being what?

15         Q.    The percentage of, in the space of

16    total fax numbers, how many are online fax

17    services?

18         A.    I would imagine it to be very small,

19    less than 10 percent.

20         Q.    Is the use of those services increasing

21    or decreasing over time or is it staying the same?

22         A.    Use of online fax services -- I don't

23    know.  I think it has increased at times, but as

24    more companies bring stuff in-house, it might be

25    decreasing.  I don't have a good -- a good basis to

Page 192

1    say one way or the other.

2         Q.   Do you have an opinion as to whether

3    the use of faxing technology at all is increasing

4    or decreasing in the U.S.?

5         A.   I know integrated messaging, which

6    includes, in part, faxing, is increasing.  So a lot

7    of people are being put on systems that have faxing

8    capability.  So from that standpoint, the number of

9    people on such systems is increasing.  But I can

10   say with experience, for example, when I was at

11   Westvaco and we put in fax server technology, that

12   was thousands and tens of thousands of people that

13   had access to it, but almost nobody used it.  So

14   with that caveat, I think the numbers of people who

15   have it available and through integrated messaging

16   may be increasing, but I'm not sure that the number

17   of actual users of it is increasing.

18        Q.   Do you have any opinions as to whether

19   the total number of faxes sent in the U.S. each

20   year is increasing or decreasing?

21        A.   Oh, I think it's increasing.

22        Q.   One of the questions that the fact

23   finder in our case will have to address is the

24   cost, the harm, and the damages from receiving an

25   unwanted fax advertisement.

Page 193

1           Do you have any opinions in this case
2    about that topic?
3           A.   Yes, I have opinions.  That's not
4    opinions I've been asked to render.
5           Q.   Have you submitted -- or are you
6    submitting -- any opinions in this case about the
7    cost, the harm, the damages from an unwanted fax
8    advertisement?
9           A.   Not unless somebody asks me about them.
10          Q.   Well, let me ask you about them.
11          With respect to a conventional fax
12   machine, what are the costs, harms, and damages
13   associated with receiving an unwanted fax
14   advertisement?
15          A.   Well, I think most of them are common,
16   depending -- regardless of which way you're looking
17   at it.  You have the opportunity costs of the
18   intrusion and dealing with the incoming stuff.
19          There's, like I said, chances of things
20   being lost or thrown away because you're throwing
21   away a junk fax, not realizing that there's
22   something you wanted stuck underneath.  I know of
23   an example of that happening.
24          With something that automatically
25   prints, you obviously are spending a couple of

Page 194

1    cents on paper and toner for the automatic
2    printing.
3              If you are using something, you know,
4    like a smartphone to read your e-faxes that come in
5    your e-mail, that takes data from your plan.
6    That's also more -- even more interruptive
7    sometimes to get the e-mail and it's just, you
8    know, basically another spam e-mail coming in.
9         Q.   Are the costs of receiving an unwanted
10   fax advertisement on an online fax service any
11   different than receiving an unsolicited e-mail?
12        A.   Oh, yes.
13        Q.   How would they be different?
14        A.   Well, faxes take up a great deal more
15   space than a spam e-mail.  And just, again, if
16   you're reading on a cell phone plan, you're eating
17   up data.  If you are looking at a mailbox with
18   limited storage, you're eating up that storage.
19   And then the fax server has to handle all of that
20   storage and extra unwanted transmission itself
21   also, and then you pay for that through the -- what
22   you pay to your fax -- your fax service provider --
23   because they have to expand their capacity to
24   handle the spam, just like an e-mail provider has
25   to expand their capacity to handle spam e-mail.

Page 195

1   You -- the client ends up paying for that in one

2   way or another.

3        Q.   Are those costs different depending on

4   whether or not the user actually receives an

5   unwanted fax message?

6        A.   They can be, yes.

7        Q.   How would they be different?

8        A.   Well, if you never get the e-mail, then

9   you don't have the costs associated with receiving

10   the e-mail.

11        Q.   Is there any other way they'd be

12   different?

13        A.   Not that I can think of right off the

14   top of my head.

15             MR. KNOWLES:  We're going to mark the

16   next exhibit.  Lizzie, if we can have internal

17   Document B, please -- B as in boy -- marked, and

18   this will be Exhibit 32 for the deposition.

19             (BIGGERSTAFF EXHIBIT 32, November 21,

20   2019, Opinion in Physicians Healthsource, Inc., v.

21   Masimo Corporation, et al., was marked for

22   identification.)

23             MR. KNOWLES:  And if we could just zoom

24   that to make the font a little bit bigger, that

25   would be great.

Page 196

1           Thank you.

2           So we're going to mark as Exhibit 32 an

3     opinion from the case Physicians Healthsource,

4     Incorporated, versus Masimo Corporation, et al.,

5     and it was an opinion filed November 21st of 2019

6     from the United States District Court in the

7     Central District of California.

8     BY MR. KNOWLES:

9           Q.   Mr. Biggerstaff -- and you can

10    certainly scroll around the document if you need

11    to -- have you ever seen this opinion before?

12          A.   Not that I recall.

13          Q.   Is this a case in which you offer

14    expert testimony?

15          A.   I may have.  I recognize Physicians

16    Healthsource.

17               MR. KNOWLES:  Can we scroll down,

18    please, to the first paragraph on Page 11.

19               THE WITNESS:  While you get there, can

20    I have 30 seconds, please?

21               MR. KNOWLES:  Sure.

22               (A brief recess was taken.)

23               THE WITNESS:  Thank you.

24               MR. KNOWLES:  Back on the record,

25    please.

Page 197

1           THE VIDEOGRAPHER:  The time on the

2    monitor is one o'clock p.m., and we're back on the

3    record.

4    BY MR. KNOWLES:

5           Q.   The last sentence of that first

6    paragraph on Page 11 states, "Thus, the Court finds

7    that Plaintiffs have failed to meet their burden of

8    proving that Biggerstaff's testimony is reliable,

9    both as to Biggerstaff's methods and as to whether

10   the testimony has a reliable basis in the knowledge

11   and experience of the discipline."

12           The next sentence then says,

13   "Accordingly, the Court grants Masimos's Motion to

14   exclude Mr. Biggerstaff's opinion for the purposes

15   of class certification and precludes Biggerstaff

16   from offering testimony on summary judgment or at

17   trial."

18           Is there any reason that your analysis

19   in this case is more reliable than your analysis in

20   the Physicians Healthsource case?

21           A.   Yes.

22           Q.   Why is that?

23           A.   In that case there was a specific

24   analysis that they're talking about, was when I was

25   using the best -- the best attempt I could at

Page 198

1    inferring a successful or a failed transmission

2    based solely on the duration of transmission.  And

3    that's because fax transmissions tend to have a

4    particularly shaped graph when you graph the

5    transmission times.  And calls that fall in a

6    certain range of times are very likely to be failed

7    transmissions, and the ones that fall within

8    another tighter series of -- or tighter range of

9    durations -- are very likely to be successful.  But

10   that's an inference.

11            Although it's a correct inference and I

12   believe supported, the Court believed in that case

13   that, you know, there was no -- that it was, like I

14   said, an inference and not a mathematical

15   calculation.

16        Q.   Is there anything you've done to

17   improve your methods or make them more robust after

18   this decision?

19        A.   No, because -- I thought about doing

20   that, but it's so rare that you have transmission

21   records that show a duration of a fax, but you

22   don't also have a column that tells you it was

23   successful or not.

24            And this -- this was a very peculiar

25   case where we had a duration of the transmission

Page 199

1   but no indication of whether there was the gold

2   standard, and that is the response from the

3   receiving machine recorded in the log as a positive

4   confirmation.

5               That's just such a rare situation to

6   have the transmission time but no indication of

7   success or failure, I didn't consider it worth time

8   to try to shore it up any further than I had.

9               MR. KNOWLES:  I think we're done with

10  this exhibit.  Lizzie, can you put up Document C,

11  which we'll mark as the next deposition exhibit,

12  which I believe is Exhibit 33.

13              While she's doing that, can I just ask

14  the reporter to confirm I'm correct that the next

15  exhibit is 33, please?

16              THE COURT REPORTER:  That's correct.

17              (BIGGERSTAFF EXHIBIT 33, February 9,

18  2018, Opinion in Community Vocational Schools of

19  Pittsburgh, Inc., v. Mildon Bus Lines, Inc., was

20  marked for identification.)

21              MR. KNOWLES:  We have what we're

22  marking as Exhibit 33.  This is an opinion from the

23  case Community Vocational Schools of Pittsburgh,

24  Incorporated, versus Mildon Bus Lines,

25  Incorporated.  It's an opinion signed February 9th

Page 200

1    of 2018 from the United States District Court for

2    the Western District of Pennsylvania.

3    BY MR. KNOWLES:

4         Q.   And, Mr. Biggerstaff, this is another

5    case where you offered an opinion, correct?

6         A.   I vaguely remember the names, but I

7    believe I do remember them, I just don't remember

8    what my opinions were in this case.

9         Q.   Okay.  Is there anything that you've

10   done to improve your methods or the reliability of

11   your methods since the time you did your work on

12   this case?

13        A.   I don't recall what work I did in that

14   case, so I can't answer that question.

15             MR. KNOWLES:  Can we scroll down to the

16   section that discusses Mr. Biggerstaff's work,

17   please.  I can give you a page number if you'll

18   give me just a moment.  It begins on Page 11 and

19   continues below that, bottom of Page 11.

20             THE WITNESS:  Can you scroll back up,

21   please.

22             Okay.  Go ahead and scroll down.  Okay.

23   BY MR. KNOWLES:

24        Q.   Does that refresh your recollection as

25   to the subject matter of your opinion in this case?

Page 201

1          A.   Yes, this was the Verdana font problem.

2          Q.   What does that mean?

3          A.   When you print a document -- or let me

4     back up.  When you create a document in Microsoft

5     Word, you can change the font of things in your

6     document.  You're familiar with that?

7          Q.   Go ahead.

8          A.   And the list of fonts that you have

9     available to you is based on the fonts that are

10    installed in your PC you're actually working on.

11    And you could have some fonts on your machine that

12    I don't have on my machine.  And if you sent me

13    that document, the original document, not a picture

14    of the document, not a fax, but the actual Word

15    document to me, I pull it up on my system and you

16    have used a font that I don't have, my system will

17    attempt to substitute the closest font that I have

18    on my system to the one that you used.  But it has

19    no way to choose a font that looks the same.  It

20    goes alphabetically and tries to find the next one

21    alphabetically, and that font may look radically

22    different than the font that you were using on your

23    system.  Does that make sense so far?

24         Q.   It does.  Continue, please.

25         A.   Thank you.

Page 202

1             Now let's say you had installed a font

2     called Verdant and the system that I'm going to

3     print it on does not have Verdant but the closest

4     one after the letter V on my system is called

5     Windings, that's W-I-N-D-I-G [sic].  And the

6     Wingding font is a bunch of symbols and pictures

7     and icons, smiley faces, things like that.

8             And I then printed your document on my

9     system, I would just see a bunch of gobbledygook.

10    I would not see the English text that you typed

11    because the letter A would always be translated

12    into a particular smiley face character, but I

13    don't know that that's a letter A or a letter B or

14    what.

15            When B2B -- business-to-business --

16    Solutions, which was a broadcast fax company in New

17    York, and they were partially -- they had some of

18    their operations back in Romania, including the

19    girl who designed the faxes for their clients.  And

20    at one point in time, she used the Verdana font,

21    and she used it to design the fax for Mildon Bus

22    Lines.  Because one of the services that B2B did

23    was not just broadcasting, but they would design

24    the fax for you.

25            And B2B, using the girl -- I forget her

Page 203

1    name -- in Romania, she created the fax, and then

2    it was sent via e-mail, and then they started

3    broadcasting the fax, but they also sent one of the

4    faxes to themselves and it was messed up.

5              There was some of the text that had

6    been translated into all of this gobbledygook that

7    you couldn't read.  And so they stopped the fax

8    broadcast, based on the records on the hard drive,

9    and they tried to re-send it, and they sent it just

10   to themselves.  And it was still messed up.  So

11   they went back and forth and back and forth for a

12   while.  And they had several iterations of the fax

13   until they finally got it working correctly, and

14   then they went on with it.  But there was -- it was

15   unclear from records on the B2B hard drive as in to

16   which version of the fax, whether it was one that

17   was readable or not readable, went out to the rest

18   of the fax transmission list.  And that's what

19   they're talking about here, there was uncertainty

20   about what was actually sent in the broadcast,

21   whether it was a fax that was readable or a fax

22   that was unreadable.

23             And the testimony of the operator was

24   that she believes that -- one thing -- and I looked

25   for evidence to back that up and I didn't find that

Page 204

1    evidence on the hard drive, but I couldn't prove it

2    one way or the other.  I just gave my opinion of

3    what I found.  And that's my recollection of the

4    Mildon fax case, which I referred to as the Verdana

5    font case.

6           Q.   And what the Court said in this case

7    was, "Mere speculation is not evidence," closed

8    quote.  That's from the top of paragraph -- the

9    first paragraph on Page 12.

10               Is there any reason your analysis and

11   techniques in the present case were more robust

12   than the ones in this Community Vocational Schools

13   case?

14          A.   There's no speculation here.  There's

15   no alternative evidence showing that the fax did

16   not go out or the fax was unreadable when it went

17   out.

18          Q.   Have you made any changes to your

19   methods since the time of the Community Vocational

20   Schools case?

21          A.   Well, the methods I used in that case

22   applied only to that case.  They're not the same

23   methods applicable here.  The fax server that was

24   in use by B2B had certain scripts and so on that

25   were customized for that system, and I was using

Page 205

1    the language of those customized scripts on that

2    system to identify the files that were in use at

3    the time of the transmissions.

4          Q.    Other than what we've just discussed,

5    have your expert opinions been rejected, stricken,

6    or excluded by a court?

7          A.    Yes, there's another case I'm aware of.

8          Q.    Which case is that?

9          A.    That was -- I don't remember the name

10   of the case -- I would have to find it if it's

11   important -- but it was a case -- I think it was in

12   either Mississippi or Alabama -- where I gave an

13   opinion about a robocall case, and the judge struck

14   the -- struck my report from being used in the

15   first summary judgment -- I think it was summary

16   judgment hearing -- because my client, the attorney

17   who retained me, did not provide a proper Rule 23

18   notice to the other side.  But my report -- so it

19   was not timely.  But for the further proceedings

20   later in the case, he did correct his Rule 23 or

21   26, whatever, disclosures, and my report and

22   testimony was allowed for the later parts of the

23   case.

24         Q.    You testified earlier that you had at

25   times been the plaintiffs in TCPA lawsuits

Page 206

1    yourself.  What's the -- what's the total amount

2    you have recovered personally as a plaintiff in

3    TCPA lawsuits?

4         A.   I have no idea.

5         Q.   Do you have records that would indicate

6    that figure?

7         A.   None whatsoever.  That -- that was a

8    very long time ago, and even to the degree there

9    was recovery, it was probably rarely in excess of

10   the resources that I had to expend to bring the

11   cases.

12        Q.   Have you ever been a lead plaintiff or

13   a class action plaintiff in a case?

14        A.   Yes, I have.

15        Q.   How many times have you done that?

16        A.   Twice.

17        Q.   Were those both TCPA cases?

18        A.   Yes, they were.

19        Q.   What were the outcomes of those two

20   cases?

21        A.   The classes were certified and settled.

22        Q.   Did you receive a bounty or an award of

23   some kind for your role as the lead plaintiff?

24        A.   I don't believe so.

25        Q.   Did you receive damages in any of those

Page 207

1    cases?

2           A.    To my best recollection, I got the same

3    thing all the other class members got.  One case

4    had an alternative of a cash or a coupon

5    settlement.  The other one was a cash settlement.

6           Q.    In what forums -- what jurisdictions

7    were those cases filed?

8           A.    State of South Carolina.

9           Q.    And approximately when were those cases

10   resolved?

11          A.    More than 20 years ago.

12          Q.    Who was your lawyer in those cases?

13          A.    Lee Cope, C-O-P-E, and I don't remember

14   the other attorney's name.

15          Q.    Have you ever had an attorney/client

16   relationship with the Anderson and Wanca firm that

17   hired you as an expert in this case?

18          A.    No, I don't believe so.

19          Q.    In other words, you've never hired them

20   as your attorney, correct?

21          A.    No.  They have, on occasion, filed

22   subpoena responses in my name, or for me, but that

23   just was so that they could file something when I

24   was out of town or I didn't have the resources to

25   do it at that time.

Page 208

1          Q.   Did they charge you for that service?

2          A.   No, and they weren't my counsel.  They

3    filed them with my permission, not as my counsel.

4               MR. KNOWLES:  We'll mark as our next

5    exhibit, which will be Exhibit 34, Document D,

6    please, Lizzie.

7               (BIGGERSTAFF EXHIBIT 34, December 28,

8    2007, Decision in Robert Biggerstaff v. FCC, was

9    marked for identification.)

10              MR. KNOWLES:  We've marked as

11   Exhibit 34 an opinion in the case Robert

12   Biggerstaff, Petitioner, versus the FCC and United

13   States of America -- excuse me -- from the United

14   States Court of Appeals for the District of

15   Columbia Circuit, decided December 28 of 2007.

16   BY MR. KNOWLES:

17         Q.   Is this a case, Mr. Biggerstaff, where

18   you were the petitioner in the case?

19         A.   That's correct.

20         Q.   Why did you file a petition to the

21   Court of Appeals in this case?

22         A.   The FCC had read in an exemption to the

23   statute that was explicitly rejected by Congress

24   and I felt they had done something they should not

25   have done.

Page 209

1          Q.   Do you feel strongly about it?

2          A.   I did at the time.

3          Q.   And was this in the same vein as, you

4    know, you see an auto accident, you'll file a

5    police report describing what you saw?

6          A.   Partially.

7          Q.   Who prepared your petition in this

8    case?

9          A.   I don't remember counsel's name.  I

10   believe they were out in Arizona.

11         Q.   Did you have to pay them?

12         A.   No.  They took it pro bono.

13         Q.   Were there any filing fees in this

14   case?

15         A.   I don't recall.  I think I filed -- I

16   think I paid the filing fees, but they did not

17   charge me for their time.

18         Q.   Do you remember about how much the

19   filing fees were?

20         A.   A few hundred dollars.

21         Q.   Did you do all of this because it was

22   something important to you personally,

23   professionally, or both?

24         A.   Both.

25         Q.   What was the outcome of this case?

Page 210

1        A.    They ruled the -- ultimately ruled that

2   the petition was untimely, saying that the -- it

3   should have been brought earlier because this

4   particular subject was brought up in an earlier

5   proceeding.  But then they also did rule -- they

6   created an exception to standing that expanded the

7   role of standing under federal statutes so that, in

8   some cases, a case that I was able to demonstrate,

9   the fear of something being brought could be

10  sufficient to survive or to establish Article III

11  standing when there was a basis of prior acts that

12  justified that fear.

13       Q.    How did you feel about that outcome?

14       A.    Well, I was happy that they did expand

15  the standing doctrine because that was the one that

16  really was -- didn't sit right with me, that I

17  would have to go and expend potentially thousands

18  of dollars litigating a case through appeal and

19  spend -- and possibly bring a case that shouldn't

20  be brought because I couldn't -- because I could

21  not directly challenge the prior order unless

22  somebody had actually raised an EDR defense against

23  me in a case I had actually going.  I couldn't rely

24  on the fact that an EDR defense had been raised to

25  me in prior cases, and I didn't want to bring a

Page 211

1   case against somebody who had an EDR defense if the
2   EDR defense was valid.
3               MR. KNOWLES:  I think we're done with
4   that exhibit.  Thank you, Lizzie.  Let's put up
5   Exhibit 26, please.
6               THE WITNESS:  One second, let me close
7   the door.
8               THE COURT REPORTER:  While she's
9   marking that, can we go off the record just for a
10  quick second?
11              MR. KNOWLES:  Yes.
12              THE VIDEOGRAPHER:  The time on the
13  monitor is 1:23 p.m., and we're going off the
14  record.
15              (A brief recess was held.)
16              THE VIDEOGRAPHER:  The time on the
17  monitor is 1:24 p.m., and we're back on the record.
18              MR. KNOWLES:  Exhibit 26, I'll
19  represent, is a document that was provided to
20  Defendant's counsel by Plaintiff's counsel together
21  with the initial expert report from
22  Mr. Biggerstaff.
23              (BIGGERSTAFF EXHIBIT 26, Resume of
24  Robert Biggerstaff, was marked for identification.)
25  BY MR. KNOWLES:

Page 212

1          Q.    Mr. Biggerstaff, can you tell us what

2     this document is?

3          A.    That appears to be my resume.

4          Q.    And did you prepare it?

5          A.    I did.

6          Q.    Is there anything in this document that

7     is inaccurate?

8          A.    Not to my knowledge.  Can you scroll

9     down, please?  Okay.  That's far enough.  That's

10    the last resume I authored, and that was in

11    December of 2003.

12         Q.    Is there anything in this document that

13    is inaccurate?

14         A.    Well, I list I was fluent in 16 program

15    languages.  It's all accurate as of the time it was

16    written, but I have probably lost my fluency in a

17    few of those -- fluency in a few of those languages

18    because of the lack of use over the last 30 years.

19         Q.    Is there anything in this document that

20    is incomplete?

21         A.    Not as of when it was written.

22         Q.    What about as of today?

23         A.    Well, I've certainly done a lot of

24    things in the fax world, in the forensic world,

25    since this was written.  At the time, this was my

Page 213

1    resume, and my resume and my work trajectory at

2    that time was in engineering, in a corporate

3    environment, but I changed tacks about the time

4    that I wrote this and began doing more consulting

5    work and more forensic work.

6         Q.   Is there any reason that you submitted

7    a resume from 2003 in this case?

8         A.   That's the only one I have.  I haven't

9    updated it.

10        Q.   Do you have any relevant experience

11   that is not reflected in this document?

12        A.   Yes, 20 years of working on these cases

13   and doing the analysis.

14        Q.   Do you submit a resume from 2003 with

15   each of the TCPA engagements that you do?

16        A.   No.  I have given people who retained

17   me, who asked for a copy of my resume, I give them

18   the resume, and then I think they just keep it and

19   then submit it each time that it's called for.

20        Q.   Do you have a more current copy than

21   this one?

22        A.   No, I've not applied for any jobs since

23   then.

24             MR. KNOWLES:  I think we're done with

25   this exhibit.  Can I have Exhibit 25, please.

Page 214

1           (BIGGERSTAFF EXHIBIT 25, Rule 26 List

2    of Robert Biggerstaff Expert Testimony for Previous

3    Four Years, was marked for identification.)

4    BY MR. KNOWLES:

5           Q.   Exhibit 25 is another document that was

6    provided to us together with your original report

7    in this case.

8                Is this list, as of the time it was

9    submitted to us in the fall of 2020, a complete and

10   accurate list of all cases in which, in the

11   previous four years, you testified as an expert at

12   trial or by deposition?

13          A.   Yes, to the best of my knowledge.

14          Q.   Who prepared it?

15          A.   I did.

16          Q.   And how do you keep track of the cases

17   to ensure this is accurate?

18          A.   I'm sorry, I didn't understand your

19   question.

20          Q.   I'm sorry.  What do you do -- how do

21   you keep track of the cases in order to ensure that

22   this report is accurate?

23          A.   It's a WordPerfect file.  I add to it

24   when I need to, delete to it when I need to delete.

25          Q.   And what do you add to it?  What's the

Page 215

1    criteria for adding a case to it?

2         A.   Well, whenever I do a deposition or a

3    trial, like today I'll add this case to it.

4         Q.   Have you testified as an expert at

5    trial or a deposition in any cases in the past four

6    years that are not listed here?

7         A.   Not that I am aware of.  I have, over

8    the years, found one or two cases that were

9    accidentally omitted and corrected them, but I'm

10   not aware of any on here that -- or any that are

11   missing from this list.  Could you scroll down to

12   the date?  I'm not aware of any that are missing

13   from this one dated December the 14th of 2020.

14        Q.   Have you testified as an expert at

15   deposition or at trial in any other cases where the

16   plaintiff is Scoma Chiropractic?

17        A.   I don't know.  The names of the parties

18   aren't part of my analysis.  The only time I see

19   them is when I put them on the cover page of the

20   report.

21             MR. KNOWLES:  Okay, we're finished with

22   this one.  Exhibit 27, please.

23             (BIGGERSTAFF EXHIBIT 27, Plaintiff's

24   Disclosure Pursuant to FRCP (26)(a)(2), was marked

25   for identification.)

Page 216

1    BY MR. KNOWLES:

2          Q.    And Exhibit 27 is another document that

3    was provided to us together with your initial

4    report.  Do you know what this is?

5          A.    I have not seen this document before.

6                MR. KNOWLES:  Can you scroll down,

7    please, Lizzie, to the Compensation section.  Right

8    there is good, yeah.

9    BY MR. KNOWLES:

10         Q.    Have you published any articles

11   regarding the TCPA in the last ten years?

12         A.    Not that I can think of, no.

13         Q.    Have you published any articles about

14   anything in the last ten years?

15         A.    Not that I can think of, no.

16         Q.    Section C, Compensation, says, "$18,000

17   flat fee per case, plus $600 per hour" of

18   deposition testimony.

19                Is that a true and accurate statement

20   of the compensation to be paid for this study and

21   testimony in this case?

22         A.    It is.

23         Q.    How many hours, approximately, have you

24   spent on this case to date?

25         A.    Did you say to date?

Page 217

1          Q.   To date, yes.  How many hours to date?

2          A.   I don't know.  I don't keep timesheets.

3     I work a little, then take -- you know, maybe doing

4     something else.  I work as time allows.

5          Q.   We've looked at your three expert

6     reports today.  Starting with your first expert

7     report, approximately, how long would it take you

8     to prepare a report like that?

9          A.   That was Exhibit 22?

10         Q.   22.

11         A.   That was an initial report.  It

12    probably took around an hour.

13         Q.   And then what -- same question as to

14    your first supplemental report, Exhibit 23.

15         A.   Same with that one, probably about an

16    hour.

17         Q.   And what about as to your second

18    supplemental report, Exhibit 24?

19         A.   That one took probably around two or

20    maybe three hours.

21         Q.   So other than the approximately five

22    hours, give or take, for those first three reports,

23    what else have you done in this case so far?

24         A.   Nothing that I can discuss.

25         Q.   Without discussing the contents of

Page 218

1    anything, have you spent any time doing analysis or

2    study of any kind?

3            A.   That was all accounted for in the time

4    to produce the reports.

5            Q.   Got it.  So if I wanted the jury to

6    understand what your hourly rate was for the work

7    you've done, I would divide the $18,000 for the

8    time -- other than your deposition today -- by

9    about five hours, give or take; is that right?

10           A.   No.

11           Q.   Why not.

12           A.   My hourly rate is 600 dollars per hour

13   for testimony, wherever I give that testimony.  The

14   flat fee applies per case; it's not an hourly rate.

15           Q.   Have you already been paid the $18,000?

16           A.   No, that's due when the case is over.

17           Q.   Do you ever write down, discount, or

18   waive the balance for your expert witness work when

19   a case doesn't have a good outcome for the client

20   that hired you?

21           A.   No, I do not.

22           Q.   How many times have you been engaged by

23   the Anderson & Wanca firm?

24           A.   I don't keep track of retentions by

25   client.

Page 219

1        Q.   Are there any contracts or agreements

2    between you and Anderson & Wanca apart from the

3    documents marked in this deposition?

4        A.   No, not that I'm aware of.

5        Q.   Do you ever refer cases to Anderson &

6    Wanca?

7        A.   Not that I -- not that I can recall.

8        Q.   Are there any TCPA cases where you

9    receive a share of the damages or the award?

10       A.   No, only the small claims cases I

11   brought on my own behalf more than 20 years ago.

12       Q.   Approximately how much do you earn --

13   or how much did you earn in the last year in your

14   work on TCPA cases as an expert witness?

15       A.   Well, I don't split my income out based

16   on the type of work I was doing.  I just have all

17   one bucket.  I don't break it down on one is based

18   on TCPA versus doing other forensic work or data

19   recovery or other types of income.

20       Q.   Approximately how much have you earned

21   in your life in all work in cases related to the

22   TCPA?

23       A.   I do not know.  I can, you know, give

24   you estimates on these things, but like your

25   previous question was just for last year.  Um, TCPA

Page 220

1    related, might have been anywhere from probably 180

2    to 200, but, again, that's just a very rough

3    estimate.

4          Q.   And is that estimate your estimate for

5    the last year or in your lifetime?

6          A.   No, that was from the last year.

7               It varies greatly from year to year.

8    Some years, it's been zero or near zero, and

9    others, you know, more than that.

10              It really is impossible to say, in the

11   entire history of TCPA stuff, since -- that would

12   go back to probably the mid 1990s.  I don't know

13   that I could give you an accurate number, and I

14   certainly don't have documents that could, you

15   know, calculate a number, because even if I had old

16   tax forms or whatever, it's not broken out by the

17   type of work done.

18         Q.   Is your estimate of the total amount

19   you've earned under the TCPA in your lifetime over

20   a million dollars?

21         A.   Since I started doing TCPA work, expert

22   work, about -- about 22 years ago, I would say,

23   yes, over my lifetime it's cumulatively more than a

24   million.

25         Q.   Other than what's in your reports and

Page 221

1    what we've discussed today, do you anticipate

2    forming or submitting any other expert opinions in

3    this case?

4         A.   Not at this time.

5         Q.   Do you anticipate submitting any more

6    reports?

7         A.   Not at this time.

8         Q.   Do you reserve the right to do so?

9         A.   I don't know what that means.

10        Q.   Just a moment, sorry.  Let me ask the

11   question this way.  Do you intend to submit any

12   more reports in this case?

13        A.   Not as I sit here today, no.

14        Q.   What, if anything, did you do to

15   prepare for today's deposition?

16        A.   Nothing.

17        Q.   Have you ever been the defendant in a

18   lawsuit?

19        A.   There was one of the TCPA cases I did a

20   long time ago, the guy filed a counterclaim against

21   me, so I was a counterclaim defendant, but that's

22   the only thing I can think of.

23        Q.   Was that a case where you were an

24   expert or where you were a plaintiff?

25        A.   No, where I was a plaintiff.

Page 222

1        Q.    Have you ever been accused of

2   professional misconduct?

3        A.    No, I have not.

4        Q.    Have you ever been accused of providing

5   false statements or information under oath?

6        A.    No.

7        Q.    Have you ever been charged with or

8   convicted of a felony?

9        A.    No.

10        Q.    Since the time we started this

11   deposition this morning, have you communicated with

12   anyone about this case or your testimony using text

13   messaging, chat, similar functions, including

14   e-mail?

15        A.    Nope, not at all.

16            MR. KNOWLES:  I don't have any more

17   questions today.  Obviously, to the extent

18   additional reports or opinions are submitted, we

19   reserve the right to seek additional deposition

20   testimony.

21            Mr. Kelly, anything at your end?

22            MR. KELLY:  No questions here.

23            MR. KNOWLES:  Okay.  I need to put a

24   transcript order in, so -- but we don't need to

25   keep the witness around for that.

Page 223

1              THE VIDEOGRAPHER:  All right.  Let me
2    get us off the record before he goes.  The time on
3    the monitor is 1:40 p.m., and this is the end of
4    the deposition.
5              MR. KELLY:  Rob, do you want to read or
6    waive?
7              THE WITNESS:  Read and sign.  Send a
8    full size copy to the PO Box.
9              (Off-the-record discussion.)
10             MR. KNOWLES:  I'd like to order
11   electronic, please, electronic only.  Just PDF
12   copies is fine at my end, but I'd like to do it
13   with exhibits, please, and I know Lizzie can
14   coordinate.  I don't know if all of those have been
15   submitted on Exhibit Share already.  Are we good on
16   those, Lizzie?
17             MS. RODD:  Yeah, all the exhibits have
18   been marked and should be on Exhibit Share.
19             MR. KELLY:  Yeah, I'll take a copy,
20   E-tran with the exhibits as well, please.
21             (The witness, after having been advised
22   of his right to read and sign this transcript, does
23   not waive that right.)
24             (The deposition was concluded at 1:42
25   p.m.)

Page 224

1                 CERTIFICATE OF REPORTER

2

3            I, Susan M. Valsecchi, Registered

4    Professional Reporter and Notary Public for the

5    State of South Carolina at Large, do hereby certify

6    that the foregoing transcript is a true, accurate,

7    and complete record.

8                 I further certify that I am neither

9    related to nor counsel for any party to the cause

10   pending or interested in the events thereof.

11                Witness my hand, I have hereunto

12   affixed my official seal this 16th day February,

13   2022 at Columbia, Richland County, South Carolina.

14

15

16

17

18

19

20

21

22                           

23

     Susan M. Valsecchi, RPR, CRR

24   My Commission expires

     December 4, 2024

25

Page 225

1                    I N D E X

2

3                                    Page       Line

4

5     ROBERT R. BIGGERSTAFF              4          22

6     EXAMINATION                        4          24

7     BY MR. KNOWLES

8     CERTIFICATE OF REPORTER          224          1

9

10

11

12

13                 E X H I B I T S

14

15                                   Page       Line

16    BIGGERSTAFF EXHIBIT 22,           18          10

17    Original Expert Report of

18    Robert Biggerstaff with

19    Internal Exhibits

20    BIGGERSTAFF EXHIBIT 23, First     18          13

21    Supplemental Expert Report of

22    Robert Biggerstaff with

23    Internal Exhibits

24    BIGGERSTAFF EXHIBIT 24, Second    18          17

25    Supplemental Expert Report of

```
                                          Page 226
 1    Robert Biggerstaff with
 2    Internal Exhibits
 3    BIGGERSTAFF EXHIBIT 25, Rule      214       1
 4    26 List of Robert Biggerstaff
 5    Expert Testimony for Previous
 6    Four Years
 7    BIGGERSTAFF EXHIBIT 26, Resume   211       23
 8    of Robert Biggerstaff
 9    BIGGERSTAFF EXHIBIT 27,          215       23
10    Plaintiff's Disclosure
11    Pursuant to FRCP (26)(a)(2)
12    BIGGERSTAFF EXHIBIT 28, Winter   34        18
13    2001 Connecticut Law Review,
14    'State Courts and the
15    Telephone Consumer Protection
16    Act of 1991: Must States
17    Opt-in? Can States Opt-Out?'
18    by Robert R. Biggerstaff
19    BIGGERSTAFF EXHIBIT 29, August   65        23
20    22 to 27, 2020, InterFAX
21    Transactions
22    BIGGERSTAFF EXHIBIT 30,          110       2
23    September 10, 2021, Deposition
24    of Dr. Louis Scoma
25    BIGGERSTAFF EXHIBIT 31,          177       13
```

Page 227

1    September 1, 2017 Reply of

2    Robert Biggerstaff to

3    AmeriFactors

4    BIGGERSTAFF EXHIBIT 32,           195      19

5    November 21, 2019, Opinion in

6    Physicians Healthsource, Inc.,

7    v. Masimo Corporation, et al.

8    BIGGERSTAFF EXHIBIT 33,           199      17

9    February 9, 2018, Opinion in

10   Community Vocational Schools

11   of Pittsburgh, Inc., v. Mildon

12   Bus Lines, Inc.

13   BIGGERSTAFF EXHIBIT 34,           208      7

14   December 28, 2007, Decision in

15   Robert Biggerstaff v. FCC

16

17

18

19

20

21

22

23

24

25

```
                                                  Page 228
 1                   Veritext Legal Solutions
                        1100 Superior Ave
 2                         Suite 1820
                      Cleveland, Ohio 44114
 3                    Phone: 216-523-1313
 4
      February 18, 2022
 5
      To: Ryan M. Kelly, Esq.
 6
      Case Name: Scoma Chiropractic, P.A. v.
 7              National Spine and Pain Centers LLC, et al.
 8    Veritext Reference Number: 4998174
 9    Witness:  Robert R. Biggerstaff        Deposition Date:  2/7/2022
10
      Dear Sir/Madam:
11
12    Enclosed please find a deposition transcript.  Please have the witness
13    review the transcript and note any changes or corrections on the
14    included errata sheet, indicating the page, line number, change, and
15    the reason for the change.  Have the witness' signature notarized and
16    forward the completed page(s) back to us at the Production address
      shown
17
      above, or email to production-midwest@veritext.com.
18
19    If the errata is not returned within thirty days of your receipt of
20    this letter, the reading and signing will be deemed waived.
21
      Sincerely,
22
      Production Department
23
24
25    NO NOTARY REQUIRED IN CA
```

Page 229

```
 1              DEPOSITION REVIEW
             CERTIFICATION OF WITNESS
 2
       ASSIGNMENT REFERENCE NO: 4998174
 3     CASE NAME: Scoma Chiropractic, P.A. v.
                 National Spine and Pain Centers LLC, et al.
       DATE OF DEPOSITION: 2/7/2022
 4     WITNESS' NAME: Robert R. Biggerstaff
 5        In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me.
 7        I have made no changes to the testimony
    as transcribed by the court reporter.
 8
    _____          _____
 9  Date                      Robert R. Biggerstaff
10        Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
          They have read the transcript;
13        They signed the foregoing Sworn
              Statement; and
14        Their execution of this Statement is of
              their free act and deed.
15
          I have affixed my name and official seal
16
    this _____ day of_____, 20_____.
17
                    _____
18                  Notary Public
19                  _____
                    Commission Expiration Date
20
21
22
23
24
25
```

**EXHIBIT 17**

# ANDERSON + WANCA
## ATTORNEYS AT LAW

---

## FIRM PROFILE

Founded in 1998, Anderson + Wanca is a boutique class-action law firm practicing all aspects of complex business and class action litigation in state and federal courts across the country. Anderson + Wanca has been appointed class counsel in over a hundred cases, securing as many class certifications for its clients. Because of the evolving nature of class-action law, Anderson + Wanca has developed a dedicated appellate team, an electronic discovery team, and proprietary software to handle over 100 million pieces of data at once, and it has its own in-house notice capabilities. Anderson + Wanca is also one of the few firms with real class-action trial experience. The ability and knowledge to try a class action case gives Anderson + Wanca added skills at the mediation and settlement phase. Our attorneys have decades of class-action experience in all ranges of case sizes and complexities.

## ATTORNEY PROFILES

### Brian J. Wanca
#### Owner

For over 25 years, Mr. Wanca focused his practice on commercial litigation involving breach of contract, shareholder derivative actions, consumer fraud, employment disputes, among other matters. In 1998, Mr. Wanca established his own firm, Anderson + Wanca, which has since become one of the premier litigation firms in the Chicago area, focusing primarily on consumer class-action cases. He was selected as a SuperLawyer in 2014.

Mr. Wanca attended Rutgers College, Brunswick, New Jersey, where he received a Bachelor of Arts with High Distinction. He graduated in 1976, *magna cum laude*. He received his J.D. from Indiana University School of Law, Indianapolis, Indiana, graduating in 1979, *cum laude*. After law school, he clerked for two years with the Honorable S. Hugh Dillon, U.S. District Court, Southern District of Indiana.

### Admissions

Illinois, 1980
U.S. District Court – Northern District of Indiana, 1979
U.S. District Court – Northern District of Illinois, 1981
U.S. District Court – Central District of Illinois, 2009
U.S. District Court – Southern District of Illinois, 2010
U.S. District Court – Eastern District of Michigan, 2010
U.S. District Court – Western District of Michigan, 2010

U.S. District Court – Western District of Wisconsin, 2010
U.S. District Court – Eastern District of Wisconsin, 2011
U.S. District Court – Northern District of Ohio, 2012
U.S. District Court – Southern District of Indiana, 2014
U.S. District Court – Eastern District of Missouri, 2015

**Memberships**

Chicago Bar Association
Lake County Bar Association
Illinois Bar Association
American Bar Association

## *Wallace Solberg*
### *Attorney*

Mr. Solberg has substantial experience in business and commercial litigation as well as government relations. His extensive experience includes a wide variety of civil litigation matters such as consumer class litigation, civil rights class litigation, contract actions, business torts, consumer fraud, trade secret actions, declaratory judgment actions, employment litigation, employment discrimination, general commercial litigation, and injunctive relief, including enforcement of covenants not to compete, multi-state regulatory actions, defamation actions, real estate litigation including zoning actions, and appellate representation.

Mr. Solberg received his J.D. from the Chicago-Kent College of Law in 1986. Before law school, he attended the University of Illinois, Urbana-Champaign, where he received a Bachelor of Arts degree in History.

**Admissions**

Illinois, 1986
U.S. District Court – Northern District of Illinois (Trial Bar), 1988
U.S. District Court – Central District of Illinois, 1990
U.S. District Court – Western District of Michigan, 2014
U.S. District Court – Eastern District of Michigan, 2014
U.S. District Court – Northern District of Ohio, 2014
U.S. Court of Appeals – 7th Circuit, 1988
U.S. Court of Appeals – 6th Circuit, 2015

## Jeffrey A. Berman
### Attorney

Mr. Berman brings to the firm over 35 years of litigation experience in trial and appellate courts, in a wide range of complex commercial litigation. He regularly appears in state and federal courts, nationwide. At Anderson + Wanca, his practice concentrates primarily on consumer class actions and related insurance coverage litigation. Mr. Berman has tried a number of cases to judgment and led several others that settled on the eve of trial. He also has successfully argued a variety of cases in both state and federal courts of appeals across the country.

Mr. Berman received a Bachelor of Science degree in Accountancy, with honors, in 1984 from the University of Illinois, Urbana-Champaign. He is an Illinois Certified Public Accountant. Mr. Berman received his J.D. from the University of Illinois, where he was an editor of the Law Review, and graduated in 1987 *magna cum laude*. Mr. Berman is AVVO Rated: Superb. He has been selected as a *Super Lawyer*, each year since 2015, and as a *Leading Lawyer*, since 2011. He has served as a member of the *Leading Lawyers* Illinois Advisory Board. Mr. Berman also has an extensive history of civic and community involvement, including serving for twenty years as an elected Village Trustee for the Village of Buffalo Grove.

### Admissions

Illinois, 1987
U.S. District Court – Northern District of Illinois (Trial Bar), 1987
U.S. District Court – Central District of Illinois, 1990
U.S. District Court – Eastern District of Michigan, 2012
U.S. District Court – Western District of Michigan, 2013
U.S. District Court – Eastern District of Wisconsin, 2012
U.S. District Court – Eastern District of Missouri, 2016
U.S. District Court – District of Columbia, 2016
U.S. District Court – Northern District of Indiana, 2017
U.S. District Court – Northern District of Texas, 2018
U.S. Court of Appeals – 1st Circuit, 2013
U.S. Court of Appeals – 3rd Circuit, 2015
U.S. Court of Appeals – 6th Circuit, 2013
U.S. Court of Appeals – 7th Circuit, 1990
U.S. Court of Appeals – 8th Circuit, 2014
U.S. Court of Appeals – 10th Circuit, 2014
U.S. Court of Appeals – 11th Circuit, 2013
U.S. Court of Appeals – D.C. Circuit, 2014
U.S. Supreme Court – 2013

### Memberships

American Bar Association
Lake County Bar Association Board of Trustees

3

Secretary, Lake County Bar Association Board of Trustees, 2022-2023
Lake County Bar Foundation Board of Trustees
    President, Lake County Bar Foundation Board of Trustees, 2017-2019
Editorial Board, *The Docket*, Lake County Bar Association
    Co-Editor, *The Docket*, since 2016

### Glenn L. Hara
#### Attorney

Mr. Hara focuses on class-action litigation and appeals. He joined Anderson + Wanca in 2013, bringing more than 10 years of experience with a wide range of class actions, including ERISA, securities fraud, and constitutional class actions, including *Sogg v. Zurz*, 905 N.E.2d 187 (Ohio 2009) (argued) (holding State of Ohio unconstitutionally failed to pay interest to unclaimed-property claimants). At Anderson + Wanca, Mr. Hara has successfully argued several TCPA cases in federal courts of appeals, including *Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, 950 F.3d 959 (7th Cir. 2020); *True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923 (9th Cir. 2018); *Radha Geismann, M.D., P.C. v. ZocDoc, Inc.*, 909 F.3d 534 (2d Cir. 2018); *Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharm., Inc.*, 847 F.3d 92 (2d Cir. 2017); and *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992 (8th Cir. 2016). Mr. Hara argued before the United States Supreme Court in *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, No. 17-1705 (argued Mar. 25, 2019).

Mr. Hara is past Chair of the Chicago Bar Association Class Litigation Committee. He earned his undergraduate degree from DePaul University in 1997 and graduated, *cum laude*, from Loyola University Chicago School of Law in 2003, where he was student articles editor of the Loyola Consumer Law Review.

### Admissions

Illinois, 2003
U.S. District Court – Northern District of Illinois, 2003
U.S. District Court – Southern District of Illinois, 2005
U.S. District Court – Eastern District of Wisconsin, 2006
U.S. District Court – Southern District of Indiana, 2011
U.S. District Court – Western District of Michigan, 2014
U.S. District Court – Eastern District of Michigan, 2014
U.S. District Court – Northern District of Ohio, 2014
U.S. Court of Appeals – 1st Circuit, 2013
U.S. Court of Appeals – 2nd Circuit, 2014
U.S. Court of Appeals – 3rd Circuit, 2018
U.S. Court of Appeals – 4th Circuit, 2016
U.S. Court of Appeals – 6th Circuit, 2015
U.S. Court of Appeals – 7th Circuit, 2010

U.S. Court of Appeals – 8th Circuit, 2015
U.S. Court of Appeals – 9th Circuit, 2016
U.S. Court of Appeals – 11th Circuit, 2017
U.S. Court of Appeals – D.C. Circuit, 2014
U.S. Supreme Court, 2017

## Ryan Kelly
### Attorney

Ryan Kelly joined the firm in 2005 bringing with him years of experience in insurance defense. His concentration at the firm is in class-action discovery and certification briefing and oral arguments. Mr. Kelly travels extensively for court appearances and depositions across the country. Mr. Kelly has tried several class actions to a judgment, as well as a number of cases that settled eve of trial or during trial.

Mr. Kelly attended the University of Illinois, Urbana-Champaign, where he earned a Bachelor of Science degree, *cum laude*, in 1996. He received his J.D. from Loyola University Chicago School of Law in 1999.

### Admissions

Illinois, 1999
Florida, 2011
U.S. District Court – Northern District of Illinois, 1999
U.S. District Court – Eastern District of Michigan, 2011
U.S. District Court – Western District of Michigan, 2011
U.S. District Court – Eastern District of Wisconsin, 2010
U.S. District Court – Western District of Wisconsin, 2011
U.S. District Court – Southern District of Florida, 2011
U.S. District Court – Middle District of Florida, 2011
U.S. District Court – Northern District of Ohio, 2012
U.S. District Court – Eastern District of Missouri, 2015
U.S. District Court – Northern District of Indiana 2015
U.S. District Court – Connecticut 2017
U.S. District Court – Northern District Florida 2017
U.S. District Court – Colorado 2022

### Memberships

Florida Bar Association
Illinois Bar Association

### *Ross Good*
*Attorney*

Ross Good received his J.D. from The John Marshall Law School in 2013. Mr. Good has helped develop the firm's electronic discovery capabilities and in-house notice services. Mr. Good concentrates on class-action, civil and commercial litigation, and class-action discovery and briefing.

Mr. Good attended the University of Illinois, Urbana-Champaign, where he earned his Bachelor of Arts in Political Science. He interned with Congressman Zack Space (D-Ohio) from January through May 2009, in Washington, D.C.

#### <u>Admissions</u>

Illinois, 2013
Florida, 2015
U.S. District Court – Northern District of Illinois, 2013
U.S. District Court – Northern District of Ohio, 2014
U.S. District Court – Eastern District of Michigan, 2014
U.S. District Court – Western District of Michigan, 2015
U.S. District Court – Eastern District of Missouri, 2015
U.S. District Court – Western District of Wisconsin, 2015
U.S. District Court – Southern District of Florida, 2015
U.S. District Court – Middle District of Florida, 2015
U.S. District Court – Central District of Illinois, 2016
U.S. District Court – Northern District of Indiana, 2016
U.S. District Court – Colorado, 2019
U.S. Court of Appeals – 9th Circuit, 2019
U.S. Court of Appeals – 11th Circuit, 2021

#### <u>Memberships</u>

American Bar Association
Lake County Bar Association
Northwest Suburban Bar Association

### *Patrick J. Solberg*
*Attorney*

Patrick Solberg joined Anderson + Wanca in 2016. Prior to joining the firm, Mr. Solberg acquired extensive experience in civil litigation while working as an Assistant Attorney General for the State of Illinois, representing officials and agencies of the State in the Circuit Courts of Illinois, the Northern District of Illinois and before the Illinois Civil Service Commission. At Anderson + Wanca, Mr. Solberg focuses on all aspects of class-action, civil and commercial litigation, and appeals.

Mr. Solberg attended the University of Illinois, Urbana-Champaign, where he earned a Bachelor of Arts degree in 1994. He received his J.D. from Northwestern University School of Law in 1997.

**Bar Admissions**

Illinois, 1997
U.S. District Court – Northern District of Illinois, 1997
U.S. Court of Appeals – 7th Circuit, 2021

## <u>ANDERSON + WANCA</u>

Appointed class counsel in the following certified class action cases:

### <u>*FEDERAL COURTS*</u>:

| | |
|---|---|
| *Duenes and Molina v. Trend Technologies and Cam Fran Tool Co.*<br>  U.S. District Court, Northern District of IL | Race Discrimination |
| *Duenes and Molina v. Beck*<br>  U.S. District Court, Northern District of IL | Race Discrimination |
| *Hinman and Italia Foods v. M & M Rental Center*<br>  U.S. District Court, Northern District of IL | TCPA |
| *CE Design v. Exterior Systems*<br>  U.S. District Court, Northern District of IL | TCPA |
| *Loy v. Motorola*<br>  U.S. District Court, Northern District of IL | FMLA |
| *CE Design v. Cy's Crab House*<br>  U.S. District Court, Northern District of IL | TCPA |
| *G.M. Sign v. Group C Communications*<br>  U.S. District Court, Northern District of IL | TCPA |
| *G.M. Sign v. Franklin Bank*<br>  U.S. District Court, Northern District of IL | TCPA |
| *G.M. Sign v. Finish Thompson*<br>  U.S. District Court, Northern District of IL | TCPA |
| *Green v. Service Master on Location*<br>  U.S. District Court, Northern District of IL | TCPA |
| *Holtzman v. Turza*<br>  U.S. District Court, Northern District of IL | TCPA |
| *Targin Sign v. Preferred Chiropractic*<br>  U.S. District Court, Northern District of IL | TCPA |
| *Paldo Sign and Display Company v. Topsail Sportswear, Inc.*<br>  U.S. District Court, Northern District of IL | TCPA |
| *CE Design Ltd., et al. v. King Supply Company*<br>  U.S. District Court, Northern District of IL | TCPA |
| *Bridgeview Health Care Center, Ltd. v. Jerry Clark*<br>  U.S. District Court, Northern District of IL | TCPA |

1

*Wilder Chiropractic, Inc. v. Pizza Hut of Southern Wisconsin, Inc.*  TCPA
  U.S. District Court, Western District of WI

*Reliable Money Order v. McKnight Sales*  TCPA
  U. S. District Court, Eastern District of WI

*American Copper & Brass, Inc. v. Lake City Industrial Products, Inc., et al.*  TCPA
  U.S. District Court, Western District, MI

*Imhoff Investment, LLC v. Sammichaels, Inc.*  TCPA
  U.S. District Court, Eastern District, MI

*Exclusively Cats v. Anesthetic Vaporizer*  TCPA
  U.S. District Court, Eastern District of MI

*Jackson's Five Star Catering, Inc. v. John R. Beason, et al.*  TCPA
  U.S. District Court, Eastern District of MI

*Avio, Inc. v. Creative Office Solutions, Inc.*  TCPA
  U.S. District Court, Eastern District of MI

*Van Sweden Jewelers, Inc. v. 101 VT, Inc., et al.*  TCPA
  U.S. District Court, Western District of MI

*The Siding and Insulation Co. v. Beachwood Hair Clinic, Inc.*  TCPA
  U.S. District Court, Northern District of OH

*Bailey Brothers Plumbing, Heating and Air Conditioning v. Papa's*  TCPA
*Leatherbarn, LLC*
  U.S. District Court, Western District of OK

*Americana Art China Company, Inc. v. Foxfire Printing*  TCPA
*and Packaging, Inc.*
  U.S. District Court, Northern District of IL

*Sparkle Hill, Inc., et al. v. Interstate Mat Corporation*  TCPA
  U.S. District Court, District of MA

*Addison Automatics, Inc. v. Precision Electronic Glass, Inc.*  TCPA
  U.S. District Court, Northern District of IL

*Sawyer v. Atlas Heating and Sheet Metal Works, Inc.*  TCPA
  U.S. District Court, Eastern District of WI

*The Savanna Group v. Trynex*  TCPA
  U.S. District Court, Northern District of IL

*A & L Industries, Inc. v. P. Cipollini Inc.*  TCPA
  U.S. District Court, District of New Jersey

*Physicians Healthsource, Inc. v. Stryker Sales Corporation et al.*                        TCPA
  U.S. District Court, Western District of Michigan

*A Aventura Chiropractic Center, Inc. v. Med Waste Management et al.*                      TCPA
  U.S. District Court, Southern District of Florida

*The Hymed Group Corporation v. Stevens & Ricci, Inc.*                                     TCPA
  U.S. District Court, Eastern District of Pennsylvania

*Arnold Chapman and Paldo Sign and Display Company v. Wagener*                             TCPA
  U.S. District Court, Northern District of Illinois

*Spine and Sports Chiropractic, Inc. v, Zirmed, Inc.*                                      TCPA
  U.S. District Court, Western District of Kentucky

*Sandusky Wellness Center, LLC v. Wagner Wellness Inc. and Robert*                         TCPA
*Wagner*
  U.S. District Court, Northern District of Ohio

*Hawk Valley, Inc. v. Elaine G. Taylor, Environmental Process Systems, Inc.*               TCPA
  U.S. District Court, Eastern District of Pennsylvania

*Physicians Healthsource, Inc. v. Doctor Diabetic Supply, LLC*                             TCPA
  U.S. District Court, Southern District of Florida

*Jonathan Small and Jotmar, Inc. v. Target Corporation*                                    TCPA
  U.S. District Court, District of Minnesota

*JWD Automotive v. DJM Advisory, et al.*                                                   TCPA
  U.S. District Court, Middle District of Florida

*Medical & Chiropractic Clinic v. KMH Cardiology Centres*                                  TCPA
  U.S. District Court, Middle District of Florida

*Avio, Inc. v. Alfoccino Of Auburn Hills, et al.*                                          TCPA
  U.S. District Court, Eastern District of Michigan

*Daisy, Inc. v. Pollo Operations, Inc.*                                                    TCPA
  U.S. District Court, Middle District of Florida

*Vinny's Landscaping v. Klochko Equipment Rental, et al.*                                  TCPA
  U.S. District Court, Eastern District of Michigan

*Dennis R. Seramur v. Rotobrush International*                                             TCPA
  U.S. District Court, Northern District of Texas

*Sandusky Wellness Center v. Medtox Scientific, Inc., et al.*
  U.S. District Court, District of Minnesota                                       TCPA

*Todd Elwert, Sandusky Wellness v. Alliance Healthcare Services, Inc.*    TCPA
 U.S. District Court, Northern District of Ohio

*G.M. Sign, Inc. v. Stealth Security*    TCPA
 U.S. District Court, Northern District of Illinois

*Bridging Communities, Inc. v. Top-Flite Financial*    TCPA
 U.S. District Court, Eastern District of Michigan

*Russel M. Holsein, PH.D., LLC v. Banner Life Insurance Company, et al.*    TCPA
U.S. District Court, New Jersey

*Physicians Healthsource, Inc. v. Vertex Pharmaceuticals, Inc. et al.*    TCPA
U.S. District Court, District of Massachusetts

*Tickling Keys, Inc. v. Transamerica World Financial, et al.*    TCPA
U.S. District Court, Middle District of Florida

*13-50 River Road Corp. v. Ansam*    TCPA
U.S. District Court, District of New Jersey

*Physicians Healthsource, Inc. v. IPC, Inc.*    TCPA
U.S. District Court, Southern District of Ohio

*Shaun Fauely v. Heska Corporation*    TCPA
U.S. District Court, Northern District of Illinois

*Community Vocational Schools of Pittsburgh, Inc. v. Mildon Bus Lines*    TCPA
U.S. District Court, Western District of Pennsylvania

*John C. Etter v. Allstate Insurance Company, et al.*    TCPA
U.S. District Court, Northern District of California

*Vandenberg & Sons Furniture, Inc. v. Alliance Funding Group*    TCPA
U.S. District Court, Western District of Michigan

*Scoma Chiropractic, P.A., et al. v. Dental Equities, LLC, et al.*    TCPA
U.S. District Court, Middle District of Florida

**_STATE TRIAL COURTS_**
**_ILLINOIS_:**

*PJ's Concrete vs. Nextel West Corp.*    Cell Phone
 Circuit Court of Lake County, IL

*Bouschard v. Southwestern Bell Mobile Systems*    Cell Phone
 Circuit Court of Lake County, IL

| | |
|---|---|
| *Kowalewski v. Prairie Title*<br>  Circuit Court of Lake County, IL | Recording Fees |
| *Wilson v. Premier Title*<br>  Circuit Court of Cook County, IL | Recording Fees |
| *Mann v. Lawyer's Title*<br>  Circuit Court of Cook County, IL | Recording Fees |
| *Stonecrafters v. Brother International*<br>  Circuit Court of McHenry County, IL | TCPA |
| *CE Design v. Federal Schedules*<br>  Circuit Court of Cook County, IL | TCPA |
| *Telecommunications Network Design v. Paradise Distributing*<br>  Circuit Court of Cook County, IL | TCPA |
| *Telecommunications Network Design v. McLeod*<br>  Circuit Court of Cook County, IL | TCPA |
| *Eclipse Manufacturing Company v. U.S. Compliance Corp.*<br>  Circuit Court of Lake County, IL | TCPA |
| *CE Design v. Lyman Contracting Corp.*<br>  Circuit Court of Kane County, IL | TCPA |
| *Tabass v. Castle Screen Print Corp.*<br>  Circuit Court of DuPage County, IL | TCPA |
| *Stonecrafters v. Handleman Insurance Agency*<br>  Circuit Court of McHenry County, IL | TCPA |
| *G.M. Sign v. Santana Equipment Trading Company*<br>  Circuit Court of Lake County, IL | TCPA |
| *CE Design v. North American Industries*<br>  Circuit Court of Lake County, IL | TCPA |
| *CE Design v. Franklin Edison*<br>  Circuit Court of Lake County, IL | TCPA |
| *G.M. Sign v. Global Shop Solutions*<br>  Circuit Court of Lake County, IL | TCPA |
| *G.M. Sign v. Pennswood Partners*<br>  Circuit Court of Lake County, IL | TCPA |
| *Derose Corp. v. Goyke*<br>  Circuit Court of Cook County, IL | TCPA |

| | |
|---|---|
| *FlexiCorps v. Amber Enterprises*<br> Circuit Court of Cook County, IL | TCPA |
| *Miller v. Professional National Title Network*<br> Circuit Court of Cook County, IL | Recording Fees |
| *Heger v. Attorneys Title Guaranty Fund*<br> Circuit Court of Lake County, IL | Recording Fees |
| *Chapman v. CT Phoenix*<br> Circuit Court of Cook County, IL | TCPA |
| *Chapman v. United Electronics*<br> Circuit Court of Lake County, IL | TCPA |
| *CE Design v. Woodland Windows*<br> Circuit Court of DuPage County, IL | TCPA |
| *CE Design v. Matrix*<br> Circuit Court of Lake County, IL | TCPA |
| *G.M. Sign v. Backhauline*<br> Circuit Court of Lake County, IL | TCPA |
| *G.M. Sign v. 400 Freight*<br> Circuit Court of Lake County, IL | TCPA |
| *Green v. Vehicle Alignment, Brakes & Tires*<br> Circuit Court of Cook County, IL | TCPA |
| *Rob-Lyn Enterprises v. Competitive Door and Supply*<br>Circuit Court of Cook County, IL | TCPA |
| *Targin Sign v. XData Solutions*<br> Circuit Court of Cook County, IL | TCPA |
| *Tree Care Enterprises v. Millennium Stone Crete*<br> Circuit Court of Cook County, IL | TCPA |
| *Telecommunications Network Design, Inc. v. Agility Computer Network Services, LLC*<br> Circuit Court of Cook County, IL | TCPA |
| *CE Design Ltd. v. Letrix USA, Inc.*<br> Circuit Court of Cook County, IL | TCPA |
| *Brodsky v NIP Group*<br> Circuit Court of Cook County, IL | TCPA |
| *Windmill Nursing Pavilion v. Res-Care Illinois*<br> Circuit Court of Cook County, IL | TCPA |

| | |
|---|---|
| *Quality Management and Consulting Services v. Blackhawk Paving*<br>  Circuit Court of Cook County, IL | TCPA |
| *Locklear Electric v. Florissant Injury & Pain Relief Center*<br>  Circuit Court of St. Clair County, IL | TCPA |
| *Rob-Lynn Enterprises v. Taste of India*<br>  Circuit Court of Cook County, IL | TCPA |
| *CE Design v. Custom Mechanical Equipment, Inc., et al.*<br>  Circuit Court of Cook County, IL | TCPA |
| *Windmill Nursing Pavilion, Ltd. v. Unitherm, Inc.*<br>  Circuit Court of Cook County, IL | TCPA |
| *G.M. Sign, Inc. v. Schane*<br>  Circuit Court of Lake County, IL | TCPA |
| *Uesco Industries, Inc. v. Poolman of Wisconsin, Inc.*<br>  Circuit Court of Cook County, IL | TCPA |
| *Fauley v. Thomas Veterinary Drug, Inc.*<br>  Circuit Court of Cook County, IL | TCPA |
| *Mixon Insurance Agency v. Taylorville Chiropractic Clinic, et al.*<br>  Circuit Court of St. Clair County, IL | TCPA |
| *Targin Sign Systems, Inc. v. CYC Golden Palace Corporation, et al.*<br>  Circuit Court of Cook County, IL | TCPA |
| *Pardridge Motors, Inc. v. Tackitt*<br>  Circuit Court of Cook County, IL | TCPA |
| *CE Design Ltd. v. David Litt d/b/a Nationwide Security Services, Inc.*<br>  Circuit Court of Cook County, IL | TCPA |
| *Quality Management and Consulting Services v. PPP-MP, Inc.,*<br>*PPP-SCH, Inc. and PPP, Inc.*<br>  Circuit Court of Cook County, IL | TCPA |
| *Italia Foods, Inc. v. Sun Tours*<br>  Circuit Court of Lake County, IL | TCPA |
| *Addison Automatics, Inc. v. Domino Plastics Company, Inc.*<br>  Circuit Court of Cook County, IL | TCPA |
| *Pekin Ins. Co. v. XData Solutions, Inc., et al.*<br>  Circuit Court of Cook County, IL | TCPA |

| | |
|---|---|
| *Loncarevic and Associates, Inc. v. Stanley Foam Corp.*<br>  Circuit Court of Cook County, IL | TCPA |
| *CE Design Ltd. v. C&T Pizza, Inc., et al.*<br>  Circuit Court of Cook County, IL | TCPA |
| *Windmill Nursing Pavilion v. Gornick's Auto Rebuilders, Inc., et al.*<br>  Circuit Court of Cook County, IL | TCPA |
| *Nack v. LexisNexis*<br>  Circuit Court of Lake County, IL | TCPA |
| *Quality Management and Consulting Services, Inc. v. Commercial Asphalt Maintenance, LLC*<br>  Circuit Court of Cook County, IL | TCPA |
| *Mt. Lookout Chiropractic Center Inc. v. Quest Diagnostics et al.*<br>  Circuit Court of Lake County, IL | TCPA |
| *Lawrence Brodsky v. Kaigler & Company*<br>  Circuit Court of Cook County, IL | TCPA |
| *Community Vocational Schools of Northeast Pennsylvania and Nuts To You, Inc. v. CBRE, Inc. and Steven T. Italiano*<br>  Circuit Court of Lake County, IL | TCPA |
| *Radha Geismann M.D., P.C. v. Byram Healthcare Centers, Inc.*<br>  Circuit Court of Lake County, IL | TCPA |
| *Carradine Chiropractic Center, Inc. v. SmartHealth, Inc., Consolea Company d/b/a Sharper Cards*<br>  Circuit Court of Lake County, IL | TCPA |
| *Flashtric Sign, Inc. v. Georgia Printco, L.L.C.*<br>  Circuit Court of Cook County, IL | TCPA |
| *Shaun Fauley, Sabon, Inc., Sandy Rothschild & Associates, Inc., Debaun Development, Inc. and Christopher Lowe Hicklin DC PLC v. Metropolitan Life Insurance Company, Storick Group Co., The Storick Group Corporation and Scott R. Storick*<br>  Circuit Court of Lake County, IL | TCPA |
| *G.M. Sign, Inc. v. Dodson Company LLC and Jeffrey Dodson*<br>  Circuit Court of Lake County, IL | TCPA |
| *Budd Engineering Corporation v. David L. Hansen d/b/a DLH Insurance Consultants*<br>  Circuit Court of Lake County, Illinois | TCPA |

*William P. Sawyer, M.D. and Physicians Healthsource, Inc., v. Stericycle, Inc., Stericycle Specialty Waste Solutions, Inc., Stericycle Communications Solutions, Inc., Stericycle Management, LLC and Stericycle International, LLC*  TCPA
  Circuit Court of Cook County, IL

*Irish Sisters, Inc. and Lanciloti Law Offices v. Crown Mortgage Company*  TCPA
  Circuit Court of Cook County, IL

*Flexicorps, Inc. and Christopher Lowe Hicklin DC PLC d/b/a Clark Road Chiropractic v. National Pen Co. LLC and National Pen Holding, LLC*  TCPA
  Circuit Court of Cook County, IL

*Shaun Fauley, Sabon, Inc., Sandy Rothschild &Associates, Inc., Debaun Development, Inc. and Christopher Lowe Hicklin DC PLC v. Metropolitan Life Insurance Company, Storick Group Corporation, Scott R. Storick*  TCPA
  Circuit Court of Lake County, IL

*Byer Clinic of Chiropractic, Ltd. v. Lensink Agency, Inc.*  TCPA
  Circuit Court of Cook County, IL

*Keith Bunch Associates v. La-Z-Boy Incorporated, et al.*  TCPA
  Circuit Court of Lake County, IL

*Evanston Northshore Hotel v. Poolman of Wisconsin*  TCPA
Circuit Court of Lake County, IL

*Dairyland Animal Clinic v. Amatheon, Inc.*  TCPA
Circuit Court of Lake County, IL

*Lawrence Brodsky v. Kaigler & Company*  TCPA
Circuit Court of Cook County, IL

*Physicians Healthsource, Inc. v. Salix Pharmaceuticals*  TCPA
Circuit Court of Lake County, IL

*Spine & Sports Chiropractic v. Advantage Medical Equipment*  TCPA
Circuit Court of Lake County, IL

*Wilder Chiropractic, Inc. v. Scrip, Inc.*  TCPA
Circuit Court of Lake County, IL

*Foley Motors, Inc. v. iMotorsports, Inc.*  TCPA
Circuit Court of Lake County, IL

*New United, Inc. v. Reif, CBM Plumbing*  TCPA
Circuit Court of Cook County, IL

*Family Health, ChiroChicago Chiropractic v. M.D. On-Line Solutions*  TCPA
Circuit Court of Lake County, IL

9

| | |
|---|---|
| *Tiffany Florist, Inc. v. PayScout, Inc.*<br>Circuit Court of Lake County, IL | TCPA |
| *Robert A. Green v. Dahn Yoga*<br> Circuit Court of Cook County, IL | TCPA |
| *Physicians Healthsource, Inc. Quinn Medical, Inc.*<br>Circuit Court of Lake County, IL | TCPA |
| *Physicians Healthsource, Inc. v. Endo Pharmaceuticals et al.*<br> Circuit Court of Lake County, IL | TCPA |
| *Lauren Minniti v. Tillys, Inc.*<br> Circuit Court of Lake County, IL | TCPA |

### *STATE TRIAL COURTS*
### *MISSOURI:*

| | |
|---|---|
| *Little v. Hiar Holdings*<br> Circuit Court of St. Louis County, MO | TCPA |
| *Boschert v. Professionals Direct Insurance Services*<br> Circuit Court of St. Charles County, MO | TCPA |
| *Goans Acquisition, Inc. v. Hard Wok Cafes, Inc.*<br> Circuit Court of Greene County, MO | TCPA |
| *All American Painting, L.L.C. v. Chiropractic & Sports Injury*<br>*Center of Creve Coeur, P.C., et al.*<br> Circuit Court of St. Louis County, MO | TCPA |
| *Medical West Ballas Pharmacy, Ltd. v. Bios Biochemicals Corp.*<br> Circuit Court of St. Louis County, MO | TCPA |
| *Douglas Phillip Brust D.C., P.C. v. Bobby's Frozen Custard, Inc.*<br> Circuit Court of St. Louis County, MO | TCPA |
| *Radha Geismann, M.D., P.C. v. Contexo Media, LLC*<br> Circuit Court of St. Louis County, MO | TCPA |
| *Radha Geismann, M.D., P.C. v. GE Healthcare, Inc.*<br> Circuit Court of City of St. Louis, MO | TCPA |
| *Michael C. Zimmer, D.C, P.C. v. Moore Medical LLC and McKesson*<br>*Medical-Surgical Inc.*<br> Circuit Court of St. Louis County, MO | TCPA |
| *Physicians Healthsource, Inc. v. Esaote North America, Inc.*<br> Circuit Court of City of St. Louis, MO | TCPA |

*Alan L. Laub, DDS, Inc. v. Den-Mat Holdings, LLC*                TCPA
  Circuit Court of St. Louis County, MO

*Radha Geismann, M.D., P.C. v. Be-Thin, Inc., et al.*             TCPA
  Circuit Court of City of St. Louis, MO

                                                                 TCPA
*Central Alarm Signal v. Business Financial Services, et al.*
  Circuit Court of City of St. Louis, MO

*John Olsen v. Siddiqui, Global Bizdimensions*                    TCPA
   Circuit Court of St. Louis County, MO

*All American Painting, LLC v. Poettker Construction Company*     TCPA
  Circuit Court of City of St. Louis, MO

*Goodland Foods v. Best Buy Builders*                             TCPA
  Circuit Court of City of St. Louis, MO

*Career Counseling, Inc. v. Amsterdam Printing, et al.*           TCPA
  Circuit Court of City of St. Louis, MO

*Radha Geismann, M.D., P.C., John H. Lary Jr., M.D. v. Rexall et al.*  TCPA
  Circuit Court of City of St. Louis, MO

*Gorss Motels, Inc. v. BES Industries*                            TCPA
  Circuit Court of City of St. Louis, MO

*Eric B. Fromer Chiropractic, Inc. v. Si-Bone Inc.*               TCPA
Circuit Court of City of St. Louis, MO

*William P. Sawyer, M.D. v. Coopersurgical, Inc., HealthLogix LLC*  TCPA
  Circuit Court of City of St. Louis, MO

*John H. Lary, Jr., M.D. v. Biodesix, Inc.*                       TCPA
  Circuit Court of City of St. Louis, MO


### *STATE TRIAL COURTS*
### *KANSAS:*

*Critchfield Physical Therapy v. The Taranto Group*               TCPA
  District Court of Johnson County, Kansas

*Fun Services of Kansas City, Inc. v. Streetglow, Inc.*           TCPA
  District Court of Johnson County, Kansas

*Anderson Office Supply, Inc. v. Advanced Medical Associates, P.A.*  TCPA
  District Court of Harvey County, KS

**_STATE TRIAL COURTS_**
**_NEW JERSEY_:**

*Local Baking v. Westfield Rental-Mart*                         TCPA
  Superior Court of Essex County, NJ

*Local Baking v. Vieira & Gomes*                               TCPA
  Superior Court of Essex County, NJ

*Nafplion v. Ansam Commercial Kitchen and Ventilation Specialists*   TCPA
  Superior Court of Bergan County, NJ


**_STATE TRIAL COURTS_**
**_FLORIDA_:**

*Florida First Financial Group, Inc. v. Magnum Painting, Inc., et al.*   TCPA
  Circuit Court of Hillsborough County, FL

*Florida First Financial Group, Inc. v. Spivey Mowers, Inc.*   TCPA
  Circuit Court of Hillsborough County, FL

*Robert A. Dalzell, Inc. v. European Tile & Floors, Inc., et al.*   TCPA
  Circuit Court of Pinellas County, FL

*Florida First Financial Group, Inc. v. Termprovider Financial Services,*   TCPA
*LLC, et al.*
  Circuit Court of Hillsborough County, FL

*Dewar v. Florida Freezz of Southwest Florida, et al.*   TCPA
  Circuit Court of Lee County, FL

*Dewar v. Kolesov & Associates*   TCPA
  Circuit Court of Lee County, FL

*Sabon, Inc. v. Aqualogic, et al.*   TCPA
  Circuit Court of Broward County, FL

*Lee Alan Reed & Associates, Inc. v. Tsunami of Brandon, Inc.*   TCPA
  Circuit Court of Hillsborough County, FL

*Florida First Financial Group, Inc. v. Superior Pharmacy LLC, Ike C.*   TCPA
*Okeke, Yvonne Okeke, and Hilda Anadiume*
  Circuit Court of Hillsborough County, FL

*Nathan S. Kaner and Another Level Health, Inc. v. Robert R. Schiffman,*   TCPA
*D.C., P.C. and Robert R. Schiffman*
  Circuit Court of Palm Beach County, FL

*Florida First Financial Group v. Termprovider*   TCPA
  Circuit Court of Hillsborough County, FL

*Medical & Chiropractic Clinic, Inc. v. Tower Imaging, LLC*                                    TCPA
  Circuit Court of Hillsborough County, FL

**STATE TRIAL COURTS**
**OTHER STATES:**

*National Vocational Schools of Boston, Inc. v. Nature Springs Water*          TCPA
*Company, Inc.*
  Superior Court, Middlesex County, MA

*Collins and National Vocational Schools of Boston, Inc. v. Locks & Keys of*    TCPA
*Woburn, Inc.*
  Superior Court, Suffolk County, MA

*Big Thyme Enterprises, Inc. v. Palmetto Gold Buying Service, Inc.*             TCPA
  Court of Common Pleas, Richland County, SC

*Wilder Chiropractic, Inc. v. Easy PC Solutions LLC*                           TCPA
  Circuit Court of Waukesha County, WI

*Slater v. Richgeis, LLC*                                                      TCPA
  Superior Court, Providence County, RI

*B.Z.B. Enterprises, Inc. v. Mag & Son, LLC*                                   TCPA
  Superior Court of Providence County, RI

*Percic Enterprises v. European Autoworks*                                     TCPA
  District Court of Hennepin County, MN

*Wilder Chiropractic, Inc. v. Microwize Technology, Inc.*                       TCPA
  Circuit Court of Dane County, WI

*Blue Wave Corporation v. North End Chiropractic LLC and Kevin Loughlin*        TCPA
  Superior Court of Suffolk County, MA