UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

SCOMA CHIROPRACTIC, P.A., a Florida
corporation, individually and as the
representative of a class of similarly situated
persons,

            Plaintiff,

v.                                           Case No. 2:20-cv-430-JLB-NPM

NATIONAL SPINE AND PAIN CENTERS
LLC, a Delaware limited liability company,
SPINE CENTER OF FL, LLC, and PAIN
MANAGEMENT CONSULTANTS OF
SOUTHWEST FLORIDA, P.L., Florida
limited liability companies,

            Defendants.

_____

# ORDER

This is a junk fax case brought pursuant to the Telephone Consumer

Protection Act of 1991, as amended by the Junk Fax Prevention Act of 2005, 47

U.S.C. § 227 (the "TCPA").  This Court previously granted Plaintiff Scoma

Chiropractic, P.A. ("Scoma") authorization to subpoena third-party phone carriers

under the Cable Communications Policy Act of 1984 (the "Cable Act") to identify

individuals who received faxes sent by Defendants on stand-alone fax machines.

(Doc. 69); see 47 U.S.C. §§ 521–73.  With the subpoena process completed, Scoma

moves for class certification.  (Doc. 84.)  Defendants have responded in opposition

(Doc. 98) and move for summary judgment, contending that the junk fax provision

of the TCPA violates the First Amendment (Doc. 116).  Scoma and the United

States have responded that the provision is not unconstitutional.  (Doc. 129; Doc. 130.)  Upon careful review, Defendants' motion for summary judgment (Doc. 116) and Scoma's motion for class certification (Doc. 84) are denied.

## BACKGROUND[1]

Scoma is a Florida entity that provides chiropractic treatment.  (Doc. 84 at 11.)  Pain Management Consultants of Southwest Florida, P.L. ("PMC") is a pain management practice that is affiliated with National Spine and Pain Centers LLC ("NSPC") and operated by Spine Center of Florida, LLC.  (Doc. 1 at 3, ¶ 11; Doc. 1-1; Doc. 116 at 9.)  PMC obtained Scoma's fax number when Scoma faxed medical records so PMC could provide medical care to a patient.  (Doc. 116 at 9; Doc. 116-2 at 57–59; Doc. 116-3; Doc. 130 at 8.)

In April and June 2020, amidst the Covid-19 pandemic, PMC sent certain medical providers a fax encouraging telemedicine appointments to "help[] to ensure patients don't end up in overburdened Emergency Rooms, where the risk of contracting coronavirus will surely be higher."  (Doc. 1-1.)  That fax stated that PMC was "making telemedicine immediately available to its affiliated providers and their patients."  (Id.)  By Scoma's count, 16,227 faxes were sent to 8,147 unique fax numbers over 18 separate broadcasts.  (Doc. 130 at 8; Doc. 84-2 at 1–17.)[2]

---

[1] Because Defendants' motion for summary judgment turns on a purely legal question, any factual dispute is immaterial to its resolution.

[2] Elsewhere the parties appear to agree that there were 16,222 transmissions received by 8,144 unique fax numbers.  (Doc. 84-2 at 415.)  Any dispute as to this amount is immaterial to the resolution of the pending motions.

Scoma received the fax on a stand-alone fax machine.  (Doc. 1 at 4, ¶ 13; Doc. 1-1.)  Scoma allegedly did not give Defendants "prior express invitation or permission" to send the "unsolicited fax," which did not "display an opt-out notice at all as required" by the TCPA.  (Doc. 1 at 5, ¶¶ 18–21.)  In response to the fax, Scoma filed a class action complaint against Defendants for violating the TCPA.  (Doc. 1.)

Defendants moved to dismiss the complaint, contending that the fax was not an unsolicited "advertisement" under the TCPA and that the TCPA's junk fax provision, 47 U.S.C. § 227(b)(1)(C), violates the First Amendment.  (Doc. 21.)  The Court denied the motion, finding that Scoma had adequately alleged at the pleading stage that the fax constituted an unsolicited advertisement.  (Doc. 53 at 11.)  The Court further declined to resolve the First Amendment challenge and permitted Defendants to renew the argument and address additional issues identified by the Court at the summary judgment stage.  (Id. at 16.)

Following the denial of the motion to dismiss, Scoma obtained authorization to subpoena third-party phone carriers under the Cable Act to identify individuals who received the faxes at issue via stand-alone fax machines instead of an online fax service.  (Doc. 69.)  This distinction is significant because the Consumer and Governmental Affairs Bureau (the "Bureau"), acting on delegated authority from the Federal Communications Commission ("FCC"), has determined that the TCPA does not apply to faxes received via online fax services.  See In the Matter of AmeriFactors Fin. Grp., LLC Petition for Expedited Declaratory Ruling, 34 F.C.C.

Rcd. 11950 (2019) ("AmeriFactors").  Accordingly, Scoma proposed—and this Court

approved—a three-step process:

1.  Subpoena the Local Number Portability Administrator of
the Number Portability Administrative Center to identify
the carriers of the recipient numbers.

2.  Subpoena the identified phone carriers and determine
whether the subscriber of each number was using online
fax services on the date of the faxing in the class definition.

3.  Provide this Court with the option to exclude all telephone
numbers where the subscriber was using online fax
services.

(Doc. 55-1 at 3.)  The subpoenas would authorize the phone carriers of each number

to disclose: (1) whether the carrier provided online fax services to the subscriber,

and (2) the name and address of the subscriber.  (Id. at 3–4; Doc. 69 at 8–9.)

Evidently, this process has been more or less completed, though the parties

dispute its results.  In any event, pursuant to Rule 23(a) and Rule 23(b)(3) of the

Federal Rules of Civil Procedure, Scoma now moves to certify "Class A":

> All persons or entities who were successfully sent a fax, on
> or about April 2, 2020, April 16, 2020, April 21, 2020, and
> June 9, 2020, that states: "In-Office and Telemedicine
> Appointments for Pain Available![''] or "Dedicated
> Physician Hotline for Pain Management Referrals."

(Doc. 84 at 9.)  Alternatively, "if the Court finds it necessary to distinguish between

faxes successfully sent to 'stand-alone' fax machines versus faxes that were

successfully sent to an 'online fax service,'" Plaintiff seeks certification of "Class B":

> All persons or entities who were successfully sent a fax to
> their stand-alone fax machine, on or about on or about [sic]
> April 2, 2020, April 16, 2020, April 21, 2020, and June 9,
> 2020, that states: "In-Office and Telemedicine

> Appointments for Pain Available!["] or "Dedicated
> Physician Hotline for Pain Management Referrals."

(Id. at 10; see also Doc. 104; Doc. 121.)  Defendants oppose certification of either

class.  (Doc. 98; Doc. 115.)  They also move for summary judgment on Scoma's TCPA

claim, again contending that section 227(b)(1)(C) of the TCPA is unconstitutional

because it violates the First Amendment.  (Doc. 116.)  Scoma has responded in

opposition.  (Doc. 130.)  The United States has intervened in this action to file a

Brief Supporting the Constitutionality of 47 U.S.C. § 227(b)(1)(C).  (Doc. 129.)

Defendants filed a consolidated reply as to both responses.  (Doc. 134.)

## DISCUSSION

Because class certification would be inappropriate if the Court were to find

section 227(b)(1)(C) unconstitutional, the Court first addresses Defendants' motion

for summary judgment.  Put simply, the Court agrees with nearly every court to

decide the issue: Intermediate scrutiny under the First Amendment applies, and

section 227(b)(1)(C) passes intermediate scrutiny.  Next, as to class certification, the

Court finds that even if Scoma has established that its proposed classes satisfy Rule

23(a)'s prerequisites, Scoma has not satisfied Rule 23(b)(3)'s predominance or

superiority prongs as to either class.  Thus, class certification is inappropriate.

## I.    Antecedent Issues Prior to Constitutional Ruling

As an initial matter, the United States argues that before addressing

Defendants' constitutional challenge to the TCPA, the Court must first resolve "two

nonconstitutional issues": (1) whether Defendants' fax constitutes an "unsolicited

advertisement"; and (2) whether Defendants had an established business

relationship with Scoma.  (Doc. 129 at 3 (citing Nw. Austin Mun. Util. Dist. No. One v. Holder, 557 U.S. 193, 204–05 (2009); Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94–95 (1998).)  The United States further asserts that this is true "even if Defendants concede these issues, because courts 'are not bound to decide a matter of constitutional law based on a concession by the particular party before the Court as to the proper legal characterization of the facts.'"  (Id. (quoting Colo. Republican Fed. Campaign Comm. v. Fed. Election Comm'n, 518 U.S. 604, 622 (1996).)  Neither Scoma nor Defendants address these contentions.

As the United States implicitly acknowledges, however, Defendants do not raise as a defense in their motion for summary judgment that the fax at issue did not constitute an unsolicited advertisement or that they had an established business relationship with Scoma.  Notably, Defendants argued in their motion to dismiss that the fax did not constitute an unsolicited advertisement under the TCPA, and this Court determined that a reasonable trier of fact could conclude otherwise.  (Doc. 53 at 5–11.)  And no defense premised on an established business relationship with Scoma was previously raised.  (Id. at 11 n.5.)  Although the United States relies on Colo. Republican Fed. Campaign Comm. for the proposition that this Court is not bound by a party's apparent concessions, the "concession" there related to the underlying constitutional issue itself, not an independent, nonconstitutional basis to dispose of a plaintiff's claim.  518 U.S. at 622.  At bottom, this Court addresses the defenses and arguments presented by the parties.

Even assuming the Court must first resolve these two nonconstitutional questions, their resolution would not allow the Court to avoid answering the constitutional question presented.  Indeed, in evaluating the potential defenses of an established business relationship with Scoma and that the fax does not constitute an unsolicited advertisement, the record does not support a finding that there is no genuine issue of material fact and Defendants are entitled to judgment as a matter of law on Scoma's TCPA claim.  See Fed. R. Civ. P. 56(a).  Despite its assertions, the United States provides no authority to support its contention that the Court must conclusively determine, at this stage in litigation, that Defendants are "liable" for violating the TCPA.  (Doc. 129 at 4.)  In short, the nonconstitutionally-based questions identified by the United States do not present a basis to avoid resolving Defendants' challenge to the constitutionality of section 227(b)(1)(C).

## II.    Whether Section 227(b)(1)(C) Violates the First Amendment

Federal Rule of Civil Procedure 56 states that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Defendants contend that summary judgment is warranted in their favor on Scoma's TCPA claim because the statute's junk fax provision violates the First Amendment.  Upon careful review, the Court disagrees.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.  Content-based restrictions

7

"are presumptively unconstitutional" and subject to strict scrutiny, which requires that the restrictions be "narrowly tailored to serve compelling state interests."  Reed v. Town of Gilbert, 576 U.S. 155, 163 (2015).  Restrictions on commercial speech that concerns "lawful activity" and is not "misleading," however, need only withstand "intermediate scrutiny" and satisfy a three-prong test: (1) the government interest must be "substantial"; (2) the regulation must "directly advance[] the governmental interest asserted," and (3) the regulation cannot be "more extensive than is necessary to serve that interest."  Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n, 447 U.S. 557, 566 (1980).

Because section 227(b)(1)(C) of the TCPA regulates commercial speech, intermediate scrutiny applies.  Indeed, section 227(b)(1)(C) regulates unsolicited advertisements, which the TCPA defines as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise."  47 U.S.C. § 227(a)(5).  The provision thus applies only to speech "inextricably linked to underlying economic content."  Dana's R.R. Supply v. Att'y Gen., 807 F.3d 1235, 1246–47 (11th Cir. 2015).

Contrary to Defendants' suggestion, strict scrutiny review is not automatically triggered simply because the Court looks at the "content" of the faxes to determine whether they constitute commercial speech.  (Doc. 116 at 11; Doc. 129 at 6–7.)  As the Supreme Court recently explained in City of Austin v. Reagan Nat'l Advertising of Austin, LLC, "[u]nderlying [commercial speech cases] is a rejection of

the view that <u>any</u> examination of speech or expression inherently triggers heightened First Amendment concern." 142 S. Ct. 1464, 1474 (2022). Rather, "restrictions on speech may require some evaluation of the speech and nonetheless remain content neutral." <u>Id.</u> at 1473. And as the Court reiterated, laws "regulat[ing] only commercial speech" are "subject to intermediate scrutiny in any event." <u>Id.</u> at 1471 n.3, 1474.

Defendants' reliance on <u>Reed</u> is unavailing. <u>See</u> Wollschlaeger v. Governor of Fla., 848 F.3d 1293, 1306–09, 1311–17 (11th Cir. 2017) (appearing to apply intermediate scrutiny to commercial speech regulation post-<u>Reed</u>); Ocheesee Creamery LLC v. Putnam, 851 F.3d 1228, 1235 n.7 (11th Cir. 2017). So too is Defendants' argument that <u>Central Hudson</u> is inapplicable because the FCC has interpreted the TCPA's definition of "unsolicited advertisement" to include both commercial and noncommercial speech. (Doc. 116 at 14–16.)

To the contrary, although the FCC issued an order construing that definition to include messages "promot[ing] goods or services even at no cost," 21 FCC Rcd. 3787, 3814–15 (2006), those messages are nonetheless "inextricably linked to underlying economic conduct." Dana's R.R. Supply, 807 F.3d at 1246–47. As an illustrative example, the FCC explained that a message that was "a pretext to advertise commercial products and services" or "part of an overall marketing campaign to sell property, goods, or services" would constitute an unsolicited advertisement. 21 FCC Rcd. at 3814. A relevant question is thus whether the fax's "primary purpose is informational, rather than to promote commercial products."

Id.  More fundamentally, Defendants do not support the proposition that an

agency's interpretation can render unconstitutional an otherwise valid statute.

See, e.g., Arizona v. Inter Tribal Council of Ariz., Inc., 570 U.S. 1, 18 (2013).[3]

Having determined that intermediate scrutiny applies, the Court next finds

that section 227(b)(1)(C) passes this level of scrutiny.  In so finding, the Court

agrees with nearly every court to decide the issue.  (See Doc. 129 at 5, n.2, 13

(collecting cases).)  Put simply, section 227(b)(1)(C) directly advances Congress's

substantial interest in protecting individuals from the privacy intrusion and

financial and operational costs of junk faxes, and it is not more extensive than

necessary to serve that interest.  See Missouri ex rel. Nixon v. Am. Blast Fax, Inc.,

323 F.3d 649, 655–60 (8th Cir. 2003).  As other courts have noted, in enacting the

provision, Congress relied on sufficient evidence of the harm it sought to remedy,

consulted research about junk faxes, and held hearings with witness testimony.  Id.

at 654.[4]

_____

[3] As an independent basis for the application of intermediate scrutiny review,
the United States argues that section 227(b)(1)(C) is a content-neutral time, place,
and manner restriction on speech.  See Ward v. Rock Against Racism, 491 U.S. 781,
791 (1989).  Indeed, the provision sets forth but one method of conveying the
information—by an unsolicited fax promoting sales or services—and does not
prohibit any individual from communicating a particular message.  See, e.g., City of
Austin, 142 S. Ct. at 1472–73 (finding ordinance that treated some billboards
differently but did "not single out any topic or subject matter for differential
treatment" similar to time-place-manner restriction subject to intermediate
scrutiny); Harbourside Place, LLC v. Town of Jupiter, 958 F.3d 1308, 1318 (11th
Cir. 2020).  In all events, intermediate scrutiny applies for the reasons noted above.

[4] As this Court noted in its order denying Defendants' motion to dismiss,
(Doc. 53 at 14), the Supreme Court recently upheld the TCPA's robocall restriction
after severing it from a content-based exception for collection of federal debt.  See

Defendants' argument that "societal and technological changes" have diminished this interest is unpersuasive and has been rejected by several courts. (Doc. 116 at 18).  Indeed, as one court aptly put it, "[a]lthough advances in technology may have made the processing of unwanted facsimiles less costly, the Supreme Court recognizes a property interest even if the property lacks a positive economic or market value. . . . The importance of the government's interest, therefore, remains unchanged despite technological advancements." Pasco v. Protus IP Sols., Inc., 826 F. Supp. 2d 825, 837 (D. Md. 2011) (quotation omitted).  And courts have noted that "modern faxes that are managed by servers and delivered by electronic mail still have the capability of tying up and disrupting even large business faxing operations." Id. (citation omitted); cf. Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.C., P.A., 781 F.3d 1245, 1252 (11th Cir. 2015) (finding that occupation of a recipient's fax machine constitutes Article III injury).

Next, as other courts have found, section 227(b)(1)(C)'s "prohibition on unsolicited commercial advertisements directly and materially advances the asserted governmental interest." Missouri, 323 F.3d at 658.  Indeed, it is self-evident that "prohibiting the sending of some unsolicited faxes surely reduces the costs of receiving unwanted faxes." Centerline Equip. Corp. v. Banner Pers. Serv.

---

Barr v. Am. Ass'n of Pol. Consultants, Inc, 140 S. Ct. 2335, 2347 (2020) (plurality opinion).  In its analysis, the plurality concluded that the government's interest in upholding the remainder of the robocall restriction was "protecting consumer privacy." Id. at 2348.  Notably, even if Defendants are correct that protecting consumer privacy is an impermissible post hoc justification for the junk fax ban, (Doc. 134 at 10), the Court finds the government's interest substantial without its consideration.

Inc., 545 F. Supp. 2d 768, 774 (N.D. Ill. 2008).  Moreover, commercial faxes likely constitute the bulk of unsolicited faxes, and "[b]y placing restrictions on those responsible for a large portion of the problem . . . [section 227(b)(1)(C)] directly and materially advances the congressional goal of limiting the harm arising from unsolicited fax advertisements." Missouri, 323 F.3d at 658.  Section 227(b)(1)(C) is thus "in proportion to the interest served" and "narrowly tailored to achieve the desired objective." Id. at 659 (quotation omitted).

In summary, because section 227(b)(1)(C) directly advances Congress's substantial interest in protecting individuals from the privacy intrusion and costs of junk faxes and is not more extensive than necessary, section 227(b)(1)(C) survives intermediate scrutiny and therefore does not violate the First Amendment. Accordingly, Defendants' motion for summary judgment is due to be denied.

## III.   Whether Certification of Class A, an Alternative Class, Is Appropriate

The Court now turns to Scoma's motion to certify alternative classes.  (Doc. 84.)  The party seeking class certification must show that the proposed class meets Rule 23's requirements.  Brown v. Electrolux Home Prods., Inc., 817 F.3d 1225, 1233–34 (11th Cir. 2016).  Rule 23(a) requires that: (1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect the interests of the class (adequacy).  Fed. R. Civ. P. 23(a).

The party seeking certification "must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013). Plaintiff seeks certification under Rule 23(b)(3), which requires that the Court find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Relevant considerations include: the class members' interests in individually controlling the prosecution or defense of separate actions; the extent and nature of any litigation concerning the controversy already begun by or against class members; the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and the likely difficulties in managing a class action. Id.

## 1.  Article III Standing

"For a district court to certify a class action, the named plaintiffs must have standing." Vega v. T-Mobile USA, Inc., 564 F.3d 1256, 1265 (11th Cir. 2009) (quotation omitted); see also Griffin v. Dugger, 823 F.2d 1476, 1482 (11th Cir. 1987) ("[A]ny analysis of class certification must begin with the issue of standing[.]").

A standing analysis is also intertwined with the requirements of Rule 23. As the Eleventh Circuit has explained, courts must "consider under Rule 23(b)(3) before certification whether the individualized issue of standing will predominate over the common issues in the case, when it appears that a large portion of the class does not have standing . . . and making that determination for these members of the

class will require individualized inquiries." Cordoba v. DIRECTV, LLC, 942 F.3d 1259, 1277 (11th Cir. 2019); see also Drazen v. Pinto, 41 F.4th 1354, 1361 (11th Cir. 2022).

To have Article III standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016). "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." Id. at 1548 (quotation omitted). "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." Id. (quotation omitted). For the injury to be "concrete," it must be "real," and not "abstract"; however, it need not be "tangible." Id. at 1548–49.

Defendants do not expressly challenge the Article III standing of Scoma, which received the fax on a stand-alone fax machine. See Golf Ctr.-Boca, Inc., 781 F.3d at 1253 (holding that receipt of an unsolicited fax on a stand-alone fax machine confers Article III standing).[5] They do, however, contend that a large portion of

---

[5] Defendants assert in passing that, in the context of an established business relationship, a fax's lack of a notice stating that the recipient can request to opt out of future unsolicited advertisements "is at most a bare procedural violation and would not give rise to standing to bring a TCPA claim." (Doc. 116 at 9 n.1; Doc. 98 at 34 n.7.) As noted, however, Defendants do not argue that they had an established business relationship with Scoma or any other specific recipient. And in light of other findings, it is unnecessary to determine whether, on this separate basis, "it appears that a large portion of the class does not have standing." Cordoba, 942 F.3d at 1277. Notably, several courts have found otherwise. See, e.g., Robert

Class A—namely, those individuals who received the fax via an online fax service—may lack standing.  (Doc. 98 at 36–37.)  This Court has agreed with this proposition in similar cases, and Scoma points to no circumstances warranting a different outcome here.  See Scoma Chiropractic, P.A. v. Dental Equities, LLC, No. 2:16-cv-41, 2021 WL 6105590 (M.D. Fla. Dec. 23, 2021).  For the sake of brevity, the Court finds persuasive the reasoning of other courts in this Circuit which have found that the mere receipt of a fax through an online fax service, even if in violation of the TCPA, does not cause an injury in fact.  See, e.g., Daisy, Inc. v. Mobile Mini, Inc., 489 F. Supp. 3d 1287, 1295–96 (M.D. Fla. 2020).  Indeed, unlike with a stand-alone fax machine, receipt of a fax via an online fax service would not necessarily occupy a recipient's fax machine or its line, or impose printing costs.  Further, the time spent reviewing a fax has no analogue in common law causes of action, and "it is clear Congress did not view one wasted minute spent reviewing a junk fax received through e-mail as a concrete injury."  Id. at 1293–97.

Although there may be circumstances where an individual who received a fax via an online fax service suffered an injury in fact, see Salcedo v. Hanna, 936 F.3d 1162, 1173 (11th Cir. 2019) (noting that "allegations of wasted time can state a concrete harm for standing purposes"), the Court would be required to determine on an individual basis whether each member read the fax, the time spent reviewing

---

W. Mauthe, M.D., P.C. v. MCMC LLC, 387 F. Supp. 3d 551, 556 (E.D. Pa. 2019); Gorss Motels Inc. v. Sprint Commc'ns Co., L.P., No. 3:17-CV-546 (JAM), 2020 WL 818970, at *5 (D. Conn. Feb. 19, 2020); Fauley v. Royal Canin U.S.A., Inc., No. 15 C 2170, 2017 WL 2955351, at *1 (N.D. Ill. July 10, 2017).

the fax, whether the fax was printed, or whether the member followed up on the fax.

Accordingly, as will be further explained, the question of standing would

predominate over the common issues of the class, and Class A cannot be certified.

See Cordoba, 942 F.3d at 1277.

## 2.    It is necessary to determine whether a fax received via an online fax service falls under the TCPA.

A district court must decide all questions of fact and law, even if "pertinent to

the merits determination," that "b[ear] on the propriety of class certification."

Comcast Corp., 569 U.S. at 34; see also Amgen Inc. v. Conn. Ret. Plans & Trust

Funds, 568 U.S. 455, 466 (2013) ("Merits questions may be considered to the extent

– but only to the extent – that they are relevant to determining whether the Rule 23

prerequisites for class certification are satisfied.").  As to specifically predominance,

the Eleventh Circuit has explained:

> [A] question of . . . law bears on predominance if, answered one
> way, an element or defense will require individual proof but,
> answered another way, the element or defense can be proved on
> a classwide basis.  It does not matter whether the question also
> pertains to the merits; if a question of law bears on a requirement
> of Rule 23, then the district court must answer it.

Brown, 817 F.3d at 1237 (citations omitted).

As this Court has previously found, see Scoma, 2021 WL 6105590, at *6, the

Court must at this stage of litigation determine whether the TCPA covers the

receipt of a fax via an online fax service.  This is because, as to Class A, if the Court

determines that receipt of a fax via an online fax service does not fall under the

TCPA, individual proof would be required to establish whether each member of the

16

class received the fax via a stand-alone machine or online fax service. Conversely, if the Court determines that receipt of a fax via an online fax service <u>does</u> fall under the TCPA, it would be unnecessary to make the individual inquiry and the element—that the fax was sent to a "telephone facsimile machine"—could be proven on a classwide basis, for example, by the transmission log of successfully sent faxes. <u>Cf.</u> <u>True Health Chiropractic Inc. v. McKesson Corp.</u>, No. 13-cv-02219-HSG, 2020 WL 7664484, at *8 (N.D. Cal. Dec. 24, 2020) (noting that in separating online and stand-alone machine classes, the court was "enab[ling] a process for identifying those who received faxes via an online fax service . . . [s]o rather than posing a threshold 'jurisdictional' issue . . . the question of whether the Online Fax Service subclass has a claim under the TCPA is simply a common merits question whose answer will be the same for all members of that subclass"). Accordingly, because the question bears on predominance, the Court must answer it. <u>See</u> <u>Comcast Corp.,</u> <u>569 U.S. at 34</u>.[6]

### 3.    The TCPA does not apply to receipt of a fax via online fax service.

The Court agrees with several other courts in finding that receipt of a fax via an online fax service, as opposed to a stand-alone fax machine, does not support a TCPA claim. <u>See, e.g.,</u> <u>Licari Family Chiropractic Inc. v.</u> <u>Eclinical Works, LLC,</u> No.

---

[6] A similar individualized inquiry is necessary due to Article III standing concerns. Although there are thus two independent reasons requiring the inquiry, both are relevant to the same predominance analysis: whether, as to Class A, common issues will predominate over individual issues. There is nothing in <u>Brown</u>, <u>Amgen</u>, or <u>Comcast</u> that suggests a question of law does not "bear on" predominance where any required individualized inquiry would overlap with another inquiry.

8:16-cv-3461-MSS-JSS, 2021 WL 4506405, at *4–7 (M.D. Fla. Jan. 11, 2021); Career Counseling, Inc. v. Amerifactors Fin. Grp., LLC, No. 3:16-cv-03013-JMC, 2021 WL 3022677, at *8–10 (D.S.C. July 16, 2021); True Health Chiropractic Inc., 2020 WL 7664484.

First, the Bureau's decision in AmeriFactors is entitled to deference under the Chevron doctrine.[7] See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984); Palm Beach Golf, 781 F.3d at 1257 n.12 (collecting cases that have deferred to the FCC's construction of the TCPA in reports and orders "issued without the formalities of regulations"). Deference is appropriate "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that agency interpretation claiming deference was promulgated in the exercise of that authority." Palm Beach Golf, 781 F.3d at 1256 (quotation omitted). The Eleventh Circuit has found that Congress "delegated to the FCC authority to promulgate binding legal rules to carry out the provisions of the TCPA." Id. (quotation omitted). Additionally, the Eleventh Circuit has held that an order issued under "delegated rulemaking authority" by the Bureau has the "same force and effect of the Commission." Gorss Motels, Inc. v. Safemark Sys., LP, 931 F.3d 1094, 1104 (11th Cir. 2019) (citing 47 C.F.R. § 0.203(b)).

Further, the first step in the Chevron analysis is satisfied because Congress has not "directly spoken to the precise question at issue" and its intent is not clear.

---

[7] Although this Court has previously determined that AmeriFactors is not a "final order" requiring deference under the Hobbs Act, Defendant NSPC "preserves its argument" that such deference is required. (Doc. 98 at 21.)

See Chevron, 467 U.S. at 842–43.  As other courts have observed, Congress did not define "any of the . . . terms used in the definition of a telephone facsimile machine, and the ordinary definitions of those terms do not shed light on whether an online fax service is included in that definition."  Advanced Rehab, 2020 WL 4937790, at *5.

Second, the FCC's determination is "based on a permissible construction of the statute."  See Chevron, 467 U.S. at 843.  In determining that online fax services fall outside the scope of the TCPA, the FCC sought comments from the community, reviewed an extensive record, and concluded that Congress intended to protect against harms associated with the use of equipment that had the capacity to print.  AmeriFactors, 2019 WL 6712128, at *2–4 (citations omitted); see Palm Beach Golf, 781 F.3d at 1257.  The Bureau further reasoned that, under the plain terms of the TCPA, an online fax service does not constitute a "telephone facsimile machine."  AmeriFactors, 2019 WL 6712128, at *3.  And while Congress "made clear that the proscription applies when such a fax is sent from" devices other than a telephone facsimile machine, Congress expressly narrowed the equipment to which it is prohibited to send an unsolicited fax.  Id.  In short, this determination is based on a permissible construction of the statute.

Even if Chevron deference did not apply, AmeriFactors would still be persuasive because the decision is well-reasoned, based on a voluminous record, consistent with earlier and later pronouncements, and decided by the agency with the requisite expertise.  See Martin v. Soc. Sec. Admin., Comm'r, 903 F.3d 1154,

1159 (11th Cir. 2018) (citation omitted).  In fact, the FCC has since reaffirmed AmeriFactors.  See In the Matter of Joseph T. Ryerson & Son, Inc. Pet. for Expedited Declaratory Ruling, No. 02-278, 05-338, 2020 WL 5362216, at *4 (OHMSV 2020).[8]  In summary, the Court finds that the TCPA does not cover receipt of a fax via an online fax service.

## 4.    Plaintiff has not satisfied Rule 23(b)(3) as to Class A.

Even assuming Scoma has met Rule 23(a)'s prerequisites, it has not satisfied Rule 23(b)(3) as to Class A.[9]  First, to establish predominance, Scoma must show that "the issues in the class action that are subject to generalized proof and thus applicable to the class as a whole . . . predominate over those issues that are subject only to individualized proof."  Babineau v. Federal Exp. Corp., 576 F.3d 1183, 1191 (11th Cir. 2009) (citation omitted).  "Common issues of fact and law predominate if they have a direct impact on every class member's effort to establish liability . . . [and] will not predominate over individual questions if, as a practical matter, the resolution of an overarching common issue breaks down into an unmanageable variety of individual legal and factual issues."  Id. (internal quotation marks,

---

[8] Because the faxes here were received after AmeriFactors was decided (Doc. 1 at 2, ¶ 3), it is unnecessary to determine whether the decision applies retroactively.  See Heimmermann v. First Union Mortg. Corp., 305 F.3d 1257, 1260 (11th Cir. 2002).

[9] Defendants contend that Scoma's claims are not typical of the claims or defenses of Class A.  (Doc. 98 at 26–27.)  As noted, however, it is unnecessary to resolve this contention due to Scoma's failure to satisfy Rule 23(b)(3).

brackets, and citations omitted).  Courts should examine the claims, defenses, relevant facts, and applicable substantive law.  Id.

As to Class A, although the members' claims relate to similar fax transmissions, the common issues do not predominate because individualized inquiries would be required to determine whether each member received a fax via a stand-alone machine or online fax service.  These inquiries would be necessary for two independent reasons: (1) as a threshold question of whether each member has Article III standing; and (2) because only those who received a fax via a stand-alone machine could potentially have a valid TCPA claim, and thus the element of receipt on a "telephone facsimile machine" would not be subject to classwide proof.  The Article III standing inquiry would require further analysis of, among other things, whether the member read the fax, how long it took that member to read the fax, and whether there were any other potential bases to support an injury in fact.

As Defendants observe, there may also be additional individualized inquiries required in this case.  Unlike cases in which a defendant blasted an advertisement to a purchased list of fax numbers, the record reflects that the faxes here were sent to known medical providers who had provided their fax numbers in referring patients to Defendants for medical treatment, including Scoma.  (Doc. 84-2 at 113–14, 142–43; Doc. 116-2 at 57–59.)  Accordingly, although Defendants do not argue Scoma consented to the fax, there may potentially also be individualized issues relating to consent as to other putative members.  See, e.g., Physicians Healthsource, Inc. v. Cephalon, Inc., 954 F.3d 615, 619 (3d Cir. 2020) ("The

21

voluntary provision of a [fax] number . . . constitutes express consent such that a received message is solicited and thus not prohibited by the TCPA, if the message relates to the reason the number was provided."); see also 47 U.S.C. § 227(a)(5) (defining "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise").[10]

_____

[10] Scoma's deposition testimony suggests the potentially individualized nature of any inquiry into consent:

> Q. Why did you put [your fax] number at the top of this document when you created the form?
> A. Because sometimes doctors need to fax me reports or—or they need to fax me a prescription on patients sometimes. . . .
> Q. So by writing the number here, you were asking for some things but not asking for other things [to be faxed], correct?
> A. Yes. . . .
> Q. . . . . [H]ow do the physicians who receive this and see your number on top know what they're allowed to send you and what they're not allowed to send you?
> A. I would say it's sort of an unwritten law that physicians have with one another. . . .
> Q. Do you know whether all physicians view this the same as you or have different opinions?
> A. You'd have to ask them specifically, take a survey.
> Q. You don't know one way or another?
> A. No.

(Doc. 116-2 at 61–63.)  Although Scoma contends that "permission based on referrals from physicians . . . is a classwide issue," the nature of the referrals—and therefore the issue of consent—may differ among the putative class members.  (Doc. 104 at 19); see e.g., Jeffrey Katz Chiropractic, Inc. v. Diamond Respiratory Care, Inc., 340 F.R.D. 383, 388 (N.D. Cal. 2021) ("[C]ommon issues do not predominate when the consent defense has considerable factual variation because it is based on

These potentially individualized issues would also predominate over any common questions of fact or law, such as whether the faxes at issue constituted advertisements.  (See, e.g., Doc. 21 at 14–24); Cordoba v. DIRECTV, LLC, No. 1:15-CV-3755-MHC, 2020 WL 5548767, at *4–7 (N.D. Ga. July 23, 2020) (finding no predominance due to failure to provide evidence of how many class members asked not to be called); Hicks v. Client Servs., Inc., No. 07-61822-CIV, 2008 WL 5479111, at *7 (S.D. Fla. Dec. 11, 2008) ("Several courts have held that proof of consent is an essential individual issue under the TCPA that makes class certification inappropriate." (collecting cases)); Gene and Gene LLC v. BioPay LLC, 541 F.3d 318, 329 (5th Cir. 2008) (rejecting certification in TCPA case because plaintiff did not prove individual questions of consent would not predominate).

Although ultimately unnecessary to support a finding that certification is inappropriate, the Court is also troubled by apparent flaws in the classwide evidence set forth by Scoma.  For example, Scoma's expert analyzed two different sets of log files compiling the same faxes.  One analysis resulted in a 99.9% completion rate, and another analysis resulted in a completion rate of 71.4%.  (Doc. 84-5 at 166–68, 241.)  The expert acknowledged that he had "no ability to test" the reliability of these records and that he did not contact InterFAX, the entity that

---

individual communications and personal relationships between [defendant's] representatives and their customers." (quotation omitted)).

Another potential defense to TCPA liability would be an established business relationship between the fax sender and recipient, but here it is undisputed that there was no compliant opt-out notice on the faxes.  See Bais Yaakov of Spring Valley v. Fed. Commc'ns Comm'n, 852 F.3d 1078, 1081–82 (D.C. Cir. 2017).

transmitted the faxes.  (Id. at 196–97.)  Although he agreed that one possibility would be to ask the members if they received the faxes, such a process, of course, would require individualized inquiries.  (Id.)

In summary, these complex individualized inquiries would dwarf the common issues among the class.  Accordingly, Scoma has not established predominance as to Class A.  Nor has Scoma established that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  Fed. R. Civ. P. 23(b)(3).

"Superiority" addresses "the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs."  Klay v. Humana, Inc., 382 F.3d 1241, 1269 (11th Cir. 2004).  As the Eleventh Circuit has observed, a "lack of predominance . . . effectively ensures that, as a substantive matter, a class action is almost certainly not superior to other available methods for fairly and efficiently adjudicating the controversy."  Vega, 564 F.3d at 1278 n.18.  Upon review of the relevant factors, Scoma has not shown that a different outcome is warranted here.  Because Scoma has not satisfied the predominance and superiority requirements of Rule 23(b)(3), certification of Class A is inappropriate.

## IV.    Whether Certification of Class B Is Appropriate

Even assuming Scoma has met Rule 23(a)'s prerequisites as to Class B, it has not established predominance and superiority.[11]  Here, it is necessary to address ascertainability and administrative feasibility.

The Eleventh Circuit has instructed that "ascertainability" requires that the class is adequately defined by objective criteria, and that "administrative feasibility is not a requirement for certification under Rule 23." Cherry v. Dometic Corp., 986 F.3d 1296, 1302–04 (11th Cir. 2021).  However, administrative feasibility "remains relevant to whether a proposed class may proceed under Rule 23(b)(3)" and is relevant to Rule 23(b)(3)(D)'s "manageability" factor. Id. at 1301–04.  "That provision requires a comparative analysis that is incompatible with a threshold, standalone administrative feasibility requirement, and the court must weigh any manageability concerns against the advantages of proceeding as a class action." Rensel v. Centra Tech, Inc., 2 F.4th 1359, 1369 (11th Cir. 2021) (quotation omitted).

Here, the putative members of Class B (and for that matter, Class A) are ascertainable in the sense that the class is defined by objective criteria.  However, as it relates to Rule 23(b)(3)(D)'s manageability factor, administrative feasibility— or the lack thereof—gives the Court pause.  Indeed, a "difficulty in identifying class

---

[11] Defendants contend that Scoma's claims are not typical of the claims or defenses of Class B and that Scoma has failed to establish numerosity. (Doc. 98 at 25–27.)  As noted, however, it is unnecessary to resolve these contentions due to Scoma's failure to satisfy Rule 23(b)(3).

members is a difficulty in managing a class action." Cherry, 986 F.3d at 1303–04. Here, Scoma has failed to show that its subpoena process resolves this difficulty.

In support of certification, Scoma offers a spreadsheet that purports to compile the subpoena responses from phone carriers and a declaration in which Scoma's counsel draws conclusions from those responses. (Doc. 84-5 at 2–7.) As an initial matter, Scoma cites no authority in its motion demonstrating that this is sufficient. See, e.g., In re Disposable Contact Lens Antitrust, 329 F.R.D. 336, 359 (M.D. Fla. 2018) ("[T]he Eleventh Circuit require[s] the Court to resolve any challenge to the reliability of information presented in an expert's report which is being offered in support of a motion for class certification." (quotation omitted) (emphasis added)).  Glaringly absent is evidence supporting the conclusions counsel draws, such as the subpoena responses from the phone carriers.[12]  In all events, counsel's conclusions are contradicted by the purported subpoena responses themselves—and by common sense.

For example, there are, by the latest count, at most 8,144 individuals who received the faxes at issue.  Of these, telephone carriers of numbers corresponding to 624 members did not respond at all, and telephone carriers of numbers corresponding to 377 members responded in a way that indicates the members received the fax via an online fax service.  (Doc. 84-5 at 5.)  Significantly, as to more than 6,000 of the remaining numbers, the telephone carriers responded that, in

---

[12] The Court acknowledges Scoma's belated invitation for the Court to view the subpoena responses in camera.  (Doc. 104 at 12.)

essence, they do "not have information available to allow [the telephone carrier] to determine whether the customer . . . used a standalone fax machine or online fax service."  (Doc. S-98-9 at 10.)

Although Scoma concludes that based on the subpoena responses 7,137 numbers correspond to stand-alone fax machines (Doc. 84-5 at 5), this total merely reflects the numbers for which the <u>carrier</u> did not provide an online fax service.  It does not necessarily follow that, because the carrier did not provide an online fax service to a user, that user received the fax on a stand-alone fax machine.  Instead, as several of the carriers' declarations confirm, the carriers are unable to determine whether their customers used an online fax service.  (<u>See</u> Doc. S-98-9.)  There are, after all, fax services that are not provided by carriers and other methods of receiving faxes that are, evidently, not discernable.  (<u>See, e.g.</u>, Doc. 84-5 at 264; Doc. 84-3 at 39; Doc. 84-3 at 38; Doc. 98 at 13–14, 16 n.4; Doc. S-104-2; Doc. S-104-3); True Health Chiropractic Inc. v. McKesson Corp., No. 13-cv-02219-HSG, 2021 WL 4818945, at *1 n.2 (N.D. Cal. Oct. 15, 2021) (rejecting unsupported conclusion that class members "must have used a stand-alone fax machine").  Significantly, as Defendants observe, contrary to Scoma's proposed subpoena process and this Court's authorization order, Scoma did not ask the phone carriers the subscriber's name associated to a particular number, which may have helped identify where an online fax provider is the subscriber of a number.  (Doc. 98 at 15–16.)[13]

---

[13] To this point, Scoma responds that the "Court's approval of the Cable Act motion wasn't based on an exact subpoena process" and that, akin to a mere formality, "as to responding cable companies, the order was a requirement" because

In short, Scoma has failed to establish that, through its own proposed subpoena process, it is administratively feasible to identify users of stand-alone fax machines.  Cf. True Health Chiropractic Inc., 2021 WL 4818945, at *3 (granting motion to decertify class and noting that "[s]imply asking whether various phone carriers themselves provided online fax services does not provide uniform class-wide proof that each class member received the faxes at issue in the manner necessary to give rise to TCPA liability"); Career Counseling, 2021 WL 3022677, at *12 ("The court finds that it would need to make an individualized inquiry of each class member to determine if the fax number identified in the fax log actually was linked to a stand-alone fax machine . . . .").[14]  With this little to go on, any other process, such as subpoenas directed at the more than eight thousand fax recipients, is unworkable or administratively infeasible—and, in all events, not adequately outlined in Scoma's motion or even reply.  (See Doc. 104 at 18.)

---

"phone carriers not subject to the Cable Act often insist on such an order." (Doc. 104 at 9.)  To the contrary, in seeking authorization Scoma outlined a detailed, three-step process by which it sought specific information, including subscriber names and addresses, and that was the process authorized by the Court.  (Doc. 69.) The Court subsequently confirmed that the full order, which included instructions as to the content of the subpoenas, should be attached to the subpoenas.  (Doc. 74.) Notwithstanding Scoma's failure to seek the information, a small percentage of carriers provided subscriber names on their own volition.  (See Doc. 115 at 4.)

[14] The Court is mindful that other courts have addressed this issue in terms of predominance or ascertainability as a threshold requirement.  Here, the issue rears its head in the context of Rule 23(b)(3)(D)'s manageability factor, but the outcome is the same: Certification is inappropriate.

The Eleventh Circuit has cautioned that "[a]dministrative feasibility alone will rarely, if ever, be dispositive." Cherry, 986 F.3d at 1305.  However, a review of Rule 23(b)(3)'s factors reveals that a class action would create more manageability problems than its alternatives, and those concerns outweigh any advantages of a class action.  Id. at 1304–05.[15]  As for any advantages, as Defendants observe, some individuals received four faxes in violation of the TCPA, which could net up to $6,000 in statutory damages.  (Doc. 84-2 at 299–01; Doc. 98 at 41); 47 U.S.C. § 227(b)(3).  Unlike in other cases, the claims here are not so small as to not incentivize separate actions by the putative class members.  See, e.g., Carriuolo v. Gen. Motors Co., 823 F.3d 977, 989 (11th Cir. 2016).

Moreover, because this motion follows Scoma's failed attempts to distinguish between users of stand-alone fax machines and online fax services, it is unnecessary to wait "to decertify a certified class that turns out to be unmanageable." Cherry, 986 F.3d at 1304 (citation omitted); see e.g., Scoma, No. 2:16-cv-41, ECF No. 205, at *5 (Mar. 16, 2022) (denying immediate review of order granting motion to certify where "plaintiffs haven't yet had the chance to attempt to show that such a determination [of who is in a stand-alone fax machine class] is, in fact, possible"); Jeffrey Katz Chiropratic, Inc., 340 F.R.D. at 390 (concluding at the outset that, due to identification difficulties, class action was not superior vehicle for dispute).

_____

[15] For similar reasons, Scoma has failed to establish superiority, even if it has established predominance.  See Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc., 601 F.3d 1159, 1184 (11th Cir. 2010) (noting relationship between predominance and superiority prongs); Vega, 564 F.3d at 1278 n.18 (same).

In addition to the sheer administrative infeasibility, other reasons countenancing denial of certification of Class B exist.  For example, even assuming every member of Class B has Article III standing, it may still be necessary, as with Class A, to conduct individualized inquiries into whether a member consented to or solicited the fax advertisements.  These complex issues, as previously explained in the context of Class A, would predominate over any common questions of law and fact.

In summary, upon applying Rule 23(b)(3) and mindful of the applicable burden of proof, the Court determines that certification of either Class A or Class B is inappropriate.  To be sure, the Court acknowledges that, against the backdrop of Cherry, this may be a closer call, but "the entire point of a burden of proof is that, if doubts remain about whether the standard is satisfied, the party with the burden of proof loses."  Brown, 817 F.3d at 1233 (quotation omitted).  After all, "the presumption is against class certification because class actions are an exception to our constitutional tradition of individual litigation."  Id. (citations omitted).

## CONCLUSION

Defendants' motion for summary judgment (Doc. 116) and Plaintiff's motion for class certification (Doc. 84) are **DENIED**.  Defendants' request for oral argument on the motion for class certification is also **DENIED**.  (Doc. 100.)

**ORDERED** in Fort Myers, Florida, on November 3, 2022.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE