UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

SCOMA CHIROPRACTIC, P.A., a
Florida corporation, individually and
as the representative of a class of
similarly-situated persons,

      Plaintiffs,

v.

NATIONAL SPINE AND PAIN
CENTERS, LLC, a Delaware limited
liability company, SPINE CENTER
OF FL, LLC, and PAIN
MANAGEMENT CONSULTANTS OF
SOUTHWEST FLORIDA, P.L.,
Florida limited liability companies,

      Defendant.

Case No:  2:20-cv-430-JLB-NPM

---

**<u>ORDER</u>**

Plaintiff Scoma Chiropractic, P.A. ("Scoma") brings this case[1] against

Defendants National Spine and Pain Centers, LLC ("NSPC"), Spine Center of

Florida ("SCF"), and Pain Management Consultants of Southwest Florida, P.L

("PMC") alleging violations of the Telephone Consumer Protection Act of 1991, as

amended by the Junk Fax Prevention Act of 2005, 47 U.S.C. § 227 (the "TCPA").

(Doc. 1).  Before the Court is Scoma's Motion for Summary Judgment seeking to

---

[1] Scoma initially filed this case as a class action (Doc. 1) and on April 18, 2022, Scoma moved to certify the class.  (Doc. 84).  On November 3, 2022, however the Court denied Scoma's Motion for Class Certification.  (Doc. 141).

recover for four alleged violations of the TCPA as to faxes it claims to have received from Defendants on April 2, 2020, April 16, 2020, April 21, 2020, and June 9, 2020. (Doc. 145). Defendants have responded and Scoma has replied. (Doc. 149; Doc. 152). For the reasons set forth below, Scoma's Motion for Summary Judgment is **GRANTED in part and DENIED in part**.

## UNDISPUTED FACTS

Scoma is a chiropractic office in Cape Coral, Florida, which is owned and operated by Dr. Louis Scoma. (Doc. 84-2 at 311–12; Doc. 98-5 at 2). NSPC is a Delaware company that provides human resources, finance, marketing, and information technology services to its affiliated pain relief providers. (Doc. 84-2 at 5, 36). PMC is a pain management provider affiliated with NSPC and serving Southwest Florida in its Bonita Springs, Cape Coral, and Fort Myers offices. (Doc. 95-2 at 12, 26; Doc. 84-2 at 267). The medical services available in those PMC locations are provided by SCF. (Doc. 84-2 at 277).

NSPC maintained an account with Interfax, a cloud-based fax platform through which users can send faxes. (Doc. 84-2 at 201–02; Doc. 104-1 at 14). NSPC's chief marketing officer, William Koleszar, had a login ID and password for Interfax and sent faxes for NSPC using Interfax. (Doc. 84-2 at 27, 29, 43–44). Sending "fax blasts" to providers was one of the techniques that the NSPC marketing team used "to engage referral sources." (Doc. S-84-7 at 6). On April 6, 2020, for example, Mr. Koleszar sent an email to a colleague stating "[a] fax blast to

2

10,000+ referral sources was sent out last week and we plan to continue doing that each week for the foreseeable future."  (*See id.*)

On April 3, 2020, NSPC and PMC sent an unsolicited fax advertisement to Scoma.  (Doc. 84-2 at 335–36; Doc. 144 at 3).  The fax was related to scheduling in-office and telemedicine appointments for pain management.  (*Id.* at 150).  Dr. Scoma recalled receiving this fax and explained that he "took it and put it into [the office's] fax folder."  (*Id.* at 335).  Dr. Scoma knew the fax came from Defendants because "it had their name on the [ ] ad."  (*Id.*)  Further, the parties have jointly stipulated that, for the purposes of Plaintiff's individual TCPA claims, NSPC and PMC—but not SCF—were the senders of such fax.  (Doc. 144 at 3).  And Dr. Scoma testified that the damage Scoma suffered because of the fax included "the tying up of the fax line."  (Doc. 84-2 at 339, 341–42).  This unsolicited fax prompted Scoma to file this lawsuit.  (*Id.* at 301).

### A. The Fax Logs

During this litigation, Scoma subpoenaed NSPC's fax records from Interfax via Interfax's parent company, Upland Software.  (Doc. 104-1 at 5, 15–16).  Upland Software produced a .csv—or comma-separated value—file, which contained fax logs for NSPC between August 22, 2016 and August 27, 2020.  (*Id.* at 21; Doc. 84-2 at 108).  Mark Hardin, a Director of Sales and Operations at Upland Software, testified that the faxes sent by NSPC were attributable to NSPC because they contained a user ID of "NSPC."  (Doc. 104-1 at 21–22).  Mr. Hardin further testified that the fax logs attributable to Scoma were "retrieved from the system of record

database of Interfax by using a query on the database to retrieve all of the transactions for this particular customer." (*Id.* at 22–23). The fax logs contained data for each fax including a unique transaction number assigned by Interfax, the user that submitted the transaction, the time the transaction was submitted, the fax number that the user requested to send the particular fax to, the subject of the fax, the time that it took to transmit the fax in seconds, and the status of the transaction, wherein "[z]ero represents successful transmission." (*Id.* at 22–26). Mr. Hardin testified that it was very important for Upland to create fax logs that are accurate and reliable to maintain the integrity of the data, which is used as a basis for charging Upland's customers for the faxes they send. (*Id.* at 30).

Robert Biggerstaff, Scoma's expert, analyzed the fax log data and found "47,619 fully received error-free fax transmissions," which were received by 11,193 unique fax numbers. (Doc. 84-2 at 177, 179–80). Mr. Hardin testified that this high rate of successful transmission was "possible," and it would not be "unusual" for a fax log—even one with tens of thousands of rows of data—to "have all zero successful transmission statuses for those faxes." (Doc. 104-1 at 39–40). Mr. Biggerstaff defined "fully received" as meaning that "the receiving fax machine sent a positive acknowledgement in accordance with the fax protocols back to the sender, and then the sender processed that successfully." (Doc. 84-5 at 131). This positive acknowledgement occurs at what Mr. Biggerstaff referred to as the "[p]ost-message procedure" phase of fax transmission. (Doc. 84-2 at 181). At this phase, "an end-of-fax instruction which indicates no more messages are left to be sent will cause the

receiving device to confirm that message back to the sending device." (*Id.* at 182). After this phase, "the sending device may transmit a disconnect signal," which indicates that the fax transmission ends. (*Id.*) As Mr. Biggerstaff testified:

> If you look at a paradigm of Point A to Point B to Point C . . . where Point A is the sending fax machine, Point B is the receiving fax machine or fax server, and then Point C is the human being who ultimately is the person you want their eyeballs to look at the fax, an online fax service or a fax server sits at Point B. And the positive confirmation in the logs [is] a record of the successful transmission without error between Point A and Point B. And . . . the faxes that I report on as fully received, error-free transmissions were fully received error-free transmissions received at Point B . . . It is irrelevant or doesn't have anything to do with the subsequent, separate journey from Point B to Point C to reach the eyeballs of the individual who the sender wanted to see the fax transmission—or the image sent in the fax transmission.

(Doc. 84-5 at 136–37).

According to Mr. Biggerstaff, "error-free fax transmission" does not require that a person—Point C in his "paradigm"—look at the fax, nor does it require that any paper or document or image be printed by a fax machine; instead, all that is required for successful fax transmission is that the fax data makes it from Point A, the sender's fax machine, to Point B, the recipient's fax machine. (Doc. 84-2 at 430, 437). As Mr. Biggerstaff stated in his report, "[a] fax transmission is a 2-way conversation between two fax machines." (Doc. 84-2 at 183). "[A] record of a successful transmission means that all the documented pages were fully received . . . . This is demonstrated by the event of the receipt from the receiving machine of the positive confirmation of receipt of the transmission." (*Id.* at 185–86). Further, "[t]he receiving machine *must* respond. If it does not, the fax transmission is recorded as unsuccessful." (*Id.* at 184 (emphasis in original)).

5

Scoma's fax number appears on a listing of 8,147 unique fax numbers, with associated names and addresses, (*see* Doc. 84-6 at 12), which Mr. Biggerstaff describes as fax numbers which received a successful transmission from NSPC and PMC. (*See* Doc. 84-2 at 428, 435). And after examining the fax records provided by Interfax, Mr. Biggerstaff "found four records of successful fax transmissions" from NSPC to Scoma. (Doc. 84-2 at 180). These were rows in the fax log data provided by Interfax where NSPC was the user that submitted the transaction, the fax number that the user requested to send the particular fax to was Scoma's fax number, and a zero was in the transmission status column, indicating that the fax had been sent successfully. (*See* Doc. 84-2 at 400; Doc. 84-5 at 206–07). Mr. Biggerstaff determined that these four successful fax transmissions had "completion time[s]" on June 10, 2020, April 22, 2020, April 16, 2020, and April 3, 2020.[2] (Doc. 84-2 at 180). The parties do not dispute that Scoma received the fax sent by NSPC and PMC on April 2, 2020 that was delivered on April 3, 2020. (Doc. 144 at 3 n.1).

**B. Accuracy of the Fax Logs**

Mr. Biggerstaff opined that the records of confirmations were reliable because "[r]ecords automatically created by fax systems recording the result of a

_____

[2] The parties generally refer to the faxes by their "SubmitTime" date, which is the date on which the faxes were sent; however, Mr. Biggerstaff at times refers to the faxes by their "CompletionTime," which is the date on which the faxes arrived successfully at the destination fax server. (Doc. 98-6 at 36). The Court will adopt the parties' practice of referring to the faxes by their "SubmitTime" dates, but the Court notes for clarity that according to the raw data in the fax logs, the June 9, 2020 fax arrived on June 10, 2020; the April 21, 2020 fax arrived on April 22, 2020; and the April 2, 2020 fax arrived on April 3, 2020. The April 16, 2020 fax arrived later in the day on April 16, 2020. (*See id.*)

transmission as successful or failure of the indicated number of pages, are reliable and are relied on in businesses and in the fields of computer analysis and forensics." (Doc. 84-2 at 179).  Specifically, Mr. Biggerstaff testified that the "only time" he has ever heard of a record being "automatically created by a fax system that [wa]s not reliable and accurate" was a "false negative" where "the sending machine's perspective [wa]s that the transmission failed even though the receiving machine did receive the entire payload without error and was attempting to confirm that fact with the sender."  (Doc. 84-5 at 159–60).  Mr. Biggerstaff added that "[y]ou'll never have a false positive; that is, a belief or a record that the transmission was successful when it was, in fact, not successful."  (*Id.* at 160).

While Mr. Biggerstaff stated that, "[a] small number of records" contained errors such as imbedded commas or misalignments, he "ignored" those rows in his analysis.  (*Id.* at 180 n.2).  Defendants' expert, Ken Sponsler, however, has opined that Mr. Biggerstaff's efforts to address these errata were not effective, or were poorly explained, such that grounds to question the accuracy of the information provided by Interfax remain.  (Doc. 98-6 at ¶¶ 66–67).  Specifically, Mr. Sponsler asserts that Mr. Biggerstaff's report did not entirely ignore the erroneous records because Mr. Biggerstaff improperly included records containing alignment errors due to extra commas and extra quotation marks.  (*Id.* at ¶ 66–68).  He also states that "thousands of rows of data in the fax log appear to have columns out of order when compared to the header row."  (*Id.* at ¶ 70).  For example, as shown in Figure

2[3] below, Mr. Sponsler points to a row of data in the fax logs where the entry under column with the header "UserID1" contains a date and time, rather than a sender's name, such as NSPC, while the column with the header "CompletionTime" states "NSPC" rather than a date and a time.  (Doc. 98-6 at 34).  Mr. Sponsler also asserts that Mr. Biggerstaff has not accounted for the manner in which he "ignored" these errors, if indeed he was able to ignore those errors—rendering the assumptions that Mr. Biggerstaff made about the erroneous data without substantiation.  (*Id.* at ¶ 75).

*Figure 2*



| | TransactionID | UserID1 | SubmitTime | PostponeTime | CompletionTime | UserID2 | DestinationFax | ReplyEmail |
|---|---|---|---|---|---|---|---|---|
| 1 | 682281105 | NSPC | 11/22/2016 16:30 | 0001-01-01 00:00:00 | 11/22/2016 16:31 | NSPC | 1410 88 | NULL |
| 2 | 684000444 | NSPC | 11/29/2016 16:33 | 0001-01-01 00:00:00 | 11/29/2016 16:35 | NSPC | 1410 88 | NULL |
| 3 | 826050679 | 2018-04-17 14:29:19 | 0001-01-01 00:00:00 | 2018-04-17 14:37:15 | NSPC | 001410 88 | NULL | NSPC |
| 4 | 1044468667 | NSPC | 4/21/2020 18:35 | 0001-01-01 00:00:00 | 4/21/2020 18:50 | NSPC | 1410 88 | WKoleszar@TreatingPain.com |

| | TransactionID | RemoteCSID | PagesSent | Status | Duration | Subject | PagesSubmitted | Units | CostPerUnit | SenderCSID | Column_18 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 682281105 | 410 88 | 1 | 0 | 81 | InterFAX Web fax | 1 | 1.4 | 0.11 | NSPC | NULL |
| 2 | 684000444 | 410 88 | 1 | 0 | 77 | InterFAX Web fax | 1 | 1.3 | 0.11 | NSPC | NULL |
| 3 | 826050679 | 410 88 | 1 | 0 | 1 | 180 | InterFAX Web fax | DE-MCI | 3.00 | 0.1100 | 1465441 |
| 4 | 1044468667 | 410 88 | 1 | 0 | 1 | 86 | NSPC Hotline - Maryland | 1.5 | 0.11 | NSPC | NULL |

37

(*Id.* at 34).

Finally, Mr. Sponsler questions the accuracy of the summary table that Mr. Biggerstaff provided regarding three of the four disputed faxes allegedly delivered to Scoma in April and June 2020 because those rows appear to have alignment errors.  (*Id.* at ¶ 76).  Namely, as shown in Figure 4 below, under the "Subject" column for the April 2, 2020, April 16, 2020, and April 21, 2020 faxes, "50," "40," and "87" are entered, respectively, but under the "PagesSubmitted" column, "NSPC

---

[3] The Figure numbers cited correspond to those used by Mr. Sponsler in his expert report.  They are not in any particular order determined by the Court.

Telemedicine Florida," "NSPC Telemedicine – Florida," and "PMC Hotline Launch"

are entered, respectively.

*Figure 4*



(*Id.* at 36).

Still, Mr. Sponsler did not note that any of the other data for those four faxes

appeared to be misaligned.  And Mr. Sponsler did not flag any of these alignment

issues for the fax sent on June 9, 2020, which according to the raw, uncorrected

data, was a two-page fax sent by NSPC to Scoma's fax number with the subject

"Florida Hotline 2" that was successfully delivered—as indicated by the "0" in the

status column—on June 10, 2020.  (*Id.*)  Mr. Sponsler's analysis reflects that the

data regarding the one fax that the parties agree was successfully transmitted from

NSPC and PMC to Scoma—the April 2, 2020 fax—has an alignment error wherein

the "Subject" column had a value of "50," and the "PagesSubmitted" column had a

value of "NSPC Telemedicine Florida."  (*Id.*)

The misalignment identified by Mr. Sponsler—wherein it appears that the

columns have been shifted to the right such that the entries for "Duration" were

moved into the "Subject" column, and the entries for "Subject" were moved into the

9

"PagesSubmitted" column—is not present in Mr. Biggerstaff's representation of the data as Mr. Biggerstaff shifted the implicated columns back to the left, as shown in Figure 3 below.

*Figure 3*

| Completion Time | Destination Fax | | Remote CSID | | Pages Sent | Status | Subject |
|---|---|---|---|---|---|---|---|
| 6/10/2020 18:19 | 123 | 963 | 123 | 963 | 2 | 0 | Florida Hotline 2 |
| 4/22/2020 12:48 | 123 | 963 | 123 | 963 | 2 | 0 | PMC Hotline Launch |
| 4/16/2020 20:42 | 123 | 963 | 123 | 963 | 1 | 0 | NSPC Telemedicine - Florida |
| 4/3/2020 11:44 | 123 | 963 | 123 | 963 | 1 | 0 | NSPC Telemedicine Florida |

(*Id.* at 35.)

Mr. Sponsler, however, stated in his report that he "ha[d] seen no evidence in the case indicating which columns are and are not out of alignment" and that "Mr. Biggerstaff appears to assume that he knows how the data should be aligned, without explaining any of this in his report." (*Id.* at 34).

**C. Receipt of the Faxes by an Actual Person**

Irrespective of the experts' disagreements about the accuracy of the data, it is undisputed that this data does not reflect that an actual person received the faxes. As Mr. Hardin explained in his deposition, "[t]he indication of the status zero means that [a fax] was delivered successfully to . . . either a fax service or a fax appliance, a fax machine. It does not indicate whether an actual person received it." (Doc. 104-1 at 45). And when asked whether there was "any data in . . . the fax log to indicate whether a fax was viewed by the recipient once it was successfully transmitted," Mr. Hardin answered, "[n]o." (*Id.* at 46). Mr. Biggerstaff also testified, "[a] person cannot receive a fax transmission . . . a person can receive a

piece of paper or a document or an image file, but they cannot receive a fax transmission." (Doc. 84-5 at 133).

Further, there is no evidence that the faxes sent on April 16, 2020, April 21, 2020, and June 9, 2020 arrived in physical form at Scoma's office. Dr. Scoma testified that "[he] did—[he] cannot say [he] saw three—four faxes. [He] can say [he] physically held in [his] hand one." (Doc. 116-2 at 73–74). Further, Dr. Scoma searched his office for the three other faxes and as of his deposition had not found any. (*Id.* at 81). Scoma has a written policy in place stating that "(1) any fax received will be given to the doctor to review[;] (2) Dr. Scoma will place unsolicited faxes in the bad fax folder[;] (3) bad faxes will be sent to Scoma's attorney to review[;] (4) if action is needed the attorney will inform [Dr. Scoma] as to the action to proceed with." (Doc. 98-5 at 2). Dr. Scoma also testified that he had never "had an instance in the past where someone told [him] they faxed something to [him] but [he] never received it." (Doc. 116-2 at 82–83).

And Dr. Scoma testified that Scoma's office manager Kirsten Marshall, who handles all of the faxes, "knows the faxes that are very important that [Dr. Scoma] needs to see right away, and [Ms. Marshall] brings them to [him]." (*Id.* at 90). Ms. Marshall also testified that when a fax arrived at Scoma's office's fax machine, "[she] would take them off the fax, put them in Dr. Scoma's office, and then he does whatever with them." (Doc. 149-2 at 9). Ms. Marshall added that she had never received a fax from the fax machine and not given it directly to Dr. Scoma, and there had never been any faxes that you delete or throw away." (*Id.* at 11–12). She

11

also testified that she "d[id]n't remember ever seeing [the fax in question] in the office."  (*Id.* at 8).

In sum, it is undisputed that the fax logs from Interfax contain data which at least one expert testified show four successful fax transmissions from NSPC's UserID to Scoma's fax line; it is undisputed that the fax log data contains errors such as misalignment; it is undisputed that the faxes constituted "unsolicited advertisements" (Doc. 145 at 2); it is undisputed that NSPC and PMC were the senders of at least one of the faxes (Doc. 144 at 3); and it is undisputed that no actual person in Scoma's office saw, held, or could account for the physical copies of the April 16, 2020, April 21, 2020, and June 9, 2020 faxes.

## SUMMARY JUDGMENT STANDARD

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' if it 'might affect the outcome of the suit under the governing law.'"  *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* (quoting *Anderson*, 477 U.S. at 248).  The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  *See Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1298 (11th Cir. 2003).  Specifically, the moving party must

12

identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law." *See Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011).

When the nonmoving party would have the burden of proof at trial, the moving party may discharge its burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove her case at trial. *See id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). If the moving party discharges its burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. *Anderson*, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record evidence and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party. *Peek-A-Boo Lounge of Bradenton v. Manatee Cnty.*, 630 F.3d 1346, 1353 (11th Cir. 2011) (citing *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 616 (11th Cir. 2007)). However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* (citation and emphasis omitted) (alteration in original). Additionally, the Court is not permitted to make credibility determinations, weigh

13

conflicting evidence to resolve factual disputes, or assess the quality of the evidence.

*Reese v. Herbert*, 527 F.3d 1253, 1271 (11th Cir. 2008).

## **DISCUSSION**

The TCPA prohibits, in pertinent part, any person within the United States

from:

> us[ing] any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement, unless—
>
> > (i)    the unsolicited advertisement is from a sender with an established business relationship with the recipient;
> >
> > (ii)   the sender obtained the number of the telephone facsimile through—
> >
> > > (I)    the voluntary communication of such number, within the context of such established business relationship, from the recipient of the unsolicited advertisement, or
> > >
> > > (II)   a directory, advertisement, or site on the Internet to which the recipient voluntarily agreed to make available its facsimile number for public distribution [. . .]; and
> >
> > (iii)  the unsolicited advertisement contains a notice meeting the requirements under paragraph (2)(D), except that the exception under clauses (i) and (ii) shall not apply with respect to an unsolicited advertisement sent to a telephone facsimile machine by a sender to whom a request has been made not to send future unsolicited advertisements to such telephone facsimile machine that complies with the requirements under paragraph (2)(E)[.]

47 U.S.C. § 227(b)(1)(C).  The statute further provides that one appropriate remedy

is "an action to recover for actual monetary loss from such a violation, or to receive

$500 in damages for each such violation, whichever is greater."  47 U.S.C. §

227(b)(3)(B).  Treble damages are also available for "willful[ ] or knowing[ ]"

violations.  *Id.* § 227(b)(3).

14

Scoma argues that it is entitled to summary judgment as to four faxes, which it asserts were unsolicited advertisements sent by NSPC to Scoma's fax number on April 2, 2020, April 16, 2020, April 21, 2020, and June 9, 2020. Scoma argues that all four of these faxes meet the elements of a TCPA violation. Defendants argue that Scoma did not receive three of the four faxes. The Court takes up the parties' arguments about each of the four faxes below.

## I.      April 2, 2020 Fax

The parties have stipulated that NSPC and PMC were the "sender" of the April 2, 2020 fax, Scoma received the fax on its fax machine, the fax constituted an unsolicited advertisement, it was not sent based on an established business relationship, and it lacked the notice described in 47 U.S.C. § 227(c)(iii). (Doc. 144 at 3–4). The parties have also stipulated that NSPC and PMC did *not* willfully or knowingly violate 47 U.S.C. § 227 with respect to the fax. (*Id.* at 4–5). Accordingly, by mutual agreement of the parties, Scoma is entitled to summary judgment as to the April 2, 2020 fax with damages of $500. (*Id.*)

## II.     April 16, 2020, April 21, 2020, and June 9, 2020 Faxes

Scoma argues that there is no genuine dispute of material fact that Defendants *transmitted* the three disputed faxes to Scoma's fax machine, the faxes constituted unsolicited advertisements, they were not based on established business relationships, and Scoma lacked the notice described in 47 U.S.C. § 227(c)(iii). (Doc. 145 at 14–15). Defendants argue that there is a genuine dispute of material fact as to whether any of the three disputed faxes were *received* by Scoma. (Doc. 149 at 19–

15

20).  Defendants also argue that because Scoma never received the fax, Scoma could not have suffered an injury in fact and thus has failed to establish Article III standing.  (*Id.* at 20 (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016))).  Scoma responds that *transmission* of the fax alone is sufficient to establish Article III standing.  (Doc. 152 at 2–5).

### A. Standing

The Court must address the issue of Scoma's Article III standing as a threshold matter because Scoma's standing implicates the Court's subject matter jurisdiction.  *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1242 (11th Cir. 2003) (citing *Juidice v. Vail*, 430 U.S. 327, 331 (1977)).  As the Supreme Court has made clear, "[t]he question of standing is not subject to waiver . . . The federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of [the jurisdictional] doctrines."  *United States v. Hays*, 515 U.S. 737, 742 (1995) (quotation omitted).

"Article III of the Constitution confines the reach of federal jurisdiction to 'Cases' and 'Controversies.'"  *Alabama-Tombigbee Rivers Coal. v. Norton*, 338 F.3d 1244, 1252 (11th Cir. 2003) (quoting U.S. Const. art. III, § 2).  To meet Article III's standing requirements, the party invoking federal jurisdiction has the burden of establishing (1) an injury in fact; (2) a causal connection between the injury and the conduct complained of; and (3) that it is likely that the injury will be redressed by a favorable court ruling.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  "[E]ach element must be supported in the same way as any other matter on which

16

the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561 (citing *Lujan v. Defs. of Wildlife*, 497 U.S. 871, 883–889 (1992)).  At the summary judgment stage, the plaintiff cannot rest on "mere allegations, but must set forth by affidavit or other evidence specific facts . . . which for purposes of the summary judgment motion will be taken to be true." *Id.* (internal quotation marks omitted); *see also Bischoff v. Osceola Cnty., Fla.*, 222 F.3d 874, 878 (11th Cir. 2000) (explaining that for questions of standing raised at the summary judgment stage, "disputed facts must be construed in the light most favorable to plaintiff").

To establish standing, the injury in fact must be (1) "concrete and particularized" and (2) "'actual or imminent, not "conjectural" or "hypothetical."'" *Id.* at 560 (quoting *Lujan*, 504 U.S. at 560–61).  Congress may not convert a generalized grievance "into an individual right vindicable in the courts." *Lujan*, 504 U.S. at 576–77 (quotation omitted).  But "Congress may create a statutory right or entitlement[,] the alleged deprivation of which can confer standing to sue even where the plaintiff would have suffered no judicially cognizable injury in the absence of statute." *Warth v. Seldin*, 422 U.S. 490, 514 (1975) (citation omitted).

Here, Scoma argues that it does have standing because according to its expert, Mr. Biggerstaff, the fax logs subpoenaed from Interfax show that on the dates in question faxes were successfully *sent* from NSPC to Scoma's fax server. (*See* Doc. 145 at 14–16; Doc. 152 at 4–5).  As Scoma has it, successful transmission of the fax alone is sufficient to constitute an injury in fact.  (Doc. 152 at 2–4).

Defendants, however, argue that because Scoma has not introduced any evidence that the April 16, 2020, April 21, 2020, and June 9, 2020 faxes were ever printed or seen by an actual person, Scoma lacks standing.  (*See* Doc. 149 at 6, 20–21).  That is, without having presented any evidence that an actual person in Scoma's office *received* any of the disputed faxes, Scoma has not shown that it was injured by the faxes.  (*Id.* at 22–23).  Accordingly, the Court must determine whether a violation of the TCPA requires transmission of the facsimile alone or whether receipt of the facsimile is required as well.

### i.    Is transmission of the fax or receipt of the fax required for Article III standing?

To answer this question, the Court looks first to the text of the TCPA penned by the representatives of the American people—Congress.  As quoted above, the TCPA creates a private right of action against any person within the United States who "use[s] any telephone facsimile machine, computer, or other device *to send*, to a telephone facsimile machine, an unsolicited advertisement" unless certain circumstances are present.  *See* 47 U.S.C. § 227(b)(1)(C) (emphasis added).  For the reasons below, the Court finds that the plain and ordinary language of TCPA's phrase "to send" merely requires that the facsimile be moved or conveyed from the originator's telephone facsimile machine, computer, or other device to another's telephone facsimile machine.

Black's Law Dictionary provides several definitions of "send," the most relevant of which states as follows: "To cause to be moved or conveyed from a present location to another place; esp., to deposit (a writing or notice) in the mail or

18

deliver for transmission by any other usual means of communication with postage or cost of transmission provided for and properly addressed <to send a message>." *See Send*, *Black's Law Dictionary* (11th ed. 2019). Thus, "to send" a facsimile merely requires causing said facsimile to be moved or conveyed to another place, *i.e.*, the addressee's facsimile machine. So long as the facsimile is "deliver[ed] for transmission," it has been sent. Whether or not the facsimile is printed and received for review by a human addressee is inconsequential to whether the unsolicited facsimile was sent in the first instance.

Non-legal dictionaries define "send" in a similar manner. For example, Merriam-Webster defines "send" as "to cause to go" and "to dispatch by a means of communication." *See Send*, *Merriam-Webster Dictionary Online* https://www.merriam-webster.com/dictionary/send (last accessed May 9, 2023). And the Oxford English Dictionary defines "send" as "[t]o cause to go" and "[t]o order or direct to go or to be conveyed." *See Send*, *Oxford English Dictionary Online* https://www.oed.com/view/Entry/175851?rskey=PCfqPA&result=3&isAdvanced=false#eid (last accessed May 9, 2023). Thus, based on the plain meaning of the term, directing a fax to be conveyed to another person would qualify as sending a fax; further, sending a fax is in no way contingent upon physical receipt of that fax into the hands—so to speak—of another person. *See id.* (noting the example, "I sent my excuses, adorned with about thirty compliments, and got off as fast I could").

Although the Court need not rely on any source beyond the unambiguous text of the TCPA to interpret the term "to send," the Court's interpretation of the plain

meaning of "to send" also aligns with what the Eleventh Circuit has identified as the legislative intent behind the TCPA.  Specifically, the statute says, "to send," not "to cause the receipt of," because, as the Eleventh Circuit has explained, one of the harms that Congress had in mind when drafting the TCPA was the tying up or occupying of U.S. citizens' fax lines during the transmission of unsolicited advertisements, which would serve to prevent the transmission of authorized faxes. *See Palm Beach Golf Center-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1252 (11th Cir. 2015) ("It is clear from the legislative history of the statute that the TCPA's prohibition against sending unsolicited fax advertisements was intended to protect citizens from the loss of the use of their fax machines during the transmission of fax data.").[4]

   This Court interprets the TCPA to cover the mere sending of an unsolicited facsimile advertisement because the tying up of a fax machine during transmission of such an unsolicited advertisement is one of the harms that Congress sought to address in enacting the TCPA.  In other words, a TCPA violation can occur even where the intended human recipient of the fax did not print and review the fax or

---

[4] Although the Court finds that the plain and ordinary language of the TCPA is dispositive here, the Court notes some of the legislative history relied on by the Eleventh Circuit in *Palm Beach Golf*.  Specifically, in drafting the TCPA, the congressional Committee on Energy and Commerce found that "[f]acsimile advertising . . . is problematic for two reasons.  First, it shifts some of the costs of advertising from the sender to the recipient.  Second, it occupies the recipient's facsimile machine so that it is unavailable for legitimate business messages while processing and printing the junk fax." H.R. Rep. No. 102–317, at 10 (1991).  The Committee added that "[w]hen a facsimile machine is receiving a fax, it may require several minutes or more to process and print the advertisement.  During that time, the fax machine is unable to process actual business communications." *Id.* at 25.

did not know that the fax was sent to him. *See Spine & Sports Chiropractic, Inc. v. ZirMed, Inc.*, No. 3:13-CV-00489-TBR, 2014 WL 2946421, at *5 (W.D. Ky. June 30, 2014) ("[T]he TCPA was intended to address the costs—including paper, ink, and time—of receiving these unwanted 'junk' faxes. These 'costs' would include the tying up of the fax line while processing these faxes"); *Physician's Healthsource, Inc. v. Vertex Pharms. Inc.*, 247 F. Supp. 3d 138, 147 (D. Mass. 2017) (same); *City Select Auto Sales, Inc. v. David Randall Assocs., Inc.*, 296 F.R.D. 299, 308 (D.N.J. 2013) ("Plaintiff has produced evidence that the fax advertisements were successfully sent, and the B2B evidence is sufficient for standing purposes. The TCPA does not specifically require proof of receipt") (quotation omitted); *Bridgeview Health Care Ctr. Ltd. v. Clark*, No. 09-C-5601, 2013 WL 1154206, at *3 (N.D. Ill. Mar. 19, 2013) ("In enacting the TCPA, Congress chose to make evidence of *transmission* of the facsimile sufficient for Article III standing by the plain language of the statute. Therefore, the question of whether Plaintiff actually received the facsimile is irrelevant to liability under the TCPA."). To adopt Defendants' construction of section 227(b)(1)(C) would necessarily result in this Court rewriting the statute, and narrowing its meaning, which is a task for Congress, not the judiciary.

Thus, while Defendants' argument that "Scoma could not possibly have standing to sue for faxes that it never received" may, at first glance, seem intuitively appealing, it is ultimately misguided and contrary to the plain language of the TCPA. (Doc. 149 at 20). While the injuries caused by transmission of a fax may be slight, the Supreme Court has stated that an "identifiable trifle" suffices as

an injury in fact for standing purposes.  *United States v. SCRAP*, 412 U.S. 669, 689

n.14 (1973).  In fact, "Congress may create a statutory right or entitlement[,] the

alleged deprivation of which can confer standing to sue even where the plaintiff

would have suffered no judicially cognizable injury in the absence of statute."

*Warth*, 422 U.S. at 514.  Said differently, "[t]he actual or threatened injury required

by Art[icle] III may exist solely by virtue of 'statutes creating legal rights, the

invasion of which creates standing.'"  *Id.* at 500 (quoting *Linda R.S. v. Richard D.*,

410 U.S. 614, 617 n.3 (1973).  "The TCPA . . . creates such a cognizable right" such

that a plaintiff "will have Article III standing to sue where the facts establish a

concrete, particularized, and personal injury to that person as a result of the

violation of th[at] new created legal right[ ]."  *See Palm Beach Golf*, 781 F.3d at

1251–52.  And since the TCPA's goal was "to protect citizens from the loss of the use

of their fax machines during the transmission of fax data," so long as the recipient's

fax machine was rendered unavailable for legitimate business messages while

processing the junk fax, "a prevailing plaintiff need not have suffered any monetary

loss in order to recover statutory damages."  *Palm Beach Golf*, 781 F.3d at 1252.

Because the TCPA creates a private right of action for those to whom

unsolicited fax advertisements are sent, *see* 47 U.S.C. § 227(b)(3), the statutory

right conferred by the TCPA is violated upon *the sending* of the unsolicited fax

irrespective of whether the fax is ultimately reviewed by an actual person.  *See*

*Craftwood II, Inc. v. Generac Power Sys., Inc.*, 920 F.3d 479, 482 (7th Cir. 2019)

(explaining that because transmission of the fax is the violative conduct

contemplated by the relevant portion of the TCPA, "it is presumptively unlawful to *send* any unsolicited fax advertisement") (emphasis added).  The Court cannot require Scoma to prove that an actual person saw or held the disputed faxes to establish violations of the TCPA as the text of the relevant portion of the statute does not require proof of receipt for an invasion of the legal right created by the statute to occur.  *See Lexmark v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (explaining that a court can no more "limit a cause of action that Congress has created" than it can "apply its independent policy judgment to recognize a cause of action that Congress has denied"); *see also Craftwood II*, 920 F.3d at 481 (observing that "[w]hether it is good public policy to use the cumbersome and costly processes of adjudication to resolve disputes about annoying fax ads is for Congress to decide.").

Accordingly, if Scoma presents evidence establishing that NSPC *sent* an unsolicited fax advertisement, which was not sent based on an established business relationship, and which lacked the notice described in 47 U.S.C. § 227(c)(iii), Scoma will have established a violation of its rights under the TCPA.  *See* 47 U.S.C. § 227. Such a violation is sufficient to establish Article III standing.  *See Florence Endocrine Clinic, PLLC v. Arriva Medical, LLC*, 858 F.3d 1362, 1366 (11th Cir. 2017) (explaining that under Eleventh Circuit precedent, a person suffers an injury in fact where the rights conferred on him by the TCPA are violated).

Here, the undisputed evidence reflects that NSPC was engaged in a campaign of sending fax blasts to providers, and Scoma's fax number appeared on

the list of providers' fax numbers contacted by NSPC. (Doc. S-84-7 at 6; Doc. 145-2 at 2). Further, copies of the faxes are in the record, it is undisputed that they are advertisements, and it is undisputed that they were unsolicited. (*See, e.g.*, Doc. 84-2 at 160; Doc. 144 at 4). Mr. Biggerstaff interpreted the fax logs as showing clearly that four faxes were successfully transmitted from NSPC to Scoma's fax number between April 2, 2020 and June 9, 2020. (Doc. 84-2 at 400). And Defendants concede that the April 2, 2020 fax was in fact sent to Scoma. (Doc. 144 at 3 n.1).

Defendants allege that there is a genuine dispute of material fact as to whether three of the four faxes were delivered because they contest the accuracy of the data that Mr. Biggerstaff relied upon and assert that his conclusions were inaccurate. (Doc. 149 at 9). As outlined above, Defendants believe that the fax logs were inaccurate, and that the inferences drawn by Mr. Biggerstaff based on those logs—namely, that the April 16, 2020, April 21, 2020, and June 9, 2020 faxes were successfully transmitted—were incorrect. (*Id.* at 16–17). Specifically, Defendants assert that imbedded commas in the .csv file fax log caused a misalignment in the data, potentially implicating the data reflecting the transmission status of the four disputed faxes. (*Id.* at 16; Doc. 98-6 at 25 n.22, 30–31).

Still, Defendants' contentions about the data's purported inaccuracy do not map cleanly onto their legal arguments. For example, Defendants argue that the June 9, 2020 fax was not successfully transmitted, (Doc. 149 at 5, 13–14), but to support this argument, they point to Mr. Sponsler's expert report wherein Mr. Sponsler appears to indicate that no alignment errors existed with respect to the

24

June 9, 2020 fax.  (Doc. 84-3 at 103–04).  As shown in Figure 4—the portion of the

fax log excerpted and marked up in Mr. Sponsler's expert report—Mr. Sponsler only

highlighted alignment errors in the April 2, April 16, and April 21, 2020 faxes.

(Doc. 98-6 at 36).  Mr. Sponsler did not, however, highlight the data in the columns

for "Subject" and "PagesSubmitted" in the row reflecting the June 9, 2020 fax as

that data appears to be properly aligned.  (*Id.*)

*Figure 4*

| | TransactionID | UserID1 | SubmitTime | PostponeTime | CompletionTime | UserID2 | DestinationFax | ReplyEmail |
|---|---|---|---|---|---|---|---|---|
| 1 | 1057575540 | NSPC | 6/9/2020 20:40 | 6/10/2020 12:01 | 6/10/2020 18:19 | NSPC | 12■■63 | WKoleszar@TreatingPain.com |
| 2 | 1044504840 | NSPC | 4/21/2020 20:03 | 4/22/2020 12:45 | 4/22/2020 12:48 | NSPC | 12■■63 | WKoleszar@TreatingPain.com |
| 3 | 1043417438 | NSPC | 4/16/2020 19:15 | 0001-01-01 00:00:00 | 4/16/2020 20:42 | NSPC | 12■■63 | WKoleszar@TreatingPain.com |
| 4 | 1040305329 | NSPC | 4/2/2020 23:23 | 4/3/2020 11:43 | 4/3/2020 11:44 | NSPC | 12■■63 | WKoleszar@TreatingPain.com |

| | TransactionID | RemoteCSID | PagesSent | Status | Duration | Subject | PagesSubmitted | Units | CostPerUnit | SenderCSID |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1057575540 | 12■■63 | 2 | 0 | 61 | Florida Hotline 2 | 2 | 2 | 0.11 | NSPC |
| 2 | 1044504840 | 12■■63 | 2 | 0 | 2 | 87 | PMC Hotline Launch | 2 | 0.11 | NSPC |
| 3 | 1043417438 | 12■■63 | 1 | 0 | 1 | 40 | NSPC Telemedicine - Florida | 1 | 0.11 | NSPC |
| 4 | 1040305329 | 12■■63 | 1 | 0 | 1 | 50 | NSPC Telemedicine Florida | 1 | 0.11 | NSPC |

(*Id.*)  At the same time, Defendants concede that the April 2, 2020 fax was

successfully delivered to Scoma, (Doc. 144 at 3 n.1), but to contest the successful

delivery of the other three faxes, they rely on Mr. Sponsler's report which concludes

that there *were* alignment errors with respect to the April 2, 2020 fax.  (Doc. 98-6 at

36).

Furthermore, the bulk of Mr. Sponsler's report opines on data issues related

to columns in the fax log that are not pertinent to the issue of successful

transmission—such as the subject of the fax, the number of pages sent, and the

delay time selected by sender.  (*Id.* at 103–104).   Nowhere in the portions of the fax

logs excerpted in Mr. Sponsler's report did Mr. Sponsler point to an error in the

"Status" column in the log.  Thus, to the extent that alignment errors exist in the log, none of these alignment errors appear to affect the pertinent issue—whether the disputed faxes were successfully transmitted to Scoma.

Next, many of the data issues flagged by Mr. Sponsler seem to relate solely to faxes that were *not* addressed to Scoma.  For example, in his opinion about the issue of imbedded commas, which misaligned certain columns of data in some rows, Mr. Sponsler points to faxes, which were sent to a 212 number.  (*Id.* at 98).  And while these rows of data representing the faxes sent to the 212 number have alignment errors, which resulted in the recipient's name being moved into the "PagesSubmitted" column, Mr. Sponsler did not reference any alignment errors impacting the data in the "Status" column for those faxes.  (*Id.*)  Given that Mr. Sponsler presents no evidence that the alignment errors in a given row of data carry over into the row of data below that implicated row, it is unclear why these alignment errors in rows which do not contain data about faxes sent to Scoma are relevant.

With respect to the portions of the fax logs purporting to represent data about faxes sent from NSPC to Scoma, Mr. Sponsler's opinions also do not pertain to transmission status.  Instead, the alignment issues flagged by Mr. Sponsler relate to data in the "Duration," "Subject," and "PagesSubmitted" columns of data, *not* the "Status" column.  (Doc. 98-6 at 36).  Mr. Sponsler also offers no opinion in his report expressly stating that the transmission statuses represented in the three lines of data representing the disputed faxes are incorrect.  Instead, Mr. Sponsler points to

testimony from Dr. Scoma and Ms. Marshall stating that they never received the faxes as "further grounds to question the accuracy of the information that InterFax provided." (*Id.*)  But, as discussed above, physical receipt of the fax by an actual person is irrelevant to the issue of successful transmission of the fax under the TCPA because one of the harms contemplated by the TCPA is the tying up of the recipient's fax machine during the transmission of the fax.

Viewing the facts in the light most favorable to Scoma, as the Court must do for questions of standing at the summary judgment stage, *see Lujan*, 504 U.S at 561, the Court finds that Defendants have not shown a genuine issue of material fact as to whether all of the three faxes in question were successfully transmitted because they have not pointed to colorable evidence that the transmission statuses of each of those faxes were incorrect.  Notably, Defendants have not introduced any evidence that there were imbedded commas or alignment errors in the row of data in the fax log showing that the June 9, 2020 fax was successfully transmitted to Scoma as Mr. Sponsler's report identifies no such inaccuracies with respect to that fax.  (Doc. 98-6 at 36; Doc. 84-3 at 103–04).

Without a genuine issue of material fact as to whether at least one of the three disputed faxes was sent to Scoma's fax machine, and considering that all of the other elements of a TCPA claim brought under 47 U.S.C. § 227(b)(1)(C) are undisputedly met, the Court finds that Scoma has established a violation of its rights under the TCPA.  *See Bischoff*, 222 F.3d at 878 (explaining that "when standing is raised at the summary judgment stage . . . .the plaintiff must set forth

by affidavit or other evidence specific fact[ual allegations of injury] which for the purposes of the summary judgment motion will be taken to be true."). Given that the violation of this statutorily created right constitutes an injury in fact, *see Palm Beach Golf*, 781 F.3d at 1252, the Court finds that Scoma has met its burden in establishing Article III standing.

## II. Scoma's Motion for Summary Judgment on the TCPA Violations

Turning to the merits of this dispute, the Court notes that because Scoma is the movant for summary judgment on its TCPA claims, the evidence is to be viewed in the light most favorable to Defendants. *See Osori v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1249 (11th Cir. 2014) (quoting *Pesci v. Budz*, 730 F.3d 1291, 1295 (11th Cir. 2013)) (explaining that at summary judgment, the Court "view[s] all evidence and draw[s] all reasonable inferences in favor of the nonmoving party"). Given that it is uncontested that the faxes in question were unsolicited fax advertisements, at least two of the Defendants sent the fax, and the fax was sent in the absence of an established business relationship or a compliant opt out notice, Scoma will be entitled to summary judgment on its TCPA violation claims as to the three disputed faxes if it can show that there is no genuine dispute of material fact that the faxes were successfully transmitted. *See* 47 U.S.C. § 227(b)(1)(C); *see Palm Beach Golf*, 781 F.3d at 1254–55.

As discussed in the preceding section, Defendants have not pointed to any evidence that there were alignment issues in the row of data reflecting that the June 9, 2020 fax was successfully transmitted to Scoma's fax machine. And while it

may be the case that alignment errors in rows preceding the June 9, 2020 row resulted in errors in that row, Defendants have not produced any evidence to that effect.  Accordingly, even viewing the fax logs in the light most favorable to the Defendants and assuming that, as Defendants allege, the log has errors which, at least in certain rows, cannot be ignored, the Court finds that the undisputed evidence reflects that an unsolicited fax was sent from NSPC to Scoma on June 9, 2020, meeting the statutory requirements of a section 227(b)(1)(C) violation. Accordingly, Scoma is entitled to summary judgment as to the June 9, 2020 fax.

Viewing the evidence in the light most favorable to Defendants, and drawing all inferences in favor of Defendants, the rows of data regarding the April 16, 2020 and April 21, 2020 faxes appear to have alignment errors, which could implicate the accuracy of the data reporting transmission status.  For example, in those rows, Mr. Sponsler has opined, and the logs show, that the data that should be in the "Duration" column is shifted to the right into the "Subject" column, while the data that should be in the "Subject" column is shifted to the right into the "PagesSubmitted" column.  (*See* Doc. 84-3 at 103–04).

One way to correct this misalignment might be to shift the implicated columns back to the left, but doing so would mean that the status for the April 16, 2020 fax would be a "1," and the status for the April 21, 2020 fax would be a "2." And according to the Interfax error codes to which both parties have directed the Court, neither a "1" nor a "2" indicates a successful transmission because a "1" means "Internal error," and a "2" means "Telephony error."  *See Fax Status Codes*,

UPLAND INTERFAX https://www.interfax.net/en/cphelp/status-codes (last accessed May 9, 2023).

Thus, based on the evidence that Defendants have introduced, there is a genuine dispute of material fact as to the accuracy of the transmission logs with respect to the April 16, 2020 and the April 21, 2020 faxes, raising the possibility that those faxes were not sent successfully, and a violation of Scoma's rights under the TCPA did not occur. And while Scoma contends that the fax logs may be relied upon and the errors contained within may be ignored, for purposes of summary judgment, it is not the Court's place to assess the quality of the evidence. *Reese*, 527 F.3d at 1271 (explaining that "it [i]s not for the district court to discount or disregard [evidence] at the summary judgment stage based on its assessment of the *quality* of the evidence"); *see also Butler v. Gualtieri*, 41 F.4th 1329, 1340 (11th Cir. 2022) (explaining that it is not "the district court's role . . . to wade into . . . factual disputes and make determinations regarding the witnesses' credibility, let alone draw appropriate inferences from the proffered facts").

"[A]t the summary judgment stage[,] the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Here, the evidence about the accuracy of the transmission status data for the April 16, 2020 and April 21, 2020 faxes is such that a reasonable factfinder could return a verdict for Defendants. *FindWhat Inv. Grp.*, 658 F.3d at 1307 (explaining that a dispute is

"genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party").

In light of this genuine dispute of material fact, the Court **GRANTS** summary judgment as to the June 9, 2020 fax, but **DENIES** summary judgment as to the April 16, 2020 and April 21, 2020 faxes.

### III.   The Court Declines to Rule on Summary Judgment as to all Claims Against SCF.

As noted above, the parties jointly stipulated that "for purposes of Plaintiff's individual TCPA claims only, Defendants do not contest that with respect to any of the Faxes that Plaintiff received, NSPC and PMC were the 'sender' of such Faxes as that term is defined in 47 C.F.R. § 1200(f)(11)." (Doc. 144 at 3). Thus, for those faxes where the Court has indicated that summary judgment is to be granted for Plaintiff on its TCPA claims, NSPC and PMC are proper Defendants.

A question remains as to SCF's liability, however. Defendants now argue that the Court should deny summary judgment as to all claims against SCF because Scoma has failed to submit evidence proving that SCF was a sender of the unsolicited faxes. (*See* Doc. 149 at 23–24). In its reply, Scoma did not address this argument. (*See* Doc. 152).

47 C.F.R. § 64.1200(f)(11) defines "sender" as "the person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement." The advertisement delivered to Scoma on April 2, 2020 states, "Pain Management Consultants is an affiliate of National Spine and Pain Centers (NSPC) . . . . Medical services available

31

in Florida locations branded as Pain Management Consultants are provided by the Spine Center of FL, LLC." (Doc. 84-2 at 150). It seems clear from the text of the fax that SCF's services were "advertised or promoted in the unsolicited advertisement," rendering SCF a "sender" within the meaning of 47 C.F.R. § 1200(f)(11).

Nevertheless, because the parties' joint stipulation contains no mention of SCF as a sender (*see* Doc. 144), and because Scoma did not respond to Defendants' arguments that SCF is not a sender in its reply brief (*see* Doc. 152), the Court declines to rule on SCF's liability at this juncture to avoid overstepping on negotiations that may have already taken place or may currently be taking place between the parties.

Defendants have requested "that the Court order the parties to meet and confer" about—among other things—the potential for settlement or dismissal of the claims against SCF, (Doc. 149 at 6), and the Court finds such conferral warranted. Accordingly, the parties are **DIRECTED** to meet and confer on or before May 23, 2023 about SCF's liability as a sender or non-sender of the faxes.

## <u>CONCLUSION</u>

For the reasons outlined above, Scoma's Motion for Summary Judgment (Doc. 145) is **GRANTED in part** and **DENIED in part**.

Specifically, Scoma's Motion for Summary Judgment is **GRANTED** as to the April 2, 2020 and the June 9, 2020 faxes but **DENIED** as to the April 16, 2020 and April 21, 2020 faxes.

The parties are **ORDERED** to meet and confer about potential settlement or dismissal of the claims for the April 16, 2020 and April 21, 2020 faxes and for all claims against SCF on or before May 23, 2023.

ORDERED at Fort Myers, Florida on May 11, 2023.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE